IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| LIGADO NETWORKS, LLC, | ) | |
| | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 23-1797 |
| | ) | Senior Judge Damich |
| THE UNITED STATES, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

## DEFENDANT'S MOTION TO DISMISS

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

NATHANAEL B. YALE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0464

January 25, 2024                    *Attorneys for Defendant*

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION AND STATEMENT OF THE CASE ............................................................1

I.     Statutory And Regulatory Background................................................................5

II.    Proceedings Before The FCC ...........................................................................7

     A.    Ligado's FCC License Applications ......................................................7

     B.    The FCC Issues The April 2020 Order ..................................................9

     C.    NTIA Petitions For Reconsideration And Stay Of The April 2020 Order ............10

III.   The 2021 National Defense Authorization Act ................................................11

IV.   Ligado's Complaint ..........................................................................................13

ARGUMENT .....................................................................................................................13

I.     Standards Of Review ........................................................................................13

II.    The Communication Act's Comprehensive Remedial Scheme Displaces This Court's Jurisdiction................................................................................................................14

III.   Ligado Fails To State A Cognizable Takings Claim ........................................18

     A.    The Complaint Does Not Allege A Cognizable Property Interest.......................19

          1.    FCC Licenses Do Not Give Rise To A Cognizable Property Interest...........20

          2.    The Cases Ligado Relies On Do Not Support A Different Result................25

          3.    Even If Ligado Has A Property Interest, Any Interest Is Contingent On The Conditions Of The License And The Statutory Scheme ........................27

     B.    Ligado Fails To Properly Plead Authorized Government Conduct......................28

     C.    Ligado Fails To State A Claim For A Physical Taking .........................................31

          1.    Ligado Fails To State A Claim Based On Physical Occupation...............31

          2.    Ligado Fails To State A Claim Based On Its "Dead Zone" Theory .........34

     D.    Ligado Fails To State A Claim For A Categorical Regulatory Taking ................35

E.      Ligado Cannot State A Regulatory Takings Claim Under *Penn Central* ..............37

F.      Ligado Fails To State A Claim For A Legislative Taking ....................................41

CONCLUSION ..............................................................................................................................45

## <u>TABLE OF AUTHORITIES</u>

*A&D Auto Sales, Inc. v. United States*,
   748 F.3d 1142 (Fed. Cir. 2014) ........................................................................... 28, 36

*Acadia Tech., Inc. v. United States*,
   458 F.3d 1327 (Fed. Cir. 2006) ............................................................................... 30

*Acceptance Ins. Cos. Inc. v. United States*,
   503 F.3d 1328 (Fed. Cir. 2007) ............................................................................... 13

*Acceptance Ins. Cos., Inc. v. United States*,
   583 F.3d 849 (Fed. Cir. 2009) ................................................................................. 36

*Alpine PCS, Inc. v. United States*,
   128 Fed. Cl. 303 (2016) ..................................................................................... 25, 26

*Alpine PCS, Inc. v. United States*,
   878 F.3d 1086 (Fed. Cir. 2018) .......................................................................... *passim*

*Am. Bankers Ass'n* v. *United States*,
   932 F.3d 1375 (Fed. Cir. 2019) ............................................................................... 25

*Am. Pelagic Fishing Co., L.P. v. United States*,
   379 F.3d 1363 (Fed. Cir. 2004) ............................................................................... 19

*Appolo Fuels, Inc. v. United States*,
   381 F.3d 1338 (Fed. Cir. 2004) ...................................................................... 39, 42, 43

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) .......................................................................................... 30, 32

*Aviation & General Ins. Co., Ltd. v. United States*,
   882 F.3d 1088 (Fed. Cir. 2018) ............................................................................... 43

*Bair v. United States*,
   515 F.3d 1323 (Fed. Cir. 2008) .......................................................................... 24, 28

*Bass Enterprises Prod. Co. v. United States*,
   381 F.3d 1360 (Fed. Cir. 2004) ............................................................................... 36

*Bd. of Regents of State Colleges v. Roth*,
   408 U.S. 564 (1972) .......................................................................................... 20, 23

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................... 14

*Branch v. United States*,
    69 F.3d 1571 (Fed. Cir. 1995) ................................................................. 36, 43

*Brown v. United States*,
    73 F.3d 1100 (Fed. Cir. 1996) ................................................................. 32, 33

*Brown v. United States*,
    105 F.3d 621 (Fed. Cir. 1997) ................................................................. 16

*Cedar Point Nursery v. Hassid*,
    141 S. Ct. 2063 (2021) ................................................................. 28, 31, 34

*Celgene Corp. v. Peter*,
    931 F.3d 1342 (Fed. Cir. 2019) ................................................................. 27

*Cienega Gardens v. United States*,
    503 F.3d 1266 (Fed. Cir. 2007) ................................................................. 42

*Commonwealth Edison Co. v. United States*,
    271 F.3d 1327 (Fed. Cir. 2001) ................................................................. 39, 43

*Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*,
    508 U.S. 602 (1993) ................................................................. 32

*Connolly v. Pension Ben. Guar. Corp.*,
    475 U.S. 211 (1986) ................................................................. 41-42

*Conti v. United States*,
    291 F.3d 1334 (Fed. Cir. 2002) ................................................................. 20, 21, 24

*Dimare Fresh, Inc. v. United States*,
    808 F.3d 1301 (Fed. Cir. 2015) ................................................................. 34

*Dow Jones & Co., Inc. v. Ablaise Ltd.*,
    606 F.3d 1338 (Fed. Cir. 2010) ................................................................. 13

*FCC v. Sanders Bros. Radio Station*,
    309 U.S. 470 (1940) ................................................................. 4, 19, 22

*Fishermen's Finest, Inc. v. United States*,
    59 F.4th 1269 (Fed. Cir. 2023) ................................................................. 20, 21, 25, 26

*Folden v. United States*,
    379 F.3d 1344 (Fed. Cir. 2004) ................................................................. 14, 15

*Forest Props., Inc. v. United States*,
    177 F.3d 1360 (Fed. Cir. 1999) ................................................................. 38

*Garelick v. Sullivan*,
   987 F.2d 913 (2d Cir. 1993)............................................................................................ 34

*Hearts Bluff Game Ranch, Inc. v. United States*,
   669 F.3d 1326 (Fed. Cir. 2012)...................................................................................... 24

*Hendler v. United States*,
   952 F.2d 1364 (Fed. Cir. 1991)...................................................................................... 34

*Hooe v. United States*,
   218 U.S. 322 (1910)........................................................................................................ 28

*Horne v. Dep't of Agriculture*,
   576 U.S. 350 (2015)........................................................................................................ 27

*Hutchens v. United States*,
   89 Fed. Cl. 553 (2009) ............................................................................................ 13, 14

*In re Atlantic Business & Community Development Corp.*,
   994 F.2d 1069 (3d Cir. 1993)......................................................................................... 26

*In re NextWave Personal Comms.*,
   200 F.3d 43 (2d Cir. 1999) ............................................................................... 19, 22, 43

*In The Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application*,
   35 FCC Rcd. 3772,  2020 WL 1963885 (Apr. 22, 2020) ................................................. *passim*

*In The Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application*,
   36 FCC Rcd. 1262, 2021 WL 8083764 (Jan. 19. 2021) ........................................ 10, 11, 38, 41

*Katz v. Cisneros*,
   16 F.3d 1204 (Fed. Cir. 1994)........................................................................................ 17

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
   480 U.S. 470 (1987)........................................................................................................ 43

*Love Terminal Partners, L.P. v. United States*,
   889 F.3d 1331 (Fed. Cir. 2018)............................................................................ 35, 36, 41

*Lucas v. South Carolina Coastal Council*,
   505 U.S. 1003 (1992)................................................................................................... *passim*

*McNutt v. Gen. Motors Acceptance Corp.*,
   298 U.S. 178 (1936)........................................................................................................ 13

*Me. Cmty. Health Options v. United States*,
140 S. Ct. 1308 (2020) ................................................................. 14

*Members of Peanut Quota Holders Ass'n, Inc. v. United States*,
421 F.3d 1323 (Fed. Cir. 2005) ..................................................... 20

*Mitchell Arms, Inc. v. United States*,
7 F.3d 212 (Fed. Cir. 1993) .......................................................... 24

*Mobile Relay Assocs. v. FCC*,
457 F.3d 1 (D.C. Cir. 2006) ................................................. *passim*

*Mugler v. Kansas*,
123 U.S. 623 (1887) ..................................................................... 44

*New York Cent. R.R. v. White*,
243 U.S. 188 (1917) ..................................................................... 43

*Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*,
138 S. Ct. 1365 (2018) ................................................................. 27

*Paradissiotis v. United States*,
304 F.3d 1271 (Fed. Cir. 2002) ............................................... 44, 45

*Penn Central Transportation Co. v. City of New York*,
438 U.S. 104 (1978) .............................................................. *passim*

*Reichelderfer v. Quinn*,
287 U.S. 315 (1932) ..................................................................... 25

*Rith Energy, Inc. v. United States*,
247 F.3d 1355 (Fed. Cir. 2001) ............................................... 28, 30

*Rith Energy, Inc. v. United States*,
270 F.3d 1347 (Fed. Cir. 2001) ..................................................... 29

*Ruckelshaus v. Monsanto*,
467 U.S. 986 (1984) ............................................................... 32, 40

*Sandwich Isles Commc'ns, Inc. v. United States*,
992 F.3d 1355 (Fed. Cir. 2021) ................................................ 15-17

*Smithson v. United States*,
847 F.2d 791 (Fed. Cir. 1988) ....................................................... 30

*St. Bernard Par. Gov't v. United States*,
887 F.3d 1354 (Fed. Cir. 2018) ............................................... 29, 30

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
  535 U.S. 302 (2002)...........................................................................36, 37

*Taylor v. United States*,
  959 F.3d 1081 (Fed. Cir. 2020)...............................................................*passim*

*United States v. Archer*,
  241 U.S. 119 (1916)........................................................................30

*United States v. Bormes*,
  568 U.S. 6 (2012)..........................................................................14

*United States v. Causby*,
  328 U.S. 256 (1946)........................................................................32

*United States v. Cent. Eureka Mining Co.*,
  357 U.S. 155 (1958)........................................................................38

*United States v. Fuller*,
  409 U.S. 488 (1973)....................................................................20, 21

*United States v. Sherwood*,
  312 U.S. 584 (1941)........................................................................16

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*,
  944 F.2d 870 (Fed. Cir. 1991).............................................................27

*Vereda, Ltda. v. United States*,
  271 F.3d 1367 (Fed. Cir. 2001).............................................................15

**Statutes**

10 U.S.C. § 2281........................................................................42, 44

16 U.S.C. § 1853(d)(3)(D)...................................................................21

28 U.S.C. § 1491(a)(1)..................................................................14, 30

28 U.S.C. § 2342(1).........................................................................15

35 U.S.C. § 261.............................................................................27

47 U.S.C. § 151.........................................................................5, 6, 39

47 U.S.C. § 301........................................................................*passim*

47 U.S.C. § 304 ......................................................................................... 6, 19, 23

47 U.S.C. § 305(a) ............................................................................................ 5

47 U.S.C. § 310(d) ...................................................................................... 6, 24

47 U.S.C. § 312 ........................................................................................... 6, 23

47 U.S.C. § 316(a)(1) ............................................................................. 6, 22, 23

47 U.S.C. § 402(a) ................................................................................... *passim*

47 U.S.C. § 402(b) ................................................................................... 6, 7, 16

47 U.S.C. § 405(a) ....................................................................................... 23, 35

47 U.S.C. § 902(b) ............................................................................................ 5

Pub. L. No. 116-283 ..................................................................................... 2, 11

**Regulations**

47 C.F.R. § 1.106 ............................................................................................. 24

47 C.F.R. § 25.117 ........................................................................................... 18

47 C.F.R. § 25.149 ............................................................................................. 7

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully requests that the Court dismiss the complaint of Ligado Networks, LLC (Ligado) for lack of subject-matter jurisdiction or, alternatively, for failure to state a claim upon which relief may be granted.

## INTRODUCTION AND STATEMENT OF THE CASE

Ligado seeks to transform a long-running regulatory dispute into a $40 billion takings suit.  For decades, the company sought approval from the Federal Communications Commission (FCC) to obtain a modified license to operate a terrestrial network within "L-Band" spectrum when the license previously allowed for only satellite use (*i.e.*, the Mobile Satellite Service (MSS)).  For years, Federal agencies, including the Department of Defense (DoD) and the National Telecommunications and Information Administration (NTIA), which manages the Federal Government's use of spectrum, have objected to Ligado's proposed license modifications because Ligado's terrestrial operations could cause harmful interference with the Global Positioning Systems, or GPS, which operates in nearby spectrum bands.  GPS use implicates the economic and national security of the United States because it is a foundation of numerous applications that support Federal agencies and citizens.

On April 22, 2020, the FCC granted Ligado's amended license modification applications (the April 2020 Order).  The FCC's administrative process did not involve an auction of spectrum; accordingly Ligado did not pay anything to the Federal Government to obtain the modified license or, by extension, the possibility of terrestrial uses of that spectrum.  The April 2020 Order includes several terms and conditions intended to mitigate harmful interference with GPS: it requires Ligado to address the Government's and industry stakeholders' harmful interference concerns, requires robust information exchange and coordination with the

Government, and requires replacement of impacted GPS equipment.  In May 2020, NTIA, on behalf of DoD and other Federal agencies, sought reconsideration and a stay of the April 2020 Order because the FCC's conditions were either insufficient or impractical for addressing the Government's GPS interference concerns.  Private entities filed seven other petitions for reconsideration.  The FCC denied NTIA's motion to stay the April 2020 Order, but it still has not ruled on NTIA's or the other seven reconsideration petitions.

Soon after the FCC issued the April 2020 Order, several members of Congress expressed strong concerns that Ligado's terrestrial operations would have harmful effects on GPS systems identified by the Government and others.  As Senator James Inhofe stated:

> Simply put, the FCC is jeopardizing GPS signals that Americans rely on every day. I chair the Senate Armed Services Committee. When you are conducting warfare, you are using GPS. You use GPS every day. Simply put, the FCC is jeopardizing GPS signals that we rely on for both our national and economic security for the benefit of just one company and its hedge fund investors.

166 Cong. Rec. S2365, S2369-2370 (May 12, 2020).

Congress subsequently included provisions in the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (2021 NDAA), Pub. L. No. 116-283, to address the concerns caused by Ligado's terrestrial deployment pursuant to the modified license.  Section 1662 of the 2021 NDAA provides that DoD may not contract with "an entity that engages in commercial terrestrial operations using [the spectrum bands of Ligado's license] unless the Secretary [of Defense] has certified" that "such operations do not cause harmful interference to a [GPS] device of the Department of Defense."  And Section 1663 directed DoD to contract with the National Academies of Science, Engineering, and Medicine (NASEM) to conduct an independent review of the FCC's order, including an "[a]ssessment of the potential for harmful

interference to mobile satellite services" operated by DoD and others.  NASEM's resulting September 2022 report found that high-precision GPS receivers would experience significant harmful interference from Ligado's proposed terrestrial operations, that the conditions in the FCC order did not resolve DoD's harmful interference concerns, and that the FCC's mitigation conditions were impractical in many circumstances.

On October 12, 2023, Ligado filed its complaint seeking approximately $40 billion from the Government for the alleged taking of its license.  Ligado contends that "[o]fficials and agencies at the highest levels of our government have engaged in an unlawful scheme to take tens of billions of dollars of property," Compl. ¶ 1,[1] and "have unlawfully prevented Ligado from using the electromagnetic spectrum that the [FCC] exclusively licensed to terrestrial services." *Id*.  Ligado also alleges that DoD has been "operating previously undisclosed systems that use or depend on Ligado's spectrum without compensation."  *Id*.  In all, Ligado raises four separate claims under the Takings Clause alleging physical, *per se* (*i.e.*, categorical) regulatory, regulatory, and legislative takings.  *Id*. ¶¶ 134-61.

Ligado's complaint suffers from several fatal flaws.  To start, this Court lacks jurisdiction.  In the Federal Communications Act, Congress established a comprehensive remedial scheme that displaces the Court's Tucker Act jurisdiction, including for takings claims that arise out of FCC licensing decisions.  The Communications Act sets out an exclusive administrative and judicial review framework for claims arising out of such decisions.  Ligado's complaint directly implicates the FCC's licensing decision, including its authority to impose

---

[1] "Compl. ¶ __" refers to paragraphs in plaintiff's complaint (ECF No. 1).

terms and conditions on Ligado's modified license, which is exactly the type of action that Congress has channeled through the Communications Act's comprehensive scheme.

Even if this Court had jurisdiction, the complaint does not state a claim. Each of Ligado's claims suffers from two fundamental deficiencies. First, Ligado cannot establish a cognizable property interest in its FCC license because "[t]he policy of the [Communications] Act is clear that no person is to have anything in the nature of a property right as a result of the granting of a license," and the Government may modify or revoke the license at any time. *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 475 (1940). Indeed, no court has held that an FCC license is property for takings purposes, and the Court with primary jurisdiction over FCC licensing matters—the D.C. Circuit—has held that FCC licenses are not property under the Takings Clause. *Mobile Relay Assocs. v. FCC*, 457 F.3d 1 (D.C. Cir. 2006).

Second, under well-established precedent, a plaintiff must litigate a takings claim on the premise that the Government action at issue is both authorized and lawful. Ligado's complaint, however, fails to allege any authorized Government actions that could give rise to takings liability, and instead it contends that the Government has been engaged in an *unlawful* effort to preclude Ligado from using its FCC license. These contentions necessarily preclude any takings liability.

The four counts of the complaint also fail for reasons specific to each claim. Ligado's physical takings claim (Count One) is deficient as a matter of law. Ligado fails to plead any plausible facts to support its purely speculative claim that the Government has occupied its licensed spectrum. And its theory that the Government required a spectrum "dead zone" around the separate spectrum bands allocated for GPS use similarly fails because Ligado cannot identify any authorized Government action that precluded it from actually using its modified license.

Ligado also cannot establish a *per se* regulatory taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003 (1992) (Count Two).  Not only have the Supreme Court and the Federal Circuit never applied this rule to something as intangible as an FCC license, but Ligado cannot plead that its license lost all value both because its license still authorizes MSS use, and because Ligado cannot plead that any economic loss is permanent.

Finally, Ligado's regulatory and legislative takings claims (Counts Three and Four) fail to establish a taking under the factors identified in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978), and so those claims must also be dismissed.

## I.    <u>Statutory And Regulatory Background</u>

The Federal Government manages the use of spectrum for various radio communication services in the United States, including MSS, Radionavigation-Satellite Service (RNSS) (where GPS operates), and terrestrial-based service, including the ancillary terrestrial component for MSS (where cellular voice services and broadband internet services operate).

Pursuant to the Federal Communications Act of 1934, the FCC is the agency that regulates non-Federal Government use of spectrum.  *See* 47 U.S.C. § 151 *et. seq*.  NTIA, located within the Department of Commerce (Commerce), manages the Federal Government's use of spectrum, such as for GPS.  *See id*. §§ 151, 301, 305(a), 902(b)(2)(A).  The Communications Act established a comprehensive framework for licensing and regulating the use of non-Federal spectrum, *id*. § 301, and authorizes the FCC to grant such licenses where the agency finds that the "public convenience, interest, or necessity will be served thereby," *id*. § 307(a); *see id*. § 309(a).  The statute specifically provides for the "use of" the electromagnetic spectrum by FCC licensees, "but not the ownership thereof."  *Id*. § 301.  Congress's deliberate withholding of any ownership interest for license-holders reflects its intent to "maintain the control of the United

States over all the channels of radio transmission." *Id*.  Accordingly, Congress provided in the statute that no license "shall be construed to create any right, beyond the terms, conditions, and periods of the license." *Id*.

The FCC issues licenses for "limited periods of time," with no guarantee of renewal. *Id*. §§ 301, 307(c).  These licenses may be transferred only "upon application to the [FCC] and upon finding by the [FCC] that the public interest, convenience, and necessity will be served thereby." *Id*. § 310(d).  The FCC may also modify the terms of any license at any time "if in the judgment of the [FCC] such action will promote the public interest, convenience and necessity." *Id*. § 316(a)(1); *see also id*. § 304 (license applicant must "waiv[e] any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the United States because of the previous use of the same, whether by license or otherwise"); *id*. § 312 (specifying circumstances for license revocation).

The Communications Act provides that "any party" or "any other person aggrieved or whose interests are adversely affected" by a decision or order of the FCC may petition for reconsideration, and that the FCC may "in its discretion" "grant such a reconsideration if sufficient reason therefor be made to appear." *Id*. § 405(a).  The petition for reconsideration does not "operate in any manner to stay or postpone the enforcement" of such an order. *Id*.  The statute further provides a comprehensive scheme for judicial review of FCC orders and decisions.  Appeals from FCC decisions and orders are properly brought to the D.C. Circuit in a number of specified circumstances, including by any applicant for a modification of a license whose application is denied by the FCC or by any other person who is aggrieved by any FCC order granting an application to modify a license. *Id*. § 402(b).  FCC orders and decisions that

do not fall within the purview of section 402(b) may be appealed to the regional circuit courts of appeals pursuant to section 402(a).

In addition, as relevant here, the FCC issued regulations in 2003 to allow MSS licensees, such as Ligado, to amend their licenses to seek authorization to operate ancillary-terrestrial component (ATC) stations, or terrestrial wireless operations, in the same frequencies for which their license authorizes satellite MSS operations, and for the purposes of filling in gaps in service that are difficult to serve with MSS, such as in urban settings where buildings can block MSS signals.  *See* 47 C.F.R. § 25.149.

## II.     Proceedings Before The FCC

### A.     Ligado's FCC License Applications

For several decades, Ligado[2] has held an FCC license authorizing it to provide satellite MSS services in the 1525-1559 MHz and 1626.5-1660.5 MHz spectrum bands, located in the L-Band.  *See* April 2020 Order, *In the Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application*, 35 FCC Rcd. 3772, 3773-74 (2020); *see* Compl. ¶¶ 25-26.[3]   Portions of this spectrum lie near spectrum bands in which GPS services operate.  In 2004, in accordance with then-recent regulatory changes, the FCC granted Ligado's license modification application for authority to conduct ATC operations (*i.e.*, terrestrial

---

[2] This brief uses "Ligado" to include several of its predecessors-in-interest.

[3] Within the L-Band, the lower authorized portion is allocated for downlink transmissions from MSS satellites to mobile earth stations, while the upper portion is allocated for uplink transmissions from mobile earth stations to MSS satellites.  *See* April 2020 Order, 35 FCC Rcd. at 3774.

operations) in its MSS licensed spectrum if it met certain conditions.  April 2020 Order, 35 FCC Rcd. at 3774-75.

In November 2010, Ligado requested that the FCC further modify its previously issued ATC authorization to accommodate Ligado's plans to implement a nationwide 4G satellite/terrestrial network under its ATC authority.  *Id*. at 3775-76.  In January 2011, the FCC granted Ligado a waiver of certain Commission ATC rules, provided that Ligado address various concerns that the network would cause harmful interference with GPS.  *See id*.  Ligado never implemented this terrestrial network because it failed to resolve the harmful interference concerns raised by NTIA and others.  *See id*. at 3774-77.  NTIA similarly opposed Ligado's license modification applications filed in September and October 2012 on harmful interference grounds.  *Id*. at 3777-78.

In December 2015, Ligado filed applications to modify its proposed terrestrial wireless operations, in which it requested authority to conduct terrestrial operations in three L-band segments.  *Id*. at 3778-79.  In May 2018, following a public comment period in which concerns about the harmful interference implications of Ligado's plan were raised, Ligado amended its 2015 license modification applications by proposing several restrictive conditions, including a reduction in base station power and specific measures to mitigate concerns about potential harmful interference to Federal Government operations.  *Id*. at 3780-82.  In response, in December 2019, NTIA notified the FCC that, based on its own assessment of the potential impact of Ligado's operations (including through the most recent technical studies), it could not recommend approval of the applications.  *Id*. at 3782-83.  And in April 2020, NTIA further explained that the Government's harmful interference concerns relating to Ligado's operations had not been resolved.  *Id*.

**B.**     <u>**The FCC Issues The April 2020 Order**</u>

In the April 2020 Order, the FCC conditionally granted Ligado's amended license modification applications seeking ATC authority, over NTIA's objections.  *Id*. at 3783; *see* Compl. ¶¶ 63-68.[4]  The FCC found that the "harmful interference concerns relating to GPS are effectively resolved based on the parameters of Ligado's amended modification applications, the test/data analyses presented in the record, and the conditions imposed" in the order.  April 2020 Order, 35 FCC Rcd. at 3841-42.  These conditions required Ligado, among other things, to: provide a 23 MHz guard-band of its licensed spectrum to separate its terrestrial base-station transmissions from neighboring operations; reduce the base-station power levels from its initial proposal; and, before Ligado could start its terrestrial operations, engage in a robust information exchange and coordination program with Government agencies.  *Id*. at 3836-41.

With respect to the last requirement, the April 2020 Order directed Ligado to cooperate directly with any agency whose GPS devices may be adversely affected by "(1) providing base station location information and technical operating parameters to federal agencies prior to commencing operations in the 1526-1536 MHz band; (2) working with the affected agency to identify the devices that could be affected; (3) working with the affected agency to evaluate whether there would be harmful interference from Ligado's operations; [] (4) developing a program to repair or replace any such devices that is consistent with that agency's programmatic needs, as well as applicable statutes and regulations relating to the ability of those agencies to accept this type of support;" and (5) providing quarterly reports to the FCC concerning the progress of its satisfaction of these conditions.  *Id*. at 3838-3840.

---

[4] Ligado did not pay the Government any money for its modified license.

To date, Ligado has not informed the FCC that it has satisfied the conditions that the FCC imposed by the April 2020 Order.  Moreover, as discussed further below, the independent NASEM report concluded that these conditions would not mitigate interference with certain critical GPS receivers and would be impractical in many cases.

## C.   NTIA Petitions For Reconsideration And Stay Of The April 2020 Order

On May 22, 2020, NTIA—on behalf of the Executive Branch—petitioned the FCC to reconsider and rescind its approval of Ligado's application.[5]  *See* Compl. ¶ 76.  NTIA stated that the FCC's April 2020 Order "gave inordinate weight to Ligado-funded tests and unproven metrics" while incorrectly dismissing the evidence provided by the Government.  Recon. Pet. 9. Also on May 22, 2020, NTIA petitioned the FCC for a stay of the April 2020 Order pending resolution of the petition for reconsideration.  *See* Compl. ¶ 76; *In The Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application*, Order Denying Motion For Stay, 36 FCC Rcd. 1262, 2021 WL 8083764, at *1 (Jan. 19. 2021) (Stay Order).  In the stay petition, NTIA stated that the FCC's April 2020 Order "relie[d] upon a new and unproven 'harmful interference' metric and impose[d] unworkable conditions while [the FCC is] still uncertain whether GPS receivers critical to national security and public safety would experience remedial harmful interference."  Stay Order, 2021 WL 8083764 at *2.

On January 19, 2021, the FCC denied the stay petition in large measure because Ligado did not "expect to commence the contemplated service within the next eighteen months," and therefore GPS users would not suffer immediate irreparable harm.  Stay Order, 2021 WL

---

[5] *In The Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application*, NTIA Petition for Reconsideration or Clarification (May 22, 2020) (Recon. Pet.), *available at*: https://www.fcc.gov/ecfs/document/105221130705320/1 (last visited Jan. 25, 2024).

8083764 at *1, 4.  The FCC added that Ligado's deployment "will not occur for some time and not before the [FCC] has an opportunity to rule on the Petition for Reconsideration and to reach a determination as to whether NTIA's claims justify barring this deployment or otherwise modifying its underlying order."  *Id*. at *4.  To date, the FCC has not ruled on NTIA's reconsideration petition.[6]

### III.    The 2021 National Defense Authorization Act

On January 1, 2021, shortly before the FCC denied NTIA's stay motion, Congress enacted the 2021 NDAA, Pub. L. 116-283, §§ 1661-1664, 134 Stat. 3388, 4073-76 (2021). Sections 1661 to 1664 relate to Ligado's use of its conditional modified license and enforcement of the April 2020 Order.  These sections address concerns about interference with critical GPS systems from Ligado's terrestrial network.

Section 1661 provides that no DoD funds "may be obligated or expended to retrofit any [GPS] device or system, or network that uses [GPS], in order to mitigate harmful interference from commercial terrestrial operations" within the spectrum bands of Ligado's license.  2021 NDAA § 1661.  Section 1662 prescribes that DoD "may not enter into a contract" with "an entity that engages in commercial terrestrial operations using [the spectrum bands of Ligado's license] unless the Secretary [of Defense] has certified" that "such operations do not cause harmful interference to a [GPS] device of the Department of Defense."  *Id*. § 1662.  Section 1663 directs DoD to contract with NASEM to conduct an independent technical review of the FCC's order, including an "[a]ssessment of the potential for harmful interference to mobile satellite services" operated by DoD and others.  *Id*. § 1663.  Finally, section 1664 provides that none of the funds

---

[6] Seven other petitions for reconsideration of the April 2020 Order were filed with the FCC, and each remains pending as of the filing of this motion.

authorized by the 2021 NDAA may be obligated or expended to comply with the April 2020

Order until the Secretary of Defense submits to the congressional defense committees an

estimate of the costs associated with harmful interference resulting from the order to DoD's GPS

devices and certifies that the estimate is accurate.  *Id*. § 1664.

In accordance with the 2021 NDAA, in September 2022, NASEM issued its

congressionally mandated report concerning the April 2020 Order.  The report concluded that

DoD's concerns regarding harmful interference had not been resolved, and that "[t]he terrestrial

network authorized by FCC Order 20-48 will create unacceptable harmful interference for DoD

missions."  NASEM Report 6.[7]  NASEM found that most commercially produced GPS receivers

will not experience significant harmful interference from Ligado's emissions as authorized by

the FCC.  *Id*. at 5.  However, NASEM found that high-precision receivers would be the most

vulnerable class of receivers, and that a "large[] proportion of [those] units tested" would

"experience significant harmful interference from Ligado operations."  *Id*.  The report stressed

that the "mitigation techniques and other regulatory provisions in FCC Order 20-48 are

insufficient to protect national security missions."  *Id*. at 6.  It also stated that even in situations

where mitigation conditions might theoretically be effective, the conditions "may be impractical

without the extensive dialog among the affected parties presumed in the order," and that in some

---

[7] National Academies of Sciences, Engineering, and Medicine, *Analysis of Potential Interference Issues Related to FCC Order 20-48* (The National Academies Press 2022), *available at*: https://nap.nationalacademies.org/catalog/26611/analysis-of-potential-interference-issues-related-to-fcc-order-20-48 (last visited Jan. 25, 2024).

cases, "mitigation may not be practical at operationally relevant time scales or at reasonable cost." *Id.* at 7.[8]

## IV.   Ligado's Complaint

In its complaint, Ligado alleges that the Government has engaged in an "unlawful scheme" to prevent Ligado from using its FCC-licensed spectrum for terrestrial services.  Compl. ¶ 1.  Ligado raises four takings claims based on physical, *per se* regulatory, regulatory, and legislative takings theories.  *See* Compl. ¶¶ 134-161.  Ligado seeks approximately $40 billion in compensation, as well as attorney fees and costs.  Compl. ¶¶ 146, 152, prayer for relief.

## ARGUMENT

## I.   Standards Of Review

Subject matter jurisdiction is a threshold requirement that must be determined at the outset of a case.  *Dow Jones & Co., Inc. v. Ablaise Ltd.*, 606 F.3d 1338, 1348 (Fed. Cir. 2010). Ligado bears the burden of proving, by a preponderance of the evidence, that the Court possesses subject-matter jurisdiction.  *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936).

When considering whether to dismiss an action for failure to state a claim, the Court "must assess whether the complaint adequately states a claim and whether plaintiffs can allege 'facts plausibly suggesting (not merely consistent with) a showing of entitlement to relief.'" *Hutchens v. United States,* 89 Fed. Cl. 553, 562 (2009) (cleaned up).  The plaintiff's factual

---

[8] In May 2023, Canada denied Ligado ATC authority to operate within the L-Band.  *Decision on the Notice of Application Received from Ligado Networks (Canada) Inc. for Ancillary Terrestrial Component (ATC) Authority in the L-Band, SMSE-007-23* (May 31, 2023), *available at* https://ised-isde.canada.ca/site/spectrum-managementtelecommunications/en/spectrum-allocation/decision-notice-application-received-ligadonetworks-canada-inc-ancillary-terrestrial-component-atc (last visited Jan. 25, 2024).

allegations must be substantial enough to raise the right to relief "above the speculative level."

*Id.* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).

## II.    The Communication Act's Comprehensive Remedial Scheme Displaces This Court's Jurisdiction

Under the Tucker Act, this Court has jurisdiction to adjudicate "any claim against the

United States founded either upon the Constitution, or any Act of Congress or any regulation of

an executive department, or upon any express or implied contract with the United States, or for

liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1).  This

grant of jurisdiction covers claims against the United States for just compensation pursuant to the

Takings Clause.  *See Acceptance Ins. Cos. Inc. v. United States*, 503 F.3d 1328, 1336 (Fed. Cir.

2007).  The Tucker Act, however, serves only a "gap-filling role" that permits "action[s] against

the United States for the breach of monetary obligations *not otherwise judicially enforceable*."

*United States v. Bormes*, 568 U.S. 6, 12-13 (2012) (emphasis added).  Thus, where another

"precisely drawn, detailed statute" contains "its own judicial remedies," "the specific remedial

scheme [of the other statute] establishes the exclusive framework for the liability Congress

created."  *Id.*  Or stated more simply: "[S]tatutory schemes with their own remedial framework

exclude alternative relief under the general terms of the Tucker Act."  *Id.* at 13; *see also Me.*

*Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1328 (2020) ("The Tucker Act yields

when the obligation-creating statute provides its own detailed remedies . . . .").

The Communications Act provides one such remedial scheme.  Nearly two decades ago,

the Federal Circuit held that, "[i]n the Communications Act, Congress enacted a comprehensive

statutory and regulatory regime governing orders of the [FCC]."  *Folden v. United States*, 379

F.3d 1344, 1357 (Fed. Cir. 2004).  The Communications Act's remedial scheme imposes detailed

administrative exhaustion requirements, contains a variety of unique filing deadlines and case processing rules, and vests the courts of appeals with exclusive authority to review FCC orders. *See id.* "[W]hen such a 'specific and comprehensive scheme for administrative and judicial review' is provided by Congress, the Court of Federal Claims' Tucker Act jurisdiction over the subject matter covered by the scheme is preempted." *Id.* (quoting *Vereda, Ltda. v. United States*, 271 F.3d 1367, 1375 (Fed. Cir. 2001)).  In recent years, the Federal Circuit has repeatedly reaffirmed that the comprehensive remedial scheme within the Communications Act displaces Tucker Act jurisdiction.  *See Sandwich Isles Commc'ns, Inc. v. United States*, 992 F.3d 1355, 1361-65 (Fed. Cir. 2021), *cert. denied*, 142 S. Ct. 2647 (2022); *Alpine PCS, Inc. v. United States*, 878 F.3d 1086, 1092-98 (Fed. Cir. 2018), *cert. denied*, 139 S. Ct. 78 (2018).

The Communications Act's remedial scheme encompasses any challenge concerning a final order issued by the FCC.  The Communications Act provides that "[a]ny proceeding to enjoin, set aside, annul, or suspend any order of the [FCC] under this chapter . . . shall be brought" to the regional courts of appeals.  47 U.S.C. § 402(a); 28 U.S.C. § 2342(1).  Under these provisions, "the statutory jurisdiction of the courts of appeals over claims that fall within the scope of subsection 402(a) is exclusive." *Sandwich Isles*, 992 F.3d at 1362 (citation omitted); *Folden*, 379 F.3d at 1355.

But the Communications Act's displacement of Tucker Act jurisdiction sweeps more broadly than just direct challenges to FCC orders that fall within section 402's express grant of exclusive jurisdiction.  The Act's comprehensive remedial scheme also displaces Tucker Act jurisdiction over any kind of claim—including takings claims—where the statutory framework can provide adequate relief.  In *Alpine*, for example, the Federal Circuit held that the Communications Act provided the exclusive basis for Federal court jurisdiction over contract

claims related to a payment agreement with the FCC, as well as a takings claim related to the

FCC's decision to cancel a license, because the FCC could have remedied both types of

allegations under the Communications Act.  *See* 878 F.3d at 1094 (holding that 47 U.S.C.

§ 402(b)(5) "provided Alpine the opportunity to argue that the FCC's decision was contrary to

the terms of the contract"); *id.* at 1096-97 (explaining why "the FCC had the power to grant

Alpine adequate relief[] by eliminating the taking, providing compensation, or some

combination").  Similarly, in *Sandwich Isles*, the Court held that the Communications Act

displaced Tucker Act jurisdiction over a takings claim alleging that the FCC had improperly

suspended certain subsidies, finding that "the true nature" of plaintiff's allegations "take aim at

FCC orders" because they necessarily "challenge[] FCC actions and orders governed by 47

U.S.C. § 402(a)."  992 F.3d at 1364.  These precedents demonstrate that if the plaintiff's claim

raises the type of challenge that implicates section 402, or if the FCC can afford the plaintiff a

remedy under the Communications Act, then the claim— regardless of how it is styled—is

subject to the Act's comprehensive remedial scheme rather than the Tucker Act's gap-filling

grant of jurisdiction.  *See id*., 992 F.3d at 1365 n.4 (explaining that where "the FCC is in the

position to prevent an alleged taking in the course of its own proceedings, the agency must be

made aware of any such claim," which is "then subsumed into the agency's final decision and

can be appealed only to the court of appeals").

     Here, Ligado alleges in its complaint that the actions of various Government actors

(including DoD[9], NTIA, and Congress) have prevented it from using the spectrum it was

---

[9] The United States, which includes the FCC, is the only proper defendant in this Court.  *See*
*United States v. Sherwood*, 312 U.S. 584, 588 (1941); *Brown v. United States*, 105 F.3d 621, 624
(Fed. Cir. 1997).  Ligado includes Commerce, DoD, and NTIA as defendants, Compl. ¶¶ 15-17,
but these agencies should be dismissed as parties.

licensed by the FCC.  *See* Compl. ¶¶ 140-41, 144-46, 149-52, 155-60.  But in evaluating jurisdiction this Court must look to the "true nature" of the action.  *Katz v. Cisneros*, 16 F.3d 1204, 1207 (Fed. Cir. 1994).  Properly characterized, Ligado's takings claim seeks to erase the mandatory conditions in the April 2020 Order—the barriers that have prevented it from using its licensed spectrum for terrestrial operations—or complain that they are so onerous as to amount to a taking.  As described above, the FCC imposed numerous conditions that Ligado must satisfy "before ATC network operations commence."  April 2020 Order, 35 FCC Rcd. at 3783, 3834-3842.  These conditions include that Ligado replace affected Government devices.  *Id.* at 3838-40.  Ligado has never informed the FCC that it has satisfied the conditions in the April 2020 Order.  Before using the spectrum at issue, Ligado needs to meet every condition, or the FCC would need to remove all of the unmet conditions precedent from its April 2020 Order.  As in *Sandwich Isles*, Ligado's "takings claims" are predicated in the first instance on a disguised challenge to the terms of its FCC license.  This kind of challenge, however, must be brought under 47 U.S.C. § 402(a), which grants the courts of appeals exclusive jurisdiction over challenges to the FCC's final orders and displaces the Tucker Act's gap-filling role.

That Congress intended this action be litigated through the Communications Act is reinforced by the fact that it arises from an ongoing and highly technical dispute before the FCC concerning whether Ligado's terrestrial operations would cause harmful interference to GPS, whether technical measures sufficiently mitigate the harm, and whether the license should therefore be rescinded or revised.  *See* Compl. ¶¶ 76-83.  This is exactly the sort of issue—the technical parameters under which a non-Federal entity may operate in spectrum—that Congress intended the FCC to address pursuant to the framework of the Communications Act.  Ligado attempts to avoid the administrative and judicial review process established by Congress by

suggesting that the FCC no longer has any role to play here.  *See* Compl. ¶¶ 4, 53.  Ligado is mistaken.  The Commission's rules provide Ligado an opportunity to seek a modification of the conditions attached to its ATC authority.  *See* 47 C.F.R. § 25.117 (Modification of Station License).  And Ligado had an opportunity to petition for reconsideration of the April 2020 Order. In addition, in accordance with Federal Circuit precedent, at any point in conjunction with these proceedings, Ligado can raise a takings claim to the FCC to seek compensation for its purported inability to use its license.  *See Alpine*, 878 F.3d at 1094, 1096-98.  But what it may not do is avoid the FCC's comprehensive scheme by asserting a takings claim in this Court.  *See id*. at 1097 (rejecting jurisdiction in this Court where "there is a comprehensive statutory scheme through which [plaintiff] could present, and is directed to present, its takings claim, to the exclusion of the Tucker Act. . . .").  Ligado is effectively seeking to usurp the FCC's ability to modify licenses and resolve reconsideration petitions pending at the administrative level (eight of which are now pending) and transfer the adjudication of interference disputes to this Court, a path that violates the comprehensive framework established by Congress and settled Federal Circuit precedent.

### III.    Ligado Fails To State A Cognizable Takings Claim

Ligado also fails to state a cognizable takings claim for several reasons.  First, it cannot establish a cognizable property interest.  Second, Ligado's claims fail to properly allege authorized Government action, which is a prerequisite for takings claims against the Government.  Third, Ligado cannot establish the elements of a physical, *per se* regulatory, regulatory, or legislative takings claim as a matter of law.

A.      The Complaint Does Not Allege A Cognizable Property Interest

The complaint fails to state a claim because Ligado cannot establish a cognizable property interest, a necessary showing for all takings claims.  *E.g.*, *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004) ("If the claimant fails to demonstrate the existence of a legally cognizable property interest, the court's task is at an end.").

As a threshold matter, Ligado does not allege that it actually owns the L-Band spectrum at issue or that it has an independent right to use the spectrum.  Compl. ¶¶ 135-138.  Nor could it. The Communications Act makes clear that no person has an independent right to own or use spectrum, and that any temporary spectrum use must flow instead from authority arising from the provisions of the Act.  47 U.S.C. §§ 301, 304; *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470, 475 (1940) ("The policy of the [Communications] Act is clear that no person is to have anything in the nature of a property right as a result of the granting of a license."); *In re NextWave Personal Comms.*, 200 F.3d 43, 51 (2d Cir. 1999).  Instead of ownership over the spectrum itself, Ligado bases its alleged property interest on the fact that it holds an FCC license pursuant to the Communications Act, and that in the April 2020 Order, the FCC modified that license to provide it with authority, subject to numerous terms and conditions, for terrestrial use of the L-Band spectrum.  Compl. ¶¶ 135-138.

Ligado's allegation that it possesses a protected property interest fails for at least two independent reasons:  (1) licenses issued by the FCC under the Communications Act do not constitute cognizable property for takings purposes; and (2) any interest arising from Ligado's modified license is subject to the provisions of the Communications Act, including that a license holder must comply with the terms and conditions of any license that is issued.

### 1.    <u>FCC Licenses Do Not Give Rise To A Cognizable Property Interest</u>

To begin, Ligado cannot establish that the modified license issued in the April 2020 Order constitutes a cognizable property interest that could support a takings claim.  In determining whether a plaintiff demonstrates a cognizable property interest, the Federal Circuit has explained that "[t]he parameters of a protected property interest are delimited by the law that creates the interest, and by 'existing rules and understandings' and 'background principles' derived from independent sources, such as state, federal, or common law."  *Members of Peanut Quota Holders Ass'n, Inc. v. United States*, 421 F.3d 1323, 1330 (Fed. Cir. 2005) (citation omitted).  "To have a property interest . . . a person . . . must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Id*. (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972)) (cleaned up).  In evaluating whether a license constitutes cognizable property, courts have paid particular attention to the source of law defining the interest, as well as the revocable nature of the license at issue.  *See United States v. Fuller*, 409 U.S. 488, 492-94 (1973); *Fishermen's Finest, Inc. v. United States*, 59 F.4th 1269, 1276-79 (Fed. Cir. 2023); *Conti v. United States*, 291 F.3d 1334, 1340-44 (Fed. Cir. 2002).  Courts have also examined other traditional hallmarks of property such as "whether the citizen had the rights to exclude, use, transfer, or dispose of the property."  *Peanut Quota Holders*, 421 F.3d at 1329; *see Conti*, 291 F.3d at 1341-42.

In *Fuller*, the Supreme Court directly addressed the significance of the revocable nature of licenses and permits issued by the Federal Government.  The *Fuller* plaintiffs engaged in ranching on their own land, but also on Federal land for which they had permits.  409 U.S. at 488-89.  After the Government condemned a portion of their land, the plaintiffs argued that they should be compensated for the value by which the grazing permits for nearby land increased

their own land, but the Supreme Court rejected that argument.  The Court determined that plaintiffs lacked any property interest in the grazing permits, and that the Federal Government "need not compensate for value which it could remove by revocation of a permit for the use of lands that it owned outright."  *Id*. at 492.  In other words, given their revocable nature, the plaintiffs could have no property interest arising from the grazing permits.

In *Conti*, the Federal Circuit also highlighted the significance of revocability in rejecting the argument that a Federal fisheries license constituted a protected property interest for takings purposes.  Although the Court analyzed a number of traditional hallmarks of property including transferability and exclusivity, *see* 291 F.3d at 1341-42, at the conclusion of its analysis, the Court drew a bright-line distinction between a compensable "property right" and a non-compensable "revocable license."  *Id*. at 1342.  Citing *Fuller*, the Court explained that it would be "counterintuitive[]" to "compensate a claimant for the value of a right that the Government can grant or withhold as it chooses."  *Id*.  Accordingly, because the Federal Government "retained the right to revoke, suspend, or modify" the license, and because the statutory scheme made clear that a license did "not create any right, title, or interest in or to any fish," the plaintiff lacked a cognizable property interest.  *Id*. (quoting 16 U.S.C. § 1853(d)(3)(D)).  *See also Fishermen's Finest*, 59 F.4th at 1276-77 (focusing on the Government's statutory authority to revoke, suspend, or modify license in rejecting fisheries license as compensable property interest).

These holdings are equally applicable to FCC licenses.  In the only case to directly address whether the Communications Act confers a property right for purposes of asserting a takings claim, *Mobile Relay Associates v. FCC*, 457 F.3d 1, 11-12 (D.C. Cir. 2006), the D.C. Circuit rejected the notion that the statute creates such a right.  In *Mobile Relay*, license holders

filed petitions for review of FCC orders that reconfigured a spectrum band.  In conjunction with the petition, the license holders brought takings claims alleging that the FCC's reconfiguration of the spectrum band resulted in their inability to operate certain cellular systems, reducing the value of their previous spectrum assignments.  *Id.* at 11-12.  In analyzing whether the holder of an FCC license possesses a cognizable property interest, the D.C. Circuit relied on the Supreme Court's statement in *FCC v. Sanders Brothers Radio Station*, 309 U.S. 470, 475 (1940): "[t]he policy of the [Communications] Act is clear that no person is to have anything in the nature of a property right as a result of the granting of a license" by the FCC.  In reaching its decision, the D.C. Circuit further focused on the fact that under the statutory scheme, the FCC "has the unilateral authority, provided it gives notice to the licensee, to modify a license 'either for a limited time or for the duration of the term thereof, if in the judgment of the Commission such action will promote the public interest, convenience, and necessity.'"  *Mobile Relay*, 457 F.3d at 11-12 (citing 47 U.S.C. § 316(a)(1)).  The D.C. Circuit thus rejected the plaintiff's takings claims, holding that FCC licenses "confer the right to use the spectrum for a duration expressly limited by statute subject to the Commission's considerable regulatory power and authority," and that such a "right does not constitute a property interest protected by the Fifth Amendment."  *Id.* at 12; *see also NextWave*, 200 F.3d at 51 ("A license does not convey a property right; it merely permits the licensee to use the portion of the spectrum covered by the licenses in accordance with its terms.").

These precedents establish that licenses and permits that may be modified or revoked, including those issued under the Communications Act, do not give rise to a cognizable property interest.  Because the Government retains the right to modify or withdraw such grants at any time, the licensee or permittee has no continuing right to the benefit that the license or permit

provides.  And without such a right, a cognizable property interest cannot exist.  *See Bd. of Regents of State Colleges*, 408 U.S. at 577 (to have a cognizable property interest in a benefit, a plaintiff "must . . . have a legitimate claim of entitlement to it.").

Ligado thus cannot establish a cognizable property right in its spectrum license.  Under the Communications Act, Congress has expressly provided the FCC with authority to modify the terms of any license at any time "if in the judgment of the [FCC] such action will promote the public interest, convenience and necessity."  47 U.S.C. § 316(a)(1); *see Mobile Relay*, 457 F.3d at 11-12; *see also* 47 U.S.C. § 312 (identifying circumstances in which FCC can revoke license entirely).  Indeed, the FCC has the statutory authority to simply reallocate assigned spectrum by modifying spectrum licenses, and the statutory language makes clear that Congress has not provided license holders with any right to continued use of that spectrum in such circumstances.  *See* 47 U.S.C. § 304 (license applicant must "waiv[e] any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the United States because of the previous use of the same, whether by license or otherwise"); *id*. § 301 (providing that licenses are issued for "limited periods of time," and that a license holder has no "ownership" in the subject of the license); *id*. § 402 (judicial review of licensing decisions).  In other words, the FCC could at any point eliminate any right Ligado may claim to operate a terrestrial network in the L-Band spectrum.  This inherent power, in turn, conclusively demonstrates that Ligado's FCC license does not create a cognizable property interest.

Moreover, the FCC may revoke or modify a license, where, as here, an adverse party has moved for reconsideration, *see* Compl. ¶ 76.  The provision that governs reconsideration, 47 U.S.C. § 405(a), existed long before Ligado's license was modified, and any license subject to this statutory reconsideration process is always contingent on the possibility that the FCC may

reverse or modify its decision.  *See Bair v. United States*, 515 F.3d 1323, 1327-29 (Fed. Cir. 2008) (holding that pre-existing Federal statute inheres in the title to property).  The FCC's regulations further make clear that the FCC may grant reconsideration "in whole or in part," and may "[s]imultaneously reverse or modify the order from which reconsideration is sought," "[r]emand the matter" for further proceedings, or order such other proceedings as may be "necessary or appropriate."  47 C.F.R. § 1.106(j),(k).  In other words, given that the FCC has not ruled on NTIA's reconsideration petition (as well as seven other petitions), Ligado's license is inherently contingent not only on Ligado's ability to satisfy the April 2020 Order's many terms and conditions, but also on the fact that the FCC may reverse its prior decision in accordance with the statutory and regulatory scheme.

In addition, other "traditional hallmarks of property" support the conclusion that Ligado cannot establish a cognizable property interest.  Ligado lacks the authority under the statutory scheme to freely sell, assign, or transfer its license.  *See Conti*, 291 F.3d at 1341-42.  As the Communications Act establishes, Congress has provided that spectrum licenses may be transferred only "upon application to the [FCC] and upon finding by the [FCC] that the public interest, convenience, and necessity will be served thereby."  47 U.S.C. § 310(d).  The transferability of a spectrum license is thus always contingent on the Government's approval.

The high degree of Government control over spectrum further reinforces that Ligado does not possess a cognizable property interest.  "Where a citizen voluntarily enters into an area which from the start is subject to pervasive Government control, a property interest is likely lacking." *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012) (citing *Mitchell Arms, Inc. v. United States*, 7 F.3d 212 (Fed. Cir. 1993)).  Although "not a *per se* exclusion of all permit or regulatory based takings," *id.*, this consideration can be yet another

indicator of whether the holder of a Government-issued license or permit has a cognizable property interest. *See Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1385-86 (Fed. Cir. 2019). This paradigm plainly applies here because the Government has closely regulated spectrum since at least 1934, when Congress established a comprehensive regulatory scheme through the Communications Act.

And, although Ligado leans into the undisputed fact that spectrum licenses may be valuable, Compl. ¶ 136, this observation does not resolve the question of whether a spectrum license is a cognizable property interest. The Supreme Court long ago explained that "the existence of value alone does not generate interests protected by the Constitution against diminution by the government, however unreasonable its action may be." *Reichelderfer v. Quinn*, 287 U.S. 315, 319 (1932); *see also Fishermen's Finest*, 59 F.4th at 1278 ("[V]alue alone does not transform a revocable, non-compensable privilege into a compensable property interest.").

Finally, the implications of the rule that Ligado proposes would be striking. If an FCC license constitutes property under the Takings Clause, then any reallocation of spectrum—indeed any modification of a license by the FCC—could raise a right to compensation. By enacting the Communications Act, Congress did not intend to hinder the FCC from ensuring that the nation's spectrum is efficiently used in accordance with the national interest. *See* 47 U.S.C. § 301.

### 2. The Cases Ligado Relies On Do Not Support A Different Result

In its complaint, Ligado cites a handful of cases addressing FCC licenses as property, but these cases only reinforce the fact that no Court has ever held that FCC licenses are cognizable property under the Fifth Amendment. *See* Compl. ¶¶ 136-138. Ligado relies on *Alpine PCS, Inc. v. United States*, 128 Fed. Cl. 303 (2016), for the proposition that this Court has recognized

that an FCC license "is property cognizable by the Takings Clause," but the statements Ligado

highlights are plainly dicta.  In *Alpine*, this Court dismissed the takings claim as untimely and,

for the purpose of its timeliness analysis, stated that it would "treat Alpine's PCS spectrum

licenses as property that could be subject to a taking."  *Id.* at 308.  That assumption was not

necessary to its holding that the takings claim was untimely and, in any event, the Federal Circuit

later expressly declined to endorse the correctness of the premise when it held that the

comprehensive remedial scheme of the Communications Act displaced Tucker Act jurisdiction

over the claim.  *See Alpine*, 878 F.3d at 1095, 1098.  As established above, the same result is

appropriate here.

Ligado's reliance on *In re Atlantic Business & Community Development Corp.*, 994 F.2d

1069 (3d Cir. 1993), Compl. ¶ 136, is similarly misplaced.  In that case, the court found that an

FCC broadcast license constituted "property" under the Internal Revenue Code (IRC) for

purposes of determining whether a tax lien attaches when a license is sold in bankruptcy.  As a

factual matter, the license sale had already taken place such that the lien was being applied to the

proceeds of the sale, rather than to the license itself.  994 F.2d at 1075.  In any event, whether

Congress intended to have a broad definition of property for tax lien purposes does not resolve

whether an FCC license constitutes property for takings purposes.  Indeed, in a recent decision

concerning fishing licenses, the Federal Circuit expressly rejected a similar argument—that the

treatment of licenses under the IRC indicated that the licenses were property for takings

purposes.  *See Fishermen's Finest*, 59 F.4th at 1278.  The Federal Circuit instead held that the

IRS can tax both Government-issued privileges and protected property under the IRC, but that

such taxation does not transform government privileges into compensable property rights.  *Id.*

Ligado further suggests that FCC licenses can be compared to patents because a patent constitutes an exclusive right issued by the Federal Government.  Compl. ¶ 138 (citing *Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC*, 138 S. Ct. 1365, 1375 (2018); *Horne v. Dep't of Agriculture*, 576 U.S. 350, 359-60 (2015)).  Although patents do constitute property for purposes of the Takings Clause, *see Celgene Corp. v. Peter*, 931 F.3d 1342, 1358 (Fed. Cir. 2019), Ligado's comparison between FCC licenses and patents is inapt.  The Patent Act is a distinct statutory scheme that specifically identifies that "patents shall have the attributes of personal property," 35 U.S.C. § 261, and it is well established that patents constitute a bundle of rights that may be freely assigned or transferred without Federal Government approval.  *See Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870, 875 (Fed. Cir. 1991).  Ligado's comparison of FCC licenses to patents merely underscores why the former lack the attributes critical to the finding of a property interest.

In sum, because the Communications Act makes clear that a license holder has no ownership interest in spectrum, a license can be modified or revoked by the Government at its discretion, and a license holder has no right to freely transfer the license without Government approval, Ligado cannot establish a cognizable property interest in its FCC license.

### 3.   Even If Ligado Has A Property Interest, Any Interest Is Contingent On The Conditions Of The License And The Statutory Scheme

Even assuming that an FCC license were a cognizable property interest, any such interest would still be subject to the limitations and conditions arising from the Communications Act, including the specific conditions of the license modification imposed in the April 2020 Order.

It is well established that certain "background principles" of law may "inhere" in the title of property to limit property rights and thereby preclude a taking under the Fifth Amendment.

*Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1029 (1992); *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1152-53 (Fed. Cir. 2014); *Bair*, 515 F.3d at 1327-28.  Accordingly, "the [G]overnment does not take a property interest when it merely asserts a 'pre-existing limitation upon the [property] owner's title.'"  *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2079 (2021) (quoting *Lucas*, 505 U.S. at 1028-29).

The Communications Act mandates that a spectrum license-holder must comply with the "terms" and "conditions" of a license.  47 U.S.C. § 301.  And as previously stated, Ligado's license modification is subject to many as-yet-unfulfilled conditions precedent.  *See supra* Section II.  The FCC did not grant Ligado an unfettered right to immediately use its modified license to roll out a terrestrial network.  *See* April 2020 Order, 35 FCC Rcd. at 3835-41.  Instead, to address GPS interference, including interference harmful to national security, the FCC attached numerous conditions that Ligado must satisfy before it can use its modified license for terrestrial purposes, conditions that inhered in the title to any purported property arising from the order.  *Id*.  Ligado has not alleged that it has satisfied those conditions, and it has not.  *See* 47 U.S.C. § 301; *Bair*, 515 F.3d at 1329.

## B.    Ligado Fails To Properly Plead Authorized Government Conduct

A plaintiff must litigate a takings claim on the assumption that the Government action at issue was "both authorized and lawful."  *Rith Energy, Inc. v. United States*, 247 F.3d 1355, 1366 (Fed. Cir. 2001); *see Hooe v. United States*, 218 U.S. 322, 335-36 (1910); *Taylor v. United States*, 959 F.3d 1081, 1089 n.4 (Fed. Cir. 2020) ("A government action cannot be a taking if . . . the government actors lacked the 'authority' to take the action[.]").

Ligado does not plausibly allege authorized Government action that would be sufficient to deprive Ligado of its property under the Takings Clause.  Ligado's categorical and regulatory

takings claims rest on six core allegations.  Compl. ¶¶ 141, 151.  Three of those allegations

concern *inaction* by the Government.  Compl. ¶ 151 ("(ii) failing to engage with the regulatory

process . . .; (iii) failing to implement . . . the April FCC 2020 Order . . .; (v) failing to certify

under the NDAA . . .").  However, "[o]n a takings theory, the government cannot be liable for a

failure to act, but only for affirmative acts."  *St. Bernard Par. Gov't v. United States*, 887 F.3d

1354, 1360 (Fed. Cir. 2018).  Consequently, these and other allegations concerning Government

inaction do not support a takings claim.[10]

Next, two of the core allegations concern Government speech.  Compl. ¶ 151 ("(iv)

making submissions to Congress …; and (vi) publishing incomplete, misleading, and false

information").  First, the "dissemination of information is a legitimate agency function,

especially in the context of public safety," and "there are good reasons for caution about

subjecting agency information disclosures . . . to the risk of takings liability."  *Taylor*, 959 F.3d

at 1089.  Second, Ligado claims it was injured because the Government made various harmful

statements about GPS interference.  But the complaint fails to allege that *any* Government

official was *authorized* to spread the allegedly false information.  Under longstanding Federal

Circuit precedent, Ligado cannot base its takings claim on allegations that Government conduct

was unauthorized or unlawful.  *Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1352 (Fed. Cir.

2001) (on petition for reconsideration) ("Rith's complaints about the wrongfulness of the permit

---

[10] Allegations pre-dating the April 2020 Order are also irrelevant because they precede the
existence of the claimed property interest, and thus could not have been a taking.

denial are therefore not properly presented in the context of its takings claim."); *Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331 (Fed. Cir. 2006).[11]

The last remaining core allegation—"(i) threatening Ligado's business partners in order to interfere with the formation or performance of contracts"—fails for the same reason.  The complaint nowhere alleges that any official was authorized to threaten private enterprises to interfere with contracts.  The allegations are also conclusory and incomplete: the complaint does not allege what entities were threatened, who threatened them, what contracts were at issue, or *any facts* supporting the conclusion that a company would have contracted with Ligado *but for*[12] the alleged threat.  A complaint that offers "naked assertions devoid of further factual enhancement" must be dismissed.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).

Finally, allegations supporting Ligado's physical takings claim similarly fail.  The complaint alleges that DoD is either transmitting or receiving signals in Ligado's licensed spectrum or receiving signals adjacent to Ligado's licensed spectrum in a manner that requires a "dead zone."  Compl. ¶ 141.  The complaint fails to allege that these activities are authorized by law.  Indeed, it asserts the opposite.  It states that the FCC is the only Federal agency with the power to allocate spectrum, that Federal agencies can only use frequencies allocated by the FCC for Federal use (and assigned by NTIA), that DoD began these activities without the knowledge of the FCC or NTIA, and that these "systems rely on and use spectrum for which DoD has no

---

[11] To the extent that Ligado's claims constitute torts, they are outside this Court's jurisdiction. *Smithson v. United States*, 847 F.2d 791, 794 (Fed. Cir. 1988) (citing 28 U.S.C. § 1491(a)(1)).

[12] "[A] takings plaintiff bears the burden of proof to establish that the government action caused the injury.  Causation requires a showing of 'what would have occurred' if the government had not acted." *St. Bernard Par. Gov't v. United States*, 887 F.3d 1354, 1362 (Fed. Cir. 2018) (quoting *United States v. Archer*, 241 U.S. 119, 132 (1916)).

license, and that the FCC has exclusively licensed to and authorized for use by Ligado." *Id.* ¶¶ 22, 41, 47.  As alleged in the complaint, DoD's supposed systems are unauthorized and thus cannot constitute a taking.  *See Rith Energy*, 247 F.3d at 1366.

### C.        Ligado Fails To State A Claim For A Physical Taking

In Count One, Ligado alleges "on information and belief" that the Government has effected a physical taking based on two separate theories:  (1) DoD's "systems are transmitting or receiving signals in Ligado's allocated spectrum that interfere with Ligado's ability to transmit or receive its own signals," or (2) DoD's "systems are receiving signals adjacent to Ligado's allocated spectrum that require the creation of a 'dead zone' for terrestrial services." Compl. ¶¶ 128-29; *see* Compl. ¶¶ 139-142.  Even assuming Ligado has a cognizable property interest in its spectrum license, and even assuming the complaint properly alleges lawful and authorized Government actions, the complaint would still fail to state a physical takings claim.

#### 1.        Ligado Fails To State A Claim Based On Physical Occupation

Ligado's physical occupation theory—that DoD has been operating undisclosed systems within its licensed spectrum—is both legally and factually deficient.

As discussed above, the Communications Act makes clear that no one can have a cognizable property interest in the spectrum.  47 U.S.C. § 301.  Ligado only has a right to use the licensed spectrum subject to the restrictive terms and conditions of the license, and this right is not a cognizable property interest.  *See supra* Section III.A.  But even if a license could be a cognizable property interest, it is not the sort of tangible property that the Supreme Court has held may be the subject of a physical taking.  Although the Supreme Court has applied the physical takings analysis to various types of real and personal property, *see Cedar Point*, 141 S. Ct. at 2071-72 (citing cases), these cases all involve tangible property that is capable of being

*physically* acquired, invaded, or occupied.  In contrast, a license (and even spectrum itself) is an intangible item, to which a regulatory, rather than physical, takings framework applies.  *See Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 643-44 (1993) (contracts); *Ruckelshaus v. Monsanto*, 467 U.S. 986, 1005-06 (1984) (intellectual property).

Even assuming that spectrum could be physically invaded, Ligado would face an additional hurdle: it has failed to offer well-pleaded facts supporting any plausible inference that DoD has been operating within the L-Band spectrum licensed to Ligado and thus interfered with Ligado's terrestrial use of that spectrum.  Its contention, on "information and belief," that "DOD was using and continues to use Ligado's exclusively licensed spectrum for its own purposes," Compl. ¶ 41, is nothing more than an insufficient "naked assertion[] devoid of further factual enhancement."  *Iqbal*, 556 U.S. at 678 (cleaned up).  And even though Ligado has held the L-Band spectrum license for decades, it cannot muster any factual details explaining how such incursion has been a "direct," "immediate," and "substantial" interference with its use of that spectrum.  *See United States v. Causby*, 328 U.S. 256, 266-67 (1946); *Taylor*, 959 F.3d at 1090; *Brown v. United States*, 73 F.3d 1100, 1102 (Fed. Cir. 1996); Compl. ¶ 140 (citing *Causby*).

The specific statements Ligado identifies in its complaint underscore the lack of any plausible factual allegations for its bald assertion of a physical occupation of its spectrum.  Ligado points to hearing testimony from Air Force Space Command General John Raymond stating that "We have to be able to operate *in that spectrum* . . . and it is absolutely critical to our joint force."  Compl. ¶ 43 (emphasis added).  But nothing in that statement suggests DoD is currently operating in the spectrum licensed to Ligado; it instead highlights DoD's need to be free of any interference from Ligado's terrestrial operations—which has consistently been

highlighted in DoD's stated concerns about the scope of Ligado's terrestrial operations and its harmful interference on neighboring GPS operations since Ligado filed its original modification applications.  Similarly, Ligado points to an August 23, 2022 letter from Senators Wicker and Warner to DoD, NTIA, and Commerce in which the Senators state "that they have recently learned that DOD has concerns relating to Ligado's terrestrial deployment that stem from the potential for interference with federal systems that were not disclosed to the FCC."  Compl. ¶ 44; Appx1-2.  Once again, there is nothing in that letter stating or even implying that the Government had been operating in Ligado's licensed spectrum; rather, the statement concerns the harmful impacts of Ligado's terrestrial use of its license.  Ligado's allegation, Compl. ¶ 45, that a statement in the NASEM report supports its physical occupation theory is similarly unavailing.  The NASEM report notes that Ligado's terrestrial network could not co-exist with DoD missions, including DoD satellite systems "aside from GPS," and Ligado contends that this demonstrates that DoD is operating in Ligado's licensed spectrum.  *Id.*  But the NASEM report does not support that inference.  The referenced statement simply notes that DoD expressed concerns that Ligado's terrestrial use of its license interfered with DoD systems *outside* the bands licensed to Ligado.  In other words, the NASEM report was merely highlighting the harmful spillover effects of Ligado's terrestrial use of its spectrum on DoD's use of its own assigned spectrum.

In sum, the Court should dismiss Ligado's takings claim based on a physical occupation theory.  Even if the Court were to find that spectrum is capable of being physically taken, Ligado fails to plead non-conclusory factual allegations either that DoD is operating in the spectrum licensed to Ligado, or that Ligado has experienced any interference with its use of the spectrum, a necessary element of any *Causby*-like claim.

2. **Ligado Fails To State A Claim Based On Its "Dead Zone" Theory**

Ligado also alleges that even if DoD is not physically occupying its licensed spectrum, it committed a physical taking by requiring the creation of a dead zone within that spectrum to prevent interference with DoD's systems.  Compl. ¶ 141.  This claim also fails because Ligado does not allege any Government action that required Ligado to maintain a so-called dead zone.

As a general matter, a physical taking occurs "[w]hen the government physically acquires private property for a public use" by taking physical possession including through occupation or invasion.  *Cedar Point*, 141 S. Ct. at 2071.  In the absence of actual invasion or occupation by the Government itself, the Government may effect a physical taking through authorized government action such as a statute, regulation, or order that directs or compels the taking.  *See id.* at 2072 (California statute authorized physical invasion of land by union organizers); *Hendler v. United States*, 952 F.2d 1364, 1378-79 (Fed. Cir. 1991) (holding that ordering installation of monitoring equipment on land is a physical taking).  Government action must "legally compel[]" an obligation affecting private property for it "to give rise to a taking."  *Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993); *see also Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1311 (Fed. Cir. 2015) (rejecting takings claim where the "government action [was] devoid of coercion, legal threat, regulatory restriction, or any binding obligation").

Although Ligado repeatedly alleges that the Government mandated the creation of a dead zone, Compl. ¶ 141, its complaint noticeably lacks allegations as to how such coercion supposedly occurred.  Any allegation that DoD merely operated in nearby licensed spectrum, and expressed its concerns with respect to the harmful effects on GPS of Ligado's terrestrial network, would be insufficient to create takings liability because none of the statements that Ligado identifies legally precluded Ligado from using its licensed spectrum.  *See Dimare Fresh*, 808

34

F.3d at 1311.  Ligado also alleges that the Government pretextually thwarted the April 2020 FCC

Order by manufacturing concerns about GPS interference by seeking reconsideration and a stay

from the FCC, and by making numerous false statements to Congress, the National Security

Council, the White House, and the public concerning the harmful effects of Ligado's proposed

network.  But again, none of these statements or actions legally prohibited Ligado from using the

licensed spectrum.  *Taylor*, 959 F.3d at 1089 (statements from Air Force to FAA insufficient

basis for taking because they had no legal effect).

　　　　With respect to the FCC proceedings specifically, as previously stated, Ligado cannot

circumvent the comprehensive scheme required by the Communications Act, whose provisions

would inhere in the title to its license (even assuming the license could otherwise constitute a

cognizable property interest).  Regardless, the FCC quickly denied NTIA's petition for a stay,

Compl. ¶ 80, and so the Government's FCC filings have not legally prevented Ligado from

physically operating in its spectrum.  Indeed, Ligado itself alleges that the April 2020 Order is a

final order, thus undermining any contention that the Government's FCC filings somehow

preclude Ligado's use of its spectrum.  *See* 47 U.S.C. § 405(a) (providing that a petition for

reconsideration does not "excuse any person from complying with or obeying" any FCC order or

postpone the enforcement of such an order).

## D.  Ligado Fails To State A Claim For A Categorical Regulatory Taking

　　　　In Count Two, Ligado alleges that DoD and Commerce have engaged in a categorical or

*per se* regulatory taking of its property.  *See* Compl. ¶ 144 (citing *Lucas v. South Carolina*

*Coastal Council*, 505 U.S. 1003, 1019 (1992)).  The complaint alleges that the agencies have

"totally deprived" Ligado of use of its property rights by, among other things, threatening

Ligado's business partners, failing to engage in the regulatory process, failing to implement the

provisions of the FCC April 2020 Order, persuading Congress to pass legislation targeting

Ligado, and publishing incomplete and misleading information suggesting that Ligado's network

deployment would cause harmful interference.  *See* Compl. ¶ 145.

As an initial matter, both of Ligado's regulatory takings claims (Counts Two and Three)

fail because they are improperly predicated on "the confluence of . . . separate government

actions," *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1341 (Fed. Cir. 2018).

The Federal Circuit has consistently held that the Court must isolate distinct Government actions

in evaluating regulatory takings claims.  *See id.*; *Acceptance Ins. Cos., Inc. v. United States*, 583

F.3d 849, 855 (Fed. Cir. 2009); *Branch v. United States*, 69 F.3d 1571, 1575 (Fed. Cir. 1995).

Accordingly, Counts Two and Three are fundamentally deficient because they consist of Ligado

throwing together numerous separate Government actions into a catch-all claim in contravention

of longstanding precedent.  *See Love Terminal Partners*, 889 F.3d at 1341.

Regardless, even setting aside that infirmity, a categorical taking occurs only in the

"extraordinary case" where the regulation permanently deprives property of all its value.  *Tahoe-*

*Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 329-30 (2002); *Bass*

*Enterprises Prod. Co. v. United States,* 381 F.3d 1360, 1364-1365 (Fed. Cir. 2004).  In a few

sentences, Ligado alleges that as of April 22, 2020 (the date of the FCC order), the Government

"eliminated" the value of its terrestrial-use spectrum.  Compl. ¶ 146.  But these allegations fail

for at least two reasons.  First, Ligado attempts to extend the doctrine far beyond what the

Supreme Court has allowed.  Indeed, "[t]he Supreme Court has mainly applied the categorical

test to regulatory takings of real property[.]"  *A & D Auto Sales, Inc. v. United States*, 748 F.3d

1142, 1151 (Fed. Cir. 2014).  In *A & D Auto Sales*, the Federal Circuit noted that it has at times

applied the categorical test to tangible personal property as well.  *Id.*  Here, Ligado attempts to

assert a categorical takings claim over spectrum arising from an FCC license.  Compl. ¶ 145.
Even if it can establish a cognizable property interest, Ligado's categorical takings claim fails
because it possesses, at most, intangible license rights, not real or tangible personal property.

Second, Count Two fails to state a claim because Ligado has not been deprived of "*all*
economically beneficial uses*" of its license.  *Lucas*, 505 U.S. at 1019.  It is well established that
in evaluating a regulatory taking, including under *Lucas*, courts must account for the "parcel as a
whole."  *Tahoe-Sierra*, 535 U.S. at 331 (citation omitted).  Accordingly, courts may not divide a
single parcel of property into individual pieces and then determine whether rights in a single
piece have been destroyed.  *Penn Central*, 438 U.S. at 130.  Instead, courts must examine the
overall effect on the entire piece of property.  *Id*. at 130-31.  Considering the entire property is
critical because a *per se* regulatory taking only occurs when the property owner suffers a total
elimination of the economic value of the property.  *See Tahoe-Sierra*, 535 U.S. at 332.

Ligado's allegations analyze the economic impact of the Government's actions on a
discrete piece of the property: "the licensed spectrum for terrestrial services," and for a limited
period of time.  Compl. ¶ 145.  But the "parcel as a whole" goes beyond terrestrial
communication services and involves the entirety of Ligado's licensed spectrum.  And Ligado
concedes that its license would still have value even if it were unable to use that license for
terrestrial services.  *See, e.g.*, Compl. ¶¶ 31 ("The ATC authority conferred through an FCC
license is a valuable property right that grants the licensee additional rights to use its licensed
spectrum for terrestrial services—*in addition to satellite services*—thereby expanding the
economic potential and exclusivity attendant to such property." (emphasis added)).

Because Ligado does not allege that it has lost all value of its alleged property, it does not
present the "extraordinary case" for a categorical taking.  *Tahoe-Sierra*, 535 U.S. at 332.

**E.**     **<u>Ligado Cannot State A Regulatory Takings Claim Under *Penn Central*</u>**

In Count Three, Ligado alleges that the Government effected a regulatory taking of its licensed spectrum under *Penn Central*.  *See* Compl. ¶¶ 149–53.  In support of this claim, Ligado alleges the same type of action by DoD, Commerce, and NTIA that it does in support of its categorical takings claim, such as interference with Ligado's ability to use spectrum terrestrial services.  *See* Compl. ¶ 151.

Whether a regulatory taking has occurred "depends largely 'upon the particular circumstances [in that] case.'" *Penn Central*, 438 U.S. at 124 (quoting *United States v. Cent. Eureka Mining Co.*, 357 U.S. 155, 168 (1958)).  Pleading a regulatory takings claim requires an examination of "the economic impact of the regulation," "the extent to which the regulation has interfered with distinct investment-backed expectations," and the "character of the governmental action." *Id*. at 124.  Ligado fails to allege facts sufficient to state a regulatory takings claim.

With respect to the first *Penn Central* factor, Ligado has not adequately asserted the required level of economic impact, nor the required nexus to Government action to establish a regulatory taking.  To satisfy this prong, the alleged economic impact must be severe*.  See Lucas*, 505 U.S. at 1019 n.8 ("[I]n at least some cases the landowner with 95% loss will get nothing").  As a general matter, courts measure economic impact by the change in fair market value of the property at issue.  *See, e.g., Forest Props., Inc. v. United States*, 177 F.3d. 1360, 1367 (Fed. Cir. 1999).  And, the economic impact must arise from the challenged Government action.  *See Penn Central*, 438 U.S. at 124; *Taylor*, 959 F.3d at 1087-88.

Here, Ligado has not sufficiently alleged a severe economic impact arising from the Government's purported "interference."  Ligado contends that the Government's actions in opposing its terrestrial use of the spectrum has made it untenable to proceed with such use.  *See*

Compl. ¶ 151.  But as the FCC recognized in its stay-denial order issued nine months after the April 2020 Order, Ligado did not expect to move forward with deployment for another eighteen months.  *See* Stay Order, 2021 WL 8083764 at *1, 4.  Ligado's complaint also fails to allege that it is prepared to move forward with the deployment of its terrestrial network, much less that any failure to do so is attributable to the alleged actions of the United States.

With respect to the second *Penn Central* factor, Ligado has failed to plead that DoD and Commerce have interfered with its reasonable investment-backed expectations.  In determining whether a property owner has established reasonable investment-backed expectations, the Federal Circuit has articulated three criteria: (a) "whether the plaintiff operated in a 'highly regulated industry'"; (b) "whether the plaintiff was aware of the problem that spawned the regulation at the time it purchased the allegedly taken property"; and (c) "whether the plaintiff could have 'reasonably anticipated' the possibility of such regulation in light of the 'regulatory environment' at the time of purchase."  *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1349 (Fed. Cir. 2004) (quoting *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1348 (Fed. Cir. 2001) (en banc)).

The *Appolo* factors, when applied to undisputable facts and the allegations of the complaint, show that Ligado has no plausible claim of a regulatory taking.  First, there can be no reasonable dispute that the telecommunications market is highly regulated; the Communications Act, which was enacted decades before Ligado ever applied for its ATC authorization, sets forth a comprehensive framework for licensing and regulating spectrum, and under the statute, licenses can be rescinded or modified at any time.  47 U.S.C. § 151 *et. seq.*  Second, Ligado's allegations make clear that it was aware of the critical nature of spectrum interference with respect to the deployment of its proposed terrestrial network.  *See* Compl. ¶ 3 (alleging that

"[o]ver the course of nearly two decades, Ligado worked . . . to ensure that Ligado's services would be able to coexist with all other known services operating in nearby spectrum"); *id*. ¶¶ 34-35 (alleging that "[l]ong before the FCC issued its April 2020 Order granting Ligado's Applications to provide terrestrial services in its exclusive program," "Ligado . . . worked with the GPS industry and other interested stakeholders to eliminate any potential for its terrestrial L-Band services to cause harmful interference with GPS receivers").  And third, Ligado could have anticipated that NTIA and DoD would voice their position concerning interference to the FCC, the public, and Congress, given that the agencies had already done so repeatedly, *see* April 2020 Order, 35 FCC Rcd. at 3775-3783, and the statutory and regulatory scheme specifically provides an avenue to seek reconsideration.  Because Ligado knew of DoD's and NTIA's opposition long before it acquired the alleged property interest in the conditional modified license, the third *Appolo* factor shows that the Government did not interfere with its reasonable investment-backed expectations.  *See also Ruckelshaus*, 467 U.S. at 1014 (rejecting takings claim based solely on lack of reasonable investment-backed expectations); *Taylor*, 959 F.3d at 1088 (dismissing takings claim because there can be no reasonable investment-backed expectation to be free from regulatory challenges).

The final *Penn Central* factor, the "character of the government action," also undermines the plausibility of any takings claim.  As the Supreme Court held in *Penn Central*, "[a] 'taking' may more readily be found when the interference with property can be characterized as a physical invasion by government . . . than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good."  438 U.S. at 124 (citation omitted).  In support of its regulatory takings claim, however, Ligado does not allege that NTIA and DoD's participation in the FCC proceedings and their statements to

Congress or the public "physically invade[d] or permanently appropriate[d] any of the assets for

[the government's] own use." *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 225 (1986);

*see* Compl. ¶ 151.  Instead, Ligado's complaint, fundamentally, is that NTIA and DoD exercised

their right as representatives of the public interest to provide their views to the FCC and others

concerning the adverse impact of Ligado's modified license for terrestrial use.  There is no

taking of property where, as here, the Government simply took permissible action to promote the

public interest.  *See Taylor*, 959 F.3d at 1089 (holding that "dissemination of information" is not

a taking because it is "a legitimate agency function, especially in the context of public safety").

### F.    Ligado Fails To State A Claim For A Legislative Taking

Finally, Ligado also fails to state a claim for a legislative taking based on Congress'

enactment of the 2021 NDAA (Count Four).  Compl. ¶¶ 11, 100-102, 154-160.  According to

Ligado, the enactment of the NDAA destroyed the value of its license by interfering with its

relationship with current and potential business partners.  Compl. ¶¶ 101, 104, 158-159.

Ligado acknowledges, Compl. ¶ 156, that its legislative takings claim must be evaluated

under the *Penn Central* factors.  *See Connolly*, 475 U.S. at 224-25 (applying *Penn Central* to

legislative takings claim).  These factors, however, demonstrate that there was no taking.

First, the economic impact factor does not support Ligado's legislative takings claim

because the complaint fails to allege that Ligado's license suffered any market value change as a

result of the NDAA provisions themselves.  *See, e.g., Love Terminal Partners, L.P. v. United

States*, 889 F.3d 1331, 1334 (Fed. Cir. 2018) ("the court must compare the value of the property

immediately before the governmental action that is alleged to cause the taking with the value of

the same property immediately after that governmental action").  Further, any allegations of

economic impact ring hollow given that the FCC stay-denial order recognized that Ligado was

not ready to move forward with deployment, and Ligado fails to allege that it has taken the necessary steps to deploy a terrestrial network.  *See* Stay Order, 2021 WL 8083764 at *4.

Second, Ligado cannot plausibly plead it had reasonable investment-backed expectations that Congress would not step in to address the national security concerns created by the April 2020 Order.  Turning again to the *Appolo* factors, with respect to the first factor, Ligado voluntarily participated in the telecommunications industry, a field Congress has long heavily regulated under the Communications Act.  And even setting aside the Communications Act, Congress has long regulated interference with GPS.  *See* 10 U.S.C. § 2281.  Having chosen to operate in such highly regulated fields, Ligado cannot claim an unlawful taking when Congress amended the law to address perceived gaps in the governing legislative scheme.  *See Connolly*, 475 U.S. at 226-27.

Ligado fares no better under the second *Appolo* factor because it was abundantly aware of the GPS-interference problem at the time of the license, as demonstrated by the undisputable facts identified above, including the proceedings before the FCC going back over a decade where concerns of interference with GPS were repeatedly raised.  *See* April 2020 Order, 35 FCC Rcd. at 3775-3783.

The final *Appolo* factor confirms that Ligado cannot plausibly plead interference with reasonable investment-backed expectations because Ligado "could have 'reasonably anticipated' the possibility of such regulation in light of the 'regulatory environment'" at the time of acquisition.  *Appolo*, 381 F.3d at 1349.  For an alleged legislative taking, the key consideration is whether a reasonable person in the relevant regulatory environment would have expected that Congress might change the law.  *Cienega Gardens v. United States*, 503 F.3d 1266, 1288 (Fed. Cir. 2007).  "No person has a vested interest in any rule of law entitling him to insist that it shall

remain unchanged for his benefit." *New York Cent. R.R. v. White*, 243 U.S. 188, 198 (1917); *see Branch v. United States*, 69 F.3d 1571, 1577-78 (Fed. Cir. 1995).

Here, the public record makes clear that Ligado could easily have anticipated in April 2020 that Congress, the ultimate overseer of both the Communications Act and GPS, might step in to ensure that an FCC license was not damaging national security by interfering with critical GPS functions. *See Commonwealth Edison*, 271 F.3d at 1348-57 (ruling by *en banc* Federal Circuit affirming dismissal of takings claim because existing legal regime revealed a lack of reasonable expectations). Indeed, Congress has long made clear that spectrum is an asset that belongs to the public and not one company or individual, and that Federal authority to ensure that spectrum is deployed in the public interest is expansive. *See In re NextWave Personal Comms.*, 200 F.3d 43, 51 (2d Cir. 1999). It therefore strains credulity for Ligado to assert that it could not reasonably anticipate that Congress might step in to address any spectrum licensing decision that could undermine national security, and that it might impose additional conditions on that license. *See Appolo*, 381 F.3d at 1349; *see also Aviation & General Ins. Co., Ltd. v. United States*, 882 F.3d 1088, 1098 (Fed. Cir. 2018) ("Surely, if Congress giveth, so too can it taketh away."). This is especially the case given that the 2021 NDAA provisions were limited, and did not include an outright revocation of Ligado's license, but rather were designed to gather information concerning harmful interference and otherwise ensure that national security interests were protected. *See* 2021 NDAA §§ 1661-1664.

Third, the character of the Government's actions, which is "critical in takings analysis," *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 488 (1987), precludes a finding of a compensable legislative taking. The Supreme Court recognized long ago that "all property in this country is held under the implied obligation that the owner's use of it shall not be

43

injurious to the community," *id.* at 491-92 (quoting *Mugler v. Kansas*, 123 U.S. 623, 665

(1887)), and "the Takings Clause did not transform that principle to one that requires

compensation whenever the [Government] asserts its power to enforce it," *id.* at 492.  This

principle applies with particular force in the national-security context.  For instance, in

*Paradissiotis v. United States*, 304 F.3d 1271, 1274-76 (Fed. Cir. 2002), the Federal Circuit

rejected a takings claim where the Government froze certain assets including stock options,

resulting in severe economic loss to the plaintiff.  The Court explained that on "several

occasions" it has rejected "takings claims raised by persons or entities that have been adversely

affected by actions taken for national security reasons."  *Id*. at 1274.  This was because "valid

regulatory measures taken to serve substantial national security interests may adversely affect

individual contract-based interests and expectations, but those effects have not been recognized

as compensable takings for Fifth Amendment purposes."  *Id*. at 1275.

There can be no reasonable dispute in this case that Congress enacted the 2021 NDAA to

address national security concerns presented by the April 2020 Order.  The plain text of the

NDAA firmly establishes that Congress enacted the provisions at issue to address the potential

harmful interference to GPS on DoD operations caused by Ligado's terrestrial use of its license.

*See* 2021 NDAA § 1662 (prescribing that DoD may not enter into certain contracts "unless the

Secretary has certified to the congressional defense committees that such operations do not cause

harmful interference to a [GPS] device of the Department of Defense"); *see also* 10 U.S.C. §

2281 (providing that the Secretary of Defense "shall provide for the sustainment of the

capabilities of the [GPS], and the operation of basic GPS services, that are beneficial for the

national security interests of the United States").  Congress' actions following the April 2020

Order only reinforce the conclusion that Congress sought to protect national security in enacting

the relevant NDAA provisions.  Shortly after the April 2020 Order, Congress held a hearing in which military officials consistently testified about the drastic potential effects to GPS that would arise if Ligado were permitted to proceed.  Later, in May 2020, Senator James Inhofe provided a detailed explanation of the harms to national security posed by Ligado's terrestrial use of its license—concerns which later were reflected in the 2021 NDAA.  He stated that DoD relies "on GPS for navigation, logistics, and precision-guided missiles in training and on the battlefield," and that the FCC "has put all of this at risk by approving Ligado's application." 166 Cong. Rec. S2365, S2369-2370 (May 12, 2020); *see* 166 Cong. Rec. at S2369.

Congress enacted the 2021 NDAA provisions at issue to "serve substantial national security interests." *Paradissiotis*, 304 F.3d at 1275.  Thus, the character of the government action weighs against finding a taking even if the Court were to assume that Ligado's interests were "adversely affected." *Id*.  A contrary conclusion would dramatically undermine Congress's ability to address national security issues arising from the highly regulated FCC licensing process.

**<u>CONCLUSION</u>**

For these reasons, we respectfully request that the Court dismiss Ligado's complaint for lack of subject-matter jurisdiction, or, alternatively, for failure to state a claim.

45

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

s/L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

s/Nathanael B. Yale
NATHANAEL B. YALE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0464

BORISLAV KUSHNIR
Senior Trial Counsel

PATRICK ANGULO
KYLE BECKRICH
Trial Attorneys

January 25, 2024                    *Attorneys for Defendant*