**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

LIGADO NETWORKS LLC,

       Plaintiff,

      v.

UNITED STATES OF AMERICA; DE-
PARTMENT OF DEFENSE;  DEPART-
MENT OF COMMERCE; and NATIONAL
TELECOMMUNICATIONS AND INFOR-
MATION ADMINISTRATION,

       Defendants.

Case No. 23-1797 L

Senior Judge Damich

Oral Argument Requested

**PLAINTIFF LIGADO NETWORKS LLC'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT UNITED STATES OF AMERICA'S
<u>MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

STATEMENT OF FACTS ..................................................................................................... 2

    A.    With the FCC's Encouragement, in 2003, Ligado Began Investing
          Significant Resources to Obtain a License and Develop Terrestrial 5G
          Services. ............................................................................................................... 4

    B.    In 2018, DOD Changed Positions and Adopted a Strategy of Deceit and
          Misinformation to Torpedo Ligado's License Application. ................................. 5

    C.    Once the FCC Granted Ligado's Application, DOD and DOC Sought to
          Destroy Ligado by Preventing It From Using Its Exclusively Licensed
          Spectrum. ............................................................................................................. 6

    D.    DOD Hid Its Use of Ligado's Exclusively Licensed Spectrum. ........................... 7

    E.    At DOD's Behest, Congress Passed the NDAA, Which Prohibits Ligado
          From Utilizing Its ATC Authority, Allowing DOD to Utilize Ligado's
          Spectrum. ............................................................................................................. 8

    F.    Ligado Has Made Significant Investments to Utilize its ATC Authority
          and Done Everything It Can Under the FCC Order to Begin to Utilize Its
          License. ............................................................................................................... 10

ARGUMENT ........................................................................................................................ 11

    A.    The Communications Act Does Not Preempt Ligado's Claims. .......................... 11

    B.    ATC Authority Granted By An FCC License Is Property Subject to a
          Takings Claim. ................................................................................................... 14

    C.    The Complaint Adequately Alleges Four Different Types of Takings................. 23

          i.    The Government's Use of Ligado's Property Constitutes a Physical
                Taking. ..................................................................................................... 23

          ii.    The Complaint Alleges That the Government's Actions Have
                Resulted in a Categorical Taking, or in the Alternative, a
                Regulatory Taking ................................................................................... 27

                (a)    DOD's refusal to implement the Order effected a
                        categorical or regulatory taking. ................................................. 27

                (b)    The complaint sufficiently alleges a categorical taking............. 29

                (c)    The complaint adequately alleges a regulatory taking............... 32

           iii.    The Restrictions Imposed by the NDAA Effected a Legislative
                Taking ..................................................................................................... 39

    D.    The Challenged Conduct Is Attributable to the Government for the
          Purposes of a Takings Claim and Is Not an Ultra Vires Action ......................... 43

CONCLUSION..................................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*767 Third Ave. Associates* v. *United States*,
   48 F.3d 1575 (Fed. Cir. 1995)......................................................................................38

*A & D Auto Sales, Inc.* v. *United States*,
   748 F.3d 1142 (Fed. Cir. 2014)...............................................................................30, 34

*Acceptance Ins. Cos., Inc.* v. *United States*,
   583 F.3d 849 (Fed. Cir. 2009)..................................................................................28, 29

*Affiliated Ute Citizens of State of Utah* v. *United States*,
   199 Ct. Cl. 1004 (1972) .................................................................................................25

*Alpine PCS, Inc.* v. *United States*,
   878 F.3d 1086 (Fed. Cir. 2018)..................................................................11, 12, 17, 18

*Am. Libr. Ass'n* v. *FCC*,
   406 F.3d 689 (D.C. Cir. 2005) .......................................................................................12

*Am. Pelagic Fishing Co.* v. *United States*,
   379 F.3d 1363 (Fed. Cir. 2004)...............................................................................33, 37

*Appolo Fuels, Inc.* v. *United States*,
   381 F.3d 1338 (Fed. Cir. 2004)...............................................................................35, 36

*In re Atlantic Business and Community Development Corp.*,
   994 F.2d at 1075 .............................................................................................17, 18, 21

*Aviation & Gen. Ins. Co., Ltd.* v. *United States*,
   882 F.3d 1088 (Fed. Cir. 2018).....................................................................................38

*Board Mach., Inc.* v. *United States*,
   49 Fed. Cl. 325 (2001) (J. Damich) .........................................................................43, 44

*Board of Regents* v. *Roth*,
   408 U.S. 564 (1972)........................................................................................................21

*United States* v. *Bormes*,
   568 U.S. 6 (2012).............................................................................................................11

*Brown* v. *United States*,
   105 F.3d 621 (Fed. Cir. 1997).........................................................................................3

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Cedar Point Nursery* v. *Hassid*,
141 S. Ct. 2063 (2021) ................................................................................23, 27

*Celgene Corp.* v. *Peter*,
931 F.3d 1342 (Fed. Cir. 2019) ...........................................................................18

*Cienega Gardens* v. *United States*,
331 F.3d 1319 (Fed. Cir. 2003) ..................................................23, 30, 33, 38, 39, 43

*Club Misty, Inc.* v. *Laski*,
208 F.3d 615 (7th Cir. 2000) ..............................................................................14

*Conti* v. *United States*,
291 F.3d 1334 (Fed. Cir. 2002) ...........................................................................19

*Creppel* v. *United States*,
41 F.3d 627 (Fed. Cir. 1994) ..............................................................................35

*United States* v. *Cress*,
243 U.S. 316 (1917) .........................................................................................24

*Darby Dev. Co.* v. *United States*,
160 Fed. Cl. 45 (2022) ......................................................................................44

*Del-Rio Drilling Programs, Inc.* v. *United States*,
146 F.3d 1358 (Fed. Cir. 1998) .................................................................13, 43, 44

*Dist. Intown Properties Ltd. P'ship* v. *D.C.*,
198 F.3d 874 (D.C. Cir. 1999) ............................................................................31

*Dugan* v. *Rank*,
372 U.S. 609 (1963) .........................................................................................25

*Fisher* v. *United States*,
148 Fed. Cl. 478 (2020) ....................................................................................41

*Fishermen's Finest, Inc.* v. *United States*,
59 F.4th 1269 (Fed. Cir. 2023) ...........................................................................19

*Folden* v. *United States*,
379 F.3d 1344 (Fed. Cir. 2004) ...........................................................................12

*Forest Properties, Inc.* v. *United States*,
177 F.3d 1360 (Fed. Cir. 1999) .......................................................................31, 32

iii

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*United States* v. *Fuller*,
    409 U.S. 488 (1973).................................................................................................19

*United States* v. *General Motors*,
    323 U.S. 373 (1945).................................................................................................15

*Hearts Bluff Game Ranch, Inc.* v. *United States*,
    669 F.3d 1326 (Fed. Cir. 2012)...............................................................................14

*Home Box Off., Inc.* v. *FCC*,
    567 F.2d 9 (D.C. Cir. 1977).....................................................................................26

*Horne* v. *Dep't of Agriculture*,
    576 U.S. 350 (2015)...........................................................................................16, 19

*In re Lightsquared, Inc.*,
    No. 12-12080 (Bankr. S.D.N.Y. Mar. 24, 2014), ECF No. 1449 ............................33

*Loretto* v. *Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982).................................................................................................24

*Loveladies Harbor, Inc.* v. *United States*,
    28 F.3d 1171 (Fed. Cir. 1994).................................................................................31

*Lucas* v. *South Carolina Coastal Council*,
    505 U.S. 1003 (1992)...............................................................................23, 30, 39, 40

*Maritrans, Inc.* v. *United States*,
    342 F.3d 1344 (Fed. Cir. 2003).........................................................................38, 39

*Members of Peanut Quota Holders Ass'n, Inc.* v. *United States*,
    421 F.3d 1323 (Fed. Cir. 2005).......................................................................15, 16, 17

*Mobile Relay Associates* v. *FCC*,
    457 F.3d 1 (D.C. Cir. 2006).....................................................................................20

*Nat'l Broad. Co.* v. *United States*,
    319 U.S. 190 (1943).................................................................................................26

*Nixon* v. *United States*,
    978 F.2d 1269 (D.C. Cir. 1992)...............................................................................31

*Oil States Energy Services, LLC* v. *Greene's Energy Group, LLC*,
    138 S. Ct. 1365 (2018).............................................................................................14

iv

**TABLE OF AUTHORITIES**
**(Continued)**

Page(s)

*Paradissiotis* v. *United States*,
   304 F.3d 1271 (Fed. Cir. 2002).....................................................................................43

*Patlex Corp.* v. *Mossinghoff*,
   758 F.2d 594 (Fed. Cir. 1985).................................................................................16, 18

*Penn Cent. Transp. Co.* v. *City of New York*,
   438 U.S. 104 (1978).......................................................................................................33

*United States* v. *Petty Motor Co.*,
   327 U.S. 372 (1946).......................................................................................................17

*Reoforce, Inc.* v. *United States*,
   853 F.3d 1249 (Fed. Cir. 2017).................................................................................33, 37

*Res. Invs., Inc.* v. *United States*,
   85 Fed. Cl. 447 (Fed. Cl. 2009) ...............................................................................38, 43

*Rose Acre Farms, Inc.* v. *United States*,
   559 F.3d 1260 (Fed. Cir. 2009)...........................................................................30, 33, 38

*Roth* v. *United States*,
   73 Fed. Cl. 144 (2006) ..................................................................................................27

*Ruckelshaus* v. *Monsanto Co.*,
   467 U.S. 986 (1984).......................................................................................................15

*FCC* v. *Sanders Bros. Radio Station*,
   309 U.S. 470 (1940).......................................................................................................20

*Sandwich Isles Comm'n Inc.* v. *United States*,
   992 F.3d 1355 (Fed. Cir. 2021).....................................................................................12

*Schultz* v. *United States*,
   2009 WL 3416453 (Fed. Cl. Oct. 21, 2009) .................................................................26

*Sherman* v. *Town of Chester*,
   752 F.3d 554 (2d Cir. 2014)..........................................................................................29

*United States* v. *Sherwood*,
   312 U.S. 584 (1941).........................................................................................................3

*Sinclair* v. *United States*,
   279 U.S. 749 (1929).......................................................................................................21

**TABLE OF AUTHORITIES**
(Continued)

Page(s)

*St. Bernard Par. Gov't* v. *United States*,
887 F.3d 1354 (Fed. Cir. 2018). Here, the Order...................................................45

*Taylor* v. *United States*,
959 F.3d 1081 (Fed. Cir. 2020)................................................................35, 44

*Thunder Basin Coal Co.* v. *Reich*,
510 U.S. 200 (1994).......................................................................................14

*Tindall* v. *United States*,
167 Fed. Cl. 440 (Fed. Cl. 2023) ..................................................................43

*Todd* v. *United States*,
155 Ct. Cl. 111 (1961) ...................................................................................20

*Todd* v. *United States*,
292 F.2d 841 (Ct. Cl. 1961) ...........................................................................14

*Tyler* v. *Hennepin County, Minn.*,
598 U.S. 631 (2023).......................................................................................14

*United Nuclear Corp.* v. *United States*,
912 F.2d 1432 (Fed. Cir. 1990)....................................................22, 36, 40, 42

*Washoe Cnty., Nev.* v. *United States*,
319 F.3d 1320 (Fed. Cir. 2003).....................................................................25

*Y.H.* v. *E.S.*,
173 N.Y.S.3d 837 (N.Y. Sup. Ct. 2022) .......................................................31

**Statutes**

10 U.S.C. § 2281.............................................................................................42, 45

28 U.S.C. § 1491(a) ...............................................................................................3

35 U.S.C. §§ 307, 318, 328...................................................................................19

43 U.S.C. § 315b (1994) .......................................................................................19

47 U.S.C. § 209......................................................................................................13

47 U.S.C. §§ 303(b)-(c) .........................................................................................41

47 U.S.C. § 310(d) ................................................................................................15

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

47 U.S.C. § 312 ...................................................................................................................17

47 U.S.C. § 312(b) ..............................................................................................................13

47 U.S.C. § 343(a) ..............................................................................................................42

47 U.S.C. § 402(b) ..............................................................................................................11

47 U.S.C. § 405(a) ..........................................................................................................21, 37

National Defense Authorization Act ("NDAA") of 2021, Pub. L. 116-283........................ *passim*

**Other Authorities**

47 C.F.R. §§ 1.9001(b) ........................................................................................................15

47 C.F.R. § 1.9005 ...............................................................................................................15

47 C.F.R. § 1.9020(a) ..........................................................................................................15

47 C.F.R. § 25.121(a)(1) ......................................................................................................16

50 C.F.R. § 635.4(a)(3) ........................................................................................................19

FEDERAL TELECOMMUNICATIONS LAW, § 10.3 ...................................................................16, 17

April 22, 2020 FCC Order ...................................................................................... *passim*

National Academies of Sciences, Engineering, and Medicine 2022, Analysis of
    Potential Interference Issues Related to FCC Order 20-48, at 73,
    https://doi.org/10.17226/26611; .................................................................................26

## PRELIMINARY STATEMENT

Plaintiff Ligado Networks, LLC (Ligado) owns an exclusive nationwide FCC license to provide 5G terrestrial wireless communications on specific spectrum bands covered by the license. The authority conferred on Ligado by that FCC license is worth up to $39 billion dollars. That valuation reflects the intense market demand for additional spectrum to support the explosion of 5G wireless services in this country. In granting the license to Ligado, the FCC specifically identified the important public interest in deploying spectrum to meet that demand.

Ligado has possessed the right to use the licensed spectrum for 5G services (known as Ancillary Terrestrial Component (ATC) authority) since 2020, but the defendants in this case— principally the Department of Defense (DOD), but also the Department of Commerce (DOC)— have prevented Ligado from deploying the spectrum for 5G services. Their ostensible justification is concern over interference with Global Positioning Service (GPS). But that concern is pretextual. DOD and DOC participated in the FCC proceedings that led to the FCC granting Ligado authority to provide terrestrial 5G services, and set forth their purported concerns in painstaking detail. The FCC—the expert governmental agency charged by Congress with making spectrum allocation decisions in the public interest—concluded that those GPS concerns were largely unfounded and could be addressed through simple ameliorative steps taken cooperatively by Ligado and DOD.

The real reason for DOD's effort to thwart Ligado's ability to deploy its spectrum was that DOD itself surreptitiously needed that spectrum to support an undisclosed national security program. Thus, rather than cooperate with Ligado to implement the modest changes needed to allow the spectrum to be used as the FCC ordered, upon the grant of ATC authority DOD and DOC blocked Ligado from realizing its investment-backed expectations in its authority to use the spectrum. In addition to refusing to take the simple steps needed to resolve those modest interference concerns, DOD refused to do business with any companies that choose to partner with

1

Ligado to provide 5G services, and ultimately pushed Congress to enact legislation that gave DOD a chokehold over Ligado's ability to do business—thereby ensuring that DOD could continue to use Ligado's licensed spectrum for its secret program.

Whatever else may be true about DOD's undisclosed national security program, DOD simply does not have the right to commandeer Ligado's immensely valuable property right to use its licensed spectrum for terrestrial 5G services without compensating Ligado for that property. The government's motion to dismiss tries to obscure that straightforward reality in a haze of regulatory complexity. But at its core, this case is straightforward. The government, through the actions of DOD, DOC, and Congress, has appropriated to itself Ligado's exclusive FCC-granted property right to use its licensed spectrum for 5G services—a right of vast economic value—in order to protect its use of that spectrum. That is a classic taking that requires just compensation.

Time is of the essence. Ligado has staked its future on the ability to use its FCC-conferred ATC authority to provide wireless 5G services. Ligado has paid out huge sums, and continues to do so, to prepare for the provision of those services—stretching the company's limited resources to the breaking point. But Defendants have engaged in an orchestrated campaign of obstruction and delay, sabotaging Ligado's efforts to realize the billions of dollars of value of its ATC authority. Those actions have driven the company to the brink of bankruptcy. Ligado therefore respectfully urges this Court to resolve this motion expeditiously.

## STATEMENT OF FACTS

Ligado owns an exclusive nationwide FCC license, worth up to $39 billion, to provide 5G terrestrial communications services using the 1526 to 1536 megahertz ("MHz"), the 1627.5 to 1637.5 MHz, and the 1646.5 to 1656.5 MHz bands of spectrum. Compl. ¶ 13. Defendants are two Executive Branch departments, DOD and DOC, as well as the National Telecommunications and Information Administration (NTIA), an agency that advises the President on telecommunications

and information policy issues, and the United States of America.[1]  Compl. ¶¶ 14-17.

The FCC is not a defendant in this case.  To the contrary, the FCC affirmatively granted to Ligado the exclusive right to deploy terrestrial communications services within a defined portion of the electromagnetic spectrum known as the L-Band.  *Id.* ¶ 32.  Unlike Defendants, the FCC—and the FCC alone—has the statutory authority to allocate bands of electromagnetic frequencies used for wireless communications, license use of those frequencies, and regulate the activities of commercial and government users of those frequencies.  *Id.* ¶ 22.  The FCC is the only federal agency with the power to grant, modify, or revoke a license of commercial spectrum.  *Id.*

Electromagnetic spectrum capacity is finite.  *Id.* ¶ 25.  The L-Band is divided among several constituencies, including, among others, Ligado, Iridium, Globalstar, and a portion which is used by GPS services, as shown in the below chart:

## Figure 1



*Id.*  Since 2003, in order to meet the overwhelming need for new terrestrial spectrum for advanced wireless services, the FCC has pursued a policy to build out America's wireless networks by

---

[1]  In a footnote, the government asserts that DOD, DOC, and NTIA should be "dismissed as parties" because the United States is the "only proper defendant in this Court."  Mot. 16 n.9. There is no statutory basis for the government's position.  The Tucker Act provides for jurisdiction over "any claim against the United States," and DOD, DOC, and NTIA are each federal agencies of the United States.  28 U.S.C. § 1491(a).  The two cases cited by the government stand for the proposition that the Court of Federal Claims has no jurisdiction over claims against private parties or state agencies.  *See United States* v. *Sherwood*, 312 U.S. 584 (1941); *Brown* v. *United States*, 105 F.3d 621 (Fed. Cir. 1997).  Neither applies here.

allocating valuable mid-band spectrum—like Ligado's L-Band spectrum—for 5G and other advanced wireless services. *Id.* ¶¶ 27-29.

> **A.** **With the FCC's Encouragement, in 2003, Ligado Began Investing Significant Resources to Obtain a License and Develop Terrestrial 5G Services.**

Starting in 2003, the FCC invited companies like Ligado, which since 1989 has owned an FCC license to operate a mobile satellite services (MSS) network in the L-Band, to seek complementary ATC authority. *Id.* ¶ 31. Over the ensuing decade, the FCC repeatedly approved Ligado's plans to provide advanced wireless services using its ATC authority, including by approving its applications for license modifications and concluding in an order that Ligado's plans "are a significant public interest benefit, both because of the competition it will bring in mobile wireless broadband services and because it will provide mobile wireless broadband service to traditionally underserved areas." *Id.* ¶ 32.

Throughout the period in which it has held its ATC authority—and particularly after it proposed to begin offering advanced terrestrial wireless services under that authorization in 2010—Ligado worked with GPS device manufacturers and other stakeholders operating in nearby spectrum bands to mitigate potential interference risks. *Id.* ¶ 35. In 2015, Ligado entered into agreements with major GPS device manufacturers and applied to modify its ATC authority to address harmful interference concerns. *Id.* ¶¶ 37-38. In that application, Ligado agreed to forgo providing terrestrial services in a portion of its ATC spectrum to create a buffer that would insulate GPS operators against potential interference. *Id.* ¶ 37. Ligado also proposed restrictions on its planned terrestrial operations, including with respect to emissions, to mitigate interference. *Id.*

As reflected in contemporaneous internal emails, DOD and DOC initially supported Ligado's 2015 application and acknowledged that Ligado's services would not cause harmful interference with GPS systems. *Id.* ¶¶ 39-40. In 2017, the National Advanced Spectrum and

Communications Test Network (NASCTN), a joint initiative of DOD, NTIA, and DOC, published data demonstrating that Ligado's services would ***not*** cause widespread harmful interference to GPS services.  *Id.* ¶ 39.  And NTIA provided a presentation to DOD in August 2017 affirming that same conclusion.  *Id.*  An internal U.S. Air Force email from early 2018 stated that the DOD Chief Information Officer (CIO) supported Ligado's license.  *Id.* ¶ 40.

      **B.**      **In 2018, DOD Changed Positions and Adopted a Strategy of Deceit and Misinformation to Torpedo Ligado's License Application.**

As Ligado approached approval of its FCC applications for ATC authority, DOD and DOC did an about-face—even though *no* facts had changed—and began actively campaigning against Ligado, based on the false pretext that Ligado's services could cause harmful interference with GPS receivers.  *Id.* ¶ 48.  According to a whistleblower letter sent on behalf of a senior career engineer (the Whistleblower) in the office of the DOD CIO tasked with evaluating Ligado's application, during the summer of 2018, DOD officials sidelined experienced DOD employees like the Whistleblower who supported Ligado's application and instead improperly and unlawfully sought to hire unqualified external contractors to evaluate Ligado's application.  *Id.* ¶¶ 49-51. Then, in 2018, DOD sent NTIA a letter claiming that Ligado's proposed ATC services could result in harmful interference with GPS systems.  NTIA also reversed course and joined in DOD's opposition to Ligado's application.  *Id.* ¶ 52.

Industry experts derided DOD's new position as illogical and unsupportable. *Id.* ¶ 54. Then-FCC Chairman Ajit Pai confirmed that DOD's position was inconsistent with FCC standards.  *Id.* ¶ 53.  Navy officials complained that it had "no analytical rigor."  *Id.* ¶ 59.  And the same Whistleblower sent an email to his superiors claiming that DOD's new position "overreaches to the point of falsity" and will be "criticized as disingenuous."  *Id.* ¶ 56.

**C.      Once the FCC Granted Ligado's Application, DOD and DOC Sought to Destroy Ligado by Preventing It From Using Its Exclusively Licensed Spectrum.**

In spite of DOD, DOC, and NTIA's lobbying efforts, in April 2020, the FCC unanimously rejected the agencies' unsupported claims of GPS interference and granted Ligado's application to provide ATC services within the restrictive operational parameters Ligado had proposed, concluding that it was "in the public interest to do so." *Id.* ¶¶ 63-64. The 74-page April 2020 Order (the Order or FCC Order) contained detailed rebuttals of DOD and DOC's harmful-interference assertions, and criticized DOD and DOC's evidence as "inconsistent with established spectrum management policies," "imprecise," and "inapplicable." *Id.* ¶ 67. To address specific circumstances in which devices "could be affected" by Ligado's terrestrial operations, the Order directed Ligado to work with government agencies to "develop[] a program to repair or replace" affected devices. *Id.* ¶ 68.

Instead of facilitating Ligado's use of its spectrum, DOD and DOC took that exclusively licensed spectrum for itself by blocking Ligado from using its ATC authority. DOD and DOC did so by refusing to implement the order beginning in April 2020. *Id.* ¶ 74. DOD and DOC instructed U.S. government agencies not to work with Ligado or share any information to permit Ligado to develop the "repair or replace" program, thereby stymying Ligado's ability to take the needed steps to repair or replace potentially affected devices. *Id.* ¶¶ 67-68. Ligado sent letters to 15 government agencies to initiate information sharing, as required by the Order, and establish the repair and replace program. *Id.* ¶ 78. At DOD's behest, no agency cooperated with Ligado. *Id.* Indeed, the only agency to respond to a second Ligado letter told Ligado that other agencies would not cooperate with Ligado due to pressure and opposition from DOD and DOC. *Id.* ¶ 82. Officials from other federal agencies that operate programs reliant on GPS technology have told Ligado that DOD and DOC instructed them to withhold cooperation with Ligado—even though those officials

6

thought that DOD and DOC's purported concerns were meritless.  *Id.* ¶ 84.  As a result of DOD's and DOC's refusal to implement the Order, Ligado has been unable to commence the ATC services authorized by the Order.  *Id.* ¶ 85.

      **D.**    **DOD Hid Its Use of Ligado's Exclusively Licensed Spectrum.**

DOD's actions were designed to cover up DOD's continued and secret use of Ligado's exclusively licensed spectrum for other purposes.  *Id.* ¶ 2.  After the FCC approved Ligado's use of its ATC authority, DOD and NTIA disclosed to the FCC that DOD was using and continues to use Ligado's exclusively licensed spectrum for its own secret purposes.  *Id.* ¶ 41.  Multiple senior government officials confirmed to Ligado that DOD needs ***all*** of Ligado's spectrum authorized for ATC services, both exclusively and permanently, for those secret purposes.  *Id.* ¶ 42.

DOD's continued use of Ligado's exclusively licensed spectrum has been further confirmed in DOD reports and letters from Congress.  *Id.* ¶¶ 43-44.  In August 2022, Senators Roger Wicker and Mark Warner wrote to DOD and NTIA, stating that they had recently learned that DOD had concerns with Ligado's ATC services—concerns related to DOD's allegedly "classified systems" that were ***not*** disclosed to the FCC.  *Id.* ¶ 44.  One month later, the National Academies of Sciences, Engineering, and Medicine (the National Academies) released a report disclosing that Ligado's ability to provide terrestrial services in its exclusively licensed spectrum could not coexist with various "DoD missions" including DOD satellite systems "aside from GPS."  *Id.* ¶ 45.  The statements in the National Academies report were "consistent with public statements made by high-ranking DOD personnel in testimony before the Senate Armed Services Committee in May 2020—after the FCC had granted Ligado's Applications for modified ATC authority."  *Id.* ¶ 46.

DOD even alluded to its use of Ligado's exclusively licensed spectrum at a Senate hearing before the Senate Armed Services Commission.  Now-retired Air Force Space Command General

John Raymond testified that "we"—referring to the DOD—"have to be able to operate *in that spectrum* . . . [A]nd it is absolutely critical to our joint force." *Id.* ¶ 43 (emphasis added). General Raymond confirmed that his concerns regarding Ligado's use of its spectrum were "*not just GPS. It is commercial communications satellites and other types of satellites that bring signals down.*" *Id.* (emphasis added). And Under Secretary of Defense Michael Griffin testified that part of the reason DOD advocated to keep Ligado out of the entire L-Band was for reasons unrelated to potential harmful interference with GPS systems. *Id.*

Those letters, reports, and statements lay bare the true motivations behind DOD, DOC, and NTIA's pretextual opposition to Ligado's use of its ATC authority:  DOD's systems have continuously used Ligado's exclusively authorized spectrum since at least April 22, 2020, the date of the FCC Order. *Id.* ¶ 47. DOD is using Ligado's exclusively licensed spectrum, either by transmitting or receiving signals in Ligado's licensed spectrum that prevent Ligado from doing so or by rendering Ligado's licensed spectrum a "dead zone" for terrestrial services so that DOD can receive signals from its undisclosed "missions" without interference with Ligado's services. *Id.* ¶¶ 45-47.

> **E.**   **At DOD's Behest, Congress Passed the NDAA, Which Prohibits Ligado From Utilizing Its ATC Authority, Allowing DOD to Utilize Ligado's Spectrum.**

DOD pushed Congress to pass legislation to help DOD frustrate Ligado's ability to provide ATC services. At a May 6, 2020 hearing before the Senate Armed Services Committee, DOD officials presented misleading information about Ligado's ATC services. *Id.* ¶¶ 88-90. DOD even launched a public website that falsely claimed that Ligado's ATC services would harm both military and civilian GPS users. *Id.* ¶¶ 93-94. DOD had no factual basis for those statements, which the FCC had considered and rejected when it gave Ligado ATC authority. *Id.* ¶¶ 63-66.

DOD, DOC, and NTIA's misinformation campaign culminated in Congress's passage of

the National Defense Authorization Act ("NDAA") of 2021. *Id.* ¶¶ 96-100. The NDAA makes it impossible for Ligado to use the ATC authority conferred by the FCC license without DOD's sign-off—effectively blocking Ligado from using its ATC authority. *Id.* ¶ 100.

First, Section 1662 bars any company that works with Ligado from obtaining government contracts with DOD. Section 1662 states:

> the Secretary of Defense may not enter into a contract, or extend or renew a contract, with an entity that engages in commercial terrestrial operations using the 1525-1559 megahertz band or the 1626.5-1660.5 megahertz band unless the Secretary has certified to the congressional defense committees that such operations do not cause harmful interference to a Global Positioning System device of the Department of Defense.

Pub. L. 116-283 § 1662. That section specifically targets Ligado, as it is the only company authorized to engage in commercial terrestrial operations in that spectrum. Compl. ¶ 101. As *Forbes* explained at the time, "any company that uses Ligado's network is not permitted to have a contract with [DOD], a substantial disincentive to doing business with Ligado." *Id.* ¶ 102.

Three additional provisions of the NDAA similarly constitute a taking of Ligado's exclusive authority. *Id.* ¶ 105. Section 1662 prohibits DOD from using appropriated funds "to retrofit any [GPS] device or system, or network that uses the [GPS] in order to mitigate interference from commercial terrestrial operations" in Ligado's spectrum. *Id.* Section 1663 mandates that DOD engage the National Academies to investigate claims of harmful interference within 30 days of the enactment of the NDAA and return a report 270 days after that. *Id.* ¶ 110. And Section 1664 prevents the Secretary of Defense from using funds to comply with the April 2020 Order until the Secretary of Defense "submits to the congressional defense committees an estimate of the extent of covered costs and the range of eligible reimbursable costs associated with harmful interference" to DOD's GPS receivers. *Id.*

Pursuant to the NDAA's purpose of blocking Ligado from using its exclusively licensed

ATC authority, DOD has refused to certify that Ligado's services would not result in harmful interference with GPS systems under Section 1662, even though the available data from NASCTN and the National Academies report, as well as the FCC's Order itself, all establish that Ligado's proposed ATC services do not cause harmful interference with the vast majority of GPS systems.[2] Nor has DOD taken steps towards making the required certification. *Id.* ¶ 109.  DOD has refused to certify estimates to replace potentially affected GPS devices under Section 1664. *Id.* ¶ 110.

Congress's passage of the NDAA, against the backdrop of DOD's opposition to Ligado's services, has been a death knell for Ligado's ability to deploy ATC services in its exclusively licensed spectrum, and threatens the company's ability to continue to do business. *Id.* ¶ 159.  In 2021 and 2022, Ligado engaged two investment bankers to pursue a strategic outreach process with companies that could utilize Ligado's spectrum. *Id.* ¶ 104.  Every one of those potential partners expressed concerns about the NDAA's impact on their ability to work with Ligado. *Id.*

**F.   Ligado Has Made Significant Investments to Utilize its ATC Authority and Done Everything It Can Under the FCC Order to Begin to Utilize Its License.**

Since the FCC Order, Ligado vigorously and diligently prepared to utilize its FCC license to provide ATC services. *Id.* ¶ 115.  Ligado has invested substantial time, energy, and capital on projects to standardize the L-Band, to invest in the L-Band ecosystem, develop technology, and to create 5G base stations and mobile chipsets compatible with its authorized spectrum. *Id.* ¶¶ 115-118.  Further, in reliance on the Order, Ligado raised approximately $4 billion in additional capital and converted $6 billion of debt to equity to build out its spectrum. *Id.* ¶ 4.

As a result of DOD's physical use of and dependence on Ligado's spectrum, DOD and

---

[2] As the government admits, the National Academies report concluded that "most commercially produced GPS receivers will not experience significant harmful interference from Ligado's" proposed ATC services.  Mot. 12.

DOC's refusal to implement the Order, and Congress's passage of the NDAA's anti-Ligado pro-visions, Ligado cannot realize the reasonable investment-backed expectations in its ability to use its ATC authority to provide terrestrial services in its exclusively licensed spectrum.  *Id.* ¶ 114.

## ARGUMENT

### A.    The Communications Act Does Not Preempt Ligado's Claims.

Contrary to the government's argument, the Communications Act does not exclude relief under the Tucker Act because the Communications Act provides no remedy for Ligado's constitutional takings claims.  The government invokes the principle, articulated by the Supreme Court in *United States* v. *Bormes*, 568 U.S. 6, 13 (2012), that "statutory schemes with their own remedial framework exclude alternative relief under the general terms of the Tucker Act."  *Id.*  But that principle applies only where the alternative statutory scheme affords a remedy for the cause of action alleged in the Complaint—and the Communications Act does not do so.

In particular, there is no merit to the government's assertion that Ligado can seek relief from the FCC through Section 402 of the Communications Act to modify its license.  That provision simply does not apply to Ligado's lawsuit.  Section 402 provides that appeals "may be taken from decisions and orders of the Commission to the United States Court of Appeals for the District of Columbia" in 10 specifically enumerated situations.  47 U.S.C. § 402(b).  Those situations comprise decisions by the FCC to grant, renew, transfer, revoke, or modify a permit or license.  But Ligado is not appealing any "decisions [or] orders" of the Commissions, much less one to grant, renew, transfer, revoke, or modify a license.

The FCC cannot grant the relief Ligado seeks because Ligado challenges conduct by DOD, DOC, NTIA, and Congress, not the FCC.  In the three cases cited by the government in which the Federal Circuit has found Section 402 preemption, the Tucker Act claim challenged actions *by the FCC*.  *See, e.g.*, *Alpine PCS, Inc.* v. *United States*, 878 F.3d 1086 (Fed. Cir. 2018) (holding that

claims related to the FCC's decision to revoke a spectrum license were preempted by the Communications Act); *Sandwich Isles Comm'n Inc.* v. *United States*, 992 F.3d 1355 (Fed. Cir. 2021) (same regarding challenge to claim based on amount of subsidy funding licensee received from FCC-administered funds); *Folden* v. *United States*, 379 F.3d 1344 (Fed. Cir. 2004) (same, regarding a challenge to the award of a license). *Alpine* is particularly instructive. There, the Federal Circuit observed that claims related to a decision to revoke a spectrum license were preempted because "the FCC had the power to grant [the plaintiff] relief, by eliminating the taking, providing compensation, or some combination." *Alpine PCS*, 878 F.3d at 1096. Here, the FCC has no power to eliminate a taking that it did not commit.

Citing *Sandwich Isles,* the government asserts that where "'the FCC is in the position to prevent an alleged taking in the course of its own proceedings, the agency must be made aware of any such claim,' which is 'then subsumed into the agency's final decision and can be appealed only to the court of appeals.'" Mot. 16 (citing *Sandwich Isles*, 992 F.3d at 1365 n.4). But in the immediately preceding sentence, the Federal Circuit made clear that "[a]s we explained in *Alpine*, we do not imply that all constitutional challenges to the FCC's actions must be presented to the FCC before they can be asserted." *Sandwich Isles*, 992 F.3d at 1365 n.4. *Sandwich Isles* thus applies only to limited circumstances that specifically involve a "constitutional challenge[] *to the FCC's actions*." *Id.* (emphasis added).

The government argues that Ligado may present its takings claims against DOD, DOC, and NTIA to the FCC or ask the FCC to modify its order to "remove all of the unmet conditions precedent" in the FCC's Order. Mot. 16-17. But the government cites no authority for that proposition. As an administrative agency, the FCC's authority is circumscribed by the Communications Act. *See Am. Libr. Ass'n* v. *FCC*, 406 F.3d 689, 698 (D.C. Cir. 2005). Ligado

does not seek to modify or remove any conditions of the Order.  Rather, Ligado seeks damages against the government—but the FCC's authority to award damages is limited in the statute to awards against common carriers in specific circumstances, *see* 47 U.S.C. § 209, and it has no free-floating authority to award compensation against the federal government for a takings claim.[3]

Regardless, the Federal Circuit rejected the government's argument in *Del-Rio Drilling Programs, Inc.* v. *United States*, 146 F.3d 1358 (Fed. Cir. 1998).  There, the government had ceded the surface rights of a tract to an American Indian tribe but retained the mineral rights.  The Bureau of Land Management (BLM) subsequently leased the mineral rights to Del-Rio, subject to the condition that Del-Rio obtain a right-of-way from the tribe before mining the land.  After several years of mining, the tribe withdrew the necessary right-of-way, ultimately leading to the lapse of Del-Rio's leases due to disuse.  Del-Rio then brought a Tucker Act takings claim against the United States.  Rejecting the argument that the government makes here, the Federal Circuit held that "[i]f the government appropriates property without paying just compensation, a plaintiff may sue in the Court of Federal Claims on a takings claim regardless of whether the government's conduct leading to the taking was wrongful, and regardless of whether the plaintiff could have challenged the government's conduct as wrongful in another forum." *Id.* at 1363.  Del-Rio thus did not have to petition BLM to remove its lease conditions or seek review of those lease conditions before suing under the Tucker Act.  This case is no different.

Finally, the Communications Act cannot preempt Ligado's claim that the NDAA constitutes a legislative taking or that DOD's conduct under the NDAA constitutes a regulatory taking.  "Adjudication of the constitutionality of congressional enactments has generally been

---

[3] Nor can the FCC issue a cease-and-desist order against the government.  47 U.S.C. § 312(b); *id.* § 153(3).

thought beyond the jurisdiction of administrative agencies." *Thunder Basin Coal Co.* v. *Reich*, 510 U.S. 200, 215 (1994) (citation and alterations omitted).

    **B.**    **ATC Authority Granted By An FCC License Is Property Subject to a Takings Claim.**

Ligado's exclusive authority to use its spectrum to deploy terrestrial services is a property interest protected by the Fifth Amendment.  In arguing otherwise, the government focuses myopically on the fact that the FCC may revoke the license in narrow circumstances—but it is well-established that a revocable government-granted license may constitute property, if it bears the critical indicia of a property right.  Ligado's ATC authority does.  Ligado's authority to use its portion of the spectrum for ATC services is exclusive, transferable, and will persist for a definite term.  And contrary to the government's argument, "unfulfilled conditions precedent," Mot. 28, have not prevented Ligado's property right from vesting; to the contrary, the Order granted Ligado immediate authority to use the spectrum, subject to ongoing operational conditions concerning collaboration with the government.

1. The existence of a protectable property interest is determined by the statutory framework that creates the interest, as well as "existing rules or understandings" derived from state, federal, or common law.  *Tyler* v. *Hennepin County, Minn.*, 598 U.S. 631, 638 (2023).  It is well established that government grants such as patents and licenses can be property protected by the Fifth Amendment.  *See Oil States Energy Services, LLC* v. *Greene's Energy Group, LLC*, 138 S. Ct. 1365, 1375 (2018) (patents); *Todd* v. *United States*, 292 F.2d 841, 845 (Ct. Cl. 1961) (fishing license); *Club Misty, Inc.* v. *Laski*, 208 F.3d 615, 618-19 (7th Cir. 2000) (liquor license).

Whether a compensable property interest exists turns on whether the interest has "crucial indicia of a property right."  *Hearts Bluff Game Ranch, Inc.* v. *United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012).  Those indicia include the right to use the interest; the right to exclude others

from the interest; and the ability to dispose of the interest through sale, assignment, or other transfer. *See id.*; *United States* v. *General Motors*, 323 U.S. 373, 377-78 (1945); *see also Ruckelshaus* v. *Monsanto Co*., 467 U.S. 986, 1002-03 (1984). Synthesizing the precedents concerning government-granted rights such as licenses, the Federal Circuit has emphasized that "a compensable interest is indicated by the absence of express statutory language precluding the formation of a property right in combination with the presence of the right to transfer and the right to exclude." *Members of Peanut Quota Holders Ass'n, Inc.* v. *United States*, 421 F.3d 1323, 1331 (Fed. Cir. 2005). Each of those factors confirms that Ligado's authority to provide ATC services is a property right protected by the Takings Clause.

2. First and foremost, Ligado's ATC authority gives it the right to exclude others from using its allotted spectrum for ATC services. Under Section 301 of the Communications Act, an entity may use part of the "channels of radio transmission" *only* pursuant to a license granted by the FCC. 47 U.S.C. § 301. Ligado holds such a license—making it the *sole* licensee nationwide that enjoys authority to operate in the relevant spectrum. Compl. ¶¶ 23, 63. Ligado therefore has the exclusive right to operate in the spectrum, and it can exclude others from doing so. *Id.* The right to exclude others is "generally one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Ruckelshaus*, 467 U.S. at 1011 (quotation marks omitted).

Second, Ligado can transfer its ATC authority. The regulatory scheme permits Ligado to assign, lease, transfer, or otherwise dispose of the rights conferred by the license, i.e., Ligado's exclusive right to use the spectrum. Compl. ¶ 138; *see* 47 U.S.C. § 310(d); 47 C.F.R. §§ 1.9001(b); § 1.9005. Ligado may transfer its spectrum interest with Commission approval, and it may lease its spectrum without prior approval (after giving notice). 47 C.F.R. § 1.9020(a). The Federal Circuit has viewed similar alienability rights as evidence of a compensable property interest;

15

contrary to the government's argument (Mot. 24), even a *restricted* alienability right is evidence of a cognizable property interest.  *See Members of Peanut Quota Holders Ass'n*, 421 F.3d at 1332 ("the mere fact that transfers of [the interest] are not unrestricted does not undermine the importance of transferability"); *accord In re Atl. Bus. & Cmty. Dev. Corp.*, 994 F.2d 1069, 1073 (3d Cir. 1993) (holding that FCC spectrum license constituted property for purposes of bankruptcy code, in part because it was alienable subject to certain limitations).

Third, Ligado enjoys these rights for as long as its ATC authority continues in force. Ligado's FCC license, to which its ATC authority is attached, has a base 15-year term.  47 C.F.R. § 25.121(a)(1).  And, like other FCC licensees, Ligado has strong renewal expectations that make its license, "for all practical purposes, permanent."   Huber, Kellogg, & Thorne, FEDERAL TELECOMMUNICATIONS LAW, § 10.3, Spectrum Allocation: General Considerations (last updated Dec. 2023).  Absent such a strong renewal expectation, licensees would lack the incentive to make the massive investments required to provide advanced telecommunications services.  Indeed, the U.S. telecommunications industry would not exist in its current form if licensees could not rely on the continuing nature of their FCC licenses.  In all events, the Federal Circuit has held that even the strictly time-limited rights conferred by a patent gave rise to a property interest for Fifth Amendment purposes during the term of the patent.  *Patlex Corp.* v. *Mossinghoff*, 758 F.2d 594, 599 (Fed. Cir. 1985) (patent conferred property rights during its then-17-year term); *accord Horne* v. *Dep't of Agriculture*, 576 U.S. 350 (2015) (explaining that patents "confer[] upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation").  In other words, permanent ownership is not

necessary to establish a protected property interest.[4]  *See United States* v. *Petty Motor Co.*, 327 U.S. 372, 377-81 (1946) (evaluating just compensation for interests taken from tenant).  An FCC license may be revoked after due process and only for specified reasons, including that the licensee has breached the terms of the license, or the licensee has willfully failed to operate as contemplated in the license.  47 U.S.C. § 312.  In other words, a licensee operating in compliance with the license can expect that its license will not be revoked.  Thus, the leading telecommunications treatise recognizes that "de facto property rights have been created."  Huber at § 10.3.

Other provisions of the Communications Act confirm that Ligado's ATC authority constitutes a property right.  Where, as here, a license includes the right to transfer and the right to exclude, "a compensable interest is indicated by the absence of express statutory language *precluding* the formation of a property right."  *Members of Peanut Quota Holders Ass'n*, 421 F.3d at 1331.  Rather than precluding property rights, the Communications Act implicitly acknowledges their existence.  Section 301 states that no license is to be "construed to create any right, *beyond* the terms, conditions, and periods of the license."  47 U.S.C. § 301 (emphasis added).  That language "implies the creation of rights akin to those created by a property interest limited only by the 'terms, conditions and periods of the license.'"  *In re Atlantic*, 994 F.2d at 1073-1074; *accord Alpine PCS*, *supra*.  In other words, the grant of the license gives rise to a property interest within the defined conditions of the license.  Once again, patents provide an apt analogy: while patents

---

[4] Section 304 of the Communications Act is not to the contrary.  That provision establishes that a license does not give rise to a renewal right, requiring that every licensee "waive[] any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the United States because of *the previous use of the same*, whether by license or otherwise."  47 U.S.C. § 304 (emphasis added).  But a renewal right is not necessary; like a patent, a license confers cognizable property rights during its term.  Notably, the government does not contend that Section 304's "waive[] any claim" language is applicable here.  And for good reason.  That provision waives claims "as against" acts of FCC regulation, not proprietary conduct by other federal actors and agencies.

confer limited exclusion rights during a defined term of years, the grant of a patent gives rise to a property interest "founded on existing rules" and limited by the conditions set forth in the statutory scheme governing patents. *Patlex Corp.*, 758 F.2d at 599; *Celgene Corp.* v. *Peter*, 931 F.3d 1342, 1358 (Fed. Cir. 2019) (noting that government did not dispute that patents confer property rights, and analyzing whether taking had occurred).

For these reasons, courts have held that FCC spectrum licenses confer cognizable property rights. For example, in *Alpine PCS, Inc.*, this Court held that an FCC spectrum license constituted a property interest for purposes of the Takings Clause because "Alpine's licenses conferred a right to use particular wireless spectrums for a period of ten years, subject to the terms and conditions of the licenses."[5] 128 Fed. Cl. at 309 (relying on 47 U.S.C. § 301). Similarly, in *In re Atlantic Business and Community Development Corp.*, the Third Circuit held that a bankruptcy petitioner's spectrum license constituted property that could be subjected to a lien favoring the United States for failure to pay tax liabilities. 994 F.2d at 1075. The court reasoned that the spectrum license bore several indicia of a property right: the license was transferable; it had value; and it was protected from alteration, revocation, or suspension by a number of procedural safeguards. *Id.* at 1072-1073. That description applies equally to Ligado's license granting ATC authority. Although the government asserts that the fact that a license is property for tax purposes does not suggest that it is property for takings purposes, the key point is that the Third Circuit recognized that a spectrum license confers concrete exclusivity and alienability rights.

---

[5] *Alpine*'s discussion was not dicta. The court first concluded that the FCC license was property for takings purposes, and only then went on to conclude that the takings claim was time-barred. 128 Fed. Cl. at 309 ("This court concurs with the Bankruptcy Court's treatment of Alpine's licenses as a property interest, and will assess its takings claim in accord with that premise.").

3.   Ignoring all that, the government urges a bright-line rule that revocable licenses can never confer a cognizable property interest.  Mot. 22.  That is wrong.  One need look no further than patents:  the government concedes that they confer compensable property rights, Mot. 27; *Horne*, 576 U.S. at 359-360, yet they may be revoked (or modified) by the granting agency in various circumstances, *see* 35 U.S.C. §§ 307, 318, 328.  Unsurprisingly, therefore, the cases on which the government relies (Mot. 20-22) for its purported bright-line rule say nothing of the sort.

In *United States* v. *Fuller*, 409 U.S. 488 (1973), the Supreme Court held that just compensation for plaintiff's condemned land did not include value derived from permits to graze on adjacent land granted pursuant to the Taylor Grazing Act.  In answering that valuation question, the Court relied on the Act's text, which specified that such permits "shall *not* create any right, title, interest, or estate in or to the lands." 43 U.S.C. § 315b (1994) (emphasis added).  The opposite is true here: section 301 of the Communications Act states that no license "shall be construed to create any right, *beyond the terms, conditions, and periods of the license*," acknowledging that an FCC license *does* give rise to rights within the "terms, conditions, and periods of the license."  47 U.S.C. § 301 (emphasis added).  It is precisely those rights that Ligado seeks to enforce.

*Conti* v. *United States*, 291 F.3d 1334 (Fed. Cir. 2002), is similarly unhelpful to the government.  There, the Federal Circuit declined to find that any property interest was created by a fishing permit because the permit granted merely a non-exclusive and non-transferable authorization to fish in a particular area.  *Id.* at 1342.  In addition, a governing regulation expressly disclaimed the creation of "*any interest that is subject to the takings provision of the Fifth Amendment . . . .*"  50 C.F.R. § 635.4(a)(3) (emphasis added).  *Fishermen's Finest, Inc.* v. *United States*, on which the government also relies, Mot. 20-21, is to the same effect.  The fishing permits there did not confer property interests not only because they are revocable, but because they were

non-transferable and non-exclusive, and the governing statute disclaimed creation of any property interest. 59 F.4th 1269, 1275-1277 (Fed. Cir. 2023). Here, by contrast, the ATC authority gives Ligado the right to exclude others and to transfer, and nothing in the statute or regulations disclaims a property right. When presented with licenses bearing similar indicia, courts have held that the licenses give rise to protectable property interests under the Fifth Amendment. *See, e.g., Todd* v. *United States*, 155 Ct. Cl. 111, 113-14 (1961).

*Mobile Relay Associates* v. *FCC*, 457 F.3d 1 (D.C. Cir. 2006), also does not support the government's argument. There, the court upheld the FCC's decision, after notice and comment, to reorganize and reallocate permitted uses for a spectrum band used by numerous licensees. *Id*. at 3-6. The licensees argued that they had a property interest in the "flexibility" permitted by the licenses and the FCC's reallocation therefore constituted a taking. In rejecting that contention, the court stated that the "right to use the spectrum for a duration expressly limited by statute subject to the [FCC's] considerable regulatory power and authority . . . does not constitute a property interest protected by the Fifth Amendment." *Id*. at 12. But that is just an application of the principle that an FCC license does not give rise to any property right "beyond the terms, conditions, and periods of the license," 47 U.S.C. § 301. Because the FCC's authority to modify a license was a condition on which the license was granted, 457 F.3d at 12 (citing 47 U.S.C. § 316(a)), the property interest in the license did not extend to any right not to have the FCC modify the license. In asserting that an FCC modification was a taking, therefore, the *Mobile Relay* licensees improperly sought to assert a property interest *beyond* the conditions of their licenses.[6] Here, by

---

[6] *FCC* v. *Sanders Bros. Radio Station*, 309 U.S. 470 (1940), on which *Mobile Relay* relied, similarly does not hold that an FCC license can never give rise to property rights. There, the Court stated, in dicta, that "no person is to have anything in the nature of a property right as a result of the granting of a[n FCC] license." *Id*. at 475. But the question before the Court was whether the holder of a broadcast license had a cognizable right to be free of competition from a rival station,

contrast, Ligado *is* asserting a property right *within* the terms and conditions of its license: the license grants Ligado the exclusive right to use the spectrum, and the FCC has not revisited that grant. Instead, *other* government agencies have deprived Ligado of the spectrum rights granted by the FCC.

That point disposes of the government's contention that recognizing Ligado's property interest in its ATC authority would effectively require the government to compensate licensees for any FCC modification of a license. Mot. 25. Because the FCC's authority is part of the existing statutory framework pursuant to which the license was granted, that authority is one of the conditions governing Ligado's property interest, and Ligado does not challenge it. Instead, it contends that when the FCC granted Ligado ATC authority, Ligado obtained a property interest that excludes others, including DOD, from the spectrum. Recognizing that property interest as compensable does not suggest that the *FCC's* exercise of its authority to alter or revoke a license, as specified in the terms and conditions, would require compensation.

The government's final revocation-based argument is that the NTIA's reconsideration petition before the FCC makes Ligado's ATC authority "contingent," and thus not a property interest, Mot. 23-24. But the text of the Communications Act states that no petition for reconsideration "shall excuse any person from complying with or obeying any order, decision, report, or action of the Commission, or operate in any manner to stay or postpone the enforcement

---

such that the FCC's statutory authority to renew or revoke licenses was limited by that right, *id*., not whether a license would give rise to a compensable property interest under the Takings Clause. *See Sinclair* v. *United States*, 279 U.S. 749, 767 (1929). And, in the intervening decades, the Court has rebuked the "wooden distinction between 'rights' and 'privileges'" that is the premise for the Court's dicta. *See*, *e.g.*, *Board of Regents* v. *Roth*, 408 U.S. 564, 571 (1972). For those reasons, courts that have subsequently considered the issue have held that *Sanders* does not preclude a conclusion that an FCC license does confer cognizable property rights. *See In re Atlantic*, 994 F.2d at 1073-74.

thereof . . . ."  47 U.S.C. § 405(a).  NTIA's reconsideration petition thus does not render the ATC authority contingent or interrupt Ligado's authority to develop its ATC network—as is confirmed by the fact that the FCC denied NTIA's request to stay the Order pending consideration of its rehearing application.  Compl. ¶¶ 76, 80.

4.  The government next argues that any property interest Ligado might possess has not vested because Ligado has not satisfied conditions precedent to its ATC authority.  Mot. 27-28. That too is wrong.  The Order's ordering clauses state that "[Ligado's] authorization for [ATC] operations . . . is modified to *include authority* to provide terrestrial service as described in its application . . . ."  Order ¶ 159 (emphasis added).  The Order thus immediately grants ATC authority to Ligado.  The "conditions" to which that grant is subject are structured to be *ongoing* obligations that shape how Ligado may use its vested authority.  That conclusion is confirmed by the Order's statement that "[f]ailure to comply with these Conditions may subject Ligado to monetary forfeitures and/or the partial loss of ATC authority . . . ."  Order ¶ 131.  If the conditions were prerequisites to Ligado's ATC authority, then there would be no ATC authority to lose if Ligado did not meet the conditions.

Even more to the point, the Federal Circuit has held that the fact that an entity requires further government approval in order to begin operations under a leasehold does not negate its property interest in the leasehold.  In *United Nuclear Corp.* v. *United States*, 912 F.2d 1432 (Fed. Cir. 1990), the plaintiff obtained a leasehold interest in mining minerals on certain land, but applicable regulations prohibited the plaintiff from beginning operations until the Interior Department approved the mining plan.  *Id*. at 1437.  That the operations right was conditioned on government approval did not dissuade the Federal Circuit from holding that the plaintiff had a cognizable property interest "in the minerals" that eventually could be mined under its leasehold.

*Id*.  The court concluded, moreover, that the government's refusal to grant approval on unreasonable and unforeseeable grounds constituted a taking.  *Id*. at 1437-38.  So too here.  Even if the 2020 Order is construed as requiring Ligado to satisfy certain conditions before beginning ATC operations, that does not alter the fact that the Order confers on Ligado immediate authority over the relevant spectrum, including the immediate rights to exclude and transfer.  The Order therefore confers a property right notwithstanding the license's conditions.

The government is also wrong that Ligado has not satisfied the license's conditions.  As stated in the Complaint, Ligado has done nothing that would justify forfeiture of its ATC authority.  Compl. ¶ 77.  Ligado attempted to exchange information with the government, per the conditions, but DOD and DOC have refused to reciprocate.  *Id.* ¶¶ 77-83.  The government's refusal to work in good faith with Ligado does not deprive Ligado of its FCC-granted ATC authority.

### C.    The Complaint Adequately Alleges Four Different Types of Takings.

The government can take property in one of four ways.  It can "physically take property for itself or someone else—by whatever means."  *Cedar Point Nursery* v. *Hassid*, 141 S. Ct. 2063, 2072 (2021).  It can categorically take property when regulations deprive an owner of "all economically beneficial use[]."  *Lucas* v. *South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992) (emphasis omitted).  It can effectuate a regulatory taking by "restrict[ing] a property owner's ability to use his own property."  *Cedar Point Nursery*, 141 S. Ct. at 2072.  Or it can effectuate a legislative taking if "regulatory restrictions in [a] statute[] go 'too far' in constraining" an owner's ability to use his own property. *See Cienega Gardens* v. *United States*, 331 F.3d 1319, 1328 (Fed. Cir. 2003).  The Complaint adequately alleges each type of taking.

### i.    The Government's Use of Ligado's Property Constitutes a Physical Taking.

"[P]hysical appropriations constitute 'the clearest sort of taking,'" and are assessed "using a simple, per se rule: The government must pay for what it takes."  *Cedar Point Nursery*, 141 S.

Ct. at 2071 (internal citations and quotation marks omitted).  A physical taking occurs not only when the government "uses the power of eminent domain to formally condemn property," but also when it "physically takes possession" or "occupies" property "without acquiring title."  *Id.*  An invasion need not be constant or even specifically intended to constitute a physical taking, so long as it ousts the owner from use and possession of his property.  The Supreme Court has recognized, for example, that construction of a dam that unintentionally results in "recurring flooding" of nearby land constitutes a physical taking.  *Id.*; *see also United States* v. *Cress*, 243 U.S. 316, 327 (1917).  In *Loretto* v. *Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), the Supreme Court explained that a physical taking is "the most serious form of invasion of an owner's property interests" because it violates each of an owner's three core property interests: his right "to possess, use and dispose" of his property.  *Id.* at 435.

The Complaint alleges that the government has committed a physical taking of Ligado's ability to provide terrestrial services in its exclusively licensed spectrum by physically occupying Ligado's spectrum, preventing Ligado from using its spectrum, and denying Ligado the ability to control its exclusively licensed spectrum.  The complaint alleges that DOD is "operating previously undisclosed systems that use—and indeed, depend on—[Ligado's] spectrum," Compl. ¶ 5; that "DOD's systems have continuously used Ligado's authorized spectrum since at least the April 22, 2020 FCC Order modifying Ligado's ATC authority—and continue to use that spectrum today—without providing compensation to Ligado," *id*. ¶ 128; and that "DOD's use of Ligado's authorized spectrum has been confirmed to Ligado by multiple senior government officials," *id*. ¶ 124.  Those allegations are not merely made on "information and belief."  Mot. 32.  The complaint alleges specific supporting facts statements made by DOD officials to Ligado, congressional

testimony by DOD officials, reports commissioned by Congress, and letters from United States Senators. *See supra* pp. 8-10.

The complaint also alleges that DOD is "transmitting or receiving signals in Ligado's allocated spectrum that prevent Ligado from transmitting or receiving its own signals in its exclusively licensed spectrum," and that DOD is "receiving signals adjacent to Ligado's allocated spectrum in a manner that requires that Ligado's allocated spectrum be a 'dead zone' for terrestrial services so as to avoid harmful interference with DOD's systems." Compl. ¶ 47. The complaint describes how the government's use of Ligado's spectrum precludes Ligado from using or obtaining value from its property, explaining that spectrum capacity is "finite," and that "[t]he operation of too many transmitters within a band can interfere with and degrade the ability of receivers to collect the information they need." *Id.* ¶ 21. And the complaint points to officials' statements confirming that DOD wishes to "keep Ligado out of the entire L-Band." *Id.* ¶ 43.

In the face of those well-pleaded allegations, the government first contends that there can be no physical taking of spectrum because "a license (and even spectrum itself) is an intangible item, to which a regulatory, rather than physical, takings framework applies." Mot. 31-33. That is incorrect. As to the law: courts recognize that intangible rights can be subject to physical takings when the *government's conduct* is physical. For example, the Federal Circuit has recognized that a physical taking of water rights—which are intangible rights—can occur "where the government has physically diverted water for its own consumptive use or decreased the amount of water accessible by the owner of the water rights." *Washoe Cnty., Nev.* v. *United States*, 319 F.3d 1320, 1326 (Fed. Cir. 2003); *Dugan* v. *Rank*, 372 U.S. 609, 625-26 (1963) (finding physical taking of water rights based on construction of a dam); *Affiliated Ute Citizens of State of Utah* v. *United States*, 199 Ct. Cl. 1004, 1006 (1972) (water rights are intangible). The government's conduct

here is similar: it involves the physical emission of electromagnetic waves in a manner that ousts Ligado's control of a resource analogous to "real property."  *See* Compl. ¶¶ 19-22.

In any event, spectrum *is* a physical object.  As alleged in Plaintiff's complaint, spectrum consists of electromagnetic waves that oscillate at designated frequencies, whose capacity is finite. *See id.*  And both the Supreme Court and lower courts have spoken of spectrum in physical terms, *see Nat'l Broad. Co.* v. *United States*, 319 U.S. 190, 213 (1943) ("the radio spectrum simply is not large enough to accommodate everybody"), including express references to "the physical restraints of the electromagnetic spectrum," *Home Box Off., Inc.* v. *FCC*, 567 F.2d 9, 46 (D.C. Cir. 1977).

Next, the government contends that Ligado failed to "offer well-pleaded facts supporting any plausible inference that DOD has been operating within [Ligado's] spectrum."  Mot. 32-33. To the contrary, Ligado cited multiple such facts, including statements made by high level government officials, Compl. ¶¶ 43, 124, a report from the National Academies, *id.* ¶ 45, and a letter from two U.S. senators, *id.* ¶ 44, Appx1-2.  Although the government offers competing interpretations of these statements, the Court "is obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor."  *Schultz* v. *United States*, 2009 WL 3416453, *2 (Fed. Cl. Oct. 21, 2009).  Even if the Court could consider the government's interpretations, they are not reasonable.  The government does not address Ligado's allegation that "multiple senior government officials" have "informed Ligado that DOD needs ***all*** of Ligado's spectrum … and that DOD needs ***permanent use*** of that authorized spectrum"—which, alone, could defeat the government's physical occupation argument at the motion to dismiss stage. Compl. ¶ 124.  Moreover, the National Academies report notes that DOD has argued that Ligado's use of its terrestrial spectrum rights would "create unacceptable harmful interference for DoD missions."  National Academies of Sciences, Engineering, and Medicine 2022, Analysis of

Potential Interference Issues Related to FCC Order 20-48, at 73, https://doi.org/10.17226/26611; Compl. ¶¶ 45-46.  That clearly indicates that DOD missions are making use of Ligado's spectrum, and that they would be disrupted if Ligado were actually to exercise its rights.  Regardless, the Complaint alleges in detail that DOD's stated concerns about GPS operations were a cover for its secret use of Ligado's spectrum.  Compl. ¶¶ 39, 40, 48, 57, 72.

Even if Ligado's allegations are construed as alleging that DOD's operations are occurring in nearby spectrum and require Ligado's spectrum to remain silent terrestrially as a "dead zone," that would *still* constitute a physical taking.  Indeed, the government acknowledges that a physical taking may occur "[i]n the absence of actual invasion or occupation by the government itself." Mot. 34 (citing *Cedar Point*, 141 S. Ct. at 2072).  While the government contends that "legal comp[ulsion]" is required for a physical taking to occur, the only cases it cites for that proposition involve *regulatory* takings.  Mot. 34.  Physical occupations—even of adjacent property—that make an owner's own property useless constitute physical takings.  *See Roth* v. *United States*, 73 Fed. Cl. 144, 148 (2006) ("It is well-settled that a closure in which defendant physically bars access to lands comprises a physical taking.").

### ii. The Complaint Alleges That the Government's Actions Have Resulted in a Categorical Taking, or in the Alternative, a Regulatory Taking

The complaint adequately pleads that DOD's refusal to implement the FCC's Order granting Ligado ATC authority effected a categorical or regulatory taking of Ligado's property.

### (a) DOD's refusal to implement the Order effected a categorical or regulatory taking.

As an initial matter, the government argues that the complaint improperly aggregates "separate Government actions into a catch-all claim" of a categorical or regulatory taking.  Mot. 36.  Not so.  The complaint makes crystal clear that the government action that accomplished the categorical or regulatory taking is DOD's refusal to implement the FCC order granting Ligado

ATC authority.  DOD's refusal started the moment the order was issued in 2020, and the extraordinary actions by DOD described in the complaint are simply subsidiary efforts that furthered DOD's overarching goal of preventing Ligado from commencing ATC operations.  A takings plaintiff need only identify the specific "conduct that the government could not engage in without paying compensation."  *Acceptance Ins. Cos., Inc.* v. *United States*, 583 F.3d 849, 855 (Fed. Cir. 2009).  Ligado's complaint did exactly that.

As the complaint alleges, the Order instructed Ligado to "cooperate directly" with DOD and DOC to "expeditiously replace or repair as needed any U.S. Government GPS devices that experience or are likely to experience harmful interference from Ligado's operations."  Order ¶¶ 130, 144.  Recognizing that this task would require affected agencies to cooperate with Ligado, Compl. ¶ 85, the FCC stated that "[c]onsistent with FCC precedent in other proceedings, we would expect Ligado and U.S. Government agencies to work together in good faith, including with regard to negotiation to resolve any disputes."  Order ¶ 105.

DOD refused to cooperate with Ligado, however, thereby effectively depriving Ligado of its ATC authority.  Compl. ¶¶ 74-77.  The complaint further alleges that because DOD needs the spectrum for its own purposes on an "exclusive[]" and "permanent[]" basis, DOD had *no intent* at the time the FCC issued its Order to coordinate with Ligado.  *Id.* ¶¶ 41-42.  The complaint therefore alleges that the government's taking of Ligado's property occurred "no later than April 22, 2020— the day the FCC granted Ligado modified ATC authority to use its exclusively licensed spectrum for terrestrial operations," *id.* ¶¶ 145-46, 151-52; *see also id.* ¶¶ 6, 74-86.  As of that day, DOD adopted, and has since maintained, a policy of not complying with the FCC's Order.  DOD's decision to refuse to cooperate with the Order as soon as it was issued is the action that effected the taking and the "conduct that the government could not engage in without paying

compensation." *Acceptance Ins.*, 583 F.3d at 855.

The government argues that the complaint describes numerous actions by DOD.  Mot. 36.
True; but that is only because DOD engaged in an extraordinary and extended course of conduct
after the Order's release, every element of which furthered DOD's decision to prevent Ligado from
using the spectrum for ATC operations.  DOD has not only refused to cooperate with Ligado itself,
but also "direct[ed] other agencies not to coordinate with Ligado," Compl. ¶ 77; successfully
lobbied Congress to enact the NDAA, *id.* ¶¶ 87-107; and leveraged its certification authority under
the NDAA to refuse to certify that Ligado's operations "do not cause harmful interference to a
[GPS] device" of DOD, in order "to maintain DOD's use of Ligado's property," *id.* ¶¶ 100, 108.
Thus, DOD's actions have all furthered its original refusal to permit Ligado to satisfy its license
conditions and exploit its ATC authority.

The purpose of requiring plaintiffs to identify the government decision that constitutes the
taking is to avoid confusion about what was taken and when.  *Acceptance Ins.*, 583 F.3d at 856.
The complaint easily satisfies those concerns.  It alleges (1) what effected the taking (DOD's
refusal to comply with the Order); (2) what was taken (Ligado's ability to use its ATC authority);
and (3) when any taking first occurred (upon the Order's issuance).  Far from creating any
confusion, the complaint's recitation of DOD's specific actions in furtherance of its decision only
confirms that DOD has no intention of *ever* allowing Ligado to use its ATC authority.  That refusal
began when the order was issued, and continues to this day.  *Cf. Sherman* v. *Town of Chester*, 752
F.3d 554, 561-63 (2d Cir. 2014) (town's ten-year "war of attrition" constituted taking).  It would
make no sense to let the government off the hook simply because it has continued to act in
furtherance of its taking.

### (b)    The complaint sufficiently alleges a categorical taking.

The complaint states a categorical takings claim based on DOD's decision not to implement

the FCC's Order.  A taking is categorical if the government's action "denies *all* economically beneficial or productive use" of the property.  *Lucas*, 505 U.S. at 1015 (emphasis added).  Once that criterion is met, there has been a "compensable taking," full stop.  *Cienega Gardens*, 331 F.3d at 1344.  By refusing to cooperate with Ligado, DOD has "*wholly* blocked Ligado from using its ATC authority."  Compl. ¶ 83 (emphasis added).  That is, without DOD's cooperation to repair or replace any affected GPS devices, Ligado cannot *begin* to implement or exploit its ATC authority.  The government has therefore deprived Ligado of all economically beneficial use of its ATC authority.  That authority "is worth as much as $39 billion," and "all of [that] value has been destroyed by the United States' unconstitutional taking of Ligado's property."  Compl. ¶ 121; *see also Rose Acre Farms, Inc.* v. *United States*, 559 F.3d 1260, 1268 (Fed. Cir. 2009).  As a result, there has been a categorical taking.  *Lucas*, 505 U.S. at 1015.

The government raises two counter-arguments, both meritless.

*First*, the government contends that a categorical takings claim can only be brought for a taking of "real or tangible personal property," not "intangible license rights."  Mot. 36-37.  As explained above, however, the property at issue is a grant of access to spectrum—i.e., electromagnetic waves with finite capacity—that exists in the physical world.  *See supra* p. 26.  Thus, even accepting the government's argument, Ligado has stated a categorical takings claim.  In any event, there *can* be a categorical taking of intangible property.  The Federal Circuit has left open the question of "whether the categorical takings test applies to takings of intangible property," *A & D Auto Sales, Inc.* v. *United States*, 748 F.3d 1142, 1151-52 (Fed. Cir. 2014), and the government does not even attempt to provide a reason why a categorical takings claim could not apply to intangible property.  "One may be just as permanently and completely dispossessed of" intangible property as of tangible property, and "[a]ny distinction along these lines would be purely

artificial." *Nixon* v. *United States*, 978 F.2d 1269, 1285 (D.C. Cir. 1992); *see, e.g.*, *Y.H.* v. *E.S.*, 173 N.Y.S.3d 837, 855 (N.Y. Sup. Ct. 2022) (applying categorical takings test to "law license").

*Second*, the government contends that Ligado's categorical takings claim fails because Ligado has not been deprived of all economically beneficial use of its property.   In the government's view, the relevant property interest is "the entirety of Ligado's licensed spectrum," Mot. 37—that is, Ligado's licensed authority covering both ATC services *and* MSS operations—and because Ligado can still use its spectrum for MSS, Ligado purportedly retains some economic value.   But as the complaint alleges, the relevant property interest under Federal Circuit precedent is the ATC authority conveyed by Ligado's FCC license, which gives it the exclusive right to make use of certain terrestrial spectrum.   The Federal Circuit applies a "flexible approach, designed to account for factual nuances" when determining how to define the relevant unit of property at issue. *Loveladies Harbor, Inc.* v. *United States*, 28 F.3d 1171, 1181 (Fed. Cir. 1994).   Particularly relevant are whether the property owners and the government have treated the property as a single unit or as distinct units, as well as considerations such as the dates of acquisition and the interrelationship of the interests. *Dist. Intown Properties Ltd. P'ship* v. *D.C.*, 198 F.3d 874, 880 (D.C. Cir. 1999) (noting that courts including the Federal Circuit take this approach); *Forest Properties, Inc.* v. *United States*, 177 F.3d 1360, 1365 (Fed. Cir. 1999).

Both the FCC and Ligado have continuously treated Ligado's authority to provide ATC services as distinct from its authority for MSS operations.   The two were conferred at different times:   Ligado has been authorized for MSS operations since 1989, Compl. ¶ 26, but the FCC originally granted Ligado ATC authority in 2004 and then approved its plans to provide service under that authority in 2020.   The Order itself expressly distinguishes between the two services, explaining that "[t]he network that Ligado proposes to deploy"—the terrestrial services network—

31

"differs significantly from the one [already] conditionally approved"—the satellite services. Order ¶ 19 (emphasis added). The Order also contemplates that Ligado may treat ATC services distinctly (though not preferentially), by offering access to services under its ATC authority that do not involve the use of MSS: "Ligado shall not offer preferential terms for the use of Ligado's spectrum for *terrestrial only service*, or otherwise discourage the availability or use of *combined MSS/ATC services in addition to terrestrial-only services*." *Id.* ¶ 150 (emphasis added). Further, Ligado has not "developed" its MSS operations and ATC services "as a single project," *Forest Properties*, 177 F.3d at 1365; instead, in reasonable reliance on the FCC order, Ligado has made significant investments specific to deployment of ATC operations. *See infra* pp. 34-36. Based on the parties' consistent treatment, therefore, the relevant unit of property at issue for categorical-takings purposes is Ligado's ATC authority, not the FCC license as a whole. In arguing to the contrary, the government offers nothing other than the conclusory assertion that Ligado has authority to provide both MSS and ATC services. Mot. 37. But Federal Circuit precedent examines how the parties have *treated* the interest, and the government does not contend that either the FCC or Ligado has treated the two distinct authorities as one interest. And because the complaint alleges that DOD's actions deprived that ATC authority of all economic value, the complaint adequately alleges a categorical taking.

(c)      **The complaint adequately alleges a regulatory taking.**

Irrespective of whether the complaint adequately alleges that Ligado has been deprived of all economically beneficial uses of its property interest, the complaint adequately alleges in the alternative that Ligado has suffered a regulatory taking. *Penn Central* sets forth three factors for courts to consider in determining whether a regulatory taking has occurred: (i) the economic impact of the action on Ligado; (ii) the extent to which the action interfered with Ligado's reasonable investment-backed expectations; and (iii) the character of the government's action.

*Penn Cent. Transp. Co.* v. *City of New York*, 438 U.S. 104 (1978); *Am. Pelagic Fishing Co.* v. *United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004); *Cienega Gardens*, 331 F.3d at 1337.  The last factor considers "the magnitude or character of the burden a particular regulation imposes upon private property rights," and the "distribution [of the burden] among property owners." *Reoforce, Inc.* v. *United States*, 853 F.3d 1249, 1271 (Fed. Cir. 2017) (citation omitted) (emphasis omitted).  If the regulation "single[s] out" or "target[s]" the plaintiff, that strongly suggests it goes too far.  *Id.*

    *First*, the complaint alleges that the DOD's refusal to cooperate has had a staggering economic impact.  The ATC authority granted to Ligado is, according to independent professional valuations, "worth as much as $39 billion."  Compl. ¶ 121.  "All of [that] value has been destroyed by the United States' unconstitutional taking of Ligado's property." *Id.*; *see also Rose Acre Farms, Inc.*, 559 F.3d at 1268 (economic impact typically measured in terms of "the lost value of the taken property").  Even accounting for the value of the MSS portion of Ligado's license, that value (less than $425 million according to Ligado's publicly filed bankruptcy plan in 2014) pales in comparison.  *See* Transcript of Hearing of Motion to Confirm Joint Plan at 26:18-21, *In re Lightsquared, Inc.*, No. 12-12080 (Bankr. S.D.N.Y. Mar. 24, 2014), ECF No. 1449 ("We applied a discount and came up with valuation of 425, reflecting principally the value of SkyTerra-1 and Skyterra-2 and the spectrum associated with those satellites.").  Thus, even if the MSS and ATC authority were considered as a single, indivisible property interest, there has been more than a *98% decrease* in the value of Ligado's ATC authority due to DOD's actions.

    The government does not contest the severity of the economic impact, but instead merely denies responsibility for causing it.  The government relies heavily on the FCC's statement *in 2021* that Ligado "did not expect to move forward with deployment for another eighteen months."  Mot.

39.  But the complaint, filed in October 2023, alleges that since then, Ligado has "prepared and is continuing to prepare to deploy critical 5G communications infrastructure," Compl. ¶ 135; *see also id.* ¶¶ 115-120 (describing Ligado's efforts), and that Ligado would be able to "operationalize its ATC authority" but for the interference of DOD, *id.* ¶ 146.  Those allegations must be taken as true—and they render the FCC's statement from over two years ago irrelevant.  The government also asserts that the complaint "fails to allege that [Ligado] is prepared to move forward with the deployment, much less that any failure to do so is attributable to the alleged actions of the United States."  Mot. 39.  That is absurd: the complaint describes in detail the preparatory work that Ligado has undertaken, and explains that "Ligado has done what it could to prepare to deploy its terrestrial services," but that "DOD and DOC continue to prevent Ligado from using its licensed spectrum."  Compl. ¶ 115; *id.* ¶¶ 114-121.  But for DOD and DOC's extraordinary actions— refusing to comply with a lawfully issued FCC order, then willfully obstructing the order's implementation—Ligado would be able to deploy ATC services, thereby realizing the value of its ATC authority.  Not only does the complaint sufficiently allege that "government action" is the but-for cause of Ligado's "economic loss," it makes clear that the very purpose of that action was to kill Ligado's ATC business before it ever got off the ground.  *A & D Auto Sales*, 748 F.3d at 1157.

*Second*, the complaint plausibly alleges that DOD's actions interfered with Ligado's reasonable investment-backed expectations as to its ATC authority.  Building out an ATC system requires different infrastructure than the MSS operations Ligado has provided for years, *see* Order ¶ 3, and enables Ligado to offer different and highly valuable new services, *see* Compl. ¶ 119 (with ATC authority, Ligado could form partnerships with carriers of cell service).  The government does not dispute that Ligado made significant investments to be able to use its spectrum for ATC

network operations.  Ligado invested "substantial time and resources" over the course of *17 years* to obtain final ATC authority from the FCC.  *See id.* ¶ 32; *see also id.* ¶¶ 35-38 (describing Ligado's efforts).  And Ligado continued to "invest[] substantial time, energy, and capital" after receiving ATC authority.  *Id.* ¶ 116 (describing Ligado's investment in "creating 5G base stations and mobile chipsets compatible with its authorized spectrum and positioning itself to serve critical spectrum infrastructure needs").  Several months after the Order, Ligado undertook an effort in which billions "of new capital [was] invested to support the [c]ompany's deployment of terrestrial services in a manner consistent with the April 2020 FCC Order."  *Id.* ¶ 73.

In determining whether Ligado reasonably made those investments "in reliance on the nonexistence of" DOD's actions, *see Creppel* v. *United States*, 41 F.3d 627, 632 (Fed. Cir. 1994), relevant considerations include "(1) whether the plaintiff operated in a highly regulated industry; (2) whether the plaintiff was aware of the problem that spawned the regulation at the time it purchased the allegedly taken property; and (3) whether the plaintiff could have reasonably anticipated the possibility of such regulation in light of the regulatory environment at the time of purchase," *Appolo Fuels, Inc.* v. *United States*, 381 F.3d 1338, 1349 (Fed. Cir. 2004) (internal quotation marks omitted).

Here, the complaint's allegations establish that Ligado could not reasonably have expected DOD's obstructionism.  First, the government relies on the fact that the spectrum is "highly regulated" under the Communications Act.  Mot. 39.  But a "property owner does not automatically relinquish [its] Fifth Amendment rights by entering a highly regulated industry."  *Taylor* v. *United States*, 959 F.3d 1081, 1088-89 (Fed. Cir. 2020) (citation omitted).  And more importantly, while Ligado might reasonably have expected action *by the FCC* pursuant to the Communications Act, Mot. 39, it had no reason to expect that *DOD* would refuse to comply with the FCC's lawfully

issued Order.  *See infra* p. 42 (Congress has authorized FCC, not DOD, to address interference with GPS devices); *United Nuclear Corp.*, 912 F.2d at 1436 (while leaseholder had reason to expect further regulation by Interior Secretary, it had no reason to anticipate that Secretary would give a *third* party—a tribe—a veto over the leaseholder's application).  The license itself *presumed* that DOD would cooperate with Ligado and that Ligado would successfully repair any relevant DOD devices. The FCC did not give DOD the power to veto Ligado's ATC authority based on its contrary views about GPS interference.  Order ¶¶ 101-103.

Ligado also was not reasonably "aware of the problem" prompting DOD's actions.  *Appolo Fuels*, 381 F.3d at 1349.  The government emphasizes that Ligado was aware of DOD's claimed concerns about "spectrum interference."  Mot. 39.  Once again, that misses the point.  Ligado addressed those purported concerns by "ensur[ing] that [its] services would be able to coexist with all other known services operating in nearby spectrum"—and the FCC ultimately *agreed* GPS devices would be "sufficiently protected."  Compl. ¶¶ 3, 64; Order ¶ 100 (definitively rejecting military's arguments).  When the FCC granted ATC authority to Ligado, therefore, Ligado reasonably understood that the purported "problem" identified by DOD had been found to be illusory by the agency *with statutory authority over spectrum licenses and GPS*.  It is difficult to imagine any greater assurance.  And in any event, DOD's stated GPS concerns were pretextual, designed to conceal its actual reasons, which—Ligado eventually discovered—involved using the spectrum for its own purposes.  Ligado certainly had no reason to anticipate that, particularly given DOD's concealment of those reasons from the FCC.  *See supra* pp. 7-8.

For similar reasons, Ligado could not "reasonably [have] anticipated" DOD's post-license obstructionism.  *Appolo Fuels*, 381 F.3d at 1349.  The government asserts that Ligado "could have anticipated that NTIA and DoD would voice their position concerning interference," and notes that

"the statutory and regulatory scheme specifically provides an avenue to seek reconsideration."

Mot. 40.  That only proves Ligado's point.  At most, Ligado could have reasonably expected DOD

to comply with the legal framework established by the Communications Act and FCC regulations:

i.e., that DOD would express its concerns during the license approval process and, once those

concerns were rejected, seek reconsideration of the FCC's order if it disagreed with the FCC's

conclusions about GPS interference.  But the Communications Act *requires* DOD to "obey[]" the

order notwithstanding any reconsideration petition by cooperating with Ligado in the meantime.

Compl. ¶ 79 (discussing 47 U.S.C. § 405(a)).  Moreover, the 2020 Order itself gave Ligado reason

to expect cooperation, as it contemplated that DOD would cooperate with the procedure

established by the FCC to enable Ligado to address any lingering GPS concerns—consistent with

the unbroken past practice of federal-private cooperation.  *See id.* ¶ 74.  What Ligado had *no* reason

to expect was that DOD would be willing to obstruct a lawfully issued FCC order to protect its

own secret interests, much less that DOD would launch an aggressive campaign (including by

providing misleading information to Congress and the public, and threatening Ligado's potential

partners) to prevent Ligado from ever using its ATC authority.  Lacking any colorable argument

that Ligado could have reasonably anticipated *those* actions, the government simply ignores them.

   *Third*, the complaint alleges that "the magnitude or character of the burden" that DOD's

actions inflict on Ligado is both severe and targeted specifically at Ligado—confirming that the

government has gone "too far."  *Reoforce, Inc.*, 853 F.3d at 1268, 1271.  The complaint's

allegations establish that the government has forced Ligado alone to pay the cost of DOD's need

to use the spectrum, which is a cost that properly "should be borne by the public as a whole."  *Am.*

*Pelagic*, 379 F.3d at 1371 (quoting *Penn Central*, 438 U.S. at 123).  DOD "targeted Ligado with

precision."  Compl. ¶¶ 11, 102.  No other license holder has been affected by DOD's appropriation

of Ligado's spectrum.  DOD has imposed a severe burden, not only "impair[ing]" Ligado's property interest in its ATC authority to a "significant degree," but stripping Ligado's authority of the lion's share of its value.  *Aviation & Gen. Ins. Co., Ltd.* v. *United States*, 882 F.3d 1088, 1097 (Fed. Cir. 2018).  That Ligado has been "solely burdened" and entirely "unbenefited" by Defendants' actions is a key indicator that those actions constitute a taking.  *Res. Invs., Inc.* v. *United States*, 85 Fed. Cl. 447, 518 (Fed. Cl. 2009) (quoting *Penn Central*, 438 U.S. at 134).  The complaint thus establishes that the government has violated the Takings Clause's primary purpose, which is "to discourage the government from requiring a few select individuals to bear the burdens of [a] public benefit."  *Maritrans, Inc.* v. *United States*, 342 F.3d 1344, 1358 (Fed. Cir. 2003).

Instead of disputing those allegations, the government asserts that DOD did not "physically invade" Ligado's property, which "undermines" a takings claim.  Mot. 40-41.  Whether the taking of Ligado's property has a physical aspect is in no way dispositive, given that a "taking may occur as a result of a regulatory action that is neither a physical invasion nor a physical restraint."  *767 Third Ave. Associates* v. *United States*, 48 F.3d 1575, 1580 (Fed. Cir. 1995).  In any event, the complaint alleges that the very reason DOD refused to implement the FCC's order was so that it could physically occupy the spectrum exclusively licensed to Ligado.  Compl. ¶ 140.  Because DOD's actions are in furtherance of a "continuing physical occupation," the character of those actions weighs in favor of a taking.  *Cienega Gardens*, 331 F.3d at 1338 (legislation "could fairly be characterized as akin to" a "physical invasion").

The government further argues that DOD's actions cannot be considered a taking because DOD was acting to "promote the public interest" by informing "the FCC and others" of its concerns about GPS interference.  Mot. 41; *see Rose Acre Farms*, 559 F.3d at 1281.  But the complaint plausibly alleges that DOD's stated GPS concerns were entirely pretextual.  That

inference is amply supported by the FCC's conclusion, after extended scientific inquiry, that DOD's stated GPS concerns did not warrant denying Ligado ATC authority, and DOD's refusal to engage in a cooperative process designed to resolve any issues presented by specific GPS devices. *See, e.g.*, Compl. ¶ 7. The government therefore cannot rely on GPS concerns to establish that it was acting for the general welfare as a matter of law. And the government notably does not argue that DOD's undisclosed need to use the spectrum for *other* purposes can establish that DOD was acting for the general welfare as a matter of law.

### *iii.*    The Restrictions Imposed by the NDAA Effected a Legislative Taking

The complaint adequately alleges that the NDAA effected a legislative taking. A legislative taking occurs if the legislation "denies *all* economically beneficial or productive use" of the property, *Lucas*, 505 U.S. at 1015 (emphasis added), *or* if application of the three-factor *Penn Central* test establishes a compensable taking, *Cienega Gardens*, 331 F.3d at 1336-37. Contrary to the government's argument, Mot. 41, Ligado does not "acknowledge[]" that the "legislative takings claim must be evaluated under the *Penn Central* factors." The Federal Circuit has applied the *Lucas* categorical takings test to legislative takings, *Maritrans*, 342 F.3d at 1353-55, and Ligado has alleged alternative theories under *Lucas* and *Penn Central*, Compl. ¶ 156.

1. The NDAA gives DOD the power to effectively block Ligado from ever using its ATC authority. In relevant part, the NDAA provides that the Secretary of Defense may not contract with any entity that uses Ligado's spectrum for ATC operations until the Secretary has certified that ATC operations in Ligado's spectrum "do not cause harmful interference to a [GPS] device of the [DOD]." Pub. L. 116-283, § 1662, 134 Stat. 3388, 4074 (2021). In practice, that means that DOD cannot do business with any entity that contracts with Ligado for ATC operations in its spectrum, unless and until DOD certifies that use of Ligado's spectrum for ATC purposes does not cause harmful GPS interference. DOD, of course, has not issued the necessary certification.

The NDAA therefore tells potential "partners and customers of Ligado:  if you contract with Ligado to use its licensed spectrum for terrestrial operations, you will no longer be allowed to do business with DOD."  Compl. ¶ 101.  Because "the ability to contract with DOD is essential to businesses operating in the telecommunications industry," not a single company has agreed to work with Ligado since the NDAA.  *Id.*  ¶¶ 103-04.  Thus, until the Secretary makes the required certification, the Act denies Ligado any practical ability to use its ATC authority.

That is the evident purpose and effect of the NDAA.  The complaint alleges that at the time of the NDAA's passage, it was clear that "Defense Department lobbyists … view[ed] the U.S. spectrum as 'theirs.'"  Compl. ¶ 102 (emphases omitted).  In urging the NDAA's enactment, senior government officials had testified in a Senate hearing that DOD had to be able to "operate *in that spectrum*."  *Id.* ¶ 43.  The NDAA thus gives DOD the ability to permanently block Ligado from ever using the ATC authority in order to protect DOD's *ability to use the spectrum for its own purposes*.  The NDAA took authority lawfully granted to a private party and appropriated it for government use, thereby rendering Ligado's ATC authority a dead letter.

2.  By conditioning Ligado's ability to use its ATC authority on action by DOD—which DOD has *no intention of ever completing* given its own competing use of the spectrum—the NDAA totally and permanently destroyed Ligado's property interest in its ATC authority.  *See Lucas*, 505 U.S. at 1015; *United Nuclear Corp.*, 912 F.2d 1432 (government takes property when—instead of rejecting approval of a permit—it conditions approval on an event that it knows is unlikely to occur).  As the complaint alleges, in response to the Order, DOD urged Congress to enact a statute giving DOD sole authority to certify whether its purported GPS concerns had been resolved.  Compl. ¶¶ 87-99.  The NDAA's only plausible purpose therefore was to give DOD the unequivocal authority to permanently prevent Ligado from using its ATC authority.  Those actions

leave no doubt that DOD did not intend ever to provide the certification, because DOD needs exclusive use of the spectrum for its own purposes.  *Id.* ¶ 5.  In other words, the NDAA gives DOD a mechanism "to frustrate Ligado's development efforts" on a permanent basis.  *Id.* ¶ 105.

The NDAA therefore completely "eliminated the value of Ligado's property," i.e., its ATC authority.  *Id.* ¶ 160.  The government does not argue otherwise.  Mot. 41-45.  It has accordingly waived any contention that Ligado failed to state a claim that the NDAA's passage constituted a categorical taking of its ATC authority.  *See Fisher* v. *United States,* 148 Fed. Cl. 478, 502 (2020).

3.  The complaint also states a claim that the NDAA effectuated a regulatory taking under the *Penn Central* test.  *First,* for the reasons explained above, the NDAA had a massive economic impact on Ligado.  *See supra* pp. 33-34.  Although the government asserts that Ligado has not alleged that its "license suffered any market value change" because of the NDAA provisions, Mot. 41, in fact the complaint expressly alleges that the NDAA "destroy[ed] Ligado's ability to use and develop its exclusively licensed spectrum to provide [ATC] services."  Compl. ¶ 159.

*Second*, for many of the reasons explained above, the NDAA interfered with Ligado's reasonable investment-backed expectations under the *Appolo* factors.  *See supra* pp. 34-37.  The government first argues that Ligado should have understood that Congress regulates "the telecommunications industry" and "GPS."  Mot. 42.  But Congress has done so by entrusting *the FCC* to make individual licensing decisions, 47 U.S.C. §§ 303(b)-(c); *see* Compl. ¶ 22, and entrusting *the FCC* to "resolve[] concerns of widespread harmful interference" in certain bands of the spectrum "to covered GPS devices," 47 U.S.C. § 343(a); *see* Order ¶ 129.[7]  Ligado thus had

---

[7] The government cites 10 U.S.C. § 2281, a general provision about the Secretary of Defense's obligations with respect to GPS.  But the relevant provision here is 47 U.S.C. § 343(a), which specifically governs spectrum management as related to GPS and confers that authority on the FCC.  *See* Order ¶ 128 n.422 (discussing relationship of the two statutory provisions).

no reason to expect that Congress would provide DOD authority in areas that Congress had assigned to the FCC.  The government also argues that Ligado was "aware of the GPS-interference problem at the time of the license."  Mot. 42.  But once again, the FCC's rejection of DOD's concerns in the Order, Compl. ¶¶ 34-40, 64, led Ligado reasonably to expect that any GPS-interference problems had been entirely resolved by the agency empowered to address the issue.

The government next contends that Ligado should have "anticipated" that Congress would "step in" to address "harmful interference" concerns.  Mot. 43.  That ignores the allegations that any GPS interference concerns were pretextual, and that DOD informed Congress that it had to be able to "operate *in that spectrum*," Compl. ¶ 43.  The NDAA fulfills that need by giving DOD the ability to permanently block Ligado from using its ATC authority.  Nothing about the statutory framework that existed when the Order was issued gave Ligado any reason to expect congressional intervention to enable DOD to nullify an order lawfully issued by the FCC—the agency with delegated statutory authority over the subject.  *United Nuclear Corp.*, 912 F.2d at 1436.

*Third*, for many of the same reasons as explained above, the character of the government action weighs in favor of finding a taking.  The NDAA places on Ligado alone the cost of DOD's use of the spectrum, which strongly suggests there has been a compensable taking.  Although the government defends the NDAA's character as intended to address "*the potential harmful interference to GPS* on DoD operations," Mot. 44 (emphasis added), the complaint plausibly alleges that those concerns are entirely pretextual.  *See, e.g.*, Compl. ¶ 7.  Those allegations must be taken as true.  It is also noteworthy that the FCC concluded that *permitting*, rather than preventing, ATC operations in Ligado's spectrum would benefit the public interest—so the Court can hardly conclude at this stage that the character of the government action favors the government so strongly that Ligado has failed to state a legislative takings claim as a matter of law.  *See id.*

¶ 29.

In any event, government actions in furtherance of a commanding public interest can still effect a taking where, as here, they are more analogous to an appropriation of property than a generally applicable regulation, and where the burden of the action falls uniquely on an individual property owner. *Cienega Gardens*, 331 F.3d at 1338; *Res. Invs.*, 85 Fed. Cl. at 519 (Where the government's regulation serves a "valid public interest," yet "plaintiffs certainly suffered a severe economic impact" and were possibly "singled out," plaintiffs were allowed to proceed with their takings claim.). The case the government cites, *Paradissiotis* v. *United States*, 304 F.3d 1271 (Fed. Cir. 2002), is distinguishable for that very reason. The Federal Circuit held that there is not a taking when a broadly-applicable regulation "freeze[s]the assets of, or prohibit[s] transactions by," a group of "foreign entities," in the name of national security. *Id.* at 1274. Those facts are a stark contrast to this case, where the NDAA singles out Ligado in particular. *See generally Tindall* v. *United States*, 167 Fed. Cl. 440, 447 n.2 (Fed. Cl. 2023).

### D.     The Challenged Conduct Is Attributable to the Government for the Purposes of a Takings Claim and Is Not an Ultra Vires Action

The government marshals a series of meritless arguments that Ligado fails to plead authorized government conduct. None holds water.

1. A compensable taking claim arises if the government's action is "authorized." *Board Mach., Inc.* v. *United States*, 49 Fed. Cl. 325, 330 (2001) (J. Damich) (quoting *Del-Rio Drilling Programs, Inc.* v. *United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998)). Government action is "authorized" so long as its agents' conduct falls "within the general scope of their duties, i.e., if their actions are a 'natural consequence of Congressionally approved measures,' or are pursuant to 'the good faith implementation of a Congressional Act[.]'" *Del-Rio*, 146 F.3d at 1362 (internal citations omitted). By contrast, conduct is "unauthorized" if it is "either explicitly prohibited" or

"outside the normal scope of the government officials' duties." *Darby Dev. Co.* v. *United States*, 160 Fed. Cl. 45, 53 (2022) (quoting *Del-Rio*, 146 F.3d at 1363).

The conduct at issue here involves authorized action.  The Complaint asserts that the agencies' conduct was part of an "unlawful scheme" to wrongfully deprive Ligado of its ATC authority for defense purposes.  Compl. ¶ 1.  But that conduct was surely within the scope of DOD's authority: the agency has authority to ensure national security.  That certain officers allegedly acted "wrongful[ly]" to further that purpose does not render the conduct unauthorized— that is, outside the scope of official duties.  *Del-Rio*, 146 F.3d at 1363 (quoting *Eyherabide* v. *United States*, 345 F.2d 565, 570 (Ct. Cl. 1965)); *see also Board Mach., Inc.*, 49 Fed. Cl. at 330 (conduct may be within the *scope* of agency authority even if it is wrongful or violates the law).

In any event, the government attacks only a subset of Ligado's allegations as involving unauthorized conduct, and its arguments are meritless.  DOD's alleged misleading statements to Congress and the public fall within government authority over the "dissemination of information," "especially in the context of public safety."  *Taylor*, 959 F.3d at 1089 & n.4.  Defendants' alleged threats to withhold contracts from Ligado's business partners were made pursuant to the NDAA, which was allegedly "designed to target Ligado" and specifically authorized DOD to withhold government contracts from Ligado's business partners.  Compl. ¶¶ 101-104.  Finally, the government's argument that DOD's alleged physical occupation of Ligado's spectrum is unauthorized *by the FCC* is misplaced.  The question is whether DOD's conduct is a "'natural consequence of Congressionally approved measures,' or are pursuant to 'the good faith implementation of a Congressional Act[.]'"  *Del-Rio*, 146 F.3d at 1362.  DOD is authorized to protect national security, and it has also justified its occupation of Ligado's spectrum under the guise of congressional authorization to protect GPS.  10 U.S.C. § 2281.

2.  The government also asserts that Ligado does not plausibly allege government *action* because three of its allegations "concern *inaction* by the Government."  Mot. 29 (emphasis in original).  But the complaint alleges that DOD affirmatively refused to implement the Order upon its issuance, and took steps (e.g., directing other agencies not to cooperate; threatening Ligado's partners) in furtherance of that decision.  *See supra* pp. 5-9.  That is not a mere claim of failure to act.  Moreover, even a claim of government inaction may give rise to a takings claim if the government is under a "duty to act."  *St. Bernard Par. Gov't* v. *United States*, 887 F.3d 1354, 1362 (Fed. Cir. 2018).  Here, the Order imposes an obligation on DOD, DOC, and NTIA to implement the Order, and the NDAA imposes on Defendants the obligation to certify certain cost estimates and establish a process for Ligado to provide reimbursements for those costs.  Compl. ¶¶ 112, 113.  Moreover, Ligado also alleges that Defendants took the affirmative action of threatening other federal agencies not to engage with Ligado.  *Id.* ¶¶ 84, 85.

## **CONCLUSION**

For the foregoing reasons, the motion to dismiss should be denied.

Dated:   March 25, 2024
        New York, New York

By: */s/ Harris M. Fischman*

**MUNGER, TOLLES, & OLSON, LLP**

Donald B. Verrilli, Jr., *Of Counsel*
Ginger D. Anders, *Of Counsel*
601 Massachusetts Ave. NW
Suite 500
Washington D.C., 200001
Tel: (202) 220-1100
Email:  donald.verrilli@mto.com
Email:  ginger.anders@mto.com

**SELENDY GAY PLLC**

Philippe Z. Selendy, *Of Counsel*
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 390-9000
Email: pselendy@selendygay.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

Harris M. Fischman
Martin Flumenbaum, *Of Counsel*
Carter E. Greenbaum*, Of Counsel*
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:  (212) 373-3000
Email: hfischman@paulweiss.com
Email: mflumenbaum@paulweiss.com
Email: cgreenbaum@paulweiss.com

**COVINGTON & BURLING LLP**

Megan Crowley, *Of Counsel*
850 10th Street NW
Washington, DC 20001-4956
Tel:  (202) 662-6000
Email: mcrowley@cov.com

*Counsel for Ligado Networks LLC*