IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|  |  |  |
|---|---|---|
| LIGADO NETWORKS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 23-1797 |
| v. | ) | |
| | ) | Senior Judge Damich |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

## DEFENDANT'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS MOTION TO DISMISS

---

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

L. MISHA PREHEIM
Assistant Director

NATHANAEL B. YALE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0464

BORISLAV KUSHNIR
Senior Trial Counsel

PATRICK ANGULO
KYLE BECKRICH
Trial Attorneys

September 9, 2024                    *Attorneys for Defendant*

Pursuant to the Court's July 29, 2024 order (ECF No. 27), defendant, the United States, respectfully submits this supplemental brief to address the questions posed by the Court.

1.     **The FCC granted Plaintiff a license with conditions attached.  Have the conditions been met?  Are the conditions precedent or on-going?**

As the Court correctly notes, the FCC granted Ligado's amended license modification applications subject to numerous conditions, which Ligado itself had proposed.  *See In the Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application*, Order And Authorization, 35 FCC Rcd. 3772, 3835 (Apr. 22, 2020) (April 2020 Order) ("The Conditions largely have been proposed or already agreed to by Ligado . . . . [W]e are accepting Ligado's proposals and making them Conditions of this license grant."). The April 2020 Order explains that many of these conditions were imposed "to ensure Ligado will address any identified potential harmful interference to GPS and MSS operations *before ATC network operations commence*."  *Id.* at 3783 (emphasis added); *see also id.* at 3834 (noting that "the conditions imposed in this Order and Authorization" were designed to "address any identified potential harmful interference concerns before ATC network operations commence"). Because Ligado must satisfy such conditions before it can commence network operations, these conditions are conditions precedent to Ligado's use of the license for terrestrial purposes.  *See* BLACK'S LAW DICTIONARY (12th ed. 2024) (defining "condition precedent" as "[a]n act or event, other than a lapse of time, that must exist or occur before a duty to perform something promised arises").[1]

---

[1] Some conditions, however, are ongoing obligations that continue to bind Ligado even after network operations commence.  *See, e.g.,* April 2020 Order, 35 FCC Rcd. at 3823, 3838 (Ligado must "expeditiously replace or repair as needed any U.S. Government GPS devices that experience or are likely to experience harmful interference," which covers devices "identified both pre- and post-deployment of Ligado's network").

Ligado has not contended that it satisfied all the conditions precedent or provided notice to the FCC that the conditions have been satisfied. *See* Pl. Resp. Nor does the docket in the ongoing FCC proceeding reflect that all the conditions precedent have been met. *See In the Matter of LightSquared Subsidiary LLC* Request to Modify its ATC Authorization, No. 12-340, available at https://www.fcc.gov/ecfs/search/docket-detail/12-340 (last visited Sept. 8, 2024).

**2.      If the conditions are conditions precedent, and certain conditions require coordination and cooperation with certain government entities, how can Plaintiff comply with the conditions if the government entities refuse to cooperate or coordinate?**

As an initial matter, many of the conditions within the April 2020 Order do not require any action by the United States. These include Ligado's obligation to provide information to GPS device manufacturers, April 2020 Order, 35 FCC Rcd. at 3838; and Ligado's obligation to set up and maintain a toll-free telephone number for the public to report interference complaints, *id.* at 3838-39. Although Ligado could have satisfied these pre-conditions without the cooperation of Government entities, nothing in the complaint or in Ligado's opposition to our motion suggests that it has done so to date. Nor has Ligado met the key condition of notifying the FCC that it is ready to deploy a nationwide network. *See id.* at 3838. Without knowing where and when Ligado will deploy, Federal agencies cannot know which GPS devices might be adversely affected by interference caused by Ligado's use of its terrestrial license. *See id.*[2]

In any event, the modified license in no way guaranteed Ligado any particular outcome from its coordination with Federal agencies. As the D.C. Circuit explained in an analogous

_____

[2] To the extent Ligado disagrees with this interpretation of the conditions in the FCC Order, or to the extent there is ambiguity in what the conditions mean, such matters should be resolved by the FCC through the comprehensive remedial scheme of the Communications Act. *Alpine PCS, Inc. v. United States*, 878 F.3d 1086, 1096-98 (Fed. Cir. 2018).

licensing dispute where the Commission conditioned an operator's use of a license upon the outcome of coordination with third parties, "the license contains no 'unconditional right' to any particular outcome in the coordination process." *AMSC Subsidiary Corp. v. FCC*, 216 F.3d 1154, 1159 (D.C. Cir. 2000).  Instead, the "license is expressly conditioned upon and thereby made subordinate to the outcome" of the coordination process.  *Id.*

And, as we pointed out in our reply brief, if Ligado is unable to comply with any of the pre-conditions in the April 2020 order, it may, pursuant to 47 C.F.R. § 25.117, petition the FCC to set aside or suspend those pre-conditions.  Ligado may also, pursuant to 47 C.F.R. § 1.3, seek waiver of any unsatisfied pre-conditions.  Ligado thus can ask the FCC to remove or modify any license conditions that it supposedly cannot meet due to Government objection.  So, even taken at face value, Ligado's allegations about lack of cooperation from Government entities do not explain why Ligado has not complied with or sought to modify the April 2020 Order.

3.    **How can the FCC remedy refusal by government agencies to cooperate and coordinate if they refuse to do so?**

The FCC directly addressed dispute resolution between Ligado and Federal agencies in the April 2020 Order: "Consistent with FCC precedent in other proceedings, we would expect Ligado and U.S. Government agencies to work together in good faith, including with regard to negotiation to resolve any disputes …."  April 2020 Order, 35 FCC Rcd. at 3825 (footnote omitted).  The FCC discussed a 2014 proceeding that similarly required coordination between private licensees and federal agencies, explaining that if the licensees there "believed that a Federal incumbent was not negotiating in good faith, then NTIA could assist and the licensee would have the option of informing the Commission."  *Id.* (citing *The Federal Communications Commission and The National Telecommunications and Information Administration:*

*Coordination Procedures in the 1695-1710 MHz and 1755-1780 MHz Bands*, 29 FCC Rcd. 8527, 8539 (2014) (AWS-3 Notice).  The FCC then added: "We would expect interested parties to follow a similar practice here, to the extent they are unable to resolve any issues associated with Ligado's commitments and the conditions we adopt in this Order."  *Id.* at 3825 n.355.

Had Ligado followed the FCC's direction and informed the Commission of its concerns about alleged agency bad faith, the FCC had tools at its disposal, including engaging NTIA assistance, to address alleged intransigence.  The FCC could set aside or suspend the conditions at issue, in whole or with respect to the specific agencies, locations, or devices at issue.  *See* 47 C.F.R. § 25.117.  Alternatively, the FCC could remedy the refusal by waiving any noncompliance by Ligado.  *See id.* at § 1.3.

In addition to these formal tools, the FCC routinely resolves coordination disputes between Federal and non-Federal operators through informal means, putting it in a strong position to remedy alleged bad faith by agencies.  Indeed, the 2014 precedent cited in the April 2020 Order contemplated "informal negotiation, mediation, or non-binding arbitration" to "clearly define and narrow the issues for formal agency resolution by NTIA, the Commission, or jointly, as applicable."  AWS-3 Notice, 29 FCC Rcd. at 8539.  Such action by the FCC would provide Ligado with adequate relief for the Government actions alleged in the complaint.  *Alpine PCS, Inc. v. United States*, 878 F.3d 1086, 1096 (Fed. Cir. 2018) (adopting "the proposition that the FCC had the power to grant Alpine adequate relief, by *eliminating the taking*, providing compensation, or some combination" (emphasis added)).  Any claim that the Government has interfered with Ligado's ability to satisfy the conditions in the April 2020 Order must be brought through the comprehensive remedial scheme of the Communications Act.  *See id.*

**4.** **The cases cited by the parties that hold that an FCC license is not a property interest appear to apply only to FCC action in not granting, revoking or limiting a license.  In this case, according to Plaintiff, government entities *other than the FCC* are occupying or interfering with the granted spectrum.  Why is this not a taking?  Is the FCC able to remedy the occupation of or interference with Plaintiff's spectrum by other government entities?**

In answering this question, it is important to distinguish between step one of the Court's takings analysis, which asks whether a property interest exists, and step two, which asks whether a taking has occurred.  Whether an FCC license constitutes a "property interest" does not turn on which entity is allegedly interfering with the license.  Because if an FCC license is not a property interest for purposes of the Takings Clause, then no Government entity can ever "take" the license under the Fifth Amendment.

The Federal Circuit has established a "two-part test" for analyzing takings claims.  *Am. Pelagic Fishing Co., L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004).  "First, as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment."  *Id.*  And "[s]econd, after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest."  *Id.*  The Court has stressed, however, that "only persons with a valid property interest at the time of the taking are entitled to compensation."  *Id.*  Thus, "[i]f the claimant fails to demonstrate the existence of a legally cognizable property interest, the court[']s task is at an end."  *Id.*; *see also Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 854 (Fed. Cir. 2009) ("[W]e do not reach this second step [of the takings analysis] without first identifying a cognizable property interest.").

Our motion establishes that Ligado lacks a property interest in its proposed terrestrial license because an FCC license does not give rise to a cognizable property interest as a matter of

law and because, even if it could, Ligado has failed to satisfy the specific pre-conditions in its proposed license.  *See* Def. Mot. 19-28; Def. Reply 4-11.  It is irrelevant that Ligado claims the alleged property interest to have been invaded by Federal agencies other than the FCC.  The Communications Act makes clear that spectrum is a public right and does not generate private property rights *vis-a-vis* the United States: "It is the purpose of this chapter, among other things, to maintain the control of the *United States* over all the channels of radio transmission." 47 U.S.C. § 301 (emphasis added).  Under the Act, it is the United States (not just the FCC) that controls spectrum.  *See also* 47 U.S.C. § 304 (license applicant must "waiv[e] any claim to the use of any particular frequency or of the electromagnetic spectrum as against the regulatory power of the *United States* because of the previous use of the same, whether by license or otherwise") (emphasis added).  And Ligado has not made (and cannot make) a claim that it has any independent right to the spectrum or its license separate and apart from Federal law.  Similarly, Ligado cites no authority for the novel proposition that it can enforce its license as property against a Federal agency other than the FCC.  This is unsurprising because Congress has never granted the FCC the authority to transform the public's spectrum into private property.

Nor does the reasoning of the D.C. Circuit in *Mobile Relay Assocs. v. FCC*, 457 F.3d 1 (D.C. Cir. 2006), allow one to argue that the Communications Act provides a private property interest against other agencies.  That case held that, in light of the dictates of section 301, any ability to use spectrum licensed by the FCC "does not constitute a property interest protected by the Fifth Amendment."  *Id*. at 12.  Although *Mobile Relay* involved the FCC, the D.C. Circuit's language was categorical and admits no exception for claims against other agencies.

The conclusion that Ligado has no cognizable property right is fatal to Ligado's takings claim, as it means that Ligado cannot proceed beyond step one of the Court's takings inquiry.

Any step two questions that examine whether a taking has occurred – such as the nature of the alleged Governmental action – are therefore irrelevant to the Court's analysis under step one. *See Fishermen's Finest, Inc. v. United States*, 59 F.4th 1269, 1278 n.6 (Fed. Cir. 2023) (declining to consider the nature of the Governmental action as part of step one of the Court's takings analysis, because "such considerations may go to whether a property was 'taken,' not to whether it was cognizable property in the first place").

5.    **Defendant correctly states that, in order for a compensable taking to occur, the taking must be authorized by the government.  It would appear that the government entities alleged to have occupied Plaintiff's licensed spectrum acted within their authority.  Doesn't this satisfy the requirement of authorized government activity?**

Ligado has not alleged authorized Governmental action, as it must to bring a takings claim, including a takings claim based on physical occupation.  Ligado contends that Congress has provided the FCC with sole statutory authority to allocate spectrum and determine the bands within which Government entities and private parties may operate, and that in the absence of the FCC's permission, Federal agencies cannot operate within that spectrum.  *See* Compl. ¶ 22 ("The Communications Act exclusively empowers the FCC to allocate certain bands of frequencies to either public or private sector uses, issue licenses to use spectrum bands to commercial users through auction or other means, and regulate the activities of those commercial and governmental users.") (footnote omitted); ¶ 24 (same).  Ligado further alleges that the Department of Defense has flouted the statutory authority committed to the FCC by engaging in a yearslong scheme to occupy the spectrum licensed to Ligado, in what amounts to a pretextual effort to hide its purported occupation from Congress, the White House, and other agencies.  *See, e.g.,* Pl. Op. 7 ("DOD's actions were designed to cover up DOD's continued and secret use of Ligado's exclusively licensed spectrum for other purposes.") (citing Compl. ¶ 2).  Under any

7

reasonable reading of *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358 (Fed. Cir. 1998), Ligado is alleging conduct that is *ultra vires* and cannot form the basis of a takings claim as a matter of law.[3]   Indeed, Ligado's allegations and briefing belie any contention that the alleged Government occupation of spectrum constitutes either a "good faith implementation of a Congressional Act" or a "natural consequence of congressional approved measures."  *Del-Rio*, 146 F.3d at 1362.  Accordingly, Ligado has not satisfied the requirement of alleging authorized Government conduct for purposes of its physical occupation claim.

**6.    Regarding the 2021 National Defense Authorization Act: doesn't Congress have the right to modify agency action?  If so, how can there be a legislative taking?**

Yes, Congress has the inherent constitutional authority to modify agency action, and Congress's exercise of such authority as it relates to this case precludes a takings claim for two reasons.  First, when a plaintiff voluntarily participates in a highly regulated industry in which Congress may oversee and modify agency action, the plaintiff likely lacks a cognizable property interest.  *See Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012) (citing *Mitchell Arms, Inc. v. United States*, 7 F.3d 212 (Fed. Cir. 1993)).

Second, where, as here, Congress steps in to regulate (or modify the regulation of) an already highly regulated field, the claimant does not possess the type of reasonable investment-backed expectations necessary to state a legislative taking claim.  *See* Def. Mot. 42-43; Def. Reply 18-20.  In fact, Congress was so interested in the harmful interference concerns that it passed specific legislation that required the FCC to notify Congress when permitting commercial

---

[3] In *Darby Development Co., Inc. v. United States*, No. 22-1929, --F. 4th--, 2024 WL 3682385 (Fed. Cir. Aug. 7, 2024), the Federal Circuit recently addressed the meaning of authority for purposes of stating a takings claim.  The mandate has yet to issue in that case, and regardless, the Government conduct alleged by Ligado in this case would be unauthorized under any reading of *Darby*.

terrestrial operation in the relevant bands, 47 U.S.C. § 343.  Ligado should not be surprised that Congress would address the significant commercial and national security concerns at issue here, especially where the positions of the two Federal spectrum regulators differed, at least in certain respects, on the measures required to address this important national security issue.  And by commissioning the National Academies of Science, Engineering, and Medicine (NASEM) report in the 2021 NDAA, Congress reinforced that the FCC's April 2020 Order was not the last word with respect to potential harmful interference by Ligado's use of its modified license for terrestrial purposes.  *See* Def. Mot. 11-12.   Accordingly, because it highlights both Ligado's failure to allege a cognizable property interest and a lack of investment-backed expectations, Congress's right to modify the FCC's licensing decision precludes any takings claims here.

7.     **How can a license, which is not a property interest vis-à-vis the FCC, become one vis-à-vis other government entities?  Is the Plaintiff's complaint best characterized as an interference with its license by other government entities, which is a tort and which can be remedied by the FCC?**

As discussed above, an FCC spectrum license is not a property interest regardless of which Government entity is alleged to have engaged in a taking.  Ligado has no property interest in its modified license, whether the alleged taking of that license is asserted against the United States acting through the FCC or another Federal agency.  *See* Response to Question 4, *supra*.

And the Court is correct that Ligado's regulatory takings claim alleges that Government agencies have unlawfully interfered with the use of its license.  But as we explained above, Ligado has a remedy for this allegedly tortious behavior – it can petition the FCC to modify or waive conditions that it contends have unfairly prevented it from being able to use its license.

The tortious nature of Ligado's physical takings claim similarly means that this Court lacks jurisdiction over that claim.  Indeed, Ligado has failed to show that its factual allegations

give rise to a physical takings claim rather than a potential tort claim.  Some invasions of private property are torts, not takings:  "[N]ot every 'invasion' of private property resulting from government activity amounts to an appropriation." *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003) (citation omitted); *see Cedar Point Nursery v. Hassid*, 594 U.S. 139, 159 (2021) ("Isolated physical invasions, not undertaken pursuant to a granted right of access, are properly assessed as individual torts rather than appropriations of a property right."); *Ideker Farms, Inc. v. United States*, 71 F.4th 964, 980-82 (Fed. Cir. 2023) (reaffirming the tort/taking distinction) (citing *Cedar Point*, 594 U.S. at 159).  To establish a physical taking rather than a tort, a plaintiff must show that: (1) the Government intended "to invade a protected property interest or the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action;" and (2) "the nature and magnitude of the government action" is sufficient to establish a taking.  *Ridge Line*, 146 F.3d at 1355-56 (citation omitted).  Ligado must satisfy both prongs to establish subject matter jurisdiction.  *See Moden v. United States*, 404 F.3d 1335, 1346 (Fed. Cir. 2005).

Ligado cannot meet the first prong here because, as discussed in our motion, its physical taking allegations rest on pure speculation.  Def. Mot. 32-33.  Nor can Ligado meet the second prong, which requires it to show that the Government's interference with any property rights "was substantial and frequent enough to rise to the level of a taking." *Ridge Line*, 346 F.3d at 1357.  Isolated invasions do not satisfy this standard.  *Id.*  As detailed in our motion, Def. Mot. 32-33; Def. Reply 14-15, Ligado fails to plead factual allegations concerning the frequency and extent of the Government's purported invasion of the licensed spectrum.  Thus, with respect to its physical takings claim, it has not alleged this second prong as a matter of law, and the Court lacks jurisdiction over the claim.  *Ridge Line*, 146 F.3d at 1355-56.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ L. Misha Preheim
L. MISHA PREHEIM
Assistant Director

/s/ Nathanael B. Yale
NATHANAEL B. YALE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0464

BORISLAV KUSHNIR
Senior Trial Counsel

PATRICK ANGULO
KYLE BECKRICH
Trial Attorneys

September 9, 2024                     *Attorneys for Defendant*