**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| LIGADO NETWORKS LLC,<br>    Plaintiff,<br>  v.<br>UNITED STATES OF AMERICA;<br>DEPARTMENT OF DEFENSE;<br>DEPARTMENT OF COMMERCE; and<br>NATIONAL TELECOMMUNICATIONS<br>AND INFORMATION<br>ADMINISTRATION,<br><br>    Defendants. | Case No. 23-1797<br>Senior Judge Damich |

**PLAINTIFF'S RESPONSE TO THE COURT'S JULY 29, 2024 ORDER**

Plaintiff Ligado Networks LLC respectfully submits the following responses to the Court's questions in its Supplemental Briefing Order.

*1. The FCC granted Plaintiff a license with conditions attached. Have the conditions been met? Are the conditions conditions precedent or on-going?*

The license conditions in Section H of the April 2020 Order ("Order") are ongoing conditions on Ligado's *operation* of its ATC authority, not conditions precedent to the *existence* of that authority. Several aspects of the Order confirm that conclusion. The Order—termed by the FCC its "Order and *Authorization*" throughout, *see, e.g.*, Order ¶¶ 128–131 (emphasis added)—grants immediate ATC authority in its ordering clauses, stating that "[Ligado's] authorization for [ATC] operations . . . is modified to *include authority to provide terrestrial service* as described in its application." Order ¶ 159 (emphasis added); MTD Opp. 22. The Order further states that Ligado's failure to comply with the conditions could result in a "partial loss of ATC authority," Order ¶ 131, confirming that Ligado currently possesses ATC authority. The conditions therefore are ongoing obligations attendant to Ligado's operation of its granted ATC authority, not conditions precedent to Ligado's attainment of ATC authority. That assurance is why Ligado has already paid billions of dollars to facilitate its ability to use its ATC authority.

As the government does not dispute, Ligado has satisfied the Order's conditions to the fullest extent possible given DOD's refusal to implement the Order. Among other things, Ligado has taken steps to develop its use of the spectrum through industry spectrum bodies, has developed an equipment replacement program, and has worked on the design of essential equipment. Compl. ¶¶ 77-78, 81-82, 84-85. However, DOD's refusal to engage with Ligado has made it impossible to meet the Order's conditions requiring Ligado to coordinate with agencies, including DOD, to address potential GPS interference concerns. Order ¶¶ 144-45. As a result, Ligado has been unable to begin using its ATC authority, bringing the company to the brink of bankruptcy.

*2. If the conditions are conditions precedent, and certain conditions require coordination and cooperation with certain government entities, how can Plaintiff comply with the conditions if the government entities refuse to cooperate or coordinate?*

As noted, the conditions are merely ongoing conditions on Ligado's *use* of its ATC authority. So long as DOD refuses to cooperate, Ligado cannot comply with the conditions requiring coordination with the government—and therefore cannot avail itself of its exclusive right to use the spectrum. DOD has instructed other agencies not to work with Ligado or permit Ligado to develop the "repair or replace" program required by the Order, thereby stymying Ligado's ability to repair or replace potentially affected devices. Compl. ¶¶ 67-68, 74. The government's argument that Ligado's inability to comply deprives Ligado of any property interest, *see* MTD 27-28, therefore reduces to an absurdity: the government argues that it cannot be held liable for a taking because DOD has nullified Ligado's property interest by refusing to implement the Order. *Cf. United Nuclear Corp. v. United States*, 912 F.2d 1432, 1437-38 (Fed. Cir. 1990) (taking occurred when agency frustrated plaintiff's satisfaction of leasehold conditions).

*3. How can the FCC remedy refusal by government agencies to cooperate and coordinate if they refuse to do so?*

The FCC cannot remedy the agencies' refusal to cooperate with Ligado. The FCC has exclusive authority to regulate spectrum but lacks any authority to compel other agencies to take (or to desist from taking) actions. 47 U.S.C. § 312(b) (authority to issue cease-and-desist orders only against "persons," a term defined in 47 U.S.C. § 153(39) not to include the government); *Return Mail, Inc. v. United States Postal Serv.*, 587 U.S. 618, 627 (2019) (presumption that "person" does not include the government). Nor could the FCC seek to enjoin these agencies from thwarting its order. 47 U.S.C. § 401 (authorizing enforcement suits only against private parties, i.e., persons under § 153(39)). That is why Ligado's remedy is a takings suit in this Court.

Notably, the government has not argued that the FCC has authority to compel DOD and

2

other agencies to cooperate. Instead, the government has suggested that Ligado's remedy is to petition the FCC to lift the relevant conditions. MTD 16-18; Reply 2. But those conditions reflect the FCC's considered judgment as to what is necessary to further the public interest, consistent with its statutory mandate. Order ¶ 2; MTD Opp. 13 (Federal Circuit precedent establishes plaintiff need not seek to remove conditions as prerequisite to suit). Even more to the point, during the FCC licensing proceedings, DOD strenuously contended that Ligado should not receive ATC authority at all, and that the conditions ultimately imposed by the FCC should be *more* rigorous, not less. DOD would doubtless make those arguments again should Ligado seek removal of the relevant conditions. It is therefore particularly inappropriate for the government to suggest to this court that the problems DOD has created can be solved by the FCC.

***4. The cases cited by the parties that hold that an FCC license is not a property interest appear to apply only to FCC action in not granting, revoking or limiting a license. In this case, according to Plaintiff, government entities other than the FCC are occupying or interfering with the granted spectrum. Why is this not a taking? Is the FCC able to remedy the occupation of or interference with Plaintiff's spectrum by other government entities?***

a. As the question indicates, the cited cases hold only that FCC license holders may not claim property rights as against the FCC's statutory authority to modify, revoke, or decline to renew licenses on statutorily enumerated grounds that were in existence when the license was granted. MTD Opp. 20-21 & n.6; *Mobile Relay Associates v. FCC*, 457 F.3d 1 (D.C. Cir. 2006); *FCC v. Sanders Bros. Radio Station*, 309 U.S. 470 (1940). *Mobile Relay*—the primary case on which the government relies—involved a takings claim based on actions the FCC took pursuant to the Communications Act. The court's statement that the rights granted to the licensees were "expressly limited by statute subject to the Commission's considerable regulatory power and authority," 457 F.3d at 12, therefore reflected the principle that any property interest conferred by a license is necessarily qualified by the FCC's statutory authority to modify, revoke, or decline to

renew the license, which acts as a condition on the license. *See* 47 U.S.C. § 312; 47 U.S.C. § 301 (no license is to be "construed to create any right, *beyond* the terms, conditions, and periods of the license") (emphasis added). A licensee therefore may not contend that the FCC's exercise of its authority to enforce the conditions of a license effectuates a taking, and the cited cases so hold.

That proposition is entirely consistent with the conclusion that the FCC's grant of ATC authority confers a property right against occupation of, and interference with, Ligado's spectrum *by DOD*. The cited cases do not address that distinct question. As an initial matter, the FCC license confers on Ligado a compensable property interest in its ATC authority because the license has the critical attributes of property: it gives Ligado the exclusive right to use the designated spectrum and to exclude others, it can be transferred, and it cannot be revoked except by the FCC on specified grounds. MTD Opp. 14-18. While the cited cases establish that the property interest conveyed by a license is qualified by the *FCC's* statutory authority, Congress has not conferred on any agency *other* than the FCC any authority over FCC licenses. 47 U.S.C. § 303. Ligado's property interest in its ATC authority is therefore *not* qualified by the ability of any other agency to alter or interfere with the license. Ligado therefore has a compensable property interest as against DOD's occupation of and interference with the spectrum granted to Ligado, and that interference effectuates a taking. *See* Compl. ¶¶ 134-53; MTD Opp. 23-39.

b. The FCC cannot remedy the agencies' interference with Ligado's ATC authority for the reasons stated in response to Question 3. In addition, the FCC lacks authority to award the damages Ligado seeks, *see* 47 U.S.C. § 209 (damages as to common carriers only), and it has no free-floating authority to award compensation against the federal government for a takings claim.

**5. *Defendant correctly states that, in order for a compensable taking to occur, the taking must be authorized by the government. It would appear that the government entities alleged to have occupied Plaintiff's licensed spectrum acted within their authority. Doesn't this satisfy the requirement of authorized government activity?***

4

The DOD, DOC, and NTIA actions alleged in the Complaint are authorized for takings purposes because they fell "within the general scope of [the agencies'] duties." *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1362 (Fed. Cir. 1998). The government focuses on several alleged actions that it asserts were unauthorized: DOD's dissemination of false information, its pressure on private companies not to contract with Ligado, and its operation in or near Ligado's spectrum. Reply 12-13. The government conflates allegedly *unlawful* actions with *unauthorized* ones. "[T]he mere fact that a government officer has acted illegally does not mean he has exceeded his authority for Tucker Act purposes, even though he is not 'authorized' to break the law." *Del-Rio*, 146 F.3d at 1362. "A Tucker Act remedy" therefore "lies if a taking occurs while the government officer is acting within the normal scope of his duties," regardless of whether the action might be tortious or illegal. *Id*. Each of the actions that the government highlights unquestionably falls within DOD's authority—to disseminate information, including to Congress; to withhold government contracts from Ligado's business partners pursuant to the NDAA; and to protect GPS under 10 U.S.C. § 2281. That those actions may also be defamatory, or may violate the Order, does not render them outside the scope of DOD's own statutory authority.

**6. Regarding the 2021 National Defense Authorization Act: doesn't Congress have the right to modify agency action? If so, how can there be a legislative taking?**

Although Congress always retains Article I power to modify agency action, its use of that power to abrogate or limit an already-created property interest may effect a taking under the Fifth Amendment. That is so even where, as here, the property interest itself arises from a congressionally enacted statute. The key question is whether, in the statutory scheme creating the property interest, Congress has conferred on the property holder vested rights that include a

5

reasonable investment-backed expectation not to be subject to future legislative action that abrogates or diminishes the value of the property right. Congress has done so here.

When Congress empowers an agency to confer a property right on a private party, the scope of that interest is defined by the statutory framework in place at the time of the interest's creation. *See Piszel v. United States*, 833 F.3d 1366, 1374 (Fed. Cir. 2016). That framework, together with background principles and the nature of the property interest created, may give rise to a reasonable expectation that once the relevant agency grants the property interest, Congress will not subsequently exercise its Article I authority to revoke or limit the property interest granted by the agency. In other words, Congress's ability to alter agency action through subsequent legislation is not a limitation that "inhere[s]" in the property interest that Congress has previously created. *Id.* If Congress nonetheless subsequently does legislate in derogation of the property interest, "retroactive application" of that legislation to the "existing property interest" will raise "difficult and sensitive questions of a taking." *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1153 (Fed. Cir. 2014)); *accord Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011 (1984) (Congress's provision that EPA would keep certain trade secret data submitted to the government confidential created a reasonable investment-backed expectation of confidentiality, such that subsequent statutory amendment permitting publication of already-submitted data could effectuate a taking).

Patents are a salient example. In the Patent Act, Congress has given the PTO authority to issue patents. The grant of a patent confers a property interest that, like an FCC license, is purely a creature of federal statute. That interest is protected by the Fifth Amendment. *See Oil States Energy Services, LLC v. Greene's Energy Group, LLC*, 138 S. Ct. 1365, 1375 (2018). The Federal Circuit has held that if Congress subsequently legislates to broaden the circumstances under which patents can be canceled, retroactive application of that law to existing patents may give rise to a

6

taking if the new law represents a "significant[] enough" change to interfere with the patentee's reasonable investment-backed expectations. *Celgene Corp. v. Peter*, 931 F.3d 1342, 1358 (Fed. Cir. 2019). That is so *even though* Congress always retains Article I authority to modify the PTO's actions. If Congress's Article I authority were a limitation inhering in the patent property right, then Congress could freely alter the governing legal framework to diminish patent rights, or even reverse the PTO's grant of particular patents, without triggering the Fifth Amendment. But the Federal Circuit has proceeded from the opposite premise: once the PTO has granted a patent, Congress's subsequent alteration of the legal framework can effectuate a taking. *Id*.

Likewise here, Congress's modification of the framework governing Ligado's FCC license implicates the Takings Clause. Ligado's FCC license conferring ATC authority constitutes a property interest for the reasons stated above and in Ligado's primary briefing. The statutory framework in existence in 2020, when the ATC authority was granted, establishes the bounds of that property interest. *Piszel*, 833 F.3d at 1374. The congressionally established limitations are narrow and definite: only the FCC may revoke or alter an FCC license, and the FCC may do so only on grounds that overwhelmingly involve the licensee's failure to comply with the terms of the license or other federal statutes (that is, the FCC's discretion to revoke or alter granted licenses is sharply constrained). 47 U.S.C. § 312. Moreover, nothing in the statute suggests that Congress might reverse the FCC with respect to the issuance of particular licenses, or empower other agencies to do so. *Cf. Cienega Gardens v. United States*, 331 F.3d 1319, 1332 (Fed. Cir. 2003) (no expectation that Congress would alter statute governing mortgages where contract did not so suggest). The law in place when Ligado's property interest was created therefore gave Ligado a reasonable investment-backed expectation that once ATC authority was granted, that authority could not be revoked or limited except by the FCC, upon a showing that Ligado had engaged in

7

the conduct that constitutes grounds for revocation or other sanctions. Indeed, that "governmental guarantee," *Ruckelshaus*, 467 U.S. at 1011, is critical to the telecommunications system: absent assurance that FCC-granted authority will not be revoked or limited except in statutorily specified circumstances, licensees would lack the incentive to make, and the ability to attract, the multi-billion dollar investments required to provide advanced telecommunications services. The U.S. telecommunications industry as we know it would not exist. Accepting the government's position would thus have sweeping repercussions for the industry as a whole—an industry that is a critical part of U.S. infrastructure.

In the 2021 NDAA, Congress purported to alter the statutory framework governing Ligado's already-granted ATC authority by permitting DOD to permanently block Ligado from using its ATC authority. The 2021 NDAA thus fundamentally alters the statutory framework governing Ligado's spectrum rights by giving an entirely different government agency—DOD, not FCC—authority to block Ligado's use of its ATC authority for reasons entirely absent from Section 312, and without any of the protections established in that provision. Because the 2021 NDAA "was enacted after [Ligado's] property interest was acquired, it cannot be said to 'inhere' in" that property interest. *Piszel*, 833 F.3d at 1374. And because Ligado had a statutorily created expectation that Congress would not purport to revoke or interfere with its license after it was granted by the FCC, Congress's enactment of the 2021 NDAA implicates the Takings Clause. That statute constitutes a taking for the reasons explained in Ligado's principal briefing.

**7. How can a license, which is not a property interest vis-à-vis the FCC, become one vis-à-vis other government entities? Is the Plaintiff's complaint best characterized as an interference with its license by other government entities, which is a tort and which can be remedied by the FCC?**

a. As an initial matter, Ligado's property interest in its ATC authority *is a property interest vis-à-vis the FCC as well as all other government entities*. Ligado's license bears the crucial

8

indicia of a property right, MTD Opp. 14-18, and those attributes establish that the FCC license confers on Ligado a cognizable property interest as against the world. To be sure, Ligado's property interest is qualified by the background limitations established in the Communications Act. *E.g.*, 47 U.S.C. § 312. The license therefore does not confer on Ligado a property interest without limitation as against the FCC, which retains a narrow right to modify or revoke the license pursuant to the agency's Communications Act authority. But if Ligado is deprived of its exclusive ATC rights through any other means, by the FCC or other government entity, a taking may occur.

Even if the Court concludes that Ligado's license does not confer a compensable property interest as against the FCC, there can be no question that its license *is* compensable property as against other government actors. While the FCC's authority is part of the existing statutory framework pursuant to which the license was granted—which makes that authority one of the conditions governing the property interest—the Communications Act does not condition FCC licenses on the authority of *other* agencies. MTD Opp. 14-18 (license is property right vis-à-vis other agencies). Rather, the Act vests exclusive authority to regulate licenses on the FCC. To other agencies, such as DOD, Ligado's license is not modifiable or revocable. Indeed, in Ligado's licensing process, DOD, DOC, and NTIA occupied a similar position as interested private parties: they expressed their views to the FCC, which had ultimate authority to (and did) reject them. When the FCC granted Ligado ATC authority, therefore, Ligado obtained a property interest that excludes other government actors, including DOD, from the spectrum. Recognizing that property interest as compensable does not suggest that the *FCC's* lawful exercise of its authority to alter or revoke a license, as specified in the terms and conditions, would require compensation.

It is not unusual for the scope of a property right to vary as against different actors. For instance, a tenant whose yard contains a tree encroaching on a next-door yard might have the right

to refuse entry to the next-door tenant who wants to cut down the tree. But he might *not* have the right to refuse entry to his own landlord when *he* comes to cut down the tree, assuming the landlord complies with the lease provisions. Ligado is similarly situated. Its license gives it robust property rights as against agencies other than the FCC but more limited rights as against the FCC itself.

      b. DOD and DOC's actions constituted a taking, not a tort. An invasion of property is a taking rather than a tort if the invasion is the "direct, natural or probable result of authorized activity," "appropriate[s] a benefit to the government . . . or at least preempt[s] the owner[']s right to enjoy his property, and is "substantial and frequent enough to rise to the level of a taking." *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355-57 (Fed. Cir. 2003). Those requirements are satisfied here. *First*, Ligado alleges that DOD's refusal to coordinate with Ligado and its other efforts to undermine Ligado's ability to use its ATC authority were intentional. In addition, any actual occupation of Ligado's spectrum for DOD's uses necessarily must have been either intentional or have come as the direct and natural result of DOD's actions. *Second*, DOD's actions have appropriated the benefit of Ligado's spectrum to DOD, at Ligado's expense: DOD has been able to use the spectrum while Ligado has not. *Third*, DOD's interference is unquestionably substantial. DOD has refused to comply with the Order since its issuance, and there is no indication that will change. DOD's interference is not the sort of one-off occurrence properly characterized as a tort. *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 159 (2021) (distinguishing between an isolated trespass and invasions undertaken pursuant to an established policy).

      c. However the invasion is characterized, the FCC would not be able to provide an adequate remedy. The FCC cannot provide monetary compensation to Ligado for a taking or a tort committed by DOD and, as discussed above, it lacks authority to compel other agencies to take or not take actions or to seek equitable relief to constrain those agencies.

Dated: September 9, 2024
New York, New York

By: */s/ Harris M. Fischman*

**MUNGER, TOLLES, & OLSON, LLP**

Donald B. Verrilli, Jr., *Of Counsel*
Ginger D. Anders, *Of Counsel*
601 Massachusetts Ave. NW
Suite 500
Washington D.C., 20001
Tel: (202) 220-1100
Email: Donald.Verrilli@mto.com
Email: Ginger.Anders@mto.com

**SELENDY GAY PLLC**

Philippe Z. Selendy, *Of Counsel*
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 390-9000
Email: pselendy@selendygay.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

Harris M. Fischman
Martin Flumenbaum, *Of Counsel*
Carter E. Greenbaum, *Of Counsel*
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
Email: hfischman@paulweiss.com
Email: mflumenbaum@paulweiss.com
Email: cgreenbaum@paulweiss.com

**COVINGTON & BURLING LLP**

Megan Crowley, *Of Counsel*
850 10th Street NW
Washington, DC 20001-4956
Tel: (202) 662-6000
Email: mcrowley@cov.com

*Counsel for Ligado Networks LLC*