**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| LIGADO NETWORKS LLC,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | Case No. 23-1797L<br><br>Senior Judge Damich |

**<u>FIRST AMENDED COMPLAINT</u>**

1. This case concerns the largest uncompensated taking of private property by our nation's government in modern times. Officials and agencies at the highest levels of our government have engaged in an unlawful scheme to take tens of billions of dollars of property, in the form of a spectrum use right, belonging to plaintiff Ligado Networks LLC ("Ligado" or the "Company") without any compensation and then to destroy Ligado's reputation, threaten its business partners, and prevent Ligado from using its spectrum.[1] The Department of Defense ("DOD"), the Department of Commerce ("DOC"),[2] and Congress have unlawfully prevented Ligado from using the electromagnetic spectrum that the Federal Communications Commission ("FCC") exclusively licensed to Ligado for terrestrial services. Indeed, DOD has gone further: it has taken Ligado's spectrum for the agency's *own* purposes, operating previously undisclosed systems that use or depend on Ligado's spectrum without compensating Ligado.

---

[1] This Complaint refers to Ligado Networks LLC and its predecessors-in-interest collectively as "Ligado." Ligado's predecessors-in-interest include LightSquared Subsidiary LLC, SkyTerra Communications, Inc., Mobile Satellite Ventures Motient Services, Inc., and American Mobile Satellite Company.

[2] Unless stated otherwise, references to DOC include the National Telecommunications and Information Administration ("NTIA"), an agency within DOC.

2. For years, the U.S. Government has favored the development of 5G technology to seamlessly connect electronic devices in rural areas and provide ultra-fast, ultra-reliable networks to support critical infrastructure industries like public safety, energy, and transportation. To fulfill these and other key policy goals, the U.S. Government encouraged companies to use their licensed spectrum to develop extensive, resource-intensive ground networks to make 5G services available to people and companies all across the country. Ligado answered that call.

3. Ligado has held a Mobile Satellite Services ("MSS") license since 1989. As the FCC forcefully reaffirmed just this past April,[3] that license vests Ligado with an exclusive right to use portions of radio spectrum for satellite communications in defined geographic areas, including the continental United States. To encourage more intensive use of the spectrum and meet the growing needs of the wireless industry, the FCC announced that it would grant Ancillary Terrestrial Component ("ATC") modifications to MSS licenses in 2003; by 2004, Ligado had obtained its first FCC authorization to deploy ATC to support communication services on satellite phones connecting to both satellite and terrestrial networks.[4] Subsequently, Ligado sought FCC approval to build a broad nationwide terrestrial network under its ATC authority so that it could bring advanced wireless services to the continental United States.

4. Over the course of nearly two decades, Ligado worked with key stakeholders in the U.S. Government and the private sector through a prolonged FCC process to ensure that Ligado's services would be able to coexist with all other known, authorized services operating in nearby spectrum. At its own cost, Ligado developed solutions to ensure that its services would not

[3] FCC, DA 26-398, *In re Space Exploration Holdings LLC* ¶ 25 (Apr. 23, 2026), https://docs.fcc.gov/public/attachments/DA-26-398A1.pdf ("2026 Order").

[4] *See* FCC, DA 04-3553, *In re Mobile Satellite Ventures Subsidiary LLC* ¶ 1 n.1 (Nov. 8, 2004), https://docs.fcc.gov/public/attachments/DA-04-3553A1.pdf ("2004 Order").

harmfully interfere with those adjacent signals—including Global Positioning System ("GPS") service—and made significant concessions to accomplish that goal. Ligado's efforts were so successful that major manufacturers of GPS receivers eventually supported Ligado's proposed terrestrial services on the basis that they would not harmfully interfere with GPS receivers—as did the National Telecommunications and Information Administration ("NTIA") and DOD (until 2018).

5. On April 22, 2020—after many years of exhaustive fact-finding, regulatory process, scientific study, and analysis—the FCC, in a unanimous, final decision, modified Ligado's license, granting Ligado ATC authority to provide wireless terrestrial 5G services in its spectrum (the "2020 Order").[5] The 2020 Order authorized a modified terrestrial network, and narrowed the scope of that authority to three frequency ranges: 1526 to 1536 megahertz ("MHz"), 1627.5 to 1637.5 MHz, and 1646.5 to 1656.5 MHz, a total of 30 MHz. This change reflected the testing conducted and agreements reached among Ligado and other stakeholders aimed at obviating any interference concerns flowing from Ligado's proposed ATC operations.

6. In reasonable, good-faith reliance on the 2020 Order, Ligado raised approximately $4 billion in additional capital and converted $6 billion of debt to equity to build out its spectrum so that it could provide 5G technologies across the United States.

7. Unbeknownst to Ligado, however, by the time the 2020 Order had issued, DOD had secretly appropriated Ligado's exclusively licensed spectrum for DOD's own use, making it impossible for Ligado to deploy its terrestrial operations.

---

[5] *See* FCC, DA 26-398, *In re LightSquared Technical Working Group Report and LightSquared License Modification Application* ¶ 1 (Apr. 22, 2020), https://docs.fcc.gov/public/attachments/FCC-20-48A1.pdf.

8. Rather than compensating Ligado for DOD's appropriation of the Company's licensed spectrum, DOD, acting in concert with DOC, improperly took steps to stymie implementation of the 2020 Order and to prevent Ligado from using the Company's spectrum for terrestrial services, from realizing the value of the Company's FCC license and newly modified ATC authority, from securing a return on the Company's immense investments, and from discovering DOD's use of Ligado's property.

9. To facilitate its multi-billion-dollar taking and cover up its previously undisclosed use of Ligado's spectrum, DOD (with DOC's assistance) made false or misleading claims to the FCC, Congress, the White House, other federal agencies, and the public about the effects of Ligado's proposed 5G terrestrial services on GPS. DOD officials even told multiple individuals at the FCC that they wanted to "kill the company," referring to Ligado. The full extent of DOD's and DOC's malfeasance may not have come to light were it not for private communications between Ligado and current and former government employees, as well as disclosures by a whistleblower and senior official within DOD (the "Whistleblower"), who revealed internal emails and discussions with high-ranking officials showing that DOD's purported GPS interference concerns were unfounded. Ligado's conversations and the Whistleblower's disclosures lay bare how numerous military and civilian officials at the highest levels of DOD and DOC, acting on the agencies' behalf, participated in numerous meetings and briefings, signed legal filings, and provided testimony to Congress in which they represented that they opposed the 2020 Order because Ligado's use of its authorized spectrum would cause harmful interference to DOD's and others' GPS receivers. DOD built a website that made sensational and libelous claims about the risks to GPS from Ligado's services, and threatened Ligado's business partners with canceling their own government contracts if they worked with Ligado. Senior government officials did this

even though assertions about harmful GPS interference had been rejected by the FCC based on extensive engineering studies, and were intended as a smokescreen to cover up DOD's unjust taking and use of Ligado's authorized spectrum without compensation. DOD's purported GPS concerns were a pretext. DOD and DOC took those remarkable steps to destroy an American company, not out of concerns about Ligado's use of its own spectrum rights, but so that DOD could continue to use Ligado's spectrum for its own purposes without paying.

10. Eventually, senior government officials confirmed that DOD's undisclosed programs require the use of Ligado's spectrum on a permanent basis. DOD officials told Ligado's leadership directly that Ligado could never launch its FCC-authorized terrestrial operations, because doing so would interfere with DOD's undisclosed systems. Those undisclosed systems were publicly acknowledged by Senator Roger Wicker and Senator Mark Warner in August 2022, over a decade after Ligado began investing to develop its terrestrial 5G network and two years after the FCC approved Ligado's ATC applications. In a letter to then-Secretary of Commerce Gina Raimondo, then-Secretary of Defense Lloyd Austin, and then-Assistant Secretary of Commerce and NTIA Administrator Alan Davidson, the Senators expressed an understanding that DOD's concerns with Ligado's terrestrial deployment stemmed not from potential GPS interference, but rather from interference with those undisclosed federal systems.

11. Through both DOD's physical appropriation of Ligado's spectrum and its campaign against Ligado, DOD has made it impossible for Ligado to operationalize its ATC authorization, and thus succeeded in taking without just compensation Ligado's extremely valuable and exclusive use right to deploy terrestrial communications services. In so doing, DOD destroyed, at great cost, Ligado's reasonable investment-backed expectations, while also frustrating the U.S. Government's longstanding policy goals of developing vital 5G services.

12. Ligado therefore seeks compensation for the U.S. Government's taking of Ligado's property which, as of the date of this filing, has deprived the Company of tens of billions of dollars.

13. This taking is ongoing and, on information and belief, will continue indefinitely. Just compensation is warranted.

## PARTIES

14. Plaintiff Ligado Networks LLC is a Delaware limited liability company, with its principal place of business in Reston, Virginia. Ligado has an exclusive nationwide FCC license and ATC authority to provide 5G terrestrial communications services using the 1526 to 1536 MHz, the 1627.5 to 1637.5 MHz, and the 1646.5 to 1656.5 MHz bands of spectrum.

15. The United States of America is named as a defendant pursuant to 28 U.S.C. § 1491.

16. The Department of Defense is an Executive Branch department of the U.S. Government and is headquartered in Arlington, Virginia. Peter B. Hegseth is the U.S. Secretary of Defense.

17. The Department of Commerce is an Executive Branch department of the U.S. Government and is headquartered in Washington, D.C. Howard W. Lutnick is the U.S. Secretary of Commerce.

18. The National Telecommunications and Information Administration is an agency within the Department of Commerce that advises the President on telecommunications and information policy issues. Arielle Roth is the NTIA Administrator, as well as the U.S. Assistant Secretary of Commerce for Communications and Information.

## JURISDICTION

19. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1491(a) because the matter in controversy relates to claims against the United States founded upon the Constitution, specifically the Takings Clause of the Fifth Amendment.

## FACTUAL ALLEGATIONS

### I. Ligado Holds Exclusive Satellite and Terrestrial Use Rights in Its Assigned Spectrum.

20. Ligado has an exclusive right to operate its terrestrial system, as well as its satellite network, within its duly licensed spectrum; indeed, the physical realities of the spectrum necessitate that these rights be exclusive. Ligado has carefully developed and coordinated its spectrum use with the only other MSS licensee in its designated band, and the FCC has reaffirmed, as recently as this year, that Ligado's use right is an exclusive one.

#### A. Spectrum Is a Finite Resource, and Its Usage Is Closely Coordinated.

##### 1. The Electromagnetic Spectrum Comprises a Finite Range of Frequencies with Finite Capacity.

21. Wireless communication works by transmitting electromagnetic waves from a transmitter to a receiver which, through technical calibration (for instance, of power levels and antenna angle), can be restricted to operate in substantial part within a defined geographical location, although the waves cannot be perfectly contained. The different types of electromagnetic waves are defined according to their frequencies—that is, how many times per second the waves oscillate. A given range of spectrum is known as a "band." The electromagnetic spectrum spans from low-frequency radio waves at one end to high-frequency gamma rays at the other.[6]

[6] For example, the electromagnetic waves picked up by an FM radio oscillate at a frequency of 88 to 108 million times per second, or 88 to 108 MHz. The radio station WTOP, for instance, broadcasts at 103.5 MHz in the Washington, D.C. metropolitan area.

22. The capacity of the electromagnetic spectrum is finite. In a 2022 statement, then-FCC Commissioner Nathan Simington compared spectrum to real estate: "[T]he era of abundant spectrum is coming to a close. Like real estate, they just aren't making any more of it. . . . We should think of [radio frequency] spectrum as fully occupied land whose usage must inevitably intensify."[7]

23. Electromagnetic waves have physical properties—the waves are physical phenomena that travel through space at the speed of light. Likewise, their effects are also physical: ultraviolet waves interact with our skin to cause a sunburn, and microwaves circulate through an oven to heat a meal. Radio communications are subject to interference when overlapping waves oppose each other, weakening or scrambling a signal. Interference can occur not only when one user transmits on the *same* frequency as another ("in-band interference"), but also when a user transmits on an *adjacent* frequency ("out-of-band interference").[8] The operation of high-power transmitters in or around a given band can thus interfere with and degrade the fidelity of those transmissions or the ability of receivers to isolate the information coming from any one of the transmitters.[9]

---

7 FCC, FCC 22-29, Statement of FCC Comm'r Nathan Simington, Promoting Efficient Use of Spectrum through Improved Receiver Interference Immunity Performance (Apr. 21, 2022), https://docs.fcc.gov/public/attachments/FCC-22-29A5.pdf.

8 In-band interference is akin to when two people are talking at the same time, making it difficult to understand what either is saying. Out-of-band interference is akin to when a person is talking near a loud jet engine, making it difficult to understand what the person is saying, even though the sound of the jet engine is very different from the sound of a human voice.

9 FCC Commissioner Carr made a statement in an unrelated FCC proceeding explaining out-of-band interference: "[P]hysically occupying an assigned spectrum band is not the only way that federal users or other incumbents can prevent a valuable swath of airwaves from being put to its highest and best use. One other way is through receivers that 'listen in' on frequencies that are beyond their assigned bands." FCC, FCC 22-29, Statement of FCC Comm'r Brendan Carr,

24. With the continuing development and proliferation of technology that relies on wireless transmission of information, the U.S. Government has determined that it is of paramount importance to maximize the efficient use of the finite spectrum available.[10] Fundamental to efficient spectrum use is extensive regulation of and coordination among operators to minimize interference.

**2. Ligado Possesses Exclusive MSS and ATC Use Rights within the L-Band.**

25. Ligado's spectrum use rights fall into two different categories: MSS and ATC.

26. MSS is a radio communication service involving transmission between a mobile earth station ("MES") and one or more space stations, *i.e.*, satellites.[11] An MES is a device located on the surface of the Earth (or in the lower atmosphere) that communicates with a satellite, or with other earth stations, by bouncing signals off a satellite. MESs are intended to be used while they are in motion, and examples include satellite phones for remote communications. The FCC has repeatedly noted the ability of MSS systems to protect public safety, finding that MSS can meet rural public safety needs and provide emergency communications to any area in times of emergencies and natural disasters.[12]

---

Promoting Efficient Use of Spectrum through Improved Receiver Interference Immunity Performance (Apr. 21, 2022), https://docs.fcc.gov/public/attachments/FCC-22-29A3.pdf.

[10] *See, e.g.*, Sec'y Com., *National Spectrum Strategy* (Nov. 13, 2023), https://www.ntia.gov/sites/default/files/publications/national_spectrum_strategy_final.pdf (detailing strategy to "make the most efficient use possible of [radio frequency spectrum, a] vital national resource[,] to enhance the quality of life for all Americans").

[11] *See* 47 C.F.R. § 2.106.

[12] FCC, FCC 03-15, *In re Flexibility for Delivery of Communications by Mobile Satellite Service Providers in the 2 GHz Band, the L-Band, and the 1.6/2.4 GHz Bands* ¶ 28 n.61 (Jan. 29, 2003), https://docs.fcc.gov/public/attachments/FCC-03-15A1.pdf ("2003 Order").

27. ATC authority gives an operator the right to deploy a ground-based network of cell towers and base stations in conjunction with a qualifying satellite network system, first authorized by the FCC in 2003.[13] In authorizing ATC operations, the FCC's aim was to "enhanc[e] [MSS operators'] ability to offer high-quality, affordable mobile services on land, in the air and over the oceans without using any additional spectrum resources beyond spectrum already allocated and authorized by the [FCC] for MSS in these bands."[14] Using the same amount of spectrum for more and better terrestrial services is possible "[b]ecause terrestrial channels can be re-used many more times over a much smaller area than the satellite use of the same channel."[15]

28. Ligado's license authorizes it to operate in a section of the electromagnetic spectrum known as the L-Band,[16] which covers frequencies from 1525 to 1559 MHz and 1626.5 to 1660.5 MHz, a total of 68 MHz.[17] 1525 to 1559 MHz, a total of 34 MHz, is used for *downlink*

---

[13] 47 C.F.R. § 25.103 (FCC defining ATC); 2003 Order ¶ 1.

[14] 2003 Order ¶ 1. "*Allocation* involves designating bands of spectrum for specific types of services or classes of users, such as for commercial or government use. *Assignment* provides a license to a specific entity, such as a wireless company, to use a specific portion of spectrum." U.S. Gov't Accountability Off., GAO-13-78R, *Spectrum Management: FCC's Licensing Approach in the 11, 18, and 23 Gigahertz Bands Currently Supports Spectrum Availability and Efficiency* (Nov. 20, 2012), https://www.gao.gov/assets/gao-13-78r.pdf (emphasis added) (citation omitted).

[15] 2003 Order ¶ 21.

[16] "'L-Band' is a general designation for the entire frequency range from one to two gigahertz." 2026 Order ¶ 25. Consistent with the FCC's usage of the term in relevant orders and in the context of MSS operations, the term "L-Band" as used herein also refers to 1525 to 1559 MHz and 1626.5 to 1660.5 MHz bands allocated primarily for MSS, unless otherwise specified. *See, e.g.*, *id.*; 2004 Order ¶ 1 n.1.

[17] *See* 47 C.F.R. § 2.106.

transmission from MSS satellites to MESs in the United States, and 1626.5 to 1660.5 MHz, also 34 MHz, is used for *uplink* transmission from MESs to MSS satellites.[18]

29. As authorized today under the FCC's 2020 Order, Ligado can operate a terrestrial network of cell towers, *i.e.*, base stations, in conjunction with its satellite service, to deliver secure and reliable communications to serve various industries.[19] By leveraging both terrestrial and satellite operations, Ligado can also deliver advanced communications services in the entire country (including rural areas) and help bridge the digital divide, *i.e.*, the increasing gap in economic access and opportunities between communities with access to high-speed broadband networks and those communities without broadband (many of them rural).[20] The FCC has recognized that a licensee's ability to control both MSS and terrestrial operations can facilitate increased network capacity, more efficient use of spectrum, enhanced competition, and economies of scale in device manufacturing that can be passed on to consumers in the form of broader coverage and more reliable service.[21]

30. Ligado is currently authorized to conduct MSS operations in 66 MHz of the L-Band. As detailed below, pursuant to international and bilateral coordination agreements, it has exclusive use of more than 40 of those 66 MHz. *See infra* Section I.A.3. Pursuant to its ATC

---

[18] "Downlink" refers to transmissions that run from a base station, like a satellite or a cell tower, to a device, like a cellphone; in the MSS context, this is the space-to-Earth direction. "Uplink" refers to the inverse: transmissions that run from the device back up to the base station; in the MSS context, the Earth-to-space direction. The 1559 to 1626.5 MHz section, which sits between the downlink and uplink spectrums, is occupied by GPS and other satellite navigation operators, as well as satellites that are not stationary but orbit around the Earth. *See* Figure 1, *infra*. Within the L-Band, use of the 1544-1545 MHz and 1645.5-1646.5 MHz band segments is limited to distress and safety communications.

[19] 2020 Order ¶ 19.

[20] *Id.* ¶ 22.

[21] *Id.* ¶ 20.

authority, Ligado is further authorized to use a 30 MHz subset of the 66 MHz (all within its more than 40 MHz of exclusive-use spectrum) for terrestrial operations, specifically 1526 to 1536 MHz (downlink), 1627.5 to 1637.5 MHz (uplink), and 1646.5 to 1656.5 MHz (uplink). The decades-long process Ligado undertook to secure that ATC authorization is detailed in Section I.B.2, *infra*.

31. The below chart illustrates where Ligado's ATC spectrum is located in relation to GPS and other global navigation satellite system ("GNSS") operations, as well as other services authorized by the FCC to operate within the L-Band:

**Figure 1**




### 3. The FCC Has Carefully Coordinated Use Among Relevant Entities.

32. As explained in Section I.A.1, *supra*, radio communications are highly susceptible to interference. The FCC has repeatedly acknowledged these technical constraints in the L-Band. It recognized the impossibility of multiple systems operating on the same frequencies in the same geography without causing or receiving interference when it first established the L-Band MSS framework in 1987. The FCC's 2003 order, which established ATC authority (the "2003 Order"), expressly determined that only existing MSS licensees—such as Ligado—could be licensed for ATC authority, stating: "the potential for interference between MSS and terrestrial mobile systems is, in fact, so great that [the FCC] believe[s] only . . . the incumbent MSS licensees [] would possess

both the ability and incentive to coordinate operations *in a manner that avoids interference*."[22] *See also* Section I.A.4, *infra* (discussing the FCC's reiteration of this same position in its April 2026 Order).

33. Because radio transmissions are so susceptible to interference and available spectrum is such a valuable resource, the FCC has carefully coordinated use of the L-Band to ensure that usage is efficiently directed at the country's highest priorities. The L-Band includes the so-called "upper L-Band" (1545-1559 MHz and 1646.5-1660.5 MHz) and "lower L-Band" (1525-1544 MHz and 1626.5-1645.5 MHz), which are internationally allocated for MSS. The FCC authorized Ligado to operate MSS in the L-Band in 1989. That same year, the FCC also permitted the predecessor of the company now called Inmarsat, a United Kingdom-licensed operator, to operate MSS in the same spectrum band. These authorizations are subject to the condition that Ligado and Inmarsat coordinate their usage with each other and with other international L-Band operators.

34. Ligado and Inmarsat's bilateral coordination obligation is effectuated through a 100-year commercial agreement that the parties signed in 2007.[23] In that agreement—the precise terms of which are confidential—Ligado and Inmarsat agreed on frequencies of exclusive use. Ligado also agreed to make payments to Inmarsat in exchange for a larger exclusive-use block of frequencies.

35. Remaining portions of the L-Band are allocated to distress and safety communications and radio astronomy, and coordinated with other international parties. This

---

[22] 2003 Order ¶ 60 (emphasis added).

[23] The FCC approvingly cited Ligado's and Inmarsat's coordination efforts in a 2011 order. FCC, DA 11-133, *In re LightSquared Subsidiary LLC* ¶ 31 (Jan. 26, 2011).

international coordination is mandated by the Mexico City Memorandum of Understanding ("Mexico City MOU"), which was executed in 1996 and signed by or on behalf of the United States, Canada, Mexico, Russia, and the United Kingdom. The Mexico City MOU expressly required a series of inter-operator coordination agreements to avoid harmful interference and to use spectrum assignments in the most efficient manner practicable.

36. The net result of these FCC authorizations and bilateral and international coordination agreements is that Ligado today has the unfettered, exclusive right to use more than 40 MHz of L-Band spectrum for MSS in the United States. Inmarsat has the exclusive right to use its own subset of the L-Band. The two companies each operate exclusively in their respective, agreed-upon frequencies (though those specific frequency assignments are confidential).[24]

**4. The FCC Has Verified That Ligado's MSS Use Right Is Necessarily Exclusive.**

37. The FCC has repeatedly reaffirmed that commercial use of the L-Band will remain limited to Ligado and Inmarsat. Most recently, on April 23, 2026, the FCC's Space Bureau issued an order (the "2026 Order") rejecting long-pending petitions by SpaceX and Iridium to revise the licensing band plan for MSS services and allow additional entities to operate in the L-Band. In that order, the FCC observed that it "has historically licensed Ligado, its predecessors, and Inmarsat as the only space station operators in L-Band spectrum due to the nature of service being provided."[25] As the FCC explained, Ligado and Inmarsat "provid[e] MSS" operations such that "it is not possible for other systems to operate on the same frequencies without causing or receiving

---

[24] *See* 2004 Order ¶ 5 n.8.

[25] 2026 Order ¶ 29.

interference."[26] Because "MSS operations are highly susceptible to harmful interference,"[27] "permitting additional commercial operators to use [Ligado's licensed L-Band] spectrum would effectively make it impossible for Ligado to provide service in these bands."[28] The FCC affirmed that it "will not consider applications for new systems where the new system's operations would cause interference to licensed systems,"[29] and expressed that with the 2026 Order, it "seek[s] to ensure that Ligado . . . will not [be] prevented from providing L-Band MSS service in any region where it may be capable of providing coverage."[30]

38. The 2026 Order's discussion of interference in the context of satellite operations applies equally to terrestrial operations. Because ATC can be deployed only by an MSS licensee using its exclusive spectrum, FCC actions to ensure MSS exclusivity necessarily extend to protect Ligado's terrestrial operations as well. The FCC has made clear that it will not permit additional MSS entrants in the L-Band, which necessarily means there will be no new ATC entrants.[31]

### B. To Increase Efficiency of L-Band Use, The FCC Granted Ligado ATC Authority.

#### 1. The FCC Developed the ATC Framework.

39. For the last 15 years, exponential growth in data consumption triggered by the advent of wireless devices like smart phones, tablet computers, and other emerging technologies has posed a looming crisis to the wireless industry. The FCC has recognized that "[i]f the U.S.

---

[26] *Id.*

[27] *Id.* ¶ 31.

[28] *Id.* ¶ 30.

[29] *Id.*

[30] *Id.* ¶ 31.

[31] *See id.* ¶ 14.

does not address this situation promptly, scarcity of mobile broadband could mean higher prices, poor service quality, an inability for the U.S. to compete internationally, depressed demand and, ultimately, a drag on innovation."[32] Indeed, millions of Americans, particularly in rural areas, continue to go without access to broadband and thus are at a profound competitive disadvantage.

40. Accordingly, the U.S. Government has for years sought to expand the capacity and coverage of the nation's mobile broadband spectrum, with the FCC specifically recognizing that Ligado's efforts "are a significant public interest benefit, both because of the competition it will bring in mobile wireless broadband services and because it will provide mobile wireless broadband service to traditionally underserved areas."[33] The FCC's recent efforts have focused on building out 5G networks, with the former Chairman of the FCC, Ajit Pai, noting that 5G "has transformative potential, including much faster speeds, much lower latency, much more capacity, and new services and applications, many of which nobody can even predict today."[34] In particular, the FCC has recognized the immense value of mid-band spectrum—like Ligado's L-Band spectrum—for 5G. Former FCC Chairwoman Jessica Rosenworcel commented that mid-band

---

[32] FCC, *Connecting America: The National Broadband Plan* 77 (2010), https://files.eric.ed.gov/fulltext/ED508905.pdf ("National Broadband Plan"). Closing this gap remains a priority for the FCC, as articulated by former Chairwoman Rosenworcel: "Our goal is to connect everyone, everywhere to high-speed broadband. But the last fully vetted and validated annual data before this agency show conclusively that we are not there yet. Nearly 24 million are not connected, including 28% of Americans living in rural areas and more than 23% of people on Tribal lands. That means millions of people still do not have the broadband they need to fully participate in modern life." FCC, FCC 24-27, Statement of Chairwoman Jessica Rosenworcel, Inquiry Concerning the Deployment of Advanced Telecommunications Capability to All Americans in a Reasonable and Timely Fashion (Mar. 14, 2024), https://civilrights.org/wp-content/uploads/2025/02/03142024-FCC-Chairwoman-Jessica-Rosenworcel-Statement.pdf.

[33] *See* FCC, DA 10-535, *In re SkyTerra Commc'ns, Inc.* ¶ 70 (Mar. 26, 2010).

[34] Ajit Pai, *The Next Big Thing*, FCC (Mar. 21, 2019), https://www.fcc.gov/news-events/blog/2019/03/21/next-big-thing.

spectrum "offers an ideal blend of capacity and coverage." She then described the urgent need for wide usage of the spectrum:

> [M]id-band . . . spectrum is key to delivering on the promise of 5G services and ensuring that it reaches as many people as possible. The bottom line is we need mid-band deployment at scale to foster invention in the new 5G spectrum frontier. . . . Our ability to be successful in this mid-band mission is as much about finding partners as it is about finding spectrum.[35]

41. Terrestrial use of the L-Band for 5G, coupled with existing satellite coverage, will improve how networks serve the industrial "Internet of Things."[36] For example, terrestrial use of the L-Band will improve the capabilities of public safety and other critical infrastructure industries, including rail transport, renewable energy, trucking, public utilities, oil and gas, aviation, and autonomous vehicles. Unsurprisingly, the U.S. Government has long supported the development and expansion of mobile broadband access as a key goal of national infrastructure policy. The FCC has recognized that "[l]ike electricity a century ago, broadband is a foundation for economic growth, job creation, global competitiveness and a better way of life."[37]

42. DOD likewise has recognized the immense value that 5G services will provide. For example, in an internal June 5, 2017 email, the Whistleblower, a career DOD engineer tasked with evaluating Ligado's FCC application, stated that "[t]he current Ligado proposal [to use its L-Band

---

35 FCC, Remarks of Jessica Rosenworcel, Chairwoman, FCC, Mobile World Congress New Frontier of Partnerships Keynote (Mar. 1, 2022), https://docs.fcc.gov/public/attachments/DOC-380838A1.pdf.

36 "The Internet of Things (IoT) refers to a network of physical devices, vehicles, appliances, and other physical objects that are embedded with sensors, software, and network connectivity, allowing them to collect and share data." *What is the Internet of Things (IoT)?*, IBM, https://www.ibm.com/think/topics/internet-of-things [https://tinyurl.com/57uuh6c3] (last visited Sept. 18, 2026).

37 National Broadband Plan at xi.

spectrum to deploy a 5G terrestrial network], and perhaps other Mobile Satellite Services ('MSS') providers that may follow, are promising our national decision-makers new life-saving services in public safety of aviation, railways, vehicles and emergency response communications, as well as new business uses." Former Secretary of Defense Lloyd Austin stated in 2022 that DOD "is committed to making the United States a world leader in 5G by working with the commercial sector and fielding 5G to the warfighter."[38] DOD's 2024 "Private 5G Deployment Strategy" similarly states that "[a] key aspect to DoD's modernization effort is to leverage 5G networks, both commercial and private, to deliver ubiquitous high-speed connectivity for mobile capabilities."[39]

43. One tactic for facilitating the deployment of 5G networks has been the removal of regulatory barriers to permit fuller utilization of the L-Band, which, as noted above, was traditionally used for MSS. The L-Band thus had potential for ancillary terrestrial use and untapped potential to carry enormous amounts of additional data and provide communications services to many more people in the United States.[40]

---

[38] *Fiscal Year 2023 Def. Budget Request, Hearing Before the H. Armed Servs. Comm.* 117th Cong. 8 (2022) (Sec'y of Def. Lloyd J. Austin III Prepared Remarks Before the H. Armed Servs. Comm.), https://docs.house.gov/meetings/AS/AS00/20220405/114628/HHRG-117-AS00-Wstate-AustinL-20220405.pdf.

[39] DOD, *Private 5G Deployment Strategy* 2 (2024), https://dodcio.defense.gov/Portals/0/Documents/Library/Private5GDeploymentStrategy_508.pdf.

[40] *See* FCC, Chairman Pai Circulates Draft Order to Approve Ligado's Application to Facilitate 5G and Internet of Things Services (Apr. 16, 2020), https://www.fcc.gov/document/chairman-pai-circulates-draft-order-approve-ligados-application ("The draft order that I have presented to my colleagues would make more efficient use of underused spectrum and promote the deployment of 5G and Internet of Things services.").

44. Between 2003 and 2010, the FCC invited operators of MSS networks, like Ligado, to seek authority to provide complementary terrestrial ATC services.[41] The FCC opened that path after finding, in 2003, that "making limited terrestrial authority available to licensed MSS operators in the form of ATC better serves the public interest than the more limited and technically difficult prospect of attempting to share the MSS spectrum, which would pose an unacceptable risk of harmful interference to the existing and planned operations of licensed MSS operators," like Ligado.[42] The ATC authority conferred through an FCC license is a valuable property right that grants the licensee additional rights to use its licensed spectrum for terrestrial services—in addition to satellite services—thereby expanding the economic potential and exclusivity attendant to such property.

**2. Ligado Obtained ATC Authority and Spent Decades Ensuring that Operations Would Not Interfere with Other L-Band or Adjacent Operations.**

45. Over the nearly two decades between the FCC's rollout of the ATC framework in 2003 and its 2020 Order granting Ligado's applications to provide terrestrial services, the FCC thoroughly studied, examined, and ultimately rejected claims that terrestrial services in Ligado's spectrum would cause harmful interference to GPS. Ligado supported those efforts, at its own expense, with testing and through negotiations with adjacent operators.

46. Ligado received its first ATC use authorization in 2004. The GPS industry then raised concerns about possible out-of-band interference between its GPS receivers and the terrestrial operations Ligado planned pursuant to that initial authorization. In response to those concerns, Ligado filed a revised ATC application in September 2012 (the "September 2012

---

[41] *See* 2020 Order ¶ 3 (citing 2003 Order).

[42] 2003 Order ¶ 2.

Application"). In its September 2012 Application, Ligado proposed limitations on the ATC authority to eliminate any harmful interference concerns. Most saliently, Ligado proposed not to deploy terrestrial services in the 1545 to 1555 MHz band of spectrum (the band closest to the frequencies used by GPS receivers), forgoing billions of dollars of commercial opportunities in doing so. Ligado also proposed to reduce operating power levels throughout its licensed spectrum, including in the 1526 to 1536 MHz, 1627.5 to 1637.5 MHz, and 1646.5 to 1656.5 MHz bands.

47. Significant portions of Ligado's September 2012 Application, and the significant concessions made therein to prevent potential harmful interference with GPS receivers, enjoyed the support of a number of government agencies—including, notably, DOD and DOC. The FCC welcomed Ligado's plans as "a unique proposal that had the prospect of attracting new investment, increasing competition, bringing additional broadband service to rural and hard-to-reach regions and creating thousands of jobs."[43] In July 2013, officials from DOD, Air Force, Navy, Army, NASA, and DOC co-signed an internal memorandum to the Interdepartment Radio Advisory Committee ("IRAC") specifically stating that Ligado's application to the FCC to use the 1627.5 to 1637.5 MHz and 1646.5 to 1656.5 MHz bands for commercial terrestrial operations "is mature enough for IRAC consideration and *ultimate recommendation*."[44] Likewise, in an October 2013 email, a Principal Deputy within the office of the DOD Chief Information Officer ("CIO") confirmed that DOD and DOC had "no issue" with the FCC "approving the [Ligado] proposal"

---

[43] *The LightSquared Network: An Investigation of the FCC's Role, Hearing Before the Subcommmm. on Oversight & Investigations of the H. Comm. on Energy & Com.*, 112th Cong. 16 (2012) (Joint Statement of Julius P. Knapp, Chief, Off. of Eng'g & Tech., FCC, and Mindel De La Torre, Chief, Int'l Bureau, FCC), https://www.govinfo.gov/content/pkg/CHRG-112hhrg86420/pdf/CHRG-112hhrg86420.pdf.

[44] Letter from Gerard J. Waldron, Counsel, Ligado, to Marlene H. Dortch, Sec'y, FCC, Attach. 1 at 2 (Aug. 3, 2021) (emphasis added).

with respect to those specific bands and co-signed the aforementioned memorandum in order to ask "IRAC to tell the FCC we approve."[45]

48. In December 2015, after lengthy discussions with major GPS device manufacturers, Ligado filed a new proposal with the FCC to "address the core concerns raised by the GPS industry and secure those benefits for all GPS parties" (the "December 2015 Applications").[46] The December 2015 Applications included the concessions set forth in the September 2012 Application, and also proposed additional substantial concessions. Ligado confirmed once more that it would relinquish terrestrial services in the 1545 to 1555 MHz band, and it also proposed highly restrictive operational parameters—including dramatic reductions of permissible power levels and out-of-band emissions—to address any remaining potential for its operations to cause harmful interference to GPS even when they were operating in Ligado's designated spectrum.

49. The December 2015 Applications stemmed from discussions with major GPS receiver manufacturers and enjoyed their support. Ligado entered into coexistence agreements with every major GPS receiver manufacturer, and key industry members registered their support for Ligado's Applications in filings with the FCC. For example, on June 27, 2016, GPS receiver manufacturer NovAtel filed with the FCC a letter stating that "NovAtel supports [the] Commission

---

45 *Id.* at 2.

46 *See* Letter from Gerard J. Waldron, Counsel, Ligado, to Marlene H. Dortch, Sec'y, FCC, at 1 (Dec. 31, 2015).

granting of [Ligado's] modification applications."[47] Other major GPS receiver manufacturers also issued similar comments to the FCC.[48]

50. DOD and DOC likewise recognized that in light of Ligado's significant concessions, there was no threat of widespread harmful interference to GPS receivers from the terrestrial services Ligado was seeking to deploy in its December 2015 Applications. For example, on February 15, 2017, the National Advanced Spectrum and Communications Test Network ("NASCTN"), which is a joint initiative of DOD and DOC, released test results from its own study that showed that Ligado's services would ***not*** cause widespread harmful interference to GPS.[49] Following the NASCTN testing, NTIA gave a presentation to DOD in August 2017, citing the NASCTN test results and concluding that "Ligado's proposed out-of-band emission levels would protect GPS operations within the [radionavigation] band allocation."

51. Until approximately March 2018, DOD and DOC acknowledged that, with the protections and concessions offered by Ligado, there was no scientific basis for any concerns that the terrestrial services proposed in Ligado's FCC license modification applications would cause harmful interference to GPS receivers or other services offered by MSS operators in adjacent spectrum. An internal Air Force email from March 15, 2018, stated that the DOD CIO supported

---

[47] Joint Letter from Doug Smith, President/CEO, Ligado and Michael Ritter, NovAtel Inc., to Marlene H. Dortch, Sec'y, FCC (June 27, 2016).

[48] *See, e.g.,* Reply Comments of Deere & Co., *In re LightSquared Request to Modify its ATC Authority and LightSquared Technical Working Group Report*, IB Docket Nos. 12-340 and 11-109, at 4-5 (June 21, 2016); Letter from Ken Mooyman, President, Leica Geosystems Inc., to Marlene H. Dortch, Sec'y, FCC (June 24, 2016); *see also* Patrick Fitzgerald, *New LightSquared Settles GPS Lawsuit With Garmin*, Wall St. J. (Dec. 17, 2015), https://www.wsj.com/articles/new-lightsquared-settles-gps-lawsuit-with-garmin-1450363420.

[49] *See* William F. Young et al., *LTE Impacts on GPS*, Nat'l Inst. of Standards and Tech. (2017).

Ligado's December 2015 Applications and intended to "support an NTIA/FCC proposal to allow Ligado Networks . . . to begin initial deployment" of Ligado's terrestrial services at specified power levels.

### 3. DOD, Assisted by DOC, Reversed Themselves by Advancing Pretextual Claims in a Bid to Prevent Ligado from Obtaining Its ATC Authority.

52. Then, in March 2018, DOD (and its ally, DOC) abruptly changed course and adopted a strategy of deceit and misinformation aimed at preventing Ligado from obtaining approval of its December 2015 Applications. They did this without notifying the FCC or Ligado of the real reason behind their objections, though that became clear in time.

53. In the spring of 2018, two new officials were confirmed to senior positions at DOD; both had responsibility for spectrum-related issues. In July 2018, senior career officials in the office of the DOD CIO, including the Whistleblower, met with one of these new appointees to discuss Ligado's December 2015 Applications. During the meeting, DOD CIO career officials said that "technical issues about GPS ha[d] been solved" and the only issue remaining was to determine whether GPS should get any protection in one section of Ligado's bandwidth, even though GPS is not "entitled to any protection in that spectrum" as a matter of law. The career officials also noted that DOD's own testing "shows [an adjacent commercial operator] will not experience interference," "GPS agreements plus lower power level[s] protect GPS much more than they need," and "[a]viation is safe according to FAA and DOT." In other words, DOD's own experts had concluded that there was no GPS-related basis on which to challenge Ligado's December 2015 Applications.

54. Shortly after this meeting, these technical experts on spectrum policy for the DOD CIO, including the Whistleblower, were cut out of the process by their superiors, including by the

now-disgraced former Deputy CIO for Command, Control and Communications at DOD, Frederick D. Moorefield, Jr.

55. Moorefield, the former Deputy DOD CIO described by DOD CIO Dana Deasy as the "heart and soul" and "man that is actually responsible for managing spectrum across the DOD," oversaw the DOD's campaign against Ligado.

56. In July 2018, the Whistleblower alleged that Moorefield took steps to systemically enter into improper or illegal contracts to hire unqualified, subservient external contractors to evaluate Ligado's December 2015 Applications.

57. On December 3, 2018, DOD submitted a letter, drafted by Moorefield, to NTIA advocating that "proposals to operate services in bands adjacent to GPS should not be approved unless, at a minimum, they do not exceed" a single decibel ("1 dB") change in the carrier-to-noise ratio (the so-called "1 dB metric") for quantifying out-of-band interference.[50] In support, DOD cited a Department of Transportation ("DOT") study that purported to assess whether GPS receivers would "experience a 1 dB carrier-to-noise density ratio ($C/N_0$) degradation in the reception of any GPS (or GNSS) satellite signal" when exposed to transmissions in adjacent spectrum.[51] But the DOT study and its 1 dB metric were fundamentally flawed in their premises.[52] The DOT study did not isolate for the effects of Ligado's proposed transmissions on GPS receivers, did not address the role of receiver design or filter selectivity in mitigating interference concerns,

---

[50] Letter from Dana Deasy, EXCOM Acting Co-Chair and Chief Info. Officer, DOD, and Heidi R. King, EXCOM Acting Co-Chair and Deputy Adm'r, NHTSA, to David J. Redl, Assistant Sec'y for Commc'ns and Info. and Adm'r, NTIA (Dec. 3, 2018) ("Letter from Deasy and King"), https://www.ntia.doc.gov/files/ntia/publications/ntia_letter_to_fcc_chairman_re_ligado_mss_atc_applications_dec._6_2019.pdf.

[51] *See* 2020 Order ¶ 36.

[52] *Id.* ¶ 59.

and based its conclusions on the worst-performing GPS receivers.[53] Indeed, the FCC recognized that the findings of the DOT study would "effectively prevent the deployment of *any* terrestrial transmitters or networks with any reasonable frequency separation from the allocations where GPS operates."[54] Nonetheless, based on this study and the artificial criterion of this "1 dB metric," DOD advocated that the FCC deny Ligado's December 2015 Applications.[55]

58. The FCC, which is subject to the Administrative Procedure Act, uses a codified harmful interference standard, which defines harmful interference as "[i]nterference that endangers the functioning of a radionavigation service or of other safety services or seriously degrades, obstructs or repeatedly interrupts a radiocommunication service[.]"[56] By contrast, DOD's proposed 1 dB metric—which does not focus on performance degradation—was found by the FCC (a fact that was communicated to DOD early on) to be scientifically unsound and legally irrelevant to the FCC's assessment of harmful interference. In a letter to Senator Mike Lee, then-FCC Chairman Ajit Pai confirmed that the "Commission has never before applied [a 1 dB] metric for determinations of harmful interference to adjacent bands."[57]

59. DOD and DOC reversed course to support the validity of a 1 dB metric because application of this "metric" would foreclose Ligado's use of its spectrum for terrestrial operations. With Ligado foreclosed from using its spectrum for terrestrial services, DOD would be able to take

---

[53] *Id*. ¶¶ 55-57.

[54] *Id*. ¶ 57 (emphasis added).

[55] *See Letter from Deasy and King*. A decibel is a measure of the carrier-to-noise ratio ("$C/N_0$") or the strength of a desired signal as compared to undesired background noise.

[56] 47 C.F.R. § 101.3.

[57] Letter from Ajit Pai, Chairman, FCC, to Mike Lee, Sen., U.S. Senate (June 12, 2020), https://www.lee.senate.gov/services/files/b5fbe322-c4be-4389-8d4b-cda4531ba011.

Ligado's spectrum and continue to use it without compensation. But, as the agency with exclusive authority over transmissions in Ligado's licensed spectrum, the FCC's standard for assessing harmful interference is the only standard that is legally relevant. As discussed in Section I.B.4, *infra*, the FCC made its final determination on this issue in the 2020 Order, in which it rejected wholesale the 1 dB metric and the DOT study as technically flawed and inconsistent with the harmful interference standard.[58]

60. Other experts agreed with the FCC that harmful interference was the appropriate standard, not 1 dB. Industry experts derided the 1 dB metric as illogical and unsupportable. NTIA, too, has previously criticized the use of the metric. During a June 22, 2017 IRAC Technical Focus Group meeting, NTIA's Chief of Spectrum Engineering and Analysis Division chastised Air Force representatives for repeatedly proposing policy cases to support a 1 dB metric absent technical evidence of its usefulness.

61. Nonetheless, in 2019, additional DOD officials sent letters to the FCC further advocating for the unfounded 1 dB metric and against Ligado's December 2015 Applications.[59] These DOD officials stated that "there are too many unknowns and the risks to GPS are too great to allow Ligado's [December 2015 Applications] to proceed,"[60] but failed to provide any scientific

---

58 2020 Order ¶¶ 48, 54-59, 126.

59 Letter from Patrick M. Shanahan, Acting Sec'y of Def., to Ajit Pai, Chairman, FCC (June 7, 2019), https://www.ntia.doc.gov/files/ntia/publications/ntia_letter_to_fcc_chairman_re_ligado_mss_atc_applications_dec._6_2019.pdf; Letter from Mark T. Esper, Sec'y of Def., to Ajit Pai, Chairman, FCC (Nov. 18, 2019), https://www.ntia.doc.gov/files/ntia/publications/ntia_letter_to_fcc_chairman_re_ligado_mss_atc_applications_dec._6_2019.pdf.

60 *Id.*

evidence to support these alleged concerns, and omitted any mention of the years of testing—including by a DOD-sponsored lab—that refuted claims of harmful interference to GPS.

62. Following these letters, NTIA similarly reversed course and concluded that NTIA could not support Ligado's December 2015 Applications before the FCC.[61] As publicly reported and evidenced by internal NTIA emails disclosed in response to Freedom of Information Act ("FOIA") requests, NTIA "originally contemplated a strategy for conditionally approving Ligado Networks' 5G plans—months before denouncing the company's proposal as a threat to national security."[62] Emails from early 2019 show that NTIA and its then-Administrator, David Redl, were planning to support Ligado's December 2015 Applications with the FCC.[63] Soon after, Redl was fired by then-Secretary of Commerce Wilbur Ross. As former FCC Commissioner Mike O'Rielly explained in congressional testimony, "NTIA has had a different viewpoint over the time period, and it wasn't until the dismissal of [Redl] that the position" suddenly changed to oppose Ligado's December 2015 Applications, in line with DOD's newfound stance.[64]

63. Inside DOD and DOC, it was well known that opposition to Ligado's December 2015 Applications in the name of protecting GPS from harmful interference was not credible. For instance, internal DOD emails show that during a March 24, 2017 meeting, DOD CIO technical

---

[61] Letter from Douglas W. Kinkoph, Deputy Assistant Sec'y for Commc'ns and Info. (Acting), to Ajit Pai, Chairman, FCC (Dec. 6, 2019), https://www.ntia.doc.gov/files/ntia/publications/ntia_letter_to_fcc_chairman_re_ligado_mss_atc_applications_dec._6_2019.pdf.

[62] John Hendel, *Trump administration originally contemplated approving Ligado's 5G plan, records show*, POLITICO (June 29, 2020), https://subscriber.politicopro.com/article/2020/06/trump-administration-originally-contemplated-approving-ligados-5g-plan-records-show-1958225?source=email.

[63] *Id.*

[64] Alexandra S. Levine, *Google stokes GOP allegations of tech bias*, POLITICO (June 16, 2020), https://www.politico.com/newsletters/morning-tech/2020/06/17/google-stokes-gop-allegations-of-tech-bias-788590.

staff concluded that Air Force had "no technical merits, nor regulatory merits, to oppose FCC; and Ligado has sufficient technical and regulatory merits for license approval by the FCC."

64. Similarly, in a June 2017 email, the Whistleblower (then a senior DOD CIO official) criticized Air Force Space Command for its unsupported position on the potential risks of harmful interference to GPS devices. Arguments based on Ligado's old proposal and the 1 dB metric were "incomplete and deficient," the email stated. The Whistleblower's email stated that DOD ignored "an elephant in the analytical room": the fact that *all* major commercial GPS receiver manufacturers had backed Ligado's proposal. Finally, the email noted that it was striking that Air Force had so far found "no tolerable commercial uses at all adjacent to GPS, not even fairly distant from GPS." "At some point soon," the email continued, DOD and Air Force "will have to answer with not just what we cannot do, but what we can do to inform and support such proposals."

65. Likewise, in response to a March 2018 email from Air Force Space Command seeking "sister service support" for a position paper endorsing the 1 dB metric, the Navy responded it "cannot support the position paper" because "[t]here is no analytical rigor in the paper" and "no mention of what Ligado might potentially do to out of band receivers," *i.e.*, GPS receivers operating outside their designated bands. And in approximately November 2018, the Whistleblower informed high-level officials in DOD that its position on the harmful effects of Ligado's use of its spectrum to GPS "overreaches to [the] point of falsity" and will be "criticized as disingenuous. . . ."

66. Officials within the Joint Chiefs of Staff ("Joint Staff") were becoming increasingly involved in determining DOD's position and directing DOD's actions with regard to Ligado's December 2015 Applications. According to individuals with knowledge of DOD's actions, the Joint Staff was "driving all efforts" to oppose FCC approval of Ligado's December 2015

Applications. Officials from Air Force and the DOD Office of General Counsel were told to "stand down" and "back off" when they attempted to obtain additional information about why the Joint Staff was representing to others in the U.S. Government that DOD opposed Ligado's December 2015 Applications and was seeking to have the FCC deny them.

67. DOD took its anti-Ligado campaign to other Executive Branch agencies too. DOD told the National Security Council, the National Economic Council, the Office of Management and Budget, the Office of Science and Technology Policy, and possibly others that Ligado's services would cause harmful interference to GPS. Tellingly, in response to repeated requests from those Executive Branch authorities for DOD to provide evidence to support its assertions, DOD never did so. On information and belief, DOD did not provide the requested information for the simple reason that DOD cannot substantiate its claims of harmful GPS interference.

#### 4. The FCC Unanimously Granted Ligado Exclusive Authority to Deploy Terrestrial 5G Services Within Its Licensed Spectrum.

68. DOD's pretextual efforts to prevent the FCC's approval of Ligado's December 2015 Applications were in vain. On April 22, 2020, the FCC unanimously approved Ligado's December 2015 Applications, and modified Ligado's exclusive license to enable it to operate ATC and thus provide 5G terrestrial communications services within the 1526 to 1536 MHz, 1627.5 to 1637.5 MHz, and 1646.5 to 1656.5 MHz bands, in addition to its existing MSS authorization.[65] The FCC Order represented the culmination of a decade-long rulemaking process and spanned seventy-four pages with 444 footnotes.

69. In the 2020 Order, the FCC concluded that its approval would "provide[] regulatory certainty to Ligado, ensure[] adjacent band operations, including Global Positioning System

---

[65] *See* 2020 Order ¶ 1.

(GPS), are sufficiently protected from harmful interference, and promote[] more efficient and effective use of our nation's spectrum resources by making available additional spectrum for advanced wireless services, including 5G."[66] The FCC found that "it is in the public interest to grant the [December 2015 Applications] to facilitate the deployment of a low power terrestrial-based network in [Ligado's] licensed MSS spectrum."[67]

70. In approving Ligado's request for ATC authority, the FCC explicitly rejected DOD's and DOC's assertions about harmful out-of-band interference to GPS. In fact, the FCC commended Ligado for addressing concerns raised by GPS receiver manufacturers and limiting any risk of harmful interference caused by the out-of-band reception of those devices.[68] The FCC noted that Ligado's work in support of Ligado's December 2015 Applications "demonstrate[s] the diligence with which Ligado has attempted to address adjacent band concerns."[69]

71. In addressing, and rejecting, DOD's and DOC's purported concerns, the FCC made the following, specific findings:

a. Ligado's planned broadcast power levels and the coexistence agreements it had reached with the GPS industry "significantly lower the potential for harmful interference to GPS devices, including those owned by the U.S. Government;"[70]

---

66 *Id.* ¶ 1. The FCC's aim of providing "regulatory certainty" is also reflected in the 2026 Order, in which the FCC states that the order "services the public" by "giv[ing] companies the clarity they need to deploy direct-to-device services intensively and invest in MSS spectrum confidently." 2026 Order ¶ 4.

67 2020 Order ¶ 2.

68 *Id.* ¶¶ 25-34.

69 *Id.* ¶ 34.

70 *Id.* ¶ 100.

b. The 1 dB metric championed by DOD is "inconsistent with established spectrum management policies designed to avoid harmful interference, and is also unsupported by the record;"[71]

c. The studies cited by DOD in opposition to Ligado's December 2015 Applications (specifically, Air Force testing and the DOT study relying on the 1 dB metric) used imprecise methodologies and inapplicable assumptions, thereby overestimating the potential for harmful interference;[72] and

d. Any potential for harmful interference could be mitigated through information sharing between Ligado and the U.S. Government, including to identify and repair or replace affected devices, and through negotiating Ligado's broadcast power levels near the devices.[73]

72. The FCC specifically provided for information sharing between the U.S. Government and Ligado under the 2020 Order to support Ligado's development of commercial terrestrial services authorized by its spectrum license. For example, the 2020 Order provided that affected agencies should "provide information to Ligado," including geographic areas of potential concern, work with Ligado to "develop[] a program to repair or replace any such devices" affected by Ligado's terrestrial operations, and "immediately" notify Ligado if an unrepairable or unreplaceable GPS receiver should be affected by Ligado's services.[74] The 2020 Order also recited the FCC's expectation that "Ligado and U.S. Government agencies [would] work together in good faith, including with regard to negotiation to resolve any disputes."[75]

---

[71] *Id.* ¶ 126; *see id.* ¶ 48.

[72] *Id.* ¶¶ 54-57, 100.

[73] *Id.* ¶¶ 101-104.

[74] *Id.* ¶¶ 101, 103.

[75] *Id*. ¶ 104.

73. The FCC directed Ligado to deploy a program within six months of the date of the 2020 Order (*i.e.*, by October 2020) that would facilitate the information sharing and coordination called for by the 2020 Order.[76]

74. The 2020 Order articulated seven ongoing conditions attendant to Ligado's ATC use right: 1) comply with co-existence agreements between Ligado and GPS manufacturers; 2) abide by power level and operating restrictions; 3) limit out-of-band emissions; 4) coordinate with federal agency GPS users and GPS device manufacturers; 5) fulfill base station database, drive-testing, and monitoring requirements; 6) ensure market-availability for MSS and integrated 5G satellite/terrestrial services; and 7) regularly report on the information-sharing and coordination program, risks, and development of a repair-and-replace program.[77]

75. The FCC determined that the findings and provisions in its 2020 Order "constitute appropriate and reasonable measures to address the federal agencies' concerns, including concerns about current 'unknowns' and risks."[78] It further noted that DOD's most recent submissions through NTIA "convey[ed] no new information, data, or arguments."[79] In fact, in April 2016, the FCC first asked all stakeholders, including U.S. Government stakeholders like DOD and DOC, to provide examples of GPS receivers that would be affected by Ligado's terrestrial services. DOD and DOC never provided any such examples.

76. The FCC's 2020 decision approving Ligado's December 2015 Applications did not grant DOD or any other federal agency the right to interfere with or alter Ligado's services in the

---

[76] *Id.* ¶ 144.

[77] *Id.* ¶¶ 131-55.

[78] *Id.* ¶ 106.

[79] *Id.* ¶ 126.

L-Band, or to operate their own systems within or reliant on Ligado's exclusively authorized spectrum. Indeed, in its 2020 Order, the FCC reaffirmed its unique and exclusive role to manage spectrum users, concluding "it is the Commission that is vested with Title III authority to determine how to manage spectrum use."[80] In concurring statements, Commissioner Carr and Commissioners Rosenworcel and Starks commended the rigor of the FCC staff members' technical analysis.[81]

77. DOD's and DOC's requests that the FCC deny Ligado's December 2015 Applications because of alleged harm to GPS devices had one thing in common: they had no support in science or law, which is why the FCC denied them. In fact, the 2020 Order expressly addressed DOD's and DOC's asserted harmful GPS interference concerns, identified the lack of scientifically sound evidence to support those concerns, and unanimously concluded that there is no credible evidence that Ligado's terrestrial services would cause harmful interference to GPS receivers.

**C. The NTIA Has No Authority to Disrupt Ligado's Exclusive Use Rights.**

78. The modern FCC was created in part to ensure that interference from chaotic spectrum use did not render wireless communications unusable.[82] To prevent this congestion and allow for the orderly assignment of spectrum to different users within the United States, Congress passed the Communications Act of 1934, codified as amended at 47 U.S.C. §§ 151-646 (the "Communications Act"). The Communications Act empowers the FCC to allocate bands of

---

80 *Id.* ¶ 128 n.422; *see also id.* ¶¶ 129-130 (concluding the 2020 Order complies with Section 343 of the Communications Act of 1934, 47 U.S.C. § 343).

81 *Id.* at 73 (Statement of FCC Comm'r Carr); *id.* at 74 (Joint Statement of FCC Comm'rs Rosenworcel and Starks).

82 *Red Lion Broad. Co. v. FCC*, 395 U.S. 367, 375-77 (1969).

frequencies, issue licenses to use spectrum bands to commercial users through auction or other means, and regulate the activities of those users.[83] NTIA assigns the spectrum designated for federal government use to specific federal spectrum users, such as DOD.[84] The FCC and NTIA coordinate through IRAC. The Table of Frequency Allocations, 47 C.F.R. § 2.106, which is maintained by the FCC, identifies which frequencies are allocated for non-federal (commercial) use, federal use, and shared federal and non-federal use.

79. The purpose of Section 301 of the Communications Act is "to maintain the control of the United States over all the channels of radio transmission; and to provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority."[85]

80. In the United States, no commercial entity may operate a transmission device without a license granted by the FCC.[86] Where a commercial entity is the only one to have been issued a license to use a particular band, as is the case with Ligado's license (as protected and coordinated through the Inmarsat coordination agreement, discussed further in Section I.A.3, *supra*), the entity enjoys the exclusive right to use that allocated spectrum.

81. Similarly, federal agencies are permitted to use only the frequencies allocated for use by the federal government and assigned to specific federal spectrum users by NTIA.[87]

---

83 *See* 47 U.S.C. §§ 303, 309(j).

84 *See id.* §§ 305(a), 902(b)(2)(A).

85 *Id.* § 301.

86 *See id.*

87 *See id.* §§ 305(a), 902(b)(2)(A).

82. Some bands are designated for shared federal and non-federal use. That means those bands can, in theory, be assigned to either commercial or government users—*i.e.*, that the FCC or NTIA may assign frequencies within these bands pursuant to their statutory authority. That said, the practical realities of spectrum use, chief among them interference concerns, require the FCC and NTIA to coordinate closely with one another in assigning frequencies within these bands to either commercial or government operators. In fact, the Communications Act mandates that the FCC and NTIA conduct joint spectrum planning regarding "spectrum management techniques to promote increased shared use of the spectrum that does not cause harmful interference as a means of increasing commercial access."[88] This FCC and NTIA coordination is governed by interagency Memoranda of Understanding.

83. Of relevance here, the FCC and NTIA executed a Memorandum of Understanding in 2003 ("2003 MOU")[89] and a Memorandum of Understanding in 2022 ("2022 MOU").[90] Both the 2003 MOU and 2022 MOU commit the agencies to coordinate their actions to mitigate

---

88 *Id.* § 922.

89 Memorandum of Understanding Between the FCC and the NTIA (Jan. 31, 2003), https://docs.fcc.gov/public/attachments/DOC-230835A2.pdf.

90 Memorandum of Understanding Between the FCC and the NTIA (Aug. 1, 2022), https://www.ntia.gov/sites/default/files/publications/ntia-fcc-spectrum_mou-8.2022.pdf.

interference.[91] Both MOUs also state that final action by one agency does not require approval of the other.[92] The 2020 Order granting Ligado's ATC authority reaffirmed this understanding.[93]

84. Importantly, once the FCC has allocated frequencies for a particular service in a shared band—as it did for MSS service in the L-Band frequencies at issue—that allocation can be changed only through FCC notice-and-comment rulemaking.[94] Further, once the FCC has assigned a frequency to a particular commercial user pursuant to that allocation, the FCC is the only federal agency that can modify or revoke that frequency assignment.[95] Accordingly, even in a shared use band, such as the L-Band—where Ligado has primary use—NTIA cannot unilaterally undo an FCC frequency assignment decision. The FCC's decision does not require NTIA's approval, and it is final absent further action by the FCC.[96] After an FCC assignment, NTIA cannot unilaterally make a subsequent assignment on that band without prior coordination with

---

[91] *See, e.g.*, 2003 MOU at 2-3 (The FCC and NTIA will "cooperate . . . and endeavor to give notice of all proposed actions that could potentially cause interference to" government and non-government operations.); 2022 MOU at 3 (The FCC and NTIA will "cooperate . . . and endeavor to give notice of all proposed actions that could potentially cause interference to" federal and non-federal operations.).

[92] 2003 MOU at 2-3; 2022 MOU at 3.

[93] In relevant part, in the 2020 Order, the FCC reaffirmed that the agencies coordinate their spectrum management responsibilities and endeavor to provide each other with notice of proposed actions that could potentially cause interference, but that "[f]inal action by either agency . . . 'does not require approval' of the other." 2020 Order ¶ 122 (citation omitted).

[94] The Table of Frequency Allocations is codified at 47 C.F.R. § 2.106. Changing an allocation necessarily means amending 47 C.F.R. § 2.106, requiring rulemaking proceedings.

[95] *See* 47 U.S.C. §§ 316 (stating that the FCC may modify commercial licenses subject to providing the holder of such a license notice and an opportunity to be heard), 312 (allowing for the FCC to revoke commercial licenses in seven enumerated circumstances).

[96] 2022 MOU at 3 ("Where applicable, FCC staff will endeavor to engage NTIA staff in discussions regarding NTIA's comments on the FCC action. Final action by the FCC, however, does not require approval of the NTIA.").

the FCC.[97] And as a practical matter, NTIA cannot authorize federal transmissions in Ligado's spectrum without rendering the spectrum unusable to all parties because of the interference that would result from both a commercial and a government operator using the same spectrum. *See supra* Section I.A.1.

85. Under 47 U.S.C. § 303(a), 303(c), and 303(y), the FCC has authority to allocate spectrum to be made available for commercial or federal transmission. The FCC has allocated Ligado's spectrum for commercial use. Only after the FCC has designated a spectrum block for federal transmission would NTIA have authority to assign frequencies to federal users.

86. In the L-Band, NTIA's authority is circumscribed. The Table of Frequency Allocations reflects that portions of the L-Band are allocated for shared federal and non-federal use. But that federal use is cabined to emergency *receivers*—not *transmitters*. Government spectrum use in the L-Band is described in a compendium of materials prepared by NTIA in consultation with the federal agencies (the "Compendium").[98] The Compendium reports that the federal government is operating simply as an end-user of commercial MSS services provided by Inmarsat and LightSquared (a Ligado predecessor).[99] As detailed in Section I.A.3, *supra*, those

---

[97] *See* NTIA, Manual of Regulations and Procedures for Federal Radio Frequency Management § 4.1.2 (Jan. 2023 rev. of 2021 ed.) ("In the case of bands shared by federal and non-federal services, frequency assignments therein *shall be subject to* coordination between the NTIA (via IRAC) and the FCC . . . ." (emphasis added)); 47 C.F.R. § 300.1(a) ("Federal agencies must comply with the requirements in the NTIA Manual . . . .").

[98] "To address the nation's growing interest in and demand for radio spectrum, NTIA, in consultation with the federal agencies, has developed a compendium of detailed reports describing federal spectrum uses from 225 MHz to 7.125 GHz." NTIA, *Compendium*, Spectrum.gov, https://www.spectrum.gov/compendium (last visited Sept. 17, 2026).

[99] NTIA, *Compendium*, *1525-1535 MHz*, Fed. Gov't Spectrum Use Reps. 225 MHz-7.125 GHz, https://www.ntia.gov/files/ntia/publications/compendium/1525.00-1535.00_01DEC15.pdf; NTIA, *Compendium*, *1535-1559 MHz*, Fed. Gov't Spectrum Use Reps. 225 MHz-7.125 GHz,

commercial services are regulated by the FCC and bilaterally coordinated by Inmarsat and Ligado. NTIA cannot assign government transmitters for use in Ligado's exclusive ATC bands because it lacks authority to do so under Title III of the Communications Act. And, if it did, then, as detailed in Sections I.A.1 and I.A.4, *supra*, the resulting interference would render both uses unviable. In fact, NTIA has not assigned DOD or any other federal entity authorization to transmit in Ligado's licensed spectrum. Ligado is not aware of any NTIA or DOD filings with the FCC claiming otherwise, and the Government has not asserted any position to the contrary in this litigation. The Table of Frequency Allocations also confirms that, in Ligado's licensed spectrum, Ligado's operations are the "***primary***" services, meaning that other operations—including any emergency receiver operations by federal entities—cannot "cause harmful interference" to Ligado.[100]

## II. Ligado Has Satisfied the Conditions Set Forth in the FCC's 2020 Order Through Extensive Cooperative Efforts and Invested Billions of Dollars in the Process.

### A. In Reliance on the 2020 Order, Ligado Invested Billions of Dollars in Satisfying the 2020 Order's Conditions and Preparing to Operationalize Its ATC Authority.

87. The 2020 Order confirms that Ligado's spectrum is designated solely for commercial use, over which the FCC exercises "its broad and well-established spectrum management authority," and that NTIA does not hold spectrum authority over Ligado's bands.[101] In reliance on the FCC's 2020 Order granting Ligado the highly valuable right to deploy terrestrial

---

https://www.ntia.gov/files/ntia/publications/compendium/1535.00-1559.00_01DEC15.pdf; NTIA, *Compendium*, *1626.5-1660 MHz*, Fed. Gov't Spectrum Use Reps. 225 MHz-7.125 GHz, https://www.ntia.gov/files/ntia/publications/compendium/1626.50-1660.00_01DEC15.pdf.

[100] 47 C.F.R. § 2.105(c)(2)(i).

[101] 2020 Order ¶ 128 n.422.

5G services within its exclusively licensed spectrum, Ligado and its investors have spent billions of dollars to enable the development of its terrestrial spectrum operations.

88. Ligado has incurred these costs over decades of good faith efforts to develop and prepare to deploy a terrestrial system that would become the cornerstone of Ligado's business, complement and operate in harmony with the other communications systems in and adjacent to the L-Band, and revolutionize broadband service to the benefit of the American public. For instance, Ligado incurred over $2 billion in costs under its 2007 cooperation agreement with Inmarsat to maintain exclusive use of larger contiguous blocks of terrestrial L-Band spectrum.

89. In October 2020, Ligado completed a comprehensive recapitalization and fundraising transaction. Billions of dollars of new capital were invested to support the Company's deployment of terrestrial services in a manner consistent with the 2020 Order, including approximately $4 billion in new debt and the conversion of approximately $6 billion of existing debt to equity.

90. Since the 2020 Order, and throughout 2021 and 2022, Ligado took significant steps to invest in the L-Band ecosystem and develop the technology necessary to integrate its potential 5G services into consumer and industrial telecommunications products. Ligado engaged in a 12-month-long successful project with the Third Generation Partnership Project ("3GPP")—the wireless industry's global standard-setting body—to standardize the L-Band and thereby enable infrastructure vendors to develop 5G products compatible with its mid-band spectrum.[102] It has also invested substantial time, energy, and capital into creating 5G base stations and mobile

---

[102] Press Release, *3GPP Approves Band Specifications of Ligado's L-Band Spectrum for 5G Deployment*, Ligado (June 21, 2021), https://ligado.com/press/3gpp-approves-band-specifications-ligados-l-band-spectrum-5g-deployment/.

chipsets compatible with its authorized spectrum and positioning itself to serve critical spectrum infrastructure needs. Ligado has also established a meaningful repair-and-replace program and expended substantial effort to make federal agencies' participation in the program as easy as possible.

91. This successful preparatory work has further confirmed the benefits, value, and potential of Ligado's exclusively authorized terrestrial services, and establishes that Ligado's authorized spectrum could play a meaningful role in accelerating 5G in the United States.

92. In addition to costs incurred preparing to roll out its 5G terrestrial network, Ligado has also lost billions of dollars in leasing revenue. Ligado is authorized to provide access to its spectrum to cellular services carriers. These agreements can be worth more than one billion dollars in revenue per year to Ligado because its valuable spectrum could be combined with finite carrier-owned spectrum to support broad-based and economical 5G carrier network deployments.[103] In the ordinary course, Ligado would have formed these carrier partnerships promptly following the 2020 Order, providing Ligado with a significant interim contracted revenue stream while Ligado completes deployment of its terrestrial 5G services. But due to DOD's actions, aided by those of DOC and other agencies, including DOD's threats to not do business with anyone who works with Ligado, which threats are backed by Section 1662 of the 2021 National Defense Authorization Act ("2021 NDAA"), *see infra* Section III.C.1, Ligado has been unable to form such carrier partnerships.

---

[103] *See, e.g.*, Howard Buskirk, *T-Mobile's Bet on Mid-Band Driving Its 5G Success, Says CEO*, Commc'ns Daily (July 14, 2022), https://communicationsdaily.com/article/print?id=1306102 (discussing how T-Mobile grew from the fourth largest carrier in the U.S. to the second largest carrier because "it predicted correctly the latest generation of wireless would unfold in mid-band" spectrum).

93. Ligado's business model, financing arrangements, and December 2015 Applications to modify its license were all predicated on its ability to use its exclusively licensed spectrum to provide terrestrial communications services, as well as the ability to lease to others its terrestrial capacity in that spectrum.

**B. Ligado Has Satisfied the Conditions in the 2020 Order.**

94. Ligado has satisfied all conditions of the 2020 Order within its control: Ligado has ensured ATC operations will comply with its GPS co-existence agreements; adjusted planned power levels and accounted for certain operating restrictions; committed to limiting out-of-band emissions to prescribed levels; standardized its bands through the 3GPP; developed a 5G equipment and chipset ecosystem with major vendors; developed an integrated handset; and built the aviation and GPS coordination databases required by the 2020 Order. Ligado notified the FCC that those requirements were completed by Spring 2022, and Ligado continues to file quarterly reports with the FCC affirming that position. The only outstanding condition of the 2020 Order contemplates Ligado's direct cooperation with DOD to identify any GPS devices that may be affected by Ligado's ATC operations, repair or replace such devices according to Ligado's established program, and facilitate the exchange of information between Ligado and the U.S. Government regarding potential interference risks on an ongoing basis—a condition that Ligado cannot satisfy unilaterally.

**III. The DOD Took Ligado's ATC Use Right Without Just Compensation.**

95. Since 2018, when it abruptly withdrew its support for Ligado's December 2015 Applications, DOD, with the help of DOC, has gone to great lengths, first to prevent Ligado from obtaining its 2020 ATC authorization, and then to overturn the FCC's final order granting Ligado's applications, all the while obstructing Ligado from using its terrestrial authority. DOD (i) has refused to engage in even nominal cooperation efforts pursuant to the 2020 Order; (ii) has

appropriated, and continues to appropriate, Ligado's spectrum for its own use; and (iii) has continued to use its leverage in Congress and as an executive agency to not only deprive Ligado of its ATC use right in its entirety, but also to destroy Ligado's reputation and business altogether. It has misled the FCC, Congress, other government agencies, Ligado, and the public to conceal its taking of Ligado's authorized spectrum—all at the expense of Ligado's terrestrial use right.

### A. In Contravention of Well-Established Law, DOD, Aided by DOC, Has Refused to Implement the 2020 Order, Preventing Ligado from Using Its Right to Deploy Terrestrial Services in Its Spectrum.

96. Since the issuance of the 2020 Order, rather than work with Ligado and other federal agencies in good faith to address any legitimate concerns about harmful out-of-band interference to GPS,[104] DOD, with the assistance of DOC, has instead obstructed Ligado's good-faith efforts to implement the provisions of the 2020 Order. In fact, rather than work with Ligado, DOD officials told multiple witnesses at the FCC that they wanted to "kill the company," referring to Ligado.

97. Ligado has complied with the 2020 Order and has tried diligently to share information with DOD and DOC, address their concerns, and establish the repair-and-replace program called for by the Order. On June 30, 2020, Ligado sent letters to approximately 15 agency members of IRAC, including DOD and DOC. Consistent with the 2020 Order, the letters asked those agencies how Ligado could assist in the agencies' evaluations of potential harmful interference to GPS from Ligado's services, if any, and in what circumstances such interference could occur so that Ligado could identify potentially impacted systems and correct any potential

---

[104] There are recent examples of such successful cooperation. For instance, in 2022, the FCC and NTIA helped to craft a coexistence arrangement between the FAA, Verizon, and AT&T to address concerns over potential interference between terrestrial 5G networks and aircraft instruments that utilize the C-Band.

issues. Ligado followed up with similar letters to these agencies at least three additional times in March 2021, September 2021, and June 2022. No agency substantively responded to Ligado's outreach.

98. On May 22, 2020, NTIA, on DOD's behalf, filed a petition with the FCC for a stay of the 2020 Order and a petition for reconsideration based on the same pretextual arguments that a 1 dB metric—which had already been thoroughly considered and rejected by the FCC—was needed to protect GPS receivers. NTIA did *not* disclose in its reconsideration petition that DOD had been using Ligado's exclusively licensed spectrum, and instead advanced only arguments about harmful GPS interference that had already been rejected by the FCC.

99. On January 19, 2021, the FCC denied NTIA's petition to stay the 2020 Order.[105] The FCC found that NTIA had not met any of the requirements for a stay: NTIA was unlikely to succeed on the merits, it would suffer no irreparable harm, Ligado would suffer far greater harm from a stay, and a stay would not be in the public interest.[106] Although the 2020 Order was final and effective as of the date it was issued by the FCC on April 22, 2020, the FCC's denial of NTIA's petition to stay confirms the FCC's conclusions in its 2020 Order. The FCC's decision to grant Ligado the right to deploy a terrestrial 5G network in the L-Band remains undisturbed to this day, over six years later.

100. The few agencies that acknowledged Ligado's letters, including DOD, provided a nonsensical excuse for their inaction, stating that, given NTIA's pending reconsideration petition, it would be "premature to begin implementation discussions." The Communications Act is clear,

---

[105] *See In re Ligado Amendment to License Modification Applications*, 36 FCC Rcd. 1262 (Jan. 19, 2021) (Order Denying Motion for Stay).

[106] *Id.* ¶ 9.

however, that a petition for reconsideration shall not "excuse any person from complying with or obeying any order . . . of the Commission, or operate in any manner to stay or postpone the enforcement thereof."[107]

101. After the FCC denied the stay petition, Ligado again reached out (on March 12, 2021) to IRAC member agencies and to NTIA. Only one agency responded substantively, with the others not responding at all or claiming that the pending reconsideration petition excused their need to engage with Ligado, despite the denial of the stay, the text of the Communications Act, and the clear provisions of the 2020 Order.

102. The one agency that did engage with Ligado indicated that the rest of the U.S. Government was firmly opposed to doing so because of pressure coming from DOD and NTIA. To this day, rather than face opposition from DOD and DOC, the IRAC member agencies simply refuse to engage with Ligado. And DOD and DOC themselves have refused to engage with Ligado concerning DOD's purported concerns of harmful interference to GPS receivers. FOIA disclosures show that NTIA has been in possession of information "quantify[ing]" GPS device use by federal agencies relevant to Ligado's terrestrial communications services since 2018, but NTIA never provided this information to Ligado or the FCC, either before the 2020 Order or in support of its petition for reconsideration.[108]

103. These federal agencies' refusal to implement the 2020 Order and respect the FCC's authoritative resolution of these issues has hindered Ligado's use of its exclusively licensed spectrum, and has wholly blocked Ligado from using its ATC authority, drawing criticism from

---

[107] 47 U.S.C. § 405(a).

[108] Letter from Valerie Green, Exec. Vice President and Chief Legal Officer, Ligado, to Marlene H. Dortch, Sec'y, FCC (June 30, 2022), https://files.fcc.gov/ecfs/download/c6e5713e-73fe-4c86-b0ec-26645f5591a0?orig=true&pk=cb77b2ec-1a58-dbc6-139b-ad192cfd5d9b.

the FCC. In April of 2022—two years after the 2020 Order—FCC Commissioner Carr lamented that the L-Band is "a valuable stretch of spectrum . . . that has been effectively sitting on the sidelines for over ten years now" with no 5G service "despite the FCC authorizing it and the band having a great mix of coverage and propagation characteristics."[109] He went on to criticize "the federal users' public arguments," stating that if you "boil them down to their essence, it comes down to a disagreement over how much interference federal devices experience when they listen in to a spectrum band located far, far away from their assigned frequencies."[110]

104. Federal officials have told Ligado that they were instructed by DOD and DOC to not cooperate or speak with Ligado after the FCC issued its 2020 Order. Officials have also told Ligado that they do not believe there is any merit to the claims that Ligado's 5G services would interfere with GPS receivers.

105. The refusal by federal agencies to work with Ligado—orchestrated by DOD, with the assistance of DOC—has directly impeded the Company's efforts to develop its authorized spectrum pursuant to the 2020 Order. Without engagement from federal agencies (and DOD and NTIA in particular), Ligado cannot implement the coordination provision of the Order—the only condition in the Order Ligado has yet to satisfy—and thus cannot commence its duly authorized terrestrial services in the L-Band.

---

[109] FCC, FCC 22-29, Statement of FCC Comm'r Brendan Carr, Promoting Efficient Use of Spectrum through Improved Receiver Interference Immunity Performance (Apr. 21, 2022), https://docs.fcc.gov/public/attachments/FCC-22-29A3.pdf.

[110] *Id.*

**B. DOD Has Appropriated Ligado's Exclusively Licensed Spectrum for Its Own Use.**

106. DOD has refused to cooperate with Ligado and gone to great lengths to ensure Ligado cannot deploy its ATC operations because, on information and belief, DOD has been operating undisclosed systems continuously, *appropriating Ligado's authorized spectrum*, since at least April 22, 2020 (the date of the 2020 Order modifying Ligado's license and ATC authority). On information and belief, DOD continues to use Ligado's spectrum today by: (1) transmitting or receiving signals in Ligado's allocated spectrum that prevent Ligado from transmitting or receiving its own terrestrial signals in its exclusively licensed spectrum, due to in-band interference; and/or (2) receiving signals adjacent to Ligado's allocated spectrum in a manner that requires that Ligado's allocated spectrum be a "dead zone" for terrestrial services so as to avoid harmful out-of-band interference with DOD's systems. In either case, DOD's systems rely on and use spectrum for which DOD has not obtained an NTIA frequency assignment, and that the FCC has exclusively licensed to and authorized for use by Ligado.

107. After the FCC granted Ligado's December 2015 Applications to provide 5G terrestrial services in its licensed spectrum, DOD began to selectively disclose to certain members of Congress and other government officials—on information and belief, for the first time—that it was using Ligado's authorized spectrum. These disclosures were made as part of a concerted effort by DOD, with the help of DOC, to rally the support of Congress, other agencies, and the public against Ligado, and to prevent Ligado from using its ATC authority for terrestrial services in its exclusively licensed spectrum.

108. Although the details regarding DOD's use of Ligado's authorized spectrum have not been publicly disclosed and are not relevant to this claim, multiple senior government officials have confirmed to Ligado that DOD needs ***all*** of Ligado's spectrum authorized for wireless

terrestrial 5G services, a demand that is completely incongruent with DOD's professed concerns about GPS interference, which principally implicate the portion of Ligado's L-Band adjacent to GPS. These officials also told Ligado that DOD needs this spectrum both exclusively and permanently.

109. Around February 2022, representatives of Ligado attended a meeting with officials from NTIA, DOC, DOJ, and DOD at which the participants formally disclosed that DOD was operating systems using Ligado's spectrum. When Ligado asked whether DOD's program relied on L-Band uplinks or downlinks, DOD replied that it needed *all* of Ligado's spectrum permanently.

110. Further confirming DOD's use of Ligado's spectrum, on August 23, 2022, United States Senators Roger Wicker and Mark Warner sent a letter to then-Secretary Gina Raimondo, then-Secretary Lloyd Austin, and then-NTIA Administrator Alan Davidson regarding DOD's previously undisclosed concerns that Ligado's terrestrial deployment could interfere with federal systems. The letter confirmed publicly what government officials had told Ligado privately: DOD has undisclosed operations that require the appropriation of Ligado's spectrum.

111. Other senior government officials have also confirmed DOD's use of Ligado's authorized spectrum publicly, as well. Now-retired Air Force Space Command General John Raymond testified in a Senate hearing concerning Ligado's spectrum that "[w]e have to be able to operate ***in that spectrum*** . . . [A]nd it is absolutely critical to our joint force."[111] He admitted that his concerns were "***not just GPS***. It is commercial communication satellites and other types of

[111] *Hearing to Receive Testimony on DOD Spectrum Policy and the Impact of the FCC's Ligado Decision on National Security Before the S. Armed Servs. Comm.*, 116th Cong. 54:1-5 (2020), https://www.armed-services.senate.gov/imo/media/doc/20-21_05-06-2020.pdf (emphasis added) ("Senate Armed Services Committee Hearing Tr.").

satellites that bring signals down."[112] In response to questioning about whether DOD was opposed to Ligado using its ATC authority because it was seeking to "protect" just GPS or whether it was seeking to keep Ligado's terrestrial operations out of the entire L-Band for other reasons, then-Under Secretary of Defense Michael Griffin admitted, "[i]t is both."[113]

112. In addition, high-ranking NTIA and DOC officials failed to disclose DOD's use of Ligado's authorized spectrum when NTIA submitted various filings to the FCC. On information and belief, NTIA and DOC lent their names and authority—as the representatives of the Executive Branch on spectrum policy—to DOD, even though DOD's true concerns were not with GPS.

113. These admissions that DOD is using Ligado's authorized spectrum came only ***after*** the FCC granted Ligado's license modification Applications, ***after*** nearly a decade of consideration by members of IRAC—including DOD and NTIA—of Ligado's plans to provide terrestrial services in its licensed spectrum, and ***after*** Ligado had spent billions of dollars investing in and preparing to deploy its FCC-licensed terrestrial services.

114. A September 9, 2022 report issued by the National Academies of Sciences, Engineering, and Medicine (the "National Academies") acknowledged that "DoD uses the MSS band for many different applications" like "communications, navigation, tracking of military assets such as equipment and vehicles."[114] But the National Academies' Report further conveyed—based on DOD's statements, which the National Academies report admitted were not publicly available—that Ligado's "terrestrial network authorized by FCC Order 20-48" could not coexist

---

[112] *Id*. at 77:7-9 (emphasis added).

[113] *Id.* at 72:23, 73:10.

[114] Nat'l Acads. of Sci., Eng'g, and Med., *Analysis of Potential Interference Issues Related to FCC Order 20-48* 73 (Nat'l Acads. Press, 2022), https://nap.nationalacademies.org/read/26611/chapter/4# ("National Academies' Report").

with various "DoD missions," including DOD satellite systems "***aside from GPS***."[115] In other words, the National Academies' Report made clear that DOD requires the entirety of Ligado's spectrum that Ligado needs to deploy its ATC operations, for reasons separate and apart from any GPS activity.

115. The National Academies' Report's statements regarding DOD's use of Ligado's spectrum are also consistent with the above-mentioned public statements made by high-ranking DOD personnel in testimony before the Senate Armed Services Committee in May 2020—after the FCC had granted Ligado's December 2015 Applications for modified ATC authority. Namely, both the National Academies' Report and the statements from DOD officials confirm that DOD's operations in and abutting Ligado's spectrum go beyond GPS.

116. DOD has not compensated Ligado for the use of its exclusively licensed spectrum. Such use has prevented, and will continue to prevent, Ligado from using its duly and exclusively licensed spectrum for terrestrial services.

117. Rather than contracting with Ligado and providing just compensation for the use of (or for Ligado not to use) Ligado's exclusively licensed spectrum, DOD, with support from DOC, has engaged in a reckless campaign of misinformation about purported harmful GPS interference. DOD and DOC have refused to work with Ligado to resolve this conflict, which is inconsistent with how DOD has dealt with similarly situated companies. Several of DOD's outside contractors provide services to DOD using those contractors' licensed spectrum adjacent to Ligado's. DOD's position with respect to Ligado, however, is clear: it wants to use the spectrum for free, rather than pay to solve the problem it created, even if that means putting Ligado out of business.

---

[115] *Id.* at 73, 75 (emphasis added).

### C. DOD Provided Misleading Information to Congress Aimed at Preventing Ligado from Using Its License and Terrestrial Authorization.

118. While DOD and DOC stonewalled Ligado and caused others to do the same—all to avoid paying Ligado just compensation—DOD was also actively pushing Congress to pass legislation that would frustrate Ligado's use of its exclusively licensed spectrum and effectively block Ligado from using its authority to provide terrestrial communications services. These were concerted efforts to keep Ligado from providing terrestrial communications services so that DOD could continue to use Ligado's exclusively licensed spectrum without compensation.

119. On May 6, 2020, two weeks after the 2020 Order, the Senate Armed Services Committee convened a hearing, at which DOD officials rallied support for such legislation. Entitled "Department of Defense Spectrum Policy and the Impact of the Federal Communications Commission's Ligado Decision on National Security," the one-sided hearing featured three DOD officials as witnesses—then-DOD CIO Dana Deasy, then-Under Secretary of Defense Michael Griffin, and now-retired Air Force Space Command General John Raymond—as well as a retired Coast Guard admiral. Disgraced former Deputy CIO Moorefield spearheaded DOD's preparations for the hearing and sat directly behind the witnesses during their testimony. No one from the FCC, Ligado, or the GPS industry was invited to participate in the hearing. In the hearing, these DOD witnesses repeated the same debunked claims of harmful interference to GPS receivers that had already been addressed and rejected by the FCC. But this time, the audience lacked the technical background and familiarity with the lengthy history of the FCC proceedings necessary to challenge these claims—including Ligado's many concessions, the contrary science, and the widespread support for Ligado's intended use of its licensed spectrum for terrestrial operations, including by DOD itself previously.

120. DOD officials presented false or misleading information to Congress during the same Senate hearing. On information and belief, members of Congress were generally unfamiliar with the meticulous review conducted by the FCC that resulted in the 2020 Order. Some Members of Congress were under the misimpression that the 20 years of FCC proceedings leading up to its decision were akin to something "done on the weekend."[116] When asked by the Chairman of the Armed Services Committee whether DOD was "consulted by or asked by the FCC for [its] opinions" during the FCC's consideration of Ligado's application, then-DOD CIO Deasy testified, "no, sir, there was not a give and take, a back and forth that we typically go through. ***And at the end of the day, we were completely caught off guard when over that weekend in April the decision was taken by the FCC to go ahead and move forward.***"[117] As then-FCC Chairman Ajit Pai confirmed in a letter to Senator Mike Lee, "Federal agencies [including the DOD] had actual possession of the draft that the FCC was poised to adopt—and thus an opportunity to comment on it—for almost *half a year* before the FCC finally adopted it."[118] The Whistleblower's disclosures further confirm that the FCC provided the DOD with a draft order approving Ligado's license modification on October 31, 2019.

121. DOD officials presented other false or misleading information during the same Senate hearing. Admiral Thad Allen testified that the tests the FCC relied upon were "funded by Ligado, were not conducted in a transparent fashion and not widely supported."[119] In reality, however, NASCTN administered the test under a cooperative research agreement at the DOD-

---

[116] Senate Armed Services Committee Hearing Tr. at 94:24.

[117] *See id.* at 38 (emphasis added).

[118] Letter from Ajit Pai, Chairman, FCC, to Mike Lee, Sen., U.S. Senate (June 12, 2020), https://www.lee.senate.gov/services/files/b5fbe322-c4be-4389-8d4b-cda4531ba011.

[119] Senate Armed Services Committee Hearing Tr. at 34:3-5.

DOC lab in Boulder, Colorado and the testing won the DOC's Gold Medal Award. As the 2020 Order recognized "NASCTN . . . is a joint effort among" the National Institute of Standards and Technology, NTIA, DOD, and NASA providing "reliable and unbiased measurements and analyses."[120] Quoting leaked internal DOD- and DOC-authored documents acknowledging that testing at the Boulder lab showed Ligado's terrestrial operations would not harmfully interfere with GPS receivers, then-FCC Chairman Ajit Pai tweeted the following about DOD's baseless attacks against Ligado and the 2020 Order: [121]

**Ajit Pai**
@AjitPai

What do the Department of Defense's technical experts *really* think about the @FCC's unanimous, bipartisan #Ligado decision? Here is what a high-ranking expert working for the DoD's Chief Information Office had to say privately after we made that decision.

> *The unanimous, bipartisan vote by the FCC is keenly obvious proof to any who are truly informed or were honest assessors of the engineering and regulatory soundness of this final determination, albeit so very long in arriving.*

12:44 PM · Jun 18, 2020

122. Other Senators, from both sides of the aisle, were rightly troubled by the failure to include key stakeholders in the congressional process and recognized the importance of hearing from the FCC and Ligado rather than accepting uncritically DOD's representations. Senator Tim

---

[120] 2020 Order ¶ 38 n.130.

[121] Ajit Pai (@AjitPai), X (formerly Twitter) (June 18, 2020, 12:44 PM), https://x.com/AjitPai/status/1273657812141461506.

Kaine observed, "[W]e have only heard one side of the case. . . . [T]he FCC is right in town and could have been at this hearing or Ligado."[122] Senator Tom Cotton agreed, saying "[I]t is really important that we hear from the unanimous FCC and from Ligado as well for us to make a reasoned conclusion."[123] Senator Angus King noted that the FCC is "an independent agency that reached a unanimous conclusion on something that has been extensively litigated"; that it must have "had some basis for doing so," especially since the 2020 Order "is one of the few unanimous orders" that has been issued by the FCC; and that it issued a "74-page order with 444 footnotes," which indicates "that some serious thought went into it."[124]

123. Despite these concerns, the Senate Committee did not hold another hearing to gather testimony from the FCC, Ligado, or the GPS industry. Although he was not invited to testify before the Senate Armed Services Committee, then-FCC Chairman Ajit Pai responded to the criticisms, explaining: "We made a decision based solely on the facts and the law and I will defend this decision before any forum in Congress or around the country. . . . [W]e've made a decision that is based . . . on sound engineering as opposed to the fear mongering that we've heard."

124. In addition, as part of this coordinated campaign to drum up support for legislation preventing Ligado from using its spectrum for terrestrial services, DOD launched a public website, again laying out the meritless case that was presented to and rejected by the FCC. The website stated that DOD opposed "a license the Federal Communications Commission has granted to a private company, Ligado, to deploy a low-power nationwide mobile broadband network."[125] The

---

[122] Senate Armed Services Committee Hearing Tr. at 63:6-10.

[123] *Id.* at 67:11-13.

[124] *Id.* at 71:18-20, 71:24-72:2.

[125] In late 2021, the website was taken offline. We provide screenshots from an archived version of the website below.

website posted sensationalistic warnings and made false and unsupported claims about the harm that Ligado would cause to both military and everyday civilian users of GPS. Screenshots of those false statements appear below:

> There are too many unknowns, and the risks are too great, to allow the proposed Ligado system to proceed. We risk lives and the security of the nation if GPS is interrupted for any amount of time.

**HOW THE LIGADO PROPOSAL COULD DISRUPT GPS**

DOD would be subject to network interruptions in the supply systems for air, land and sea platforms across the services and food supply to the Defense Commissary Agency, which manages the stores where our soldiers, sailors, airmen, Marines and their families do their primary grocery shopping.

Information systems that run banking, the supply chain for all industries, and all aspects of an industry such as travel from reservation systems to air traffic control systems could be disrupted and information throughput slowed, and networks could go down intermittently or for extended periods.

First responders could be delayed in responding to calls as they would be unable to locate where the call is coming from. They would also have increased difficulty communicating through normal channels with other first responders and be unable to communicate across multiple jurisdictions.

In reality, contrary to the website's baseless claims, the FCC concluded that:

> **"Ligado's modified ATC network should not cause harmful interference to general location and navigation devices"** and that **"significantly reduced power levels at which Ligado will operate . . . significantly lower the potential for harmful interference to GPS devices, including those owned by the U.S. Government."**[126]

---

[126] 2020 Order ¶ 100.

125. The website also derided Ligado's spectrum with zero factual basis or support, claiming it "lacks the bandwidth, power or global ecosystem to deliver robust 5G services."



Ligado's proposed network lacks the bandwidth, power or global ecosystem to deliver robust 5G services. The only beneficiaries are Ligado shareholders.

In reality, the 2020 Order approving Ligado's license modification concluded that the FCC's order:

> **"promote[s] more efficient and effective use of our nation's spectrum by making available additional spectrum for advanced wireless services, including 5G."**[127]

126. As part of a coordinated public smear campaign to destroy Ligado's reputation (in addition to the uncompensated taking of its multi-billion dollar asset), then-Secretary of Defense Mark Esper took the extraordinary and nearly unprecedented step of publishing an Op-Ed in *The Wall Street Journal*, sensationally claiming that the FCC's decision will "undermine U.S. national security and disrupt commerce and daily life."[128] The Op-Ed contained false statements about potential harmful interference with GPS, but also made unsupported attacks on Ligado's reputation and the quality of its spectrum, including that "[t]here is no evidence that [Ligado] has a technically viable 5G solution" and that Ligado was attempting to "maximize the value of its spectrum" at great "cost to Americans . . . ."[129] Prior to that, the last time an acting Secretary of Defense had

---

[127] *Id.* ¶ 156.

[128] Mark Esper, *The FCC's Decision Puts GPS at Risk*, Wall St. J. (May 5, 2020), https://www.wsj.com/articles/the-fccs-decision-puts-gps-at-risk-11588719423.

[129] *See id.*

published an Op-Ed was in 2003, when Donald Rumsfeld advocated in The Washington Post for invading Iraq.

127. Responding to misinformation and immense pressure from DOD, Members of Congress began drafting amendments to the pending 2021 NDAA to take away Ligado's ability to provide terrestrial services in its exclusively licensed spectrum. The House of Representatives drafted legislation to ban Ligado and its customers from contracting with DOD and to limit DOD's ability to cooperate with any repair-and-replace program. The Senate introduced language mandating yet another technical review of DOD's claims.

128. In response to the proposed legislation DOD was trying to push through, numerous Members of Congress, some of whom had previously been supportive of Ligado, rallied in opposition. In October 2020, a bipartisan group composed of Senators Roger Wicker, Mark Warner, John Thune, Tim Kaine, Ron Johnson, and Todd Young sent a letter to Senate Armed Services Committee Chairman Jim Inhofe and Ranking Member Jack Reed urging them to strike certain 2021 NDAA provisions related to the FCC's decision approving Ligado's license modification Applications.

129. In November 2020, Chairman Frank Pallone and Ranking Member Greg Walden of the House Energy and Commerce Committee also opposed the legislation in a letter sent to Chairman Adam Smith and Ranking Member Mac Thornberry of the House Armed Services Committee, and characterized the proposed legislation as an attempt to limit or prevent DOD from implementing the provisions of the 2020 Order.

130. Despite these efforts, DOD persisted, and when the House and Senate met in conference committee in early December 2020, the language targeting Ligado became more stringent. Both House provisions and both Senate provisions were retained, and the committee

eliminated findings that acknowledged Ligado's commitment to working with DOD to resolve the agency's concerns and cover certain of DOD's costs.

### 1. The 2021 NDAA Prevents Ligado from Using Its ATC Authority.

131. The 2021 NDAA became law on January 1, 2021.[130] The 2021 NDAA contains four sections in Subtitle E of Title XVI that make it impossible for Ligado to use the ATC authority conferred by Ligado's FCC license without DOD's sign-off. The most problematic of these provisions is Section 1662, which states:

> **Section 1662—Limitation on Awarding Contracts to Entities Operating Commercial Terrestrial Communication Networks that Cause Harmful Interference with the Global Positioning System.** The Secretary of Defense may not enter into a contract, or extend or renew a contract, with an entity that engages in commercial terrestrial operations using the 1525-1559 megahertz band or the 1626.5-1660.5 megahertz band unless the Secretary has certified to the congressional defense committees that such operations do not cause harmful interference to a Global Positioning System device of the Department of Defense.[131]

132. Ligado is the only company authorized to utilize spectrum for terrestrial operations in the 1525-1559 MHz band or the 1626.5-1660.5 MHz band. Section 1662 was intended to be, and has been, devastating to Ligado's business. It specifically targets terrestrial services in Ligado's exclusively licensed spectrum. Section 1662 is a warning to all current and potential partners and customers of Ligado: if you contract with Ligado to use its licensed spectrum for terrestrial operations, you will no longer be allowed to do business with DOD.

133. There is no question that the 2021 NDAA was designed to target Ligado. In December 2020, House Energy and Commerce Committee Ranking Member Cathy McMorris

---

130 *See* William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. 116-283, §§ 1661-1664, 134 Stat. 3388, 4073-76 (2021).

131 *Id.* § 1662.

Rodgers opposed inclusion of the language in the 2021 NDAA that singled out Ligado: "The NDAA shouldn't target an American company that will hurt our ability to beat China in the 5G race. Why single out an American company focused on boosting our country's 5G leadership but leave out protections against Chinese drone manufacturers threatening our national security? This should be made right."[132] Former Chairman of the FCC Mark Fowler described the 2021 NDAA as follows:

> Defense lobbyists have now inserted language into the annual defense bill that among other things forbids Pentagon contract awards to Ligado or any company who uses Ligado. ***This soft corruption violates all limits of restraint in the U.S. Constitution.*** These punitive provisions should be seen for what they are: ***bullying by the Defense Department lobbyists, who view U.S. spectrum as "theirs."***[133]

And public reporting, including in *Forbes*, explained that "any company that uses Ligado's network is not permitted to have a contract with the U.S. Department of Defense, a substantial disincentive to doing business with Ligado."[134]

134. Given that the ability to contract with DOD is essential to businesses operating in the telecommunications industry, the provision effectively prohibits any firm from doing business with Ligado with respect to its terrestrial services. Ligado has been told by potential commercial

---

[132] Press Release, Congresswoman Cathy McMorris Rodgers, McMorris Rodgers Statement on NDAA Provisions Regarding Ligado (Dec. 4, 2020), https://web.archive.org/web/20241015164930/https://mcmorris.house.gov/posts/mcmorris-rodgers-statement-on-ndaa-provisions-regarding-ligado.

[133] Mark Fowler, *Spectrum War Ceasefire: Trust the FCC on Ligado*, Morning Consult (Oct. 7, 2020), https://morningconsult.com/opinions/spectrum-war-ceasefire-trust-the-fcc-on-ligado/ [https://perma.cc/MXZ3-RAKA] (emphasis added).

[134] Diana Furchtgott-Roth, *Yet More Problems for Ligado*, Forbes (Dec. 28, 2022), https://www.forbes.com/sites/dianafurchtgott-roth/2022/12/28/yet-more-problems-for-ligado/?sh=11836a871bbd [https://tinyurl.com/eu4uhcz3].

partners that Ligado is too "hot" to do business with as a result of Section 1662 and DOD's hostile attitude towards Ligado. On information and belief, DOD even threatened one of Ligado's potential partners that if it engaged with Ligado, the vendor would not be able to contract with DOD.

135. From January 2021 through mid-2022, Ligado engaged two investment bankers to pursue a strategic outreach process with companies that could utilize Ligado's spectrum, conducting meaningful diligence. Every one of those potential partners expressed concerns about the impact of the 2021 NDAA on their ability to work with Ligado. Ultimately, no one agreed to partner with Ligado to support its terrestrial 5G connectivity plans.

136. In addition to Section 1662, the 2021 NDAA contained other provisions that specifically target Ligado and were intended to delay, disrupt, and destroy Ligado's commercial terrestrial operations. For instance, Section 1661 prohibits DOD from using appropriated funds "to retrofit any Global Positioning System device or system, or network that uses the Global Positioning System, in order to mitigate harmful interference from commercial terrestrial operations" in Ligado's spectrum.[135] It does not, however, prohibit DOD from using funds to "conduct[] technical or information exchanges with" entities that operate in the L-Band.[136] Likewise, Section 1664 prevents the Secretary of Defense from using funds to comply with the 2020 Order until the Secretary of Defense "submits to the congressional defense committees an estimate of the extent of covered costs and the range of eligible reimbursable costs associated with harmful interference" to DOD's GPS receivers resulting from the 2020 Order and certifies to such

---

[135] 2021 NDAA § 1661(a).

[136] *Id.* § 1661(b)(1).

committees that such estimate is accurate "with a high degree of certainty."[137] Through these provisions, Congress gave DOD what it wanted: an excuse to frustrate Ligado's development efforts, rather than implement the 2020 Order, and the continued ability to use Ligado's authorized spectrum without compensating Ligado.

137. The 2021 NDAA, enacted based on DOD's misleading statements about harm to GPS, upended the reasonable investment-backed expectations of Ligado and its investors for no legitimate reason. Once the FCC unanimously approved Ligado's application to use its license to develop and deploy 5G terrestrial communications services, no one reasonably could have predicted that DOD would cause Congress to override the FCC licensing process, prohibit commercial operators from contracting with Ligado on efforts to develop its authorized spectrum if they do any business with DOD, and effectively transfer to DOD a right to block Ligado's use of its spectrum for terrestrial operations indefinitely.

138. The 2021 NDAA made no legislative findings to support these drastic actions. The minimal congressional record underlying the relevant provisions targeting Ligado does not spell out a threat to GPS. Congress never had the benefit of hearing testimony from the FCC, Ligado, or any GPS receiver manufacturers. Congress never received or reviewed the technical or scientific studies that disprove DOD's flawed or false harmful GPS interference assertions presented to the Senate Armed Services Committee in May 2020. Nor did Congress receive from DOD evidence to support DOD's claims about the potential for harmful interference to GPS.

**2. DOD Has Failed to Make the 2021 NDAA Certifications.**

139. Since the passage of the 2021 NDAA, DOD has either delayed implementing the statute or has failed to comply with it entirely. This non-compliance is yet another tool wielded

[137] *Id.* § 1664.

by DOD to prevent Ligado from using its property, and to maintain DOD's use of Ligado's property, without just compensation.

140. Even though DOD knows that there is no legitimate basis to question the FCC's conclusion that GPS receivers would not experience harmful interference caused by Ligado's authorized use of its licensed spectrum, *see* Section I.B.4, *supra*, DOD has not yet made a certification to that effect under Section 1662, nor does it appear to have taken any steps towards doing so.

141. Section 1663 mandates that DOD engage the National Academies within 30 days of the enactment of the 2021 NDAA and that the National Academies return a report 270 days after that.[138] If DOD had acted in a timely manner, the full report would have been submitted to Congress by the end of October 2021. Instead, DOD delayed the study and the National Academies did not hold its first meeting of the study team until September 20, 2021, merely five weeks before Congress asked for the study to be completed. Because of DOD's delay, the National Academies' Report was not published until September 9, 2022, nearly a year after the timeline Congress established.

142. Section 1664 requires DOD to estimate and certify the costs of complying with the 2020 Order before taking any steps to implement it. DOD has not yet issued that certification and has provided no indication that it plans to do so. Most tellingly, DOD has refused Ligado's attempts to assist in identifying potentially affected GPS receivers. In fact, neither DOD nor DOC has provided even a single example of a GPS receiver that would be harmed by Ligado's terrestrial services, even though Section 1661 explicitly provides that DOD may spend funds to "conduct[] technical or information exchanges with" Ligado regarding harmful interference to GPS devices.

---

[138] *Id.* §§ 1663(a)(2), (c)(1).

Given that DOD studied the impacts of Ligado's proposals for more than 20 years, the agency's failure to develop a cost estimate more than six years after the 2020 Order is clearly deliberate.

143. DOD's behavior demonstrates that it is abusing the regulatory and legislative process to cover up its own use of Ligado's authorized spectrum and to prevent Ligado's use of its ATC authority for 5G terrestrial services, all without providing just compensation. Congress, through passage of Section 1613 of the 2022 NDAA, has indicated its own frustration at the pace of DOD's compliance and its concern that DOD may not have shared all relevant information with Congress, agencies having jurisdiction over spectrum, or entities with authority over DOD, like the White House and the National Security Council. Section 1613 of the 2022 NDAA, which became law on December 27, 2021, includes remarkable language directing DOD to brief the National Security Council, DOC, FCC, and Congress on "(1) potential operational impacts that have been studied" with respect to the L-Band and "(2) impacts that could be mitigated, if any, including how such mitigations could be implemented," within 30 days of the passage of the 2022 NDAA.[139] Congress thus passed a law requiring DOD to tell the truth about the impacts of the 2020 Order on "other tactical or strategic systems" of DOD, in addition to GPS.[140]

144. Section 1682 of the 2022 NDAA also pushes DOD to take action with respect to its obligations under the 2021 NDAA. For instance, it requires the Secretary of Defense to provide Ligado with an estimate of repair-and-replace expenses related to GPS "[a]s soon as practicable" after making the certification required by Section 1664 of the 2021 NDAA.[141] Section 1682 also

---

[139] National Defense Authorization Act for Fiscal Year 2022, Pub. L. 117-81, § 1613, 135 Stat. 1541, 2083-84 (2021) ("2022 NDAA").

[140] *Id.*

[141] *Id.* § 1682(d).

requires that the Secretary of Defense establish a process for Ligado to provide reimbursement for such certified costs.[142] To date, and over five years since Congress originally instructed DOD to calculate repair-and-replace estimates in the 2021 NDAA, DOD has failed to provide Ligado any such estimate or to establish a reimbursement process. This continuous failure to identify any repair-and-replace costs due to Ligado's purported harmful interference with DOD's GPS receivers, as explicitly required by Congress in two consecutive NDAAs, is strong evidence that no such costs or harmful GPS interference exist. The legislative taking began on or about January 1, 2021—the day Congress enacted the 2021 NDAA—and it has continued at least through the date of this filing.

## IV. Ligado's ATC Use Right Is a Valuable Property Interest Under the 2020 Order and Governing Law.

145. Congress has structured the Communications Act and related statutes, and the FCC has implemented them, in ways that reflect an intent for spectrum licenses to function as property. Spectrum licenses are bought, sold, and treated as property in bankruptcy;[143] they are transferable; they are renewable by operation of law on the satisfaction of objective criteria; and they are revocable only through formal proceedings tethered to statutory standards which, in practice, are virtually never satisfied. Congress provided in the Communications Act that the statute is not to be "construed to create any right, *beyond* the terms, conditions, and periods of the license,"[144] clearly allowing for the creation of rights *within* those terms, conditions, and periods.

---

[142] *Id.* § 1682(f).

[143] *See, e.g.*, *In re Atl. Bus. & Cmty. Dev. Corp.*, 994 F.2d 1069, 1073-75 (3d Cir. 1993).

[144] 47 U.S.C. § 301 (emphasis added).

146. Ligado's rights under its FCC license—each further detailed in Section I.A.2, *supra*—include a right to exclusively use Ligado's licensed spectrum for MSS operations, the right to exclusively use a subset of that spectrum for terrestrial operations, the right to partially alienate its use rights, and the de facto right of license renewal. Taken together, these rights, which are key indicia of property, make Ligado's license cognizable property under the Fifth Amendment. This litigation concerns the taking of a stick from that bundle of rights: Ligado's terrestrial use right in the L-Band, as authorized by the 2020 Order.

**A. Ligado's ATC Use Right Is Exclusive.**

147. Ligado's license grants it exclusivity over the sections of the L-Band allocated to it. As discussed in Section I.A.3, *supra*, Inmarsat is the only other MSS operator in the L-Band in the United States. The two companies' bilateral cooperation agreement, as well as the multilateral coordination of international operators undertaken pursuant to the Mexico City MOU, have produced discrete, contiguous bands in which only Ligado is permitted to operate. That means that in the continental United States, Ligado is the sole operator authorized to transmit in more than 40 MHz out of the 68 MHz of L-Band spectrum,[145] a 30 MHz subset of which can be used for terrestrial operations.

148. The 2026 Order reaffirmed the exclusivity of Ligado's use rights. That Order reflects the basic physical reality that simultaneous, nonexclusive use in the L-Band is impossible: overlapping operations would cause such destructive interference as to render them useless. As discussed in Section I.A.4, *supra*, the 2026 Order's reaffirmation of Ligado's exclusive MSS use rights extends to Ligado's proposed terrestrial operations. Where a given frequency band has been

[145] Aside from Ligado and Inmarsat, the FCC has reserved the 1 MHz slices at 1544-1545 MHz and 1645.5-1646.5 MHz for satellite-based distress, safety, and emergency communications.

allocated to MSS use, only the holder of that MSS license is eligible to run terrestrial operations in that band. Thus, by protecting the exclusivity of Ligado's MSS operations in the L-Band, the 2026 Order necessarily protected the exclusivity of Ligado's authorized terrestrial operations there.

149. The FCC has been focused on interference risks and intent upon ensuring the exclusivity of operations within the L-Band since it first established the ATC framework in 2003. Pursuant to Section 309(j)(1) of the Communications Act, the FCC is required to put new (as opposed to modifications of existing) spectrum licenses up to auction for competitive bidding.[146] But the FCC specifically held that competitive bidding for terrestrial operations in the L-Band was *not* necessary because terrestrial commercial communications would operate concurrently with existing satellite operations. Because of "an unacceptable risk of harmful interference,"[147] those concurrent components would have to be closely coordinated on an ongoing basis, such that only existing MSS operators—*i.e.*, Ligado and Inmarsat—could run terrestrial operations in the L-Band.

**B. Ligado's ATC Use Right Is Transferable.**

150. FCC regulations set forth spectrum leasing rules for services in which licensees hold "exclusive use rights."[148] ATC authorization is expressly recognized as providing "exclusive use rights" for spectrum leasing purposes.[149] Licensees are permitted to lease out their use rights "without the need for prior Commission approval," so long as the licensee maintains de facto

---

[146] 47 U.S.C. § 309(j)(1).

[147] 2003 Order ¶ 2.

[148] 47 C.F.R. § 1.9005.

[149] *Id.* § 1.9049(a).

control of the license and provides the FCC with advance notice of the lease.[150] The "de facto control" provision requires the licensee to remain "fully responsible for ensuring the spectrum lessee's compliance with the Communications Act" and related rules,[151] and the notice stipulation requires the licensee to submit a notification form to the Commission in the weeks preceding the lessee's operations.[152] So long as licensees satisfy those conditions, they can freely lease out their use rights. Licensees may also fully assign or transfer control of their license to another party, subject to FCC approval.[153]

151. An active secondary market in leasing, assigning, and transferring spectrum licenses has developed under that codified FCC framework. In 2019, the FCC noted that in the decade prior, it had received more than 8,000 spectrum lease applications and notifications pertaining to approximately 26,000 licenses.[154] Ligado itself has, since 2007, leased 5 MHz of spectrum in the 1670 to 1675 MHz band from Crown Castle MM Holding LLC ("Crown Castle"), under a long-term de facto transfer lease agreement.[155] That lease agreement includes a Ligado purchase option for the licensed spectrum and contemplates renewal for a further term, if and when the Crown Castle license is renewed by the FCC.[156] There is nothing in the FCC's 2020 Order,

---

150 *Id.* § 1.9020(a).

151 *Id.* § 1.9010(b)(1).

152 *Id.* § 1.9020(e)(1)(ii).

153 *Id.* § 25.119(a).

154 *In re Partitioning, Disaggregation, & Leasing of Spectrum*, 34 FCC Rcd. 1758, 1761 (2019).

155 *See In re Ligado Networks LLC, et al.*, No. 25-10006 (Bankr. D. Del. Jan. 6, 2025), Dkt. No. 2 ¶¶ 23-24.

156 *Id.*

nor in the FCC framework, nor elsewhere in the applicable regulatory schema, that prohibits Ligado from likewise leasing its exclusive right.

152. Indeed, full assignment or transfer transactions in spectrum licenses and their terrestrial components routinely attract substantial commercial interest. In May 2026, the FCC approved the $40 billion sale of EchoStar's wireless spectrum to AT&T and SpaceX.[157] The deal will transfer 50 MHz of midband spectrum to AT&T and 65 MHz to SpaceX[158] to deploy a hybrid terrestrial-satellite network for consumer applications. Prior to the deal, AT&T had been accessing the same spectrum through leasing agreements.[159] Ligado's own license and ATC authority are of the same commercially viable character. The FCC itself stated in the 2026 Order that it "intends to support the renaissance in direct-to-device by fostering a predictable regulatory environment that . . . encourages secondary-market transactions."[160]

### C. Ligado's ATC Use Right Is Subject to a Strong and Well-Recognized Renewal Expectancy.

153. Decades ago, the FCC moved away from a competitive renewal model to one wherein all spectrum licenses are renewed on an effectively pro forma basis. For instance, in the broadcast context, Congress stipulated that broadcast licenses "shall" be renewed if the licensee has "served the public interest" and not committed "serious violations." 47 U.S.C. § 309(k)(1). Other FCC licenses also carry a strong expectation of renewal such that, as a leading treatise

---

[157] David Shepardson, *FCC approves $40 billion sale of EchoStar spectrum to SpaceX, AT&T*, Reuters (May 12, 2026), https://www.reuters.com/business/media-telecom/fcc-approves-echostar-sales-65-megahertz-spectrum-spacex-50-megahertz-att-2026-05-12/.

[158] Jake Neenan, *FCC Approves EchoStar Spectrum Sales, With Escrow Requirement*, Broadband Breakfast (May 12, 2026), https://broadbandbreakfast.com/fcc-approves-echostar-spectrum-sales-with-escrow-requirement/.

[159] *Id.*

[160] 2026 Order ¶ 2.

concluded, "[w]hile technically provisional, these licenses are, for all practical purposes, permanent."[161]

154. That understanding is reflected in business practices. Industry valuation analysts assume indefinite renewal of spectrum licenses,[162] and billions of dollars of investment across the telecommunications industry have been predicated on those reasonable renewal expectations. For example, that renewal expectation is reflected in the $40 billion price AT&T and SpaceX paid to EchoStar for its licenses (set to expire in approximately two years, which would render their $40 billion purchase price exorbitant but for a reasonable expectation of renewal), the tens of billions of dollars that are routinely raised when the FCC auctions off new spectrum licenses,[163] and the long-term agreements that Ligado has entered with both Crown Castle and Inmarsat.

155. As a matter of law, longstanding policy, industry practice, and market reliance, Ligado's license and ATC authority are therefore effectively permanent, subject only to a pro forma renewal process. That settled expectation is integral to the value of the license and to Ligado's ability to make large, long-term investments, which the FCC not only encourages but mandates. *See* 2020 Order (seeking to "provide[] regulatory certainty to Ligado"); 2026 Order ¶ 2

---

[161] *See* Peter W. Huber, Michael K. Kellogg & John Thorne, *Fed. Telecomms. Law* § 10.3.1 (3d ed. 2020 & Supp. 2026).

[162] *See, e.g.*, Kim Randolph, *Tuning In to Spectrum Valuation*, Stout (May 1, 2017), https://www.stout.com/en/insights/article/sj17-tuning-in-to-spectrum-valuation ("[R]enewals of FCC licenses are routine, with no legal, regulatory, competitive, or economic reasons that would limit the useful life of the asset. As a result, for financial reporting purposes, licensees generally treat FCC licenses as indefinitely lived intangible assets under the provisions of Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) Topic 820, Fair Value Measurements and Disclosures.").

[163] *See, e.g.*, FCC, *FCC Announces Winning Bidders in C-Band Auction* (Feb. 24, 2021), https://docs.fcc.gov/public/attachments/DOC-370267A1.pdf (announcing over $81 billion in gross winning bids for licenses to operate in the C-Band).

("The Commission intends to support the renaissance in direct-to-device by fostering a predictable regulatory environment that protects investment-backed expectations and encourages secondary-market transactions."), ¶ 4 ("[W]e give companies the clarity they need to deploy direct-to-device services intensively and invest in MSS spectrum confidently.").[164]

156. Likewise, FCC license revocations are exceedingly rare. The FCC has revoked licenses only a handful of times over the past half-century—the FCC's website lists only seven revocation orders issued in the past 50 years.[165] Ligado is not aware of any instances where an MSS or ATC license has been denied renewal or revoked.

* * *

157. As a result of DOD's physical use of and dependence on Ligado's spectrum, DOD's and DOC's pretextual boycott and campaign against Ligado, the anti-Ligado provisions of the 2021 NDAA, and DOD's refusal to make the certifications required by that statute, Ligado cannot make use of its property right to deploy terrestrial operations in the L-Band, nor realize the reasonable investment-backed expectations of its ATC authority.

158. Independent, third-party, professional valuations have determined that the terrestrial authority exclusively granted to Ligado is worth as much as $39 billion. All of this value has been destroyed by the United States' unconstitutional taking of Ligado's property, damages

---

[164] *See also* Brief for USTelecom—the Broadband Association as Amicus Curiae Supporting Plaintiff-Appellee, *Ligado v. United States*, 2025 WL 2905068, at *17 (Fed. Cir. Oct. 6, 2025) ("If licensees cannot count on their exclusive right to use spectrum for the term of their licenses, subject only to the FCC's exclusive and statutorily constrained authority to modify or revoke, their incentive to invest in the wireless networks that power the modern American economy could be undermined.").

[165] FCC, Enforcement Actions, https://www.fcc.gov/enforcement/orders [https://tinyurl.com/47xcyxbd] (last visited Sept. 18, 2026) (select "Order of Revocation" from "EDOCS Document Type" list; then select January 1, 1976 from "Since" list).

that with prejudgment interest from 2020 through this filing now exceed $50 billion. Beyond stonewalling Ligado's deployment of a terrestrial 5G network, DOD has also prevented Ligado from leasing or otherwise monetizing its property—a highly valuable alternative to Ligado operationalizing the terrestrial network itself—foreclosing Ligado's ability to mitigate its losses. Without full compensation, the value of Ligado's property is completely unrealizable due to the United States' taking.

## CAUSES OF ACTION

### COUNT ONE
### (Uncompensated Physical Taking by DOD)

159. Ligado re-alleges paragraphs 1 through 158 as if set out fully herein.

160. Using its long-established FCC license for MSS services, the ATC authority to develop terrestrial services conferred by the 2020 Order, and its allocated portion of the electromagnetic spectrum, Ligado prepared and remains prepared to deploy critical 5G communications infrastructure, such as cell towers, which will provide ultra-fast, ultra-reliable services to the public and billions of dollars in revenue to Ligado.

161. The electromagnetic spectrum is finite, just as land is finite. Electromagnetic waves travel through physical space, oscillating at different frequencies, and the finite number of frequencies on which these waves travel comprises the spectrum. Within the operable spectrum inside the borders of the United States, Ligado has, through a combination of its FCC license and its cooperation agreement with Inmarsat, more than 40 MHz of spectrum within which to exclusively operate its satellite services, in 30 MHz of which it is further authorized to conduct terrestrial operations.

162. In order to make use of its spectrum to deploy ATC operations at all, Ligado must have exclusive use of its spectrum. If a different operator is transmitting on Ligado's designated

frequencies, then Ligado cannot transmit on those same frequencies in the same geography; if it were to try to transmit on the given frequency while another operator was simultaneously transmitting on that same frequency, then those simultaneous transmissions would degrade the fidelity of and interfere with one another, such that the receivers would not be able to isolate the information coming from any one of the transmitters. In other words, neither operator would be able to make use of the frequency in question. Ligado therefore must be able to broadcast exclusively within its spectrum in order to operationalize its terrestrial use right.

163. Ligado's exclusive right to use this spectrum pursuant to its ATC authority is property protected by the Fifth Amendment to the U.S. Constitution, which provides that the U.S. Government shall not take "private property . . . for public use, without just compensation." U.S. Const. amend. V. Broadcast licenses such as Ligado's are immensely valuable assets that are recognized as and behave like property in a wide variety of contexts, including in bankruptcy and for purposes of taxation. *See Alpine PCS, Inc. v. United States*, 128 Fed. Cl. 303, 309 (2016) (recognizing FCC license is property cognizable by the Takings Clause); 47 U.S.C. § 301 (Communications Act provides that FCC licenses should not be construed "to create any right, *beyond* the terms, conditions, and periods of the license." (emphasis added)); *In re Atl. Bus. & Cmty. Dev. Corp.*, 994 F.2d 1069, 1075 (3d Cir. 1993); *In re Alpine PCS, Inc.*, 2008 WL 5076983, at *5 (Bankr. D.D.C. Oct. 10, 2008), *aff'd*, 404 F. App'x 504 (D.C. Cir. 2010).

164. Ligado's ATC authorization grants it the exclusive right to deploy 5G terrestrial communications services for a specific, well-defined spectrum: the 1526 to 1536 MHz, 1627.5 to 1637.5 MHz, and 1646.5 to 1656.5 MHz bands of spectrum. *See* 2020 Order; *see also* ¶¶ 30, 68. These characteristics—exclusivity and clear boundaries—further show that Ligado has a compensable property interest in the ATC authorization. *See, e.g.*, *Members of the Peanut Quota*

*Holders Ass'n, Inc. v. United States*, 421 F.3d 1323, 1334 (Fed. Cir. 2005) (observing right to exclude is key indicator of Fifth Amendment property right); *Todd v. United States*, 155 Ct. Cl. 87 (1961) (recognizing taking of fishing permits that granted plaintiff exclusive fishing rights in "specific locations").

165. "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner, regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002) (citations omitted). When the government appropriates the owner's right to exclude others—"one of the most treasured strands in an owner's bundle of property rights," *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982)—the government's actions constitute "the clearest sort of taking," *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-48 (2021) (citation omitted).

166. The United States has thus effected a *per se* physical taking of Ligado's terrestrial use right by appropriating Ligado's spectrum to operate DOD's previously undisclosed systems. *See United States v. Causby*, 328 U.S. 256, 265 (1946) (holding that the United States' use of airspace super-adjacent to private property to land aircraft—which destroyed private owner's ability to use land as a chicken farm—was a physical taking because the United States' use of the super-adjacent airspace was "so close to the land that continuous invasions of it affect the use of the surface of the land itself"); *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 33 (2012) (confirming that flooding of land by government constitutes a taking and noting that takings claims are "not confined to instances in which the Government took outright physical possession of the property involved," but also include "government action occurring outside the property

[that] give rise to a direct and immediate interference with the enjoyment and use of the land") (internal quotation marks omitted). This physical taking began no later than April 22, 2020—the day the FCC granted Ligado modified ATC authority to use its exclusively licensed spectrum for terrestrial operations—and it has continued at least through the date of this filing, and on information and belief, will continue indefinitely.

167. To the extent DOD's systems are transmitting or receiving signals in Ligado's allocated spectrum, causing in-band interference, that is a physical taking of Ligado's licensed spectrum—an appropriation of Ligado's right to deploy ATC operations. To the extent DOD's systems are receiving signals adjacent to Ligado's allocated spectrum, thus requiring the creation of a "dead zone" or buffer in Ligado's allocated spectrum to avoid harmful out-of-band interference with DOD's systems, that too is a physical taking of Ligado's licensed spectrum, with the same result. Under either scenario, DOD's systems have appropriated Ligado's exclusively licensed spectrum and have deprived Ligado of its property right, specifically the right to use its ATC authority, including to lease its terrestrial use right for economic gain.

168. The government conduct in question was authorized. *See Darby Dev. Co. v. United States*, 112 F.4th 1017, 1024 (Fed. Cir. 2024); *Ligado Networks LLC v. United States*, No. 2025-1792, 2026 WL 653982, at *4 (Fed. Cir. Mar. 9, 2026).

169. For all these reasons, the United States has effected and is continuing to effect a physical taking for public use within the meaning of the Fifth Amendment of the U.S. Constitution, and Ligado is entitled to just compensation.

**COUNT TWO**
**(Uncompensated Categorical Taking by DOD, DOC, and NTIA)**

170. Ligado re-alleges paragraphs 1 through 169 as if set out fully herein.

171. A categorical taking occurs when regulations completely deprive an owner of "all economically beneficial use" of private property. *Lucas* v. *South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992). Government action that renders property completely useless effects a loss "as complete as if the United States had entered upon the surface of the land and taken exclusive possession of it." *Causby*, 328 U.S. at 261.

172. DOD's action constitutes a categorical taking of the terrestrial use right conferred by Ligado's license, because said action has completely deprived Ligado of all economic value in the use of its exclusively allocated and licensed spectrum for terrestrial services. The FCC granted Ligado ATC authority to use its authorized spectrum to provide terrestrial communications services. But DOD, with the support of DOC and NTIA, has engaged in conduct that has made Ligado unable to actually develop and deploy such terrestrial services. DOD has totally deprived Ligado of all the economic benefits that Ligado could have expected from using and developing its exclusively allocated and licensed spectrum for terrestrial services by, among other things: (i) threatening Ligado's business partners in order to interfere with the formation or performance of contracts necessary for the development of Ligado's authorized terrestrial services; (ii) failing to engage with the regulatory process and thereby delaying FCC action on Ligado's December 2015 Applications; (iii) failing to implement the provisions of the 2020 Order, which provides for federal agencies to engage in information sharing and planning discussions in order to facilitate the deployment of Ligado's terrestrial services; (iv) making submissions to Congress to cause it to include punitive provisions in the NDAA to prevent Ligado from utilizing the spectrum for terrestrial services; (v) failing to certify under the NDAA that Ligado's use of its allocated spectrum for terrestrial services does not cause harmful interference with GPS receivers even though it is clear that it does not; and (vi) publishing incomplete, misleading, and false information

about the potential for harmful interference from Ligado's development of its authorized spectrum for terrestrial services.

173. The government conduct in question was authorized. *See Darby*, 112 F.4th at 1024; *Ligado*, 2026 WL 653982, at *4.

174. Through this action, DOD, with the assistance of DOC and NTIA, has prevented Ligado from using its immensely valuable right to deploy terrestrial communications services within the L-Band. The U.S. Government has eliminated the value of Ligado's property—specifically, its ATC authority, which has been valued as worth up to $39 billion—and appropriated Ligado's property for its own benefit. These actions have had, and will continue to have, catastrophic economic effects on Ligado, preventing it from earning income from the provision of terrestrial services through its exclusive ATC authority and spectrum, from leasing the spectrum to others for terrestrial use, or from otherwise monetizing its valuable ATC use right. This categorical taking began no later than April 22, 2020—the day the FCC granted Ligado modified ATC authority to use its exclusively licensed spectrum for terrestrial operations—and it has continued at least through the date of this filing, and on information and belief, will continue indefinitely.

175. For all these reasons, the United States has effected and is continuing to effect a categorical taking for public use within the meaning of the Fifth Amendment of the U.S. Constitution, and Ligado is entitled to just compensation.

**COUNT THREE**
**(Uncompensated Regulatory Taking by DOD, DOC, and NTIA)**

176. Ligado re-alleges paragraphs 1 through 175 as if set out fully herein.

177. Although the government may enact regulations and take appropriate action that restricts an owner's ability to use its own property "to a certain extent, if regulation goes too far it

will be recognized as a taking." *Cedar Point Nursery*, 594 U.S. at 148 (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). To determine whether a use restriction effects a taking, courts balance "factors such as the economic impact of the regulation, its interference with reasonable investment-backed expectations, and the character of the government action." *Id.* (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)).

178. The FCC granted Ligado ATC authority to use its exclusively allocated spectrum to provide terrestrial communications services. After the FCC did so, Ligado engaged in fundraising and raised approximately $4 billion in new debt and converted approximately $6 billion of existing debt to equity, all in reliance on the 2020 Order. Those investments were reasonable, given the FCC's final and exclusive authority in allocating spectrum for commercial use.

179. DOD, with the assistance of DOC and NTIA, has made it untenable for Ligado to actually develop and operate such terrestrial services. They have denied Ligado the economic benefits expected to flow from its ATC authority by, among other things: (i) threatening Ligado's business partners in order to interfere with the formation or performance of contracts necessary for the development of Ligado's authorized terrestrial spectrum; (ii) failing to engage with the regulatory process and thereby delaying FCC action on Ligado's Applications; (iii) failing to implement the provisions of the 2020 Order, which provides for federal agencies to engage in information sharing and planning discussions in order to facilitate the deployment of Ligado's terrestrial services; (iv) making submissions to Congress to cause it to include punitive provisions in the NDAA to prevent Ligado from utilizing the spectrum for terrestrial services; (v) failing to certify under the NDAA that Ligado's use of its allocated spectrum for terrestrial services does not cause harmful interference with GPS receivers even though it is clear that it does not; and (vi)

publishing incomplete, misleading, and false information about the potential for harmful interference from Ligado's development of its authorized spectrum for terrestrial services. And DOD, with the help of DOC and NTIA, has accomplished these actions by specifically burdening and targeting Ligado, a private actor, for an alleged public benefit—the quintessential character of a regulatory taking.

180. The government conduct in question was authorized. *See Darby*, 112 F.4th at 1024; *Ligado*, 2026 WL 653982, at *4.

181. Ligado's business model, financing arrangements, and Ligado's December 2015 Applications were all predicated on its ability to use its exclusive FCC license to provide FCC-authorized terrestrial communications services, including the ability to lease to others its terrestrial capacity in that spectrum or otherwise monetize its valuable property. DOD, DOC, and NTIA's actions have rendered Ligado unable to proceed with its FCC-approved plans. The U.S. Government has gutted the value of Ligado's property—in particular its ATC authority, which has been valued as worth up to $39 billion—and appropriated Ligado's property for its own benefit. These actions have had, and will continue to have, catastrophic economic effects on Ligado, preventing it from earning income from its exclusive license, ATC authority, and spectrum. In addition, Ligado's inability to operationalize its ATC authority due to DOD's, DOC's, and NTIA's interference and the United States' taking—including the inability to lease to others the terrestrial capacity in the spectrum or otherwise monetize its valuable property—has resulted in billions of dollars in additional uncompensated takings. This regulatory taking began no later than April 22, 2020—the day the FCC granted Ligado modified ATC authority to use its exclusively licensed spectrum for terrestrial operations—and it has continued at least through the date of this filing, and on information and belief, will continue indefinitely. As of the date of this filing, Ligado's

damages resulting from this unconstitutional taking, inclusive of prejudgment interest, exceed $50 billion.

182. For all these reasons, the United States has effected and is continuing to effect a regulatory taking for public use within the meaning of the Fifth Amendment of the U.S. Constitution, and Ligado is entitled to just compensation.

**RESERVATION OF DISMISSED CLAIM**
**(Uncompensated Legislative Taking by the United States through the 2021 NDAA)**

183. The Court previously dismissed Ligado's legislative takings claim against the United States.[166] Because the failure to include a dismissed claim in an amended pleading may constitute a waiver of the right to challenge on appeal the basis for dismissal, Ligado repleads its legislative taking allegations in this Amended Complaint and preserves this claim for review by the U.S. Court of Appeals for the Federal Circuit under 28 U.S.C. § 1295(a)(3).

[166] ECF No. 31.

## PRAYER FOR RELIEF

WHEREFORE, Ligado specifically requests that judgment be entered:

A. Ordering the United States to provide Ligado just compensation in an amount to be determined at trial for its past, present, and future taking of Ligado's right pursuant to the 2020 Order and prior FCC orders to deploy terrestrial services in the 1526 to 1536 MHz, 1627.5 to 1637.5 MHz, and 1646.5 to 1656.5 MHz bands;

B. Granting Ligado costs and attorneys' fees pursuant to 28 U.S.C. § 2412; and

C. Such other and further relief that the Court deems just and proper.

Dated: September 18, 2026

By: */s/ Harris M. Fischman*

**MUNGER, TOLLES & OLSON LLP**

Donald B. Verrilli, Jr., *Of Counsel*
Ginger D. Anders, *Of Counsel*
601 Massachusetts Ave. NW
Suite 500
Washington D.C., 20001
Tel: (202) 220-1100
Email: Donald.Verrilli@mto.com
Email: Ginger.Anders@mto.com

**SELENDY GAY PLLC**

Philippe Z. Selendy, *Of Counsel*
Lena Konanova, *Of Counsel*
David Coon, *Of Counsel*
Will Rathgeber, *Of Counsel*
1290 Avenue of the Americas
New York, NY 10104
Tel: (212) 390-9000
Email: pselendy@selendygay.com
Email: lkonanova@selendygay.com
Email: dcoon@selendygay.com
Email: wrathgeber@selendygay.com

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**

Harris M. Fischman
Martin Flumenbaum
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: (212) 373-3000
Email: hfischman@paulweiss.com
Email: mflumenbaum@paulweiss.com

**COVINGTON & BURLING LLP**

Kevin King, *Of Counsel*
850 10th Street NW
Washington, DC 20001-4956
Tel: (202) 662-6000
Email: kking@cov.com

*Counsel for Ligado Networks LLC*