IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| LIGADO NETWORKS LLC, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 23-1797 |
| | ) | Senior Judge Damich |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

# DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

ERIC P. BRUSKIN
Assistant Director

NATHANAEL B. YALE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0464

BORISLAV KUSHNIR
Senior Trial Counsel

October 28, 2026

*Attorneys for Defendant*

**TABLE OF CONTENTS**

INTRODUCTION AND STATEMENT OF THE ISSUE ........ 1

STATEMENT OF THE CASE ........ 7

I. The History of Ligado's ATC License Before the FCC ........ 7

II. The FCC Issues the 2020 Order ........ 10

III. NTIA Petitions for Reconsideration and Stay of the 2020 Order ........ 11

IV. Ligado Files Suit and Proceedings Before This Court ........ 12

V. The Federal Circuit's Decision ........ 13

VI. Ligado's Amended Complaint ........ 13

ARGUMENT ........ 16

I. Standard of Review ........ 16

II. The Framework for Evaluating the Existence of a Cognizable Property Interest ........ 16

III. Ligado Cannot Establish a Cognizable Property Interest in Its License ........ 18

A. The Communications Act Does Not Provide Ligado with the Rights Necessary to Prove a Protected Property Interest ........ 19

B. Neither the 2020 Order Nor Any Other FCC Decision Provides Ligado with the Rights Necessary to Prove a Protected Property Interest ........ 27

IV. The Government Actions Alleged in Ligado's Complaint Reinforce That It Does Not Have the Rights Necessary to Prove A Cognizable Property Interest ........ 31

V. Other Considerations Mentioned by the Federal Circuit Further Demonstrate That Ligado Has No Cognizable Property Interest ........ 33

A. Pervasive Government Control ........ 33

B. Investment-Backed Expectations ........ 34

VI. Alternatively, the Court Should Dismiss the Amended Complaint Because the Property Interest Ligado Alleges Has Not Vested ........ 37

CONCLUSION ........ 40

**TABLE OF AUTHORITIES**

**Cases** **Page(s)**

*Aeronautical Radio, Inc v. FCC*,
928 F.2d 428 (D.C. Cir. 1991) ........ 7

*Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*,
594 U.S. 758 (2021) ........ 17

*Am. Bankers Ass'n v. United States*,
932 F.3d 1375 (Fed. Cir. 2019) ........ 33

*Am. Pelagic Fishing Co., L.P. v. United States,*
379 F.3d 1363 (Fed. Cir. 2004) ........ 16, 18

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 16

*Bd. of Regents of State Colleges v. Roth*,
408 U.S. 564 (1972) ........ 35

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 16

*Cedar Point Nursery v. Hassid*,
594 U.S. 139 (2021) ........ *passim*

*Cienega Gardens v. United States*,
331 F.3d 1319 (Fed. Cir. 2003) ........ *passim*

*College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,*
527 U.S. 666 (1999) ........ 18

*Conti v. United States*,
291 F.3d 1334 (Fed. Cir. 2002) ........ 18, 40

*Electric Welfare Trust Fund v. United States*,
153 F.4th 1369 (Fed. Cir. 2025) ........ 16

*Entick* v. *Carrington*,
2 Wils. K. B. 275, 95 Eng. Rep. 807 (K. B. 1765) ........ 29

*Fairholme Funds, Inc. v. United States*,
26 F.4th 1274 (Fed. Cir. 2022) ........ 17

*FCC v. Sanders Brothers Radio Station*,
309 U.S. 470 (1940) .......... 20

*Fishermen's Finest, Inc. v. United States*,
59 F.4th 1269 (Fed. Cir. 2023) .......... 17, 18

*Florida v. Jardines*,
569 U.S. 1 (2013) .......... 29

*Hearts Bluff Game Ranch, Inc. v. United States*,
669 F.3d 1326 (Fed. Cir. 2012) .......... 33, 34

*In re NextWave Personal Comm'ns., Inc.*,
200 F.3d 43 (2d Cir. 1999) .......... 20

*Kaiser Aetna v. United States*,
444 U.S. 164 (1979) .......... 18

*King v. United States*,
151 F.4th 1348 (Fed. Cir. 2025), *cert. denied*, 146 S. Ct. 2688 (2026) .......... 36

*Klamath Irr. District v. United States*,
635 F.3d 505 (Fed. Cir. 2011) .......... 17

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994) .......... 37

*Ligado Networks LLC v. United States*,
No. 25-1792, 2026 WL 653982 (Fed. Cir. Mar. 9, 2026) .......... *passim*

*Lingle v. Chevron U.S.A. Inc.*,
544 U.S. 528 (2005) .......... 17

*Loretto v. Teleprompter Manhattan CATV Corp.*,
458 U.S. 419 (1982) .......... 17

*Mallenbaum v. Adelphia Comms. Corp.*,
74 F.3d 465 (3d Cir. 1996) .......... 26

*Maritrans Inc. v. United States*,
342 F.3d 1344 (Fed. Cir. 2003) .......... 35

*McCutchen v. United States*,
14 F.4th 1355 (Fed. Cir. 2021) .......... 37, 38, 39

*Members of Peanut Quota Holders Ass'n, Inc. v. United States*,
421 F.3d 1323 (Fed. Cir. 2005)........................................................................ 30, 35, 40

*Mitchell Arms, Inc. v. United States*,
7 F.3d 212 (Fed. Cir. 1993) ..................................................................................... 33, 34

*Mobile Relay Assocs. v. FCC*,
457 F.3d 1 (D.C. Cir. 2006) ..................................................................................... 20, 27

*Murr v. Wisconsin*,
582 U.S. 383 (2017)............................................................................................................ 37

*Ortho Pharmaceutical Corp. v. Genetics Institute, Inc.*,
52 F.3d 1026 (Fed. Cir. 1995)............................................................................................ 31

*Perrong v. Bradford*,
157 F.4th 251 (3d Cir. 2025) .............................................................................................. 21

*Prism Techs. LLC v. Sprint Spectrum L.P.*,
849 F.3d 1360 (Fed. Cir. 2017)........................................................................................... 30

*Prometheus Radio Project v. FCC*,
373 F.3d 372 (3d Cir. 2004)................................................................................................ 20

*Propat Int'l Corp. v. RPost, Inc.*,
473 F.3d 1187 (Fed. Cir. 2007)........................................................................................... 31

*Public Safety Spectrum Alliance v. FCC*,
184 F.4th 640 (D.C. Cir. 2026).................................................................................. 20, 23, 24

*Return Mail, Inc. v. United States Postal Serv.*,
587 U.S. 618 (2019)............................................................................................................ 21

*Rite-Hite Corp. v. Kelley Co.*,
56 F.3d 1538 (Fed. Cir. 1995)...................................................................................... 30, 31

*Scripps-Howard Radio, Inc. v. FCC*,
316 U.S. 4 (1942)................................................................................................................ 20

*Sharifi v. United States*,
987 F.3d 1063 (Fed. Cir. 2021)........................................................................................... 17

*Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*,
560 U.S. 702 (2010)............................................................................................................ 37

*United States v. Causby*,
328 U.S. 256 (1946) ........ 29, 32

*United States v. Fuller*,
409 U.S. 488 (1973) ........ 18, 22

*United States v. Gen. Motors Corp.*,
323 U.S. 373 (1945) ........ 40

*Vermont Agency of Natural Res. v. United States ex rel. Stevens*,
529 U.S. 765 (2000) ........ 21

*Will v. Mich. Dep't of State Police*,
491 U.S. 58 (1989) ........ 21

**Statutes**

28 U.S.C. § 1292(d)(2) ........ 12

35 U.S.C. § 154(a) ........ 22, 30

47 U.S.C. § 153(39) ........ 4, 21, 26

47 U.S.C. § 153(49) ........ 20

47 U.S.C. § 301 ........ *passim*

47 U.S.C. § 303 ........ 4, 21, 25

47 U.S.C. § 303(a) ........ 25

47 U.S.C. § 303(c) ........ 25

47 U.S.C. § 303(y) ........ 22, 23, 25

47 U.S.C. § 304 ........ 36

47 U.S.C. § 305 ........ 4, 23

47 U.S.C. § 305(a) ........ *passim*

47 U.S.C. § 307 ........ 4, 19, 22

47 U.S.C. § 307(a) ........ 34

47 U.S.C. § 307(c) ........ 34

47 U.S.C. § 309 ........ 4, 22

47 U.S.C. § 309(j) ........ 2

47 U.S.C. § 310(d) ........ 26

47 U.S.C. § 312 ........ 26

47 U.S.C. § 312(a) ........ 34

47 U.S.C. § 316(a) ........ 26, 34

47 U.S.C. § 401(b) ........ 25, 26

47 U.S.C. § 402(b) ........ 20

47 U.S.C. § 503 ........ 26

47 U.S.C. § 902(b) ........ 5, 23, 24

47 U.S.C. §§ 901-942 ........ 23

Consolidated Appropriations Act, 2012,
Pub. L. No. 112-74, 125 Stat. 786 (2012) ........ 9

Taylor Grazing Act,
43 U.S.C. § 315b ........ 22

Telecommunications Authorization Act of 1992,
Pub. L. No. 102-538, 106 Stat. 3533 (1992) ........ 23

William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021,
Pub. L. 116-283, 134 Stat. 3388 (2021) ........ 12

**Rules**

RCFC 12(b) ........ *passim*

**Regulations**

47 C.F.R. § 2.105(b) ........ 24

47 C.F.R. § 2.105(d) ........ 24

47 C.F.R. § 2.106(a) ........ 5, 24

**Other Authorities**

*In The Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application*, NTIA Petition for Reconsideration or Clarification (May 22, 2020) *available at*: https://www.fcc.gov/ecfs/document/105221130705320/1 (last visited October 26, 2026) ........ 11

Memorandum of Understanding between the Federal Communications Commission and the National Telecommunications and Information Administration, Aug. 1, 2022, *available at*: https://www.ntia.gov/sites/default/files/publications/ntia-fcc-spectrum_mou-8.2022.pdf (last visited Oct. 26, 2026) ........ 24

Memorandum Opinion and Order and Second Order on Reconsideration, FCC 05-30, 20 FCC Rcd. 4616 (2005) ........ 9

Order, DA 12-2051, 27 FCC Rcd. 15882 (2012) ........ 9

Order and Authorization, 35 FCC 89-183, 4 FCC Rcd. 6041 (1989) ........ 1, 8

Order and Authorization, DA 04-3553, 19 FCC Rcd. 22144 (2004) ........ 8

Order and Authorization, DA 10-534, 25 FCC Rcd. 3043 (2010) ........ 9

Order and Authorization, DA 11-133, 26 FCC Rcd. 566 (2011) ........ 9

Order and Authorization, FCC 20-48, 35 FCC Rcd. 3772 (2020) ........ *passim*

Order Denying Motion For Stay, FCC 21-22, 36 FCC Rcd. 1262 (2021) ........ 12

Public Notice, DA 16-442, 31 FCC Rcd. 3802 (2016) ........ 9

Report and Order,
35 FCC 02-24, 17 FCC Rcd. 2704 (2002) ........ 8

Report and Order,
35 FCC 89-185, 4 FCC Rcd. 6072 (1989) ........ 7

Report and Order and Notice of Proposed Rulemaking,
FCC 03-15, 18 FCC Rcd. 1962 (2003), *modified by* Order on Reconsideration, FCC 03-162, 18 FCC Rcd. 13590 (2003) ........ 8

Second Report and Order,
FCC 86-552, 2 FCC Rcd. 485 (1987) ........ 7

Pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims, defendant, the United States, respectfully submits this motion to dismiss the amended complaint of Ligado Networks, LLC (Ligado), ECF No. 61, for failure to state a claim upon which relief may be granted because Ligado cannot establish a cognizable property interest in its modified spectrum license issued by the Federal Communications Commission (FCC or Commission).

## INTRODUCTION AND STATEMENT OF THE ISSUE

This is a unique case in which the Federal Government is alleged to have interfered with a spectrum license that it awarded for free with onerous conditions to mitigate the potential for harmful interference with other spectrum users—including the Federal Government itself. For decades, Ligado[1] has had an FCC license to use certain electromagnetic spectrum located within the "L-Band" for Mobile Satellite Service (MSS). Unlike many spectrum licensees today, Ligado paid nothing for this license in 1989 because it did not purchase the license through an FCC spectrum auction. Ligado now seeks a $50 billion windfall from the taxpayers based on the Federal Government's decision to act consistent with the terms of Ligado's license and its spectrum management authorities to protect spectrum users from harmful interference.

On April 22, 2020, and over objections from federal agencies including the Department of War (DoW) and the National Telecommunications and Information Administration (NTIA), the FCC granted Ligado's request to modify its license, authorizing it to operate ancillary-terrestrial component (ATC) stations in some of the same frequencies for which its license already authorizes MSS operations (the 2020 Order).[2] For years, DoW and NTIA, among others,

[1] This brief uses "Ligado" to include several of its predecessors-in-interest including LightSquared Subsidiary LLC, SkyTerra Communications, Inc., Mobile Satellite Ventures, Motient Services, Inc., and American Mobile Satellite Company. *See* Am. Compl. ¶ 1 n.1.

[2] Order and Authorization, FCC 20-48, 35 FCC Rcd. 3772 (2020).

had objected to Ligado's planned terrestrial operations because they could cause harmful interference with the Global Positioning Systems, or GPS, which operate in nearby spectrum bands. Although the FCC granted Ligado's applications over other federal agencies' objections, it imposed unique conditions in the 2020 Order designed to mitigate the potential harmful interference of Ligado's planned ATC operations on GPS. There is no dispute, therefore, that Ligado's ATC license is conditional and unique compared to other FCC licenses. One of these conditions is that Ligado must cooperate and coordinate with various federal agencies to reduce the potential for harmful interference with GPS, including by replacing impacted Government GPS equipment. As Ligado concedes, however, it has yet to satisfy this condition.

Rather, on October 12, 2023, Ligado filed suit seeking approximately $40 billion for the alleged taking of its ATC license, a license it notably did not obtain through an FCC competitive bidding auction and for which Ligado paid no money, *see* 47 U.S.C. § 309(j). Ligado's initial complaint asserted four separate claims against the Government under the Takings Clause, alleging physical, *per se* (*i.e.*, categorical) regulatory, regulatory, and legislative takings. As relevant here, although the Court dismissed Ligado's legislative takings claim, it held that Ligado had sufficiently alleged a cognizable property interest in its FCC license. Order and Opinion, ECF No. 31. On interlocutory appeal, the Federal Circuit vacated the Court's property interest holding and remanded for further proceedings. *Ligado Networks LLC v. United States*, No. 25-1792, 2026 WL 653982 (Fed. Cir. Mar. 9, 2026).

On "the central issue" of "whether Ligado has a property interest in the license to provide certain radio services using the spectrum at issue," the Federal Circuit explained that determining whether Ligado has a cognizable property right for takings purposes "calls for a full understanding of the Communications Act and pertinent actions under it" to determine whether

pervasive government control precludes a cognizable property interest and whether the asserted property right has the crucial indicia of property, such as the ability to exclude, sell, assign, or transfer. *Id*. at *4-6 (citations omitted). The panel identified a number of "doctrinal issues" that warrant further inquiry on remand, including: (1) the extent to which Ligado actually has a right to exclude based on its license as opposed to merely being the only licensee for a particular present use; (2) whether a legally cognizable property interest may be "based on an expectancy generated from regular practice involving grants under a statute;" and (3) whether Ligado has not only a "property right in general," but a "property right against the particular actors and challenged actions it identifies—namely, the challenged [DoW] spectrum use and the challenged non-cooperation of [DoW] and others in ways identified in the 2020 Order's conditions on Ligado commencing service." *Id*. at *6-7.

Following remand, Ligado filed an amended complaint, ECF No. 61, in which it continues to allege that DoW and NTIA have prevented it from using its license for terrestrial purposes and that DoW has been operating previously undisclosed systems that use or depend on Ligado's spectrum without compensation. Ligado's amended complaint, which now seeks approximately $50 billion, asserts three claims pursuant to physical, *per se* (*i.e.*, categorical) regulatory, and regulatory takings theories.

As set forth below, an analysis of the considerations identified by the Federal Circuit leads to one inescapable conclusion in this unique takings case—Ligado has failed to plausibly allege that it has a cognizable property interest in its FCC license for terrestrial services. As a starting point, and considering the Federal Circuit's direction, there is no dispute that Ligado's claimed property interest must arise, if at all, from the unique conditional license provided in the 2020 Order, which was issued pursuant to the Communications Act. *Ligado Networks*, 2026 WL

653982, at *5. It is equally indisputable that, as the Supreme Court has consistently explained, the "right to exclude" is the critical element of a cognizable property right for Fifth Amendment takings purposes. *See, e.g.*, *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021) (characterizing the right to exclude to be "a fundamental element of the property right," and the "*sine qua non*" of property) (citations omitted).

Ligado cannot demonstrate that the FCC granted it the right to exclude non-FCC federal agencies, such as DoW, in its ATC license, and the court cannot read a right to exclude those agencies into the license. Congress provided in the Communications Act that "no such license shall be construed to create any right, ***beyond the terms, conditions, and periods of the license***." 47 U.S.C. § 301 (emphasis added). Section 301 thus reflects congressional intent to limit any interest provided in a spectrum license to the interests expressly stated in the terms and conditions of the license and the statutory provisions under which it was issued. Here, neither Ligado's ATC license nor the statutory provisions pursuant to which the FCC issued the license provide Ligado with the right to exclude non-FCC agencies from its licensed spectrum.

For example, Section 301 of the Communications Act further states that "[n]o person shall use or operate any apparatus for the transmission of energy or communications or signals by radio" under several circumstances except "with a license," but that provision only applies to a "person," not the Federal Government. 47 U.S.C. § 153(39). Indeed, Section 305(a) provides that "[r]adio stations belonging to and operated by the United States shall not be subject to the provisions of [47 U.S.C. §§] 301 and 303[.]" Thus, as the Federal Circuit explained, the Federal Government is *not* subject to Section 301's prohibition on using radio channels without a license. *See Ligado Networks*, 2026 WL 653982, at *8-9.

Moreover, none of the provisions under which Ligado's ATC license was expressly issued—Sections 307 and 309—provide Ligado with the critical right to exclude DoW or any other federal agency. Section 307 provides that the FCC can grant a license if "public convenience, interest, or necessity will be served thereby," and Section 309 provides for the FCC to grant license applications. 47 U.S.C. §§ 307(a), 309. But as the Federal Circuit already highlighted, neither of these provisions define the right granted to Ligado as a right to exclude (or even as a right to exclusivity). *See Ligado Networks*, 2026 WL 653982, at *8.

NTIA's statutory authority further undermines Ligado's claim that it has exclusivity or the right to exclude vis-à-vis non-FCC federal agencies. NTIA has the express statutory authority to issue assignments to federal agencies to operate within federally allocated spectrum. 47 U.S.C. §§ 305(a), 902(b)(2)(A). And here, with respect to the specific spectrum at issue, NTIA has the statutory authority and discretion to assign federal users to the same spectrum covered in Ligado's ATC license because that spectrum is designated as shared for federal and non-federal use. *See id.*; 47 C.F.R. § 2.106(a) (at pages 33-35). Following sound principles of spectrum management policy, NTIA would coordinate such decisions with the FCC to ensure the best long-term use of electromagnetic spectrum. But given that the statutory framework provides multi-agency authority for the management of the spectrum at issue, the FCC simply could not grant Ligado the sort of "sole use" rights that it claims to possess vis-à-vis DoW and NTIA.

Ligado largely relies on the terms of the 2020 Order to allege the existence of a cognizable property interest in its license, but the Federal Circuit held "that Order on its face does not go further than to give Ligado a right to use the spectrum in identified ways subject to various conditions." *Ligado Networks*, 2026 WL 653982, at *12. Ligado's amended complaint thus relies on a new source of the alleged property right—an order issued by the FCC in 2026—

but these allegations are even more off base because that recent order involved Ligado's license for *MSS services*, did not adjudicate the ATC license, and said nothing that could be interpreted as providing a right to exclude non-FCC agencies from the relevant spectrum.

Finally, even if the 2020 Order had provided Ligado with a cognizable property interest—and it does not—Ligado concedes that it has not yet satisfied all the conditions in the 2020 Order required to commence ATC operations in the L-Band. Thus, even if Ligado had alleged the existence of a cognizable property interest, that interest would necessarily be contingent on Ligado's future ability to satisfy the remaining condition within the 2020 Order, which means that Ligado's interest has not vested and is, consequently, not protected by the Takings Clause.

At bottom, deciding whether Ligado has alleged a cognizable property interest in this novel Fifth Amendment takings case requires the Court to choose, consistent with the Communications Act, between (1) the plain meaning of the 2020 Order and (2) Ligado's desire to read additional rights (its own) and unstated obligations (on the Government) into the 2020 Order that granted only conditional rights to Ligado. Ligado indeed asks the Court to read a right to exclude into the 2020 Order despite the Federal Circuit having already explained that the order, on its face, provides no such right. Ligado further asks the Court to read into the 2020 Order an obligation on DoW and NTIA to cooperate with Ligado, but the order does not, on its face, require such cooperation. Accordingly, at every turn, Ligado's amended complaint asks the Court to flout Section 301's admonition against reading additional rights and obligations into its license. As the Federal Circuit explained, the Court's task is to interpret the plain meaning of the 2020 Order in light of the Communications Act, most notably Section 301. Faithfully doing so

yields one result: Ligado has not plausibly alleged a cognizable property interest in its license for terrestrial services, and the amended complaint must therefore be dismissed.

Nothing we have said should be read to suggest that the Federal Government is claiming the power or desire to operate—or to interfere with any commercial licensee's operation—in any spectrum band at any time. Although Ligado lacks a property interest in the unique and free conditional license that the FCC awarded, the FCC has a robust process for awarding spectrum licenses via auction (in which Ligado did not participate due to this license's unique procedural history), and the Federal Government fully expects to honor the terms of FCC licenses to allow operators to make full commercial use of that spectrum, subject to the FCC's spectrum management authority and the NTIA's authority to coordinate spectrum use by the Federal Government.

## STATEMENT OF THE CASE

### I. The History of Ligado's ATC License Before the FCC

In 1987, the FCC allocated certain frequencies within the L-Band[3] for shared use by MSS and aeronautical mobile satellite service (Route) (AMSS(R)). Second Report and Order, ¶¶ 1-2, FCC 86-552, 2 FCC Rcd. 485, 485-86 (1987).[4] Two years later, the FCC authorized Inmarsat, a satellite telecommunications company, to use the L-Band to establish AMSS(R) operations. Report and Order, ¶¶ 55, 73, FCC 89-185, 4 FCC Rcd. 6072, 6079, 6082 (1989).

---

[3] The "L-Band" is generally considered the frequency range from 1000-2000 MHz, but in accordance with the FCC's terminology in the relevant orders, we use the term to refer specifically to the 1525 to 1559 MHz and 1626.5 to 1660.5 MHz bands unless otherwise specified.

[4] AMSS(R) provides communications to support domestic and international air traffic, including air traffic control. *Aeronautical Radio, Inc v. FCC*, 928 F.2d 428, 434 (D.C. Cir. 1991).

The FCC also granted Ligado a license to provide MSS on the allocated frequencies in 1989, *see* Order and Authorization, ¶ 1, FCC 89-183, 4 FCC Rcd. 6041 (1989); 2020 Order, ¶¶ 1-3, 35 FCC Rcd. at 3773-74. Notably, Ligado did not obtain this authority through a spectrum auction. *See id*. After the Commission had allocated additional spectrum in the L-Band for MSS users, it authorized Ligado to use 1525-1559 MHz for downlink transmissions and 1626.5-1660.5 MHz for uplink transmissions.[5] Report and Order, ¶ 1, FCC 02-24, 17 FCC Rcd. 2704, 2704 (2002); *see* 2020 Order, ¶¶ 4, 7, 35 FCC Rcd. at 3774-75, 3777. Accordingly, for several decades, Ligado has held an FCC license authorizing it to provide satellite MSS services in the 1525-1559 MHz and 1626.5-1660.5 MHz spectrum bands of the L-Band. *Id*.; *see* Am. Compl. ¶¶ 3, 14, 28. Portions of this spectrum lie near spectrum bands in which GPS services operate. *See* 2020 Order, ¶¶ 4, 7, 35 FCC Rcd. at 3774-75, 3777; *see* Am. Compl. ¶ 31.

In 2003, the FCC announced that it would consider allowing existing MSS licensees including in the L-Band to integrate an ATC into their MSS networks provided certain conditions were met. *See* Report and Order and Notice of Proposed Rulemaking, ¶¶ 1-2, 218, FCC 03-15, 18 FCC Rcd. 1962, 1964-65, 2068 n.573 (2003), *modified by* Order on Reconsideration, FCC 03-162, 18 FCC Rcd. 13590 (2003). In 2004, in accordance with that regulatory change, the FCC authorized Ligado to conduct ATC operations in its MSS licensed spectrum if it met certain conditions. Order and Authorization, ¶ 1, DA 04-3553, 19 FCC Rcd. 22144, 22144 & n.1 (2004); 2020 Order, ¶ 4, 35 FCC Rcd. at 3774-75. However, in 2005, the

[5] Within the L-Band, the lower authorized portion is allocated for downlink transmissions from MSS satellites to mobile earth stations, while the upper portion is allocated for uplink transmissions from mobile earth stations to MSS satellites. *See* 2020 Order, ¶ 3, 35 FCC Rcd. at 3774.

FCC "tightened some of the ATC-use conditions in response to submissions from NTIA and others about interference with other uses, notably GPS services using 1559–1610 MHz frequencies." *Ligado Networks*, 2026 WL 653982, at *12 n.8 (citing Memorandum Opinion and Order and Second Order on Reconsideration, ¶¶ 15-18, 40, 68-72, FCC 05-30, 20 FCC Rcd. 4616, 4621-22, 4630-31 & n.95, 4641-43 (2005)).

In November 2010, Ligado requested that the FCC modify its previously issued ATC authorization to accommodate Ligado's plans to implement a nationwide 4G satellite/terrestrial network under its ATC authority. April Order, ¶ 5, 35 FCC Rcd. at 3775-76. In January 2011, the FCC granted Ligado a waiver of certain Commission ATC rules, provided that Ligado address concerns raised by NTIA and others that its network would cause harmful interference with GPS. *See id*. Ligado never resolved these concerns and never implemented the terrestrial network. *See id*. at 3774-77. And when Ligado sought additional license modifications from the FCC in September and October 2012, NTIA again opposed based on harmful interference with GPS. *Id*. at 3777-78. As the Federal Circuit summarized, "Ligado did not (and at times could not) commercially provide ATC services before 2020, given harmful-interference concerns, as expressed by NTIA related to GPS systems and [DoW's] use of Inmarsat and in legislation." *Ligado Networks*, 2026 WL 653982, at *12 n.8 (citing Order and Authorization, ¶¶ 1-12, 27-32, DA 10-534, 25 FCC Rcd. 3043, 3043-48, 3052-54 (2010); Order and Authorization, ¶¶ 1, 39-43, DA 11-133, 26 FCC Rcd. 566, 566-67, 585-87 (2011); Consolidated Appropriations Act, 2012, Pub. L. No. 112-74, § 628, 125 Stat. 786, 927–28 (2012); Order, ¶ 1, DA 12-2051, 27 FCC Rcd. 15882, 15882 (2012); Public Notice, DA 16-442, 31 FCC Rcd. 3802, 3802-07 (2016)).

In December 2015, however, after working with GPS-device manufacturers, Ligado filed new applications with the FCC to modify its proposed terrestrial wireless operations to authorize

it to conduct terrestrial operations in three L-band segments. 2020 Order, ¶ 9, 35 FCC Rcd. at 3778-79. In May 2018, following a public comment period in which stakeholders raised concerns about the harmful GPS interference of Ligado's planned operations, Ligado amended its 2015 license modification applications by proposing several additional conditions, including a reduction in base station power and specific measures to mitigate concerns about interference with the Federal Government's operations. *Id*. at 3780-82. In response, NTIA notified the FCC in December 2019 that, based on its own assessment of the potential impact of Ligado's operations (including from recent technical studies), it could not recommend approval of the applications. *Id*. at 3782-83. In April 2020, NTIA notified the FCC that the Government's concerns with Ligado's planned operations had not been resolved. *Id*.

## II. The FCC Issues the 2020 Order

In April 2020, over NTIA's objections, the FCC issued an order conditionally granting Ligado's amended license modification applications seeking ATC authority. 2020 Order, ¶ 17, 35 FCC Rcd. at 3783; *see* Am. Compl. ¶¶ 68-76. The FCC found that the "harmful interference concerns relating to GPS are effectively resolved based on the parameters of Ligado's amended modification applications, the test/data analyses presented in the record, and the conditions imposed" in the Order. 2020 Order, ¶ 157, 35 FCC Rcd. at 3841-42. These conditions, which Ligado had proposed, required Ligado, among other things, to provide a 23 MHz guard-band of its licensed spectrum to separate its terrestrial base-station transmissions from neighboring operations; to reduce the base-station power levels from its initial proposal; and, before Ligado could start its terrestrial operations, to engage in a robust information exchange and coordination program with Federal Government agencies. *Id*. ¶¶ 131-55, 35 FCC Rcd. at 3835-41.

With respect to the last requirement, the 2020 Order directed Ligado to "cooperate directly with any U.S. Government agency that anticipates that its GPS devices may be affected by Ligado's ATC operations by: (1) providing base station location information and technical operating parameters to federal agencies prior to commencing operations in the 1526-1536 MHz band; (2) working with the affected agency to identify the devices that could be affected; (3) working with the affected agency to evaluate whether there would be harmful interference from Ligado's operations; [] (4) developing a program to repair or replace any such devices that is consistent with that agency's programmatic needs, as well as applicable statutes and regulations relating to the ability of those agencies to accept this type of support;" and (5) providing quarterly reports to the FCC concerning the progress of its satisfaction of these conditions. *Id*. at 3838-40.

## III. <u>NTIA Petitions for Reconsideration and Stay of the 2020 Order</u>

On May 22, 2020, NTIA—on behalf of the Executive Branch—petitioned the FCC to reconsider and rescind its approval of Ligado's application.[6] *See* Am. Compl. ¶ 98. NTIA stated that the FCC's 2020 Order "gave inordinate weight to Ligado-funded tests and unproven metrics" while incorrectly dismissing the Government's evidence. Recon. Pet. 9.[7] Also on May 22, 2020, NTIA petitioned the FCC for a stay of the 2020 Order pending resolution of the

[6] *In The Matter of LightSquared Technical Working Group Report and LightSquared License Modification Application*, NTIA Petition for Reconsideration or Clarification (May 22, 2020) (Recon. Pet.), *available at*: https://www.fcc.gov/ecfs/document/105221130705320/1 (last visited October 26, 2026).

[7] Seven other petitions for reconsideration of the 2020 Order were filed with the FCC, and each remains pending as of the filing of this motion.

petition for reconsideration. *See* Am. Compl. ¶ 98. On January 19, 2021, the FCC denied the stay petition.[8] The FCC has not yet ruled on NTIA's reconsideration petition.[9]

## IV. Ligado Files Suit and Proceedings Before This Court

On October 12, 2023, Ligado filed its initial complaint, asserting four claims under the Takings Clause for the alleged taking of its ATC license. ECF No. 1. On November 18, 2024, this Court granted in part and denied in part our motion to dismiss, dismissing Ligado's legislative takings claim but otherwise holding that it possessed jurisdiction to entertain Ligado's takings claim, that Ligado had stated a cognizable property interest, and that Ligado had sufficiently alleged authorized conduct for takings purposes. On February 28, 2025, this Court certified the November order and opinion for interlocutory review pursuant to 28 U.S.C. § 1292(d)(2), and on May 20, 2025, the Federal Circuit granted our petition for interlocutory review based on four legal issues.

[8] Order Denying Motion For Stay, FCC 21-22, 36 FCC Rcd. 1262 (2021).

[9] On January 1, 2021, Congress addressed the national security concerns arising from Ligado's ATC license. Section 1661 of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (2021 NDAA), Pub. L. 116-283, §§ 1661-1664, 134 Stat. 3388, 4073-76 (2021), provides that no DoW funds "may be obligated or expended to retrofit any [GPS] device or system, or network that uses [GPS], in order to mitigate harmful interference from commercial terrestrial operations" within the spectrum bands of Ligado's license. 2021 NDAA § 1661. Section 1662 directs that DoW "may not enter into a contract" with "an entity that engages in commercial terrestrial operations using [the spectrum bands of Ligado's license] unless the Secretary [of War] has certified" that "such operations do not cause harmful interference to a [GPS] device of the Department of [War]." *Id.* § 1662. Section 1663 required DoW to contract with the National Academies of Sciences, Engineering, and Medicine (National Academies) to conduct an independent technical review of the [2020 Order], including an "[a]ssessment of the potential for harmful interference to mobile satellite services" operated by DoW and others. *Id.* § 1663.

**V. <u>The Federal Circuit's Decision</u>**

On March 9, 2026, the Federal Circuit issued an opinion addressing the interlocutory appeal. *Ligado Networks LLC v. United States*, No. 25-1792, 2026 WL 653982 (Fed. Cir. Mar. 9, 2026). To start, the Federal Circuit affirmed this Court's decision that it possesses jurisdiction to hear Ligado's takings claims and that Ligado had met the authorized government-conduct requirement to invoke takings liability.

Next, with respect to "the central issue" of "whether Ligado has a property interest in the license to provide certain radio services using the spectrum at issue," the Federal Circuit vacated this Court's decision and remanded "for further development of the analysis required for a sound conclusion." *Ligado Networks*, 2026 WL 653982, at *4. The Court explained that determining whether Ligado has a cognizable property right for takings purposes "calls for a full understanding of the Communications Act and pertinent actions under it" because that is needed to evaluate whether this is a case where a property right does not exist based upon pervasive government control or more broadly whether the asserted right has the crucial indicia of property such as the ability to sell, assign, transfer, or exclude. *Id*. at *6-7. (citations omitted).

On September 4, 2026, this Court determined that the Federal Circuit's mandate required renewed Rule 12(b)(6) briefing on the property interest issue and, on September 16, 2026, issued a scheduling order that included a date by which Ligado may file an amended complaint. ECF Nos. 58, 60.

**VI. <u>Ligado's Amended Complaint</u>**

On September 18, 2026, Ligado filed its amended complaint alleging that DoW, the Department of Commerce (Commerce) (of which NTIA is a part), and Congress "have unlawfully prevented Ligado from using the electromagnetic spectrum that the [FCC]

exclusively licensed to Ligado for terrestrial services," and that DoW "has gone further" by "operating previously undisclosed systems that use or depend on Ligado's spectrum without compensating Ligado." Am. Compl. ¶ 1.

With respect to its purported property interest, Ligado alleges that its ATC use right constitutes a valuable property interest under the 2020 Order and governing law. Am. Compl. ¶¶ 145-46. According to Ligado, its "rights under its FCC license" include "a right to exclusively use Ligado's licensed spectrum for MSS operations, the right to exclusively use a subset of that spectrum for terrestrial operations, the right to partially alienate its use rights, and the de facto right of license renewal." Am. Compl. ¶¶ 146, 163-64. Ligado alleges that these rights "make[] Ligado's license cognizable property under the Fifth Amendment," and that this case concerns "the taking of a stick from that bundle of rights: Ligado's terrestrial use right in the L-Band, as authorized by" the 2020 Order. Am. Compl. ¶ 146. Ligado alleges that its license grants it "exclusivity over the sections of the L-Band allocated to it," and that "in the continental United States, Ligado is the sole operator authorized to transmit in more than 40 MHz out of the 68 MHz of L-Band spectrum, a 30 MHz subset of which can be used for terrestrial operations." Am. Compl. ¶ 147. Ligado further alleges that the FCC's 2026 Order, which rejected petitions by "SpaceX and Iridium to revise the licensing band plan for MSS services and allow additional entities to operate in the L-Band[,]" reaffirmed the exclusivity of its MSS operations. Am. Compl. ¶¶ 37-38. Ligado thus contends that because "ATC can be deployed only by an MSS licensee using its exclusive spectrum, FCC actions to ensure MSS exclusivity necessarily extend to protect Ligado's terrestrial operations as well." Am. Compl. ¶ 38. Ligado adds that the FCC "has made clear that it will not permit additional MSS entrants

in the L-Band, which necessarily means that there will be no new ATC entrants." Am. Compl. ¶ 38.

With respect to the conditions of its ATC license, Ligado alleges that it "has satisfied all conditions of the 2020 Order within its control." Am. Compl. ¶ 94. According to Ligado, "the only outstanding condition of the 2020 Order contemplates Ligado's direct cooperation with [DoW] to identify any GPS devices that may be affected by Ligado's ATC operations, repair or replace such devices according to Ligado's established program, and facilitate the exchange of information between Ligado and the U.S. Government regarding potential interference risks on an ongoing basis—a condition that Ligado cannot satisfy unilaterally." Am. Compl. ¶ 94. Ligado acknowledges that because it "cannot implement the coordination provision of the Order," it "cannot commence its duly authorized terrestrial services in the L-Band." Am. Compl. ¶ 105.

Ligado contends that its property rights were taken under four separate legal theories based on claims of physical, *per se* regulatory, regulatory, and legislative[10] takings. Am. Compl. ¶¶ 159-183. With respect to the physical takings claim, Ligado alleges that DoW systems have continuously used Ligado's licensed spectrum since at least the issuance of the 2020 Order by:

> (1) transmitting or receiving signals in Ligado's allocated spectrum that prevent Ligado from transmitting or receiving its own terrestrial signals in its exclusively licensed spectrum, due to in-band interference; and/or (2) receiving signals adjacent to Ligado's allocated spectrum in a manner that requires that Ligado's allocated spectrum be a 'dead zone' for terrestrial services so as to avoid harmful out-of-band interference with [DoW's] systems.

[10] Ligado asserts its previously dismissed legislative takings claim in its amended complaint to avoid a "waiver of the right to challenge on appeal the basis for dismissal." Am. Compl. ¶ 183.

Am. Compl. ¶ 106. With respect to its two regulatory takings claims, Ligado alleges that Commerce and DoW have failed to cooperate with Ligado to implement the 2020 Order and have instead engaged in various actions preventing Ligado from using the licensed spectrum for terrestrial services. *See* Am. Compl. ¶¶ 172, 179.

## ARGUMENT

### I. Standard of Review

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.*; *see also Twombly*, 550 U.S. at 555 (requiring a pleading to offer "more than labels and conclusions"). In addition, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Rather, a plaintiff must plead sufficient factual matter to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

### II. The Framework for Evaluating the Existence of a Cognizable Property Interest

The Federal Circuit has established a "two-part test" for analyzing takings claims. *Am. Pelagic Fishing Co., L.P. v. United States,* 379 F.3d 1363, 1372 (Fed. Cir. 2004); *see Electric Welfare Trust Fund v. United States*, 153 F.4th 1369, 1373 (Fed. Cir. 2025). "First, as a threshold matter, the court must determine whether the claimant has established a property interest for purposes of the Fifth Amendment." *Am. Pelagic*, 379 F.3d at 1372. This is a critical inquiry because "[i]f the claimant fails to demonstrate the existence of a legally cognizable

property interest, the court[']s task is at an end." *Id.* "Second, after having identified a valid property interest, the court must determine whether the governmental action at issue amounted to a compensable taking of that property interest." *Id.* With respect to the first part of the takings analysis, it is well-established that the Fifth Amendment does not create property interests and that courts must look to an "independent source such as state, federal or common law" to determine whether a cognizable property interest exists. *Sharifi v. United States*, 987 F.3d 1063, 1068 (Fed. Cir. 2021) (citations and internal quotation marks omitted); *see Klamath Irr. District v. United States*, 635 F.3d 505, 511 (Fed. Cir. 2011). Because the existence of a cognizable property interest is a legal question, it is amenable to resolution on a motion to dismiss for failure to state a claim. *See, e.g.*, *Fishermen's Finest, Inc. v. United States*, 59 F.4th 1269, 1274, 1279-80 (Fed. Cir. 2023).

To determine whether a cognizable property interest exists for Fifth Amendment takings purposes, courts focus heavily on whether the plaintiff possesses the right to exclude, "one of the most fundamental elements of property ownership." *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021); *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) (explaining that the right to exclude is "one of the most treasured strands in an owner's bundle of property rights"); *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005) (stating that the right to exclude is "perhaps the most fundamental of all property interests"); *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 158 (2021) (the right to exclude is "a fundamental element of the property right," not "an empty formality, subject to modification at the government's pleasure"); *Fairholme Funds, Inc. v. United States*, 26 F.4th 1274, 1303 (Fed. Cir. 2022) ("[R]egulated financial entities lack the fundamental right to exclude the government from their property when the government could place the entities into

conservatorship or receivership[.]") (citation omitted); *Cienega Gardens v. United States*, 331 F.3d 1319, 1336 n.30 (Fed. Cir. 2003) (explaining that the "chief and one of the most value characteristics of the bundle" of property rights is "the right to exclude strangers, or for that matter friends, but especially the Government"). Indeed, the Supreme Court has deemed the right to exclude the "*sine qua non*" of property, *Cedar Point*, 594 U.S. at 150, and has emphasized that the "hallmark of a protected property interest is the right to exclude others." *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.,* 527 U.S. 666, 673 (1999). The right to exclude is therefore recognized as "one of the most essential sticks in the bundle of rights that are commonly characterized as property" and is "universally held to be a fundamental element of the property right." *Kaiser Aetna v. United States*, 444 U.S. 164, 176, 179-180 (1979).

In addition to the right to exclude, in analyzing whether licenses constitute property, courts have examined whether license holders have the right to sell and transfer the license and whether the license is revocable. *See United States v. Fuller*, 409 U.S. 488, 492-94 (1973); *Fishermen's Finest*, 59 F.4th at 1276-79; *Conti v. United States*, 291 F.3d 1334, 1340-42 (Fed. Cir. 2002).

## III. <u>Ligado Cannot Establish a Cognizable Property Interest in Its License</u>

Ligado's amended complaint fails to state a claim and must be dismissed because Ligado cannot plausibly establish a cognizable property interest in its FCC license. *E.g.*, *Am. Pelagic*, 379 F.3d at 1372 (Fed. Cir. 2004) ("If the claimant fails to demonstrate the existence of a legally cognizable property interest, the court's task is at an end.").

To start, Ligado's property interest must come from the license issued in the 2020 Order, which itself was issued pursuant to the Communications Act. *See Ligado Networks*, 2026 WL

653982, at *5 (explaining that "the only potential basis for the property right asserted is the federal government grant—the Commission's 2020 Order—issued under 47 U.S.C. §§ 307, 309"). In other words, because Ligado has no state law or common law right to utilize spectrum, its purported interest can go no further than the terms of its license and the provisions of the Communications Act under which it was issued. As set forth below, none of the FCC orders implicated in this case provide Ligado with the property interest it purports to possess. Finally, other considerations weigh heavily against finding that Ligado possesses a protected property interest in its ATC license.

### A. The Communications Act Does Not Provide Ligado with the Rights Necessary to Prove a Protected Property Interest

The Communications Act itself does not provide Ligado with a right to exclude non-FCC federal agencies from the spectrum that it is currently licensed by the FCC to use for terrestrial services.

The Communications Act expressly defines and limits any potential interest provided by the Federal Government when the FCC issues a spectrum license. Section 301 declares the congressional purpose "to ***maintain the control of the United States*** over all the channels of radio transmission; and to provide for the use of such channels, ***but not the ownership*** thereof, by persons for limited periods of time, under licenses granted by Federal authority" and also proscribes that "no such license shall be construed to create any right, ***beyond the terms, conditions, and periods of the license***." 47 U.S.C. § 301 (emphasis added). Section 301 therefore reflects congressional intent that the Government maintain firm control over the electromagnetic spectrum and, to that end, that any interest the Government provides with a spectrum license is limited to whatever is actually provided in the terms and conditions of the

license and the statutory provisions under which it is issued. *See also* 47 U.S.C. § 153(49) (defining a "license" as an "instrument of authorization" for the use or operation of apparatus that transmits energy, communications, or signals by radio).

Given this restrictive statutory language, courts long have broadly determined that a spectrum license granted by the FCC does not constitute a property interest. *FCC v. Sanders Brothers Radio Station*, 309 U.S. 470, 475 (1940) ("The policy of the Act is clear that no person is to have anything in the nature of a property right as a result of the granting of a license."); *see Scripps-Howard Radio, Inc. v. FCC*, 316 U.S. 4, 14-15 (1942) (stating that "[t]he Communications Act of 1934 did not create new private rights" and that the appeal right granted by 47 U.S.C. § 402(b) exists to protect "the public interest," not "the interests of private property"); *Public Safety Spectrum Alliance v. FCC*, 184 F.4th 640, 653 (D.C. Cir. 2026) (explaining that "no person is to have anything in the nature of a property right as a result of the granting of a license") (citations omitted); *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11–12 (D.C. Cir. 2006) (rejecting takings claim because the spectrum-use right given by a license under 47 U.S.C. § 301 "does not constitute a property interest protected by the Fifth Amendment"); *Prometheus Radio Project v. FCC*, 373 F.3d 372, 428 (3d Cir. 2004) (rejecting takings claim because "broadcast licenses, which are the subject of the Commission's restriction on transferability, are not protected property interests under the Fifth Amendment"); *In re NextWave Personal Comm'ns., Inc.*, 200 F.3d 43, 51 (2d Cir. 1999) ("A license does not convey a property right[.]"). Indeed, no court has ever held that an FCC spectrum license constitutes or otherwise provides a cognizable property interest for Fifth Amendment takings purposes.

In the face of these broad determinations universally rejecting the existence of property rights in FCC licenses, Ligado argues that although it may have no property right against the

FCC, it has a property interest against non-FCC federal agencies, including DoW and NTIA. *See Ligado Networks*, 2026 WL 653982, at *6. According to Ligado, this property right exists because Ligado is the only entity currently licensed to operate within the L-Band spectrum at issue and its license has other attributes of property, including the ability to transfer the license (albeit with Government approval). Am. Compl. ¶¶ 145-156. These allegations fail as a matter of law.

Ligado cannot establish that the Communications Act provides it with the right to exclude non-FCC federal agencies from the spectrum covered by its ATC license. Although Section 301 states that "[n]o person shall use or operate any apparatus for the transmission of energy or communications or signals by radio" under several circumstances except "with a license[,]" this provision only applies to a "person" and that term does not include the Federal Government. 47 U.S.C. § 153(39) ("The term 'person' includes an individual, partnership, association, joint-stock company, trust or corporation."); *see Ligado Networks*, 2026 WL 653982, at *8 ("It is established law that the term 'person' in a statute is inapplicable to a sovereign, such as the United States, unless Congress has clearly stated otherwise." (citing *Return Mail, Inc. v. United States Postal Serv.*, 587 U.S. 618, 626-27 (2019); *Vermont Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 787 (2000); *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 65-66 (1989); *Perrong v. Bradford*, 157 F.4th 251, 260-61 (3d Cir. 2025)). Indeed, Section 305(a) specifically states that "[r]adio stations belonging to and operated by the United States shall not be subject to the provisions of [47 U.S.C. §§] 301 and 303[.]" As the Federal Circuit explained, the Federal Government is not subject to Section 301's bar on using radio channels without a license. *See Ligado Networks*, 2026 WL 653982, at *8.

Nor could Section 301 imply a right of Ligado to exclude non-FCC federal agencies from its licensed spectrum given that this section provides that "no such license shall be construed to create any right, beyond the terms, conditions, and periods of the license." 47 U.S.C. § 301. In interpreting similar statutory permit language in the Taylor Grazing Act, 43 U.S.C. § 315b, which authorized the Government to issue permits for livestock grazing on federal lands, the Supreme Court made clear that such statutory language cuts off the existence of a cognizable property interest. *United States v. Fuller*, 409 U.S. 488 (1973). In *Fuller*, the statutory language provided that the issuance of a permit "shall not create any right, title, interest, or estate in or to the lands," 43 U.S.C. § 315b (quoted at 409 U.S. at 489). The Supreme Court held that the language "make[s] clear the congressional intent that no compensable property might be created in the permit lands themselves as a result of the issuance of the permit," *Fuller*, 409 U.S. at 494. The same holds true here.

Moreover, none of the other provisions of the Communications Act confer on Ligado the right to exclude non-FCC federal agencies from its licensed spectrum. Section 307 provides that the FCC can grant a license if "public convenience, interest, or necessity will be served thereby," and Section 309 provides for the FCC to grant license applications. Neither of these provisions define the right granted to Ligado as a right to exclude (or even as a right to exclusivity). *See Ligado Networks*, 2026 WL 653982, at *8. This is particularly noteworthy given that, in other statutory schemes, Congress has expressly identified the right provided as the right to exclude. *See id*. (contrasting the Communications Act with 35 U.S.C. § 154(a), where Congress defined the patent right as "the right to exclude").

Section 303(y) also provides no statutory basis for Ligado to exclude non-FCC federal agencies. *See Ligado Networks*, 2026 WL 653982, at *8. That provision authorizes the FCC "to

allocate electromagnetic spectrum as to provide flexibility of use" where the FCC finds the allocation would be in the public interest, the "use would not deter investment in communications services and systems, or technology development," and the use "would not result in harmful interference among users." 47 U.S.C. § 303(y). To be sure, this provision authorizes the FCC to issue spectrum licenses to non-governmental entities in a manner that minimizes interference among users, but that authority does not authorize the FCC to grant licenses that exclude non-FCC federal agencies because Section 303 is not applicable to the Federal Government. 47 U.S.C. § 305(a).

To the contrary, the Communications Act makes clear that the FCC lacks the authority to grant Ligado a license that would exclude other Government agencies. Specifically, Section 305(a) plainly states that "[a]ll such Government stations shall use such frequencies as shall be assigned to each or to each class by the President." *Id*. § 305(a). In other words, the "Communications Act bars the FCC from licensing or assigning the frequency to such federal entities, instead reserving that power for the President." *Public Safety Spectrum Alliance*, 184 F.4th at 645. The President delegated this authority to the Executive Office of the President and then to the Secretary of Commerce. *See id*. § 305 note. In 1992, Congress enacted the Telecommunications Authorization Act of 1992, Pub. L. No. 102-538, §§ 101-05, 106 Stat. 3533, 3533-40 (codified at 47 U.S.C. §§ 901-942), which created NTIA within Commerce. Section 902(b)(2) provides that the authority delegated to NTIA is the "authority delegated by the President to the Secretary to assign frequencies to radio stations or classes of radio stations belonging to and operated by the United States, including the authority to amend, modify, or revoke such assignments." 47 U.S.C. § 902(b)(2)(A). In addition to that authority, Congress assigned to NTIA the "authority to establish policies concerning spectrum assignments and use

by radio stations belonging to and operated by the United States," and also the "responsibility to ensure that the view of the executive branch on telecommunications matters are effectively presented to the Commission." *Id.* § 902(b)(2)(K), (J). Accordingly, a "different regulatory system governs use of spectrum on radio stations 'belonging to and operated by the United States.'" *Public Safety Spectrum Alliance*, 184 F.4th at 645 (quoting 47 U.S.C. § 305(a)). NTIA, not the FCC, has the statutory authority to issue assignments to federal agencies to operate within federally allocated spectrum. 47 U.S.C. §§ 305(a), 902(b)(2)(A).[11]

In this instance, the United States Table of Frequency Allocations identifies which parts of the spectrum have been allocated for federal use, non-federal use, or shared federal and non-federal use. *See* 47 C.F.R. § 2.106(a); *see id.* at § 2.105(b) (identifying the categories for spectrum allocation in the United States); *id.* at § 2.105(d)(2) (explaining formatting of the Table of Frequency Allocations). The particular spectrum at issue in this case has been allocated for shared federal and non-federal use, meaning that both the FCC and NTIA can license entities to use it. 47 C.F.R. § 2.106(a) (at pages 33-35).

The FCC has the statutory authority to assign the spectrum at issue in this case to one or more non-federal entities, and NTIA has the clear statutory authority to assign it to federal users. Any suggestion that Ligado possesses the right to exclude NTIA and assigned federal users based solely on the Communications Act is unavailing. Indeed, given that the statutory framework provides multi-agency authority for the management of the particular spectrum at

[11] *See* Memorandum of Understanding between the Federal Communications Commission and the National Telecommunications and Information Administration, Aug. 1, 2022, available at: https://www.ntia.gov/sites/default/files/publications/ntia-fcc-spectrum_mou-8.2022.pdf (last visited Oct. 26, 2026) (outlining the agreed upon cooperation between the FCC and NTIA on spectrum decisions).

issue in this case, the FCC cannot provide the sort of "sole use" rights that Ligado alleges to possess vis-à-vis non-FCC federal agencies in this spectrum. *See Ligado Networks*, 2026 WL 653982, at *4, *10.

Despite this comprehensive statutory scheme, Ligado asserts in its amended complaint that "[u]nder 47 U.S.C. § 303(a), 303(c), and 303(y), the FCC has authority to allocate spectrum to be made available for commercial or federal transmission," and that because the "FCC has allocated Ligado's spectrum for commercial use," "only after the FCC has designated a spectrum block for federal transmission would NTIA have authority to assign frequencies to federal users." Am. Compl. ¶ 85. That view of the law turns Section 305, not to mention Sections 301 and 303, on its head; Section 305(a) provides that "[r]adio stations belonging to and operated by the United States *shall not* be subject to the provisions of [47 U.S.C. §§] 301 and 303[.]" (Emphasis added.) Ligado thus asks the Court to read "not" out of Section 305, and to ignore the meaning of "person" in Section 301. The Court should reject Ligado's effort to subvert the plain meaning of title 47.

The Communications Act's remedy provisions further reinforce that it does not provide Ligado with a right to exclude non-FCC federal agencies. Section 401(b) provides that if "any person fails or neglects to obey any order of the Commission other than for the payment of money, while the same is in effect, the Commission or any party injured thereby, or the United States, by its Attorney General, may apply to the appropriate district court of the United States for the enforcement of such order." 47 U.S.C. § 401(b). As explained above, the term "person"

in the Communications Act does not include the United States, 47 U.S.C. § 153(39), meaning that Ligado has no remedies against the Federal Government under Section 401(b).[12]

Accordingly, the Communications Act alone does not provide Ligado with a private right of action against non-FCC federal agencies. And any contention that such a right exists independent of the Communications Act cannot be squared with the Communications Act's express limitation that a license cannot be "construed to create any right, ***beyond the terms, conditions, and periods of the license***." 47 U.S.C. § 301 (emphasis added).[13]

Finally, in addition to providing Ligado with no right to exclude vis-à-vis non-FCC federal agencies, the Communications Act expressly authorizes the FCC to modify the terms of a license "if in the judgment of the [FCC] such action will promote the public interest, convenience and necessity." 47 U.S.C. § 316(a)(1); *see also* 47 U.S.C. § 312 (identifying circumstances in which FCC can revoke license entirely); 47 U.S.C. § 310(d) (providing that "[n]o . . . station license, or any rights thereunder, shall be transferred, assigned, or disposed of in any manner" except upon application to the FCC and subject to its affirmative finding that the "public interest, convenience, and necessity will be served thereby"). That the FCC has the

[12] Section 401(b), moreover, applies only to FCC *orders* and does not, therefore, cover violations of the statute itself. Accordingly, a violation of Section 301 for using radio frequencies without a license could not even be enforced by a private party through a suit in district court. *See Ligado Networks*, 2026 WL 653982, at *11; *see also Mallenbaum v. Adelphia Comms. Corp.*, 74 F.3d 465, 468 (3d Cir. 1996) (explaining that Section 401(b) provides "an express right to enforce FCC '*orders*'") (emphasis added).

[13] Section 503 sets forth penalties including forfeiture of a license for any "person" "determined by the Commission" who commits certain specified violations of the Communications Act including "willfully or repeatedly fail[ing] to comply substantially with the terms and conditions of any license." 47 U.S.C. § 503. But once, again, the United States is not a "person" pursuant to the Communications Act and therefore these provisions would not be applicable to any purported unlicensed use of spectrum and would not provide Ligado with an available path to compel enforcement against the Federal Government.

statutory authority to reallocate assigned spectrum by modifying spectrum licenses pursuant to its modification authority further supports the conclusion that Ligado has no cognizable property interest in its license. *See Mobile Relay Associates v. FCC*, 457 F.3d 1, 11-12 (D.C. Cir. 2006).

### B. Neither the 2020 Order Nor Any Other FCC Decision Provides Ligado with the Rights Necessary to Prove a Protected Property Interest

In its amended complaint, Ligado repeatedly asserts that the 2020 Order provides it with a cognizable property right because the FCC granted it an "exclusive" right to use the L-Band spectrum for terrestrial services. *See* Am. Compl. ¶¶ 145-156. But as the Federal Circuit held, the 2020 Order "on its face does not go further than to give Ligado a right to use the spectrum in identified ways subject to various conditions." *Ligado Networks*, 2026 WL 653982, at *12 (citing 2020 Order, ¶¶ 159-64, 35 FCC Rcd. at 3842-43). "Ligado cites nothing in the order guaranteeing exclusive-use status." *Id*. The Federal Circuit aptly pointed out that the FCC used the word "exclusive" or a variant only two times, with neither use referring to Ligado being an exclusive user. *Id*. (citing 2020 Order, ¶¶ 115 n.373, 150, 35 FCC Rcd. at 3828, 3840). Thus, Ligado's central allegation that the 2020 Order grants it exclusive user status without the order ever saying so flies in the face of the Communications Act's express admonition against construing licenses to "to create any right, ***beyond the terms, conditions, and periods of the license***." 47 U.S.C. § 301 (emphasis added).

Taking a different tack, Ligado alleges in its amended complaint that the FCC's 2026 Order, which rejected petitions by "SpaceX and Iridium to revise the licensing band plan for MSS services and allow additional entities to operate in the L-Band[,]" "reaffirmed" the exclusivity of its MSS operations. Am. Compl. ¶¶ 37-38. Ligado contends that because "ATC can be deployed only by an MSS licensee using its exclusive spectrum, FCC actions to ensure

MSS exclusivity necessarily extend to protect Ligado's terrestrial operations as well." Am. Compl. ¶ 38. Ligado adds that the FCC "has made clear that it will not permit additional MSS entrants in the L-Band, which necessarily means that there will be no new ATC entrants." Am. Compl. ¶ 38.

Ligado's view of the legal import of the 2026 Order is unavailing. To start, as Ligado acknowledges in its amended complaint, the 2026 Order involved FCC decision making with respect to Ligado's *MSS* license and whether the relevant spectrum would be open to additional *MSS* licensees. *See* Am. Compl. ¶¶ 37-38. The 2026 Order mentions Ligado's ATC authorization only twice and in passing, and never to address the terms of that license or the supposedly exclusive nature of Ligado's ATC use in particular. The FCC was simply not faced with petitions challenging or discussing the 2020 Order or Ligado's license for terrestrial services; the 2026 Order is plainly not germane to the analysis. And Ligado's argument that exclusive use status can be inferred from the 2026 Order runs headlong into Congress's express prohibition on construing licenses "to create any right, ***beyond the terms, conditions, and periods of the license***." 47 U.S.C. § 301 (emphasis added).

Moreover, Ligado's allegations concerning the exclusivity of its MSS license gloss over the fact that it is *not* the only authorized satellite user in the spectrum at issue. As even Ligado must acknowledge, in 1989, the FCC authorized a "predecessor of the company now called Inmarsat, a United Kingdom-licensed operator, to operate MSS in the same spectrum band." Am. Compl. ¶ 33. Although Ligado alleges that it has since entered into agreements with Inmarsat so that it has "exclusive" authorized use of 60 megahertz of the spectrum at issue, Am. Compl. ¶¶ 80, 147, this fact only undermines Ligado's claim that the FCC through the 2020 Order granted Ligado exclusive use of the L-Band.

Fundamentally, Ligado cannot demonstrate that the FCC granted it a right to exclude non-FCC agencies in its ATC license which, given the allegations in this case, is the critical stick in the Fifth Amendment bundle of property rights. The Supreme Court's seminal decision in *Cedar Point Nursery v. Hassid*, 594 U.S. 139 (2021), is instructive. In that case, the Supreme Court found a physical taking where a California law authorized union organizers to enter plaintiffs' property for three hours a day and up to 120 days a year. Crucial to the Court's holding that the state law affected a physical invasion of plaintiffs' property was the determination that the plaintiffs had the underlying legal right to exclude third parties, including the Government, from their land except in limited circumstances. *Id*. at 150, 158. Indeed, the common law has long provided landowners with this right to exclude. *See Florida v. Jardines*, 569 U.S. 1, 8 (2013) (quoting *Entick* v. *Carrington*, 2 Wils. K. B. 275, 291, 95 Eng. Rep. 807, 817 (K. B. 1765)). By contrast, the Supreme Court in *Cedar Point* explained that in situations where a landowner does not possess a right to exclude the government, there could be no taking. *Cedar Point*, 594 U.S. at 160-61.

Similarly helpful is *United States v. Causby*, 328 U.S. 256 (1946), a case Ligado cited in its amended complaint to support its physical takings claim. *See* Am. Compl. ¶ 166. In *Causby*, the Supreme Court held that the Government's low-level flights over the plaintiff's farm constituted a taking in the form of an avigation easement because the flights caused substantial interference with plaintiff's property rights, including frightening the farm animals. But the finding of a taking was predicated on the plaintiff's underlying common law right to the airspace immediately above his land such that "invasions of it are in the same category as invasions of the surface." *Causby*, 328 U.S. at 265. In other words, the plaintiff had a distinct, legally

recognized right to exclude others, including government planes, with respect to his land and the airspace immediately above it.

Here, Ligado can point to nothing analogous to the right of landowners to exclude strangers, most importantly non-FCC federal agencies, in the 2020 Order. At most, Ligado alleges that it is *presently* the only licensee for ATC use in the specified frequencies which the Federal Circuit explained in *Ligado*, is insufficient to establish a property interest. *See Ligado Networks*, 2026 WL 653982, at *6. Indeed, in circumstances where a license holder is simply an authorized user of a resource without a legal right to exclude others under the statutory scheme, the Federal Circuit has found no cognizable property interest in a license. *See Members of Peanut Quota Holders Ass'n, Inc. v. United States*, 421 F.3d 1323, 1333-34 (Fed. Cir. 2005) (addressing the Federal Circuit's fishing license cases, where no right to exclude was found, and explaining that "[s]o long as the government retains the discretion to determine the total number of licenses issued, the number of market entrants is indeterminate" and no right to exclude exists).

The Federal Circuit's treatment of patent licenses is instructive when considering the difference between the right to exclude—needed to assert a cognizable property interest—and a non-exclusive license—which is what Ligado has. Congress provides *patent holders* with the statutory "right to exclude." 35 U.S.C. § 154(a); *see Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1370 (Fed. Cir. 2017) ("A patent gives nothing but the right to exclude, which in our system generally means a right to call on the courts."). A patent licensee, on the other hand, only has a right to sue for infringement if they "received, not only the right to practice the invention within a given territory, but also the patentee's express or implied promise that others shall be excluded from practicing the invention within that territory." *Rite-Hite Corp. v. Kelley*

*Co.*, 56 F.3d 1538, 1552 (Fed. Cir. 1995). If the patent licensee has not received this exclusivity guarantee, which is "the right to exclude others from making, using, or selling the patented invention," the licensee has only a "'bare license.'" *Id.* at 1552. A bare licensee, or a non-exclusive licensee, has no right to enforce patent rights because it did not receive the right necessary to exclude others. *See id.*; *Propat Int'l Corp. v. RPost, Inc.*, 473 F.3d 1187, 1193 (Fed. Cir. 2007). This is so even if the non-exclusive licensee has been harmed by the alleged infringement. *See Ortho Pharmaceutical Corp. v. Genetics Institute, Inc.*, 52 F.3d 1026, 1031 (Fed. Cir. 1995) (citations omitted).

Consequently, because Ligado can demonstrate at most that it is the only licensee presently authorized by the FCC to use the spectrum at issue for ATC purposes, analogous to a "bare licensee," it does not have the right to exclude the non-FCC federal agencies necessary to establish a cognizable property interest in this case. Ligado has no guarantee of exclusive-use status or any way to enforce its alleged exclusivity against non-FCC federal agencies and therefore does not allege a cognizable property interest.

## IV. The Government Actions Alleged in Ligado's Complaint Reinforce That It Does Not Have the Rights Necessary to Prove A Cognizable Property Interest

The Federal Circuit explained in *Ligado* that this Court's property interest analysis should consider whether Ligado has not only a "property right in general," but also a "property right against the particular actors and challenged actions it identifies—namely, the challenged [DoW] spectrum use and the challenged non-cooperation of [DoW] and others in ways identified in the April 2020 Order's conditions on Ligado commencing service." *Ligado Networks*, 2026 WL 653982, at *7.

With respect to the physical takings claim, Ligado takes aim at DoW and alleges that DoW's systems have continuously used Ligado's licensed-spectrum since at least the issuance of the 2020 Order by: "(1) transmitting or receiving signals in Ligado's allocated spectrum that prevent Ligado from transmitting or receiving its own terrestrial signals in its exclusively licensed spectrum, due to in-band interference; and/or (2) receiving signals adjacent to Ligado's allocated spectrum in a manner that requires that Ligado's allocated spectrum be a 'dead zone' for terrestrial services so as to avoid harmful out-of-band interference with [DoW's] systems." Am. Compl. ¶ 106. For the reasons set forth above, Ligado cannot demonstrate that its license gives it the right to exclude DoW from the spectrum at issue. Indeed, Ligado can point to nothing in the 2020 Order or the underlying statutory scheme that provides exclusive spectrum rights to Ligado vis-à-vis DoW akin to the rights enjoyed by plaintiff property owners in *Cedar Point* or *Causby*. Ligado's lack of a right to exclude non-FCC federal agencies distinguishes this case from the seminal physical takings cases, including *Cedar Point*, where the plaintiff property owners had a legally enforceable right to exclude that served as the predicate for the meritorious takings claims. *See Cedar Point*, 594 U.S. at 149-50; *Causby*, 328 U.S. at 265.

With respect to its two regulatory takings claims, Ligado alleges that NTIA and DoW have failed to cooperate with Ligado to implement the 2020 Order and have instead engaged in various actions preventing Ligado from using the licensed spectrum for terrestrial services. *See* Am. Compl. ¶¶ 172, 179. But Ligado can point to nothing in the Communications Act, the 2020 Order, or any other FCC order or decision that provides it with the right to require non-FCC agencies, including NTIA and DoW, to cooperate with Ligado to implement the terms of the 2020 Order—terms that Ligado itself unilaterally proposed to the FCC. Rather than identify a source of any obligation on NTIA and DoW, Ligado asks the Court to read such an obligation

into the 2020 Order. But the Court must heed the express limitation in the Communications Act that a license cannot be construed to "create any right, ***beyond the terms, conditions, and periods of the license***." 47 U.S.C. § 301 (emphasis added). Ligado therefore has no rights concerning the key alleged government inaction underlying its regulatory takings claims, Am. Compl. ¶¶ 74, 94-95, 105, and the claim fails as a matter of law.

## V. Other Considerations Mentioned by the Federal Circuit Further Demonstrate That Ligado Has No Cognizable Property Interest

The Federal Circuit identified several additional considerations that may be relevant to the Court's property interest analysis. These additional considerations lend further support to the conclusion that Ligado lacks a cognizable property interest.

### A. Pervasive Government Control

"Where a citizen voluntarily enters into an area which from the start is subject to pervasive Government control, a property interest is likely lacking." *Hearts Bluff Game Ranch, Inc. v. United States*, 669 F.3d 1326, 1330 (Fed. Cir. 2012); *see also Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 216 (Fed. Cir. 1993) (holding that the plaintiff did not have a cognizable property interest in permits for the importation of firearms because the Government closely controlled that arena through the Gun Control Act). Pervasive Government control "is not a *per se* exclusion of all permit or regulatory based takings." *Hearts Bluff*, 669 F.3d at 1330. Nonetheless, this consideration can be another indicator that the holder of a government-issued license or permit lacks a cognizable property interest for Fifth Amendment purposes. *See Am. Bankers Ass'n v. United States*, 932 F.3d 1375, 1385-86 (Fed. Cir. 2019). The Federal Circuit thus correctly recognized in *Ligado* that this Court should "evaluate whether this is a case in which a property right for takings purposes does not exist because the alleged interest is in an area subject to 'pervasive Government control.'" *Ligado Networks*, 2026 WL 653982, at *6.

It is beyond dispute that the Federal Government maintains pervasive control over spectrum rights. The Communications Act provides for "the control of the United States over all the channels of radio transmission." 47 U.S.C. § 301. As part of such control, the Government may "provide for the use of such channels, but not the ownership thereof, by persons for limited periods of time, under licenses granted by Federal authority." *Id.* The Communications Act accordingly authorizes the FCC to grant limited licenses for spectrum use under certain conditions. *Id.* at § 307(a) (permitting spectrum to be licensed only "if public convenience, interest, or necessity will be served thereby"); *id.* at § 307(c) (establishing statutory limits on license terms). But the Communications Act also makes clear that the FCC may modify a spectrum license at any time upon a finding that doing so would "promote the public interest, convenience, and necessity." *Id.* at § 316(a)(1). And under certain circumstances, the FCC may even revoke a spectrum license outright. *Id.* at § 312(a). This type of pervasive government control, the Federal Circuit has held, provides strong evidence that the license-holder lacks a protected property interest in its license. *Cf. Hearts Bluff*, 669 F.3d at 1331-32 (holding that a plaintiff has no property interest in a government program that is subject to the government's "discretionary authority"); *Mitchell Arms*, 7 F.3d at 216 (explaining that an area subject to pervasive government control lacks the "right to exclude" necessary to establish a cognizable property interest).

**B. <u>Investment-Backed Expectations</u>**

The Federal Circuit also suggested that the Court should examine Ligado's investment-backed expectations as part of the property interest inquiry. *See Ligado Networks*, 2026 WL 653982, at *12 ("Whether there are express guarantees of presumptive exclusivity, *or implicit guarantees or protected expectations of the same* (subject to authorized alterations) based on

technical or economic considerations, requires careful examination on remand." (emphasis added)); *see also id.* at *7 (rhetorically asking: "does the language [of the statute] preclude arguments for a property right based on (investment-backed) expectations that go beyond the license's express provisions?").

To start, Ligado's expectations—whether investment-backed or otherwise—are not directly relevant to the question whether Ligado has a cognizable property interest. A plaintiff's property interest in a takings case is "derived from independent sources[] such as state, federal, or common law." *Members of Peanut Quota Holders*, 421 F.3d at 1330. That independent source of law, in turn, defines the full scope of the plaintiff's property rights. *See id.* ("The parameters of a protected property interest are delimited by the law that creates the interest."); *Maritrans Inc. v. United States*, 342 F.3d 1344, 1352 (Fed. Cir. 2003) (the sources of law that create the property interest also "define the dimensions of the requisite property rights for purposes of establishing a cognizable taking"). Indeed, as the Supreme Court held long ago, a cognizable property right to a benefit requires a plaintiff to have "more than an abstract need or desire for it" and "more than a unilateral expectation of it"; the plaintiff "must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) (quoted in *Members of Peanut Quota Holders*, 421 F.3d at 1330). Thus, Ligado's unilateral expectations about spectrum rights, however well-founded or reasonable they may seem, are simply incapable of defining the scope of its property interest in this takings case.

But even if investment-backed expectations could conceivably inform the Court's property interest inquiry, the resulting analysis would only support our position. Review of investment-backed expectations "incorporates an objective test" that asks "what, under all the circumstances, the [plaintiff] should have anticipated." *Cienega Gardens v. United States*, 331

F.3d 1319, 1346 (Fed. Cir. 2003); *see also King v. United States*, 151 F.4th 1348, 1366 (Fed. Cir. 2025), *cert. denied*, 146 S. Ct. 2688 (2026).[14] Here, Ligado had no objective basis for expecting any rights beyond the terms and conditions in the 2020 Order. The Communications Act unambiguously provides that "no [spectrum] license shall be construed to create any right[] beyond the terms, conditions, and periods of the license." 47 U.S.C. § 301. The 2020 Order itself reiterates this important statutory limitation, similarly providing that Ligado's license is "subject to" the terms and conditions established therein. 2020 Order, ¶ 159, 35 FCC Rcd. at 3842. Given these pronouncements, no reasonable licensee in Ligado's shoes would have expected to obtain or exercise spectrum rights beyond those expressly stated in the 2020 Order.

In its amended complaint, Ligado nowhere alleges investment-backed expectations of exclusivity. *See* Am. Compl. at ¶¶ 36, 76, 146 (alleging exclusivity based on the express terms of the 2020 Order). Ligado instead alleges an expectation of something else: The ability to renew its ATC license in perpetuity. *Id.* at ¶¶ 153-56. The 2020 Order, however, says nothing at all about license renewal, which necessarily means that Ligado has never had the renewal rights it now alleges. *See* 47 U.S.C. § 301 ("[N]o [spectrum] license shall be construed to create any right[] beyond the terms, conditions, and periods of the license."). Indeed, as a condition of obtaining a license from the FCC, the Communications Act requires licensees to waive any claim that the license somehow guarantees the use of spectrum in the future. *Id.* at § 304. Such waiver precludes Ligado from now claiming that the 2020 Order guarantees its use of L-Band spectrum in perpetuity.

---

[14] As *Cienega Gardens* and *King* both demonstrate, the investment-backed expectations analysis becomes relevant at step two of the regulatory takings inquiry, only after a plaintiff has successfully established the existence of a cognizable property interest at step one.

## VI. Alternatively, the Court Should Dismiss the Amended Complaint Because the Property Interest Ligado Alleges Has Not Vested

The Federal Circuit also stated in *Ligado* that Ligado's takings claim "raises questions about whether [Ligado] had a property right protected against the alleged non-cooperation when the license expressly made [Ligado's] use right conditional on obtaining the identified cooperation without compulsion of the Order." *Ligado Networks*, 2026 WL 653982, at *13. In light of this observation, the Federal Circuit inquired "whether any property right Ligado has in using its spectrum did not vest until Ligado met the conditions for such operation, conditions that were not wholly within its control and whose fulfillment may have been contingent and uncertain, speculative or discretionary." *Id.* (citations and internal quotations omitted).

The Federal Circuit was right to ask whether the property interest Ligado alleges has vested. Long ago, the Supreme Court explained that "[t]he Fifth Amendment's Takings Clause prevents the Legislature (and other government actors) from depriving private persons of *vested* property rights except for a 'public use' and upon payment of 'just compensation.'" *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994) (emphasis added). The Federal Circuit has reiterated this principle, likewise recognizing that only a property interest that "vests" in the plaintiff can give rise to a cognizable takings claim. *Cienega Gardens*, 331 F.3d at 1328. More recently, the Federal Circuit elaborated that a property interest must be "established" or "recognized" to satisfy the property interest inquiry. *McCutchen v. United States*, 14 F.4th 1355, 1367-68 (Fed. Cir. 2021) (citing *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 560 U.S. 702 (2010), and *Murr v. Wisconsin*, 582 U.S. 383 (2017)). This is so, the Court held, because a

property right that is "contingent and uncertain" or "speculative or discretionary" is "not enough" for takings purposes. *Id.* at 1368.

Here, Ligado claims that the Federal Government has deprived it of the "valuable property right" of "us[ing] its licensed spectrum for terrestrial services." Am. Compl. at ¶ 44; *see also id.* at ¶ 163 (alleging that Ligado's "right to use [] spectrum pursuant to its ATC authority is property protected by the Fifth Amendment"). In deciding whether that alleged property interest has vested, two undisputed facts should inform the Court's analysis.

First, the 2020 Order imposed unique conditions on Ligado's ability to deploy ATC operations in the L-Band. That is apparent from the 2020 Order itself, which lists seven "strict" conditions for ATC authority to mitigate ongoing concerns about harmful GPS interference. 2020 Order, ¶ 131, 35 FCC Rcd. at 3835. The FCC made clear in the 2020 Order that Ligado had to satisfy all seven conditions in full "before ATC network operations commence." *Id.* at 3783. Accordingly, the Federal Circuit has determined that these conditions were prerequisites to ATC operations, which cannot commence unless and until Ligado satisfies them all. *Ligado Networks*, 2026 WL 653982, at *1 ("But the Commission expressly made the grant of authority conditional on Ligado's meeting various conditions . . ."); *id.* at *12 (explaining that the 2020 Order "on its face does not go further than to give Ligado a right to use the spectrum in identified ways subject to various conditions"). Even Ligado, in its amended complaint, readily acknowledges that the conditions within the 2020 Order were "attendant to Ligado's ATC use right." Am. Compl. at ¶ 74.

Second, Ligado alleges that it has only satisfied six of the seven unique conditions within the 2020 Order. *See* Am. Compl. at ¶ 94. It admits that the remaining condition—coordination with affected federal agencies, including DoW—remains "outstanding." *Id.* Because Ligado has

not satisfied this last condition to date, it admittedly "cannot commence its duly authorized terrestrial services in the L-Band." *Id.* at ¶ 105. It is thus undisputed that, as of this day, Ligado lacks the authority to commence any ATC operations in the L-Band.

Taken together, these undisputed facts establish that Ligado has not plausibly alleged a vested property interest in this case. That is, because Ligado has not satisfied all the necessary conditions attendant to the authorization to deploy ATC operations in the L-Band, it does not possess that alleged "right" yet. *See* Am. Compl. at ¶ 105. Instead, any such deployment is contingent on Ligado's future ability to satisfy the remaining condition within the 2020 Order. *See id.* Ligado, however, "cannot satisfy [the coordination condition] unilaterally," as doing so requires action by DoW. *Id.* at ¶ 94. Ligado's "right" to deploy ATC operations is therefore entirely "speculative" and "uncertain" at this point, which is "not enough" to allege the vested property interest necessary for a cognizable takings claim. *McCutchen*, 14 F.4th at 1368.

Ligado may argue in response that it would be inequitable to dismiss its claim on this basis when it alleges that the Government has prevented Ligado from satisfying the coordination condition in the first place. *See* Am. Compl. at ¶ 105. But this contention ignores the fact that Ligado itself proposed the conditions within the 2020 Order to overcome concerns about harmful GPS interference and then agreed to make those conditions a prerequisite to ATC deployment. *See* 2020 Order, ¶ 131, 35 FCC Rcd. at 3835 ("The Conditions largely have been proposed or already agreed to by Ligado . . . . To the extent discussed herein, we are accepting Ligado's proposals and making them Conditions of this license grant."). In so doing, Ligado helped create a conditional right that, even today, remains contingent on discretionary government action. To the extent Ligado might complain that the Government has precluded that right from vesting, it has only itself to blame for making its interest so "speculative" and "uncertain."

Regardless, the Federal Circuit has made clear that "it is [the plaintiff's] relationship with the asserted permit—not the government's—that determines whether a property right exists." *Conti v. United States*, 291 F.3d 1334, 1341 (Fed. Cir. 2002) (citing *United States v. Gen. Motors Corp.*, 323 U.S. 373, 378 (1945)); *see also Members of Peanut Quota Holders*, 421 F.3d at 1330 (explaining that the property interest inquiry "focus[es] on the nature of the citizen's relationship to the alleged property"). Thus, to establish a cognizable property interest, Ligado must demonstrate that *it* has a vested property right. The Government's actions (or inactions) with respect to the 2020 Order are immaterial to the Court's analysis on that question.

## CONCLUSION

For these reasons, we respectfully request that the Court dismiss Ligado's complaint for failure to state a claim under Rule 12(b)(6) of the Court's rules.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. MCCARTHY
Director

ERIC P. BRUSKIN
Assistant Director

s/Nathanael B. Yale
NATHANAEL B. YALE
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
Telephone: (202) 616-0464

BORISLAV KUSHNIR
Senior Trial Counsel

October 28, 2026

*Attorneys for Defendant*